IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────────

RALPH BUCK PHILLIPS,

                                    Plaintiff,

          v.                                        Civil Action No.
                                                    9:08-CV-0878(FJS/DEP)

BRIAN FISCHER, Commissioner, New York
State Department of Correctional Services, *et al.*

                            Defendants.

───────────────────────────────────

APPEARANCES:                        OF COUNSEL:


FOR PLAINTIFF:

RALPH BUCK PHILLIPS, *Pro Se*
06-B-3437
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ANDREW M. CUOMO                JAMES B. McGOWAN, ESQ.
Attorney General of                 Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Ralph Buck Phillips, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983, complaining of various alleged civil rights

violations arising from his incarceration.  Though pared down significantly

from its predecessors plaintiff's second amended complaint, which is

currently before the court, is nonetheless comprehensive, naming the

Commissioner of the New York State Department of Correctional Services

("DOCS") and twenty-eight other DOCS employees as defendants and

asserting twenty-eight causes of action stemming from events at two

separate correctional facilities.[1]  The claims asserted in plaintiff's pending

complaint include, *inter alia*, allegations of the use of excessive force and

failure to intervene to prevent such conduct, deprivations of procedural due

process, cruel and unusual punishment, violation of his right to practice his

chosen religion, and retaliation for filing grievances and raising complaints

regarding prison conditions.  As relief, plaintiff seeks the entry of a

_____

[1]      Plaintiff's original complaint, which named thirty-tree defendants as well as
two additional "Doe" defendants, was comprised of 226 pages, including 137 pages of text
along with accompanying exhibits, containing 354 separate paragraphs and fifty-two
distinct claims, and it asserted claims involving occurrences at six different prison facilities.
*See* Dkt. No. 1.

preliminary and permanent injunctions as well as awards of compensatory and punitive damages.

In response to plaintiff's second amended complaint defendants have moved for its dismissal, asserting that plaintiff has failed to state a plausible claim upon which relief may be granted in any of the twenty-eight causes of action alleged.  For the reasons set forth below, I recommend that defendants' motion be granted in part, but otherwise denied.

I.    BACKGROUND[2]

Plaintiff is a New York State prison inmate as a result of convictions for aggravated murder, as well as a separate conviction for escape.[3]  *See People v. Phillips,* 56 A.D.3d 1163, 867 N.Y.S.2d 234 (3d Dep't 2008); *leave to appeal denied*, 12 N.Y.3d 761, 876 N.Y.S.2d 712 (2009) (Table); *People v.*

_____

[2]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

[3]    Plaintiff's convictions for murder and attempted murder were based upon his shooting of two New York State Police Troopers.  *People v. Phillips,* 56 A.D.3d 1163, 1164 N.Y.S.2d 324 (3d Dep't 2008).  While under ordinary circumstances the nature of an inmate plaintiff's underlying conviction might not be relevant to claims challenging his or her conditions of confinement, it is in this instance since Phillips attributes hostility on the part of corrections officers toward him to his criminal history, which he claims served as the motivation for various retaliatory acts alleged in his complaint.  *See generally* Second Amended Complaint (Dkt. No. 52).

*Phillips,* 56 A.D.3d 1168, 867 N.Y.S.2d 633 (3d Dep't 2008); *leave to appeal denied*, 11 N.Y.3d 928, 874 N.Y.S.2d 14 (2009) (Table).  Following those convictions plaintiff initially was received into DOCS custody at the Elmira Correctional Facility ("Elmira") on December 21, 2006 for processing and was later transported to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York.  Second Amended Complaint (Dkt. No. 52) ¶¶ 6, 10-11.  Plaintiff's complaint, as amended, represents an amalgamation of claims based upon events occurring at both Elmira and at Clinton.[4]

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on August 18, 2008.  Dkt. No. 1.  Plaintiff's Second Amended Complaint, the filing of which was approved by the court, *see* Dkt. No. 51, was submitted by Phillips on or about June 19, 2009.  Dkt. No. 52.  In his most recent amended complaint plaintiff names as defendants DOCS Commissioner Brian Fischer and twenty-eight other DOCS employees stationed at DOCS headquarters, Elmira, or Clinton, and includes two additional "John Doe" defendants identified only as correctional officers at Clinton.  *Id.*  Plaintiff's Second Amended Complaint sets forth twenty-eight

---

[4]      The events forming the basis for plaintiff's claims will be more fully described in the portions of this report that follow.

4

causes of action alleging, among other things, that he was subjected to cruel and unusual punishment based upon alleged use of excessive force, the denial of contact visits and medical care, and the prison conditions that he generally experienced; denied his First Amendment right of free religious exercise; deprived of procedural due process in association with his relegation to administrative segregation and disciplinary actions pursued by prison officials against him; retaliated against for having filed grievances and complained of prison conditions, in violation of his rights under the First Amendment; and suffered interference with his access to the courts, also in violation of the First Amendment.

On September 15, 2009 defendants moved to dismiss plaintiff's second amended complaint on a variety of grounds.[5]  Dkt. No. 76.  Plaintiff has since

---

[5]        In support of that motion, defendants have submitted a declaration from Assistant Attorney General James P. McGowan, attaching documents relating to a proceeding commenced by the plaintiff in New York State Supreme Court under Article 78 of the New York Civil Practice Law and Rules ("CPLR"), as well as those associated with the internal DOCS determination to place plaintiff in administrative segregation.  Dkt. No. 76-2.  The judicial documents and official court records associated with the state court proceeding, as publically available documents, are properly considered by the court and entitled to judicial notice in connection with this lawsuit. *See* Federal Rules of Evidence 201 and 1005; *see also Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 WL 1069165 at *1 n. 1 (S.D.N.Y. April 17, 2009).   Moreover, it is well established that a district court may rely on matters of public record in deciding whether to dismiss a complaint.  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998)(citations omitted); *see also Anderson v. Coughlin*, 700 F.2d 37, 44 n.5 (2d Cir. 1983).

responded in opposition to the pending dismissal motion,  Dkt. No. 77, which

is now ripe for determination, and has been referred to me for the issuance of

a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Dismissal Motion Standard

    A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure, calls upon a court to gauge the facial

sufficiency of that pleading, utilizing as a backdrop a pleading standard

which, though unexacting in its requirements, "demands more than an

unadorned, the-defendant-unlawfully-harmed me accusation" in order to

withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937,

1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S.

Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure

requires that a complaint contain "a short and plain statement of the claim

showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*

While modest in its requirement, that rule commands that a complaint contain

more than mere legal conclusions; "[w]hile legal conclusions can provide the

6

framework of a complaint, they must be supported by factual allegations."
*Ashcroft,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient
facts which, when accepted as true, state a claim which is plausible on its
face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing
*Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has
observed, "[w]hile *Twombly* does not require heightened fact pleading of
specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the
line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d
47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the
material facts alleged in the complaint as true and draw all inferences in favor
of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723,
1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir.
2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*,
356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  The burden
undertaken by a party requesting dismissal of a complaint under Rule
12(b)(6) is substantial; the question presented by such a motion is not

whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

     B.    Administrative Segregation Due Process Claim

On December 22, 2006 defendant George Seyfert, a DOCS Deputy Inspector General, issued a recommendation to place plaintiff in administrative segregation.  Second Amended Complaint (Dkt. No. 52) ¶ 13. Accompanying that recommendation was a memorandum from Clinton Superintendent Dale Artus, also a named defendant, informing Phillips that he would be limited to non-contact visits indefinitely  *Id.* at ¶ 14.  A hearing was subsequently convened by defendant Curtis Brown to address defendant Seyfert's recommendation, leading to a determination upholding the recommended placement in administrative confinement.[6]  *Id.* at ¶ 13.  That

---

[6]    In the New York State prison system, administrative segregation is subject to a comprehensive regulatory scheme which requires, *inter alia*, that a hearing be conducted within fourteen days of an inmate's admission into administrative segregation. 7 N.Y.C.R.R. § 301.4(a).  "Administrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility."  7 N.Y.C.R.R. § 301.4(b). The regulations also provide for periodic post-segregation review of the inmate's circumstances at sixty-

hearing result was upheld on the plaintiff's internal appeal to defendant

Donald Selsky, a Deputy DOCS Commissioner.  *Id.*  Plaintiff thereafter

remained in administrative custody, apparently receiving the required periodic

reviews, *see, e.g.,* Second Amended Complaint (Dkt. No. 52) ¶ 22, until

October 1, 2007, when he began serving a one-year sentence to SHU

disciplinary confinement following a later Tier III hearing.[7]

Plaintiff's fourth, fifth, eleventh, thirteenth, and fourteenth causes of

action are addressed to the administrative segregation determination and the

periodic review of plaintiff's confinement therein.  In his fourth claim, plaintiff

asserts he was deprived of a fair and impartial hearing in connection with the

---

day intervals.  7 N.Y.C.R.R. § 301.4(d).   Administrative segregation inmates are housed in the special housing unit ("SHU") and are subject to most of the restrictions that apply to disciplinary SHU inmates.  *Edmonson v. Coughlin*, 21 F. Supp. 2d 242, 248-249 (W.D.N.Y. Sep 30, 1998).  SHU inmates are confined in their cells between twenty-two and twenty-three hours per day, but are not completely restricted.  *Husbands v. McClellan*, 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  In general, they are allowed two showers per week and one hour of outdoor exercise per day, unlimited legal visits and one non-legal visit per week and have access to counselors and sick call.  *Id.*  Additionally, they can participate in cell study programs and can receive books from the library.  *Id.*

[7]      The DOCS conducts three types of inmate disciplinary hearings.  *See* 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

initial administrative segregation determination by defendant Curtis Brown.

Second Amended Complaint (Dkt. No. 52) Fourth Cause of Action.  Plaintiff's

fifth cause of action alleges that the administrative segregation

recommendation was lodged against him by defendant Seyfert in order to

punish him for his crimes and for the purpose of subjecting him to cruel and

unusual punishment.[8]  *See id.* at Fifth Cause of Action.  Interpreting these

claims as asserting deprivations of procedural due process, in their motion

defendants maintain that they are not plausibly stated.

The placement  of a prison inmate into administrative segregation is an

event that can implicate a liberty interest protected under the Fourteenth

Amendment if it results in an "atypical and significant hardship on inmate in

relation to the ordinary incidents of prison life."  *Sandin v. Connor*, 515 U.S.

––––––––––––––––––––

[8]      "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the constitution or federal laws."  *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) (citing *Hynes*, 143 F.3d at 657 (other citations omitted).  To sufficiently allege a claim of retaliation for having exercised his First Amendment rights, a prisoner must show (1) that he engaged in speech or conduct that was protected by the First Amendment, (2) that he suffered an adverse action by the defendant, and (3) that there was a causal connection between the protected conduct and the adverse action.  *Espinal v. Goord*, 554 F.2d 216, 227 (2d Cir. 2009) (citations omitted).  Under different circumstances, plaintiff's allegation in this case that the administrative segregation recommendation was motivated by plaintiff's prior actions could lead to the conclusion that a claim has been plausibly set forth under the First Amendment.  It is beyond cavil, however, that the conduct allegedly triggering the administrative segregation recommendation, including the killing of a New York State Trooper, does not qualify as protected conduct under the First Amendment.

472, 484, 115 S. Ct. 2293 (1995); *see also Davis v. Barrett*, 576 F.3d 129 (2d Cir. 2009) (holding that forty-one days in administrative confinement could represent the deprivation of a cognizable liberty interest, depending upon the conditions to which the plaintiff inmate was subjected).  In this instance, the defendants have assumed that plaintiff's period of administrative segregation did result in the deprivation of a constitutionally significant liberty interest, and I will do likewise.

The next issue to be addressed is the extent of due process the constitution mandates with regard to the administrative segregation determination.  Such a determination must be made against the backdrop of the well-accepted principle that "the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials . . .." *Hewitt v. Helms*, 459 U.S. 460, 470, 103 S. Ct. 864 (1983).  It should also be noted, moreover, that "[t]he requirements imposed by the [due process] Clause are, of course, flexible and variable dependent upon the particular situation being examined." *Id.* at 472, 103 S. Ct. 864 (citations omitted).

The procedural safeguards to which a prison inmate is entitled before

being subjected to the deprivation of a constitutionally cognizable liberty interest for disciplinary reasons are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S. Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence".  *Superintendent v. Hill*, 472 U.S. 445, 105 S. Ct. 2768 (1985).

While in this case it appears that the procedures leading up to his placement into administrative segregation may well have satisfied the more stringent requirements of *Wolff*, the Supreme Court recognized in its decision

in *Hewitt* that in light of the paramount importance of preserving the safety of

a prison, its guards, and inmates, the full panoply of rights guaranteed under

*Wolff* are not required in every situation where administrative segregation is

ordered, stating the following:

> We think an informal, non-adversary evidentiary
> review sufficient both for the decision that an inmate
> represents a security threat and the decision to
> confine an inmate to administrative segregation
> pending completion of an investigation into
> misconduct charges against him.  An inmate must
> merely receive some notice of charges against him [or
> her] and an opportunity to present his views to the
> prison official charged with deciding whether to
> transfer him to administrative segregation.  Ordinarily
> a written statement by the inmate will accomplish this
> purpose, although prison administrators may find it
> more useful to permit oral presentation in cases
> where they believe a written would be ineffective.  So
> long as this occurs, and the decisionmaker reviews
> the charges and then–available evidence against the
> prisoner, the Due Process Clause is satisfied.

*Hewitt*, 459 U.S. at 476-77, 103 S. Ct. 864 (footnote omitted); *see also Taylor

v. Rodriguez*, 238 F.3d 188 (2d Cir. 2001) (holding that a prisoner facing

administrative segregation must be provided with a meaningful notice of the

basis for the decision as well as a decision that is based upon "some

evidence").  Provided that these safeguards are implemented, and

additionally that periodic post-segregation reviews are conducted, *see Hewitt*,

13

499 U.S. at 477, n.9, 103 S. Ct. 864, the due process requirements of the

Fourteenth Amendment are satisfied when a prison inmate is placed in

administrative segregation.

The distinction to be drawn between disciplinary confinement, with its

procedural requisites as discussed in *Wolff*, and administrative confinement

subject to the requirements of *Hewitt*, is upon whether the segregation is

punitive in nature.  Plaintiff appears to assert that his administrative

confinement was punitive in nature, rather than based upon legitimate

penological concerns for his safety, or that of others.  As the Second Circuit

has observed,

> [t]he line between civil and criminal sanctions is often hard to
> draw, and this is nowhere more true than in the context of
> prisons, where the punitive character of the environment may
> make even purely regulatory sanctions appear punitive in nature.
> The need to maintain order, however, is a legitimate nonpunitive
> interest, even if it sometimes requires that prison officials take
> action of a punitive character.

*Porter v. Coughlin*, 421 F.3d 141, 148 (2d Cir. 2005), *see also Iqbal v. Hasty*,

490 F.3d 143 (2d Cir. 2007), *overruled on other grounds, sub nom. Ashcroft

v. Iqbal,* ___ U.S. ___. 129 S. Ct. 1937 (2009).  Accordingly, "[w]here a

prisoner's placement in restrictive confinement has both a punitive and an

administrative, non-punitive basis, the placement decision will not be found to

14

have impaired a protected liberty interest."[9]  *Rosenberg v. Meese*, 622 F. Supp. 1451, 1468-69 (S.D.N.Y. 1985) (citing *Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984)) (other citations omitted).  Regardless of whether measured against *Wolff*, or instead the more generous *Hewitt* standard, with the exception limited outlined below, it is not clear from plaintiff's complaint that he was denied any of the procedural safeguards guaranteed under the Fourteenth Amendment.

Additionally, since "administrative segregation may not be used as a pretext for indefinite confinement of an inmate[,]" prison officials must periodically review their decision to ascertain whether a prisoner remains a security risk.  *Hewitt*, 459 U.S. at 477 n.9, 103 S. Ct. at 874 n.9.  While these reviews must be "meaningful and not simply perfunctory", *McClary* v. Kelly, 4 F. Supp. 2d 195, 213 (W.D.N.Y. 1998) (citing *Giano v. Kelly*, 869 F. Supp. 143, 150-51 (W.D.N.Y. 1994)), the Supreme Court made it clear in *Hewitt* that they will not necessarily require that prison officials permit the submission of any additional evidence or statements, stating

> [t]he decision whether a prisoner remains a security

---

[9]      More recent cases illustrate that the distinction between administrative segregation and SHU confinement for disciplinary or punitive reasons is not easily recognizable, and in the end when *Sandin's* liberty interest criteria are satisfied, basic due process is required regardless of intent.  *See Iqbal v. Hasty*, 490 F.3d at 164-65.

> risk will be based on facts relating to a particular
> prisoner – which will have been ascertained when
> determining [whether] to confine the inmate to
> administrative segregation – and on the officials'
> general knowledge of prison conditions and tensions,
> which are singularly unsuited for "proof" in any highly
> structured manner.  Likewise, the decision to continue
> confinement of an inmate pending investigation of
> misconduct charges depends upon circumstances
> that prison officials will be well aware of – most
> typically, the progress of the investigation.

*Hewitt*, 459 U.S. at 477 n.9, 103 S. Ct. at 874 n.9.[10]

Plaintiff's complaint appears to center upon the allegation that the individual assigned to conduct his initial administrative segregation hearing, defendant  Curtis Brown, was biased.  Second Amended Complaint (Dkt. No. 52) ¶ 13.  In support of that contention plaintiff alleges that during the hearing defendant Brown turned off the hearing tape and stated to Phillips that because of the crimes he had committed he would be "tortured for the rest of [his] life in prison. . .".  *Id.*  When accepted as true and considered in a light most favorable to the plaintiff, that statement could ostensibly support a finding that the hearing officer was predisposed in favor of administrative segregation.  On that basis and at this early procedural juncture, considering

---

[10]      At least one court has held that these essential elements of minimal due process are easily satisfied by the detailed regulations that govern placement of inmates in administrative segregation in DOCS facilities.  *McClary*, 4 F. Supp. 2d at 213.

16

all of plaintiff's allegations as true and drawing all reasonable inferences in

his favor, I am unable to conclude that plaintiff has not stated a plausible

claim for deprivation of due process and therefore recommend that

defendants' motion to dismiss his procedural due process claim directed

toward the administrative segregation determination, as alleged in the fourth

action, be denied.

Plaintiff's only allegations against Seyfert are that he filed the

December 22, 2006 administrative segregation recommendation based upon

hearsay and false and misleading statements.  "Preparation of an

[administration segregation] recommendation is not a basis for § 1983 claim."

*Edmonson*, 21 F. Supp. 2d at 254 (citing *Freeman v. Rideout*, 808 F.2d 949,

951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S. Ct. 1273 (1988)).  Due

process is satisfied as long as the inmate is afforded a hearing to rebut the

allegedly false charges.  *Id.* at 255.  For these reasons, plaintiff has failed to

state a viable claim against defendant Seyfert, and I recommend dismissal of

the fifth cause of action.

Two of the defendants named in plaintiff's complaint, Roy Ano and

Joseph Pucelli, appear to have been sued by Phillips solely as a result of

their alleged participation in periodic post-segregation reviews, described by

17

plaintiff as "sham" reviews and "mere formalities".  *See* Second Amended

Complaint (Dkt. No. 52) ¶¶ 22, 24, Eleventh and Thirteenth Causes of Action.

Plaintiff does not appear to deny that the required periodic reviews were

conducted.[11]  Plaintiff's bald and conclusory allegation that those reviews

were "sham" and conducted to assure results that were foregone conclusions

is insufficient to satisfy the pleading requirements recognized in *Iqbal* and

*Twombly* as necessary to demonstrate a plausible claim of due process

deprivation.  I therefore recommend that all of plaintiff's claims against those

two defendants, including the eleventh and thirteenth causes of action, be

dismissed .

C.   False Misbehavior Report

On October 1, 2007, plaintiff was issued a misbehavior report authored

by defendant W. Allan based upon an authorized mail watch of plaintiff's

---

[11]      The DOCS regulations require review of administrative segregation status
every 60 days.  7 N.Y.C.R.R. § 301.4(d).  Pursuant to the outlined procedures a three-
member committee shall examine the inmate's institutional record and prepare and submit
to the superintendent or designee a report setting forth the reasons why the inmate was
initially put in administrative segregation, information regarding the inmate's subsequent
behavior and attitude, and any other relevant factors in favor of retention or release.  *Id.*
That report, together with any statement from the inmate, is forwarded to the
superintendent or designee who shall make a determination to retain or release the inmate
from administrative segregation.  *Id.*  At least one court has held that because the
superintendent is the only person with authority to make the determination, those serving
on the review committee have no personal involvement in the decision and therefore
cannot be held liable under section 1983.  *Edmonson*, 212 F. Supp. 2d at 256.

18

outgoing mail which revealed that plaintiff sought to obtain explosives.  *See Second Amended Complaint  (Dkt. No. 52) ¶ 30.  In his Seventeenth Cause of Action plaintiff alleges that defendants Allan and Ohler "conspire[d] with wanton malicious intent to place adverse evidence into the record to prejudice plaintiff's 60-day administrative segregation review and to further provide a basis to retain and maintain plaintiff in such confinement (see paragraph 30) for the sole purpose of punishing him for the crimes of his conviction. . .."[12]  *Id.* at Seventeenth Cause of Action.  Apparently interpreting this claim as one for retaliation based upon a false misbehavior report, in their motion defendants assert that any such claim is barred by virtue of the plaintiff's failed effort to overturn the disciplinary determination in the state courts.

As an initial matter, it should be noted that standing alone, the mere allegation that a false misbehavior report has been filed against an inmate

---

[12]    It is not entirely clear whether in his twenty-fourth cause of action plaintiff attempts to assert an additional retaliation claim against Allan. In that cause of action plaintiff alleges that defendant Allan "tampered with his mail" in retaliation for his having filed grievances. *See id.* at ¶ 37 and Twenty-Fourth Cause of Action.  This cause of action refers to paragraph thirty-seventh of the body of the complaint, which alleges that plaintiff began filing grievances against Allan in February of 2008, three months after Allan issued plaintiff the allegedly false misbehavior report. According to plaintiff's own allegations then, Allan could not have issued the misbehavior report in retaliation for plaintiff's grievances against Allan, and I have therefore interpreted the twenty-fourth cause of action as alleging only an illegal mail watch cause of action rather than claiming retaliation.

does not implicate constitutional conduct.  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman,* 808 F.2d at 951.  The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, suffices to state a claim for retaliation.  *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

As is the case with regard to retaliation claims generally, the claim that a misbehavior report issued to a prison inmate is false and was motivated by an inmate's protected conduct, whether consisting of a threat to file grievances or otherwise, is easily made.  As District Judge David N. Hurd recognized in his decision in *Barclay v. New York*, 477 F. Supp. 2d 546 (N.D.N.Y. 2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay*, 477 F. Supp. 2d at 558.  More than conclusory allegations are required to establish such a claim; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord*, 119 F.

Supp. 2d 327, 339 (S.D.N.Y. 2000).

The record now before the court reflects that following a disciplinary determination on October 9, 2007 finding the plaintiff guilty of violating inmate rules regarding violent conduct, possession of explosives, soliciting, harassment, and making threats, he petitioned New York State Supreme Court, Albany County, under CPLR Article 78 seeking to have that determination overturned.[13]  McGowan Decl. (Dkt. No. 76-2) Exh. A. Rejecting the plaintiff's claim that he was denied a fair and impartial hearing, Acting New York State Supreme Court Justice Henry F. Zwack issued a decision on August 11, 2008 upholding the hearing officer's determination and dismissing Phillip's petition.  *Id.* at Exh. D.  In his decision, Judge Zwack discerned no basis to conclude that Phillips was denied his right to procedural due process in connection with the hearing officer's determination.  *See id.*

Against the backdrop of these circumstances, plaintiff alleges no facts to support his claim of retaliation.  It appears as though plaintiff attributes the

---

[13]     The state court's Article 78 decision, which is included among the materials submitted in support of defendants' motion is a document of which, as was previously noted, this court is empowered to take judicial notice notwithstanding the nature of defendants' dismissal motion.  *Pani*, 152 F.3d at 75; *see also Wilson*, 2009 WL 1069165 at *1 n. 1.

October 1, 2007 misbehavior report to a desire to punish him for his acts

against the New York State Police and to retain him in administrative

segregation.  *See* Second Amended Complaint  (Dkt. No. 52) ¶ 30.  As was

previously noted, it cannot seriously be disputed that plaintiff's shooting of

New York State troopers, the conduct for which plaintiff claims Allan and

Ohler retaliated, is not conduct protected by the constitution or statute; quite

the contrary, it is statutorily defined as criminal conduct.  As a result, the

plaintiff cannot establish the first required element of a retaliation claim.

*Espinal*, 554 F.2d at 227.  Moreover, the misbehavior report was not false.

Indeed, in his Article 78 petition, a sworn pleading submitted to the state

court, the plaintiff admitted that he wrote the letter that led to the misbehavior

report, but claimed to have done so solely for the purpose of confirming the

suspected mail watch.[14]  McGowan Decl. (Dkt. No. 76-2) Ex. A.

        In view of the foregoing, it seems quite obvious that plaintiff's retaliation

claim against Allan and Ohler is beyond implausible, and his seventeenth

cause of action should therefore be dismissed.

        D.    Access To The Courts

        Defendants next challenge the sufficiency of plaintiff's twelfth cause of

---

        [14]      Additionally, the hearing officer found plaintiff guilty on five of the eight
charges set forth in the misbehavior report.

action, which accuses defendants Racette and Jarvis of interfering with his access to the courts.  Second Amended Complaint (Dkt. No. 52) Twelfth Cause of Action.  That claim stems from a denial of permission for plaintiff to receive a contact visit from a paralegal, Wendy Gambles, allegedly resulting in Phillips' inability to provide Ms. Gambles with certain legal documents. *Id.* at ¶ 23.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established.  *Bounds v. Smith*, 430 U.S. 817, 823, 97 S. Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted).  Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *id.* at 828, 97 S. Ct. at 1498, the Court later clarified that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.  Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180 (1996) (internal

quotations and citations omitted).  Instead, an inmate "must go one step

further and demonstrate that the alleged shortcomings in the library or legal

assistance program hindered his efforts to pursue a legal claim." *Id.*  In other

words, to establish a violation of the right of access to the courts, a plaintiff

must demonstrate that defendants' interference caused him or her actual

injury – that is, that a "nonfrivolous legal claim had been frustrated or was

being impeded" as a result of defendants' conduct.  *Id.* at 353, 116 S. Ct. at

2181.

In their motion, defendants assert that plaintiff's court access denial

claim is legally deficient in light of his failure to identify any prejudice

stemming from defendants' conduct.  Plaintiff's complaint does, however,

assert that he was adversely affected by the denial, alleging that

> [s]uch act by defendants caused plaintiff such a delay which
> effected [sic] his being able to persuade the Appellate Division,
> Fourth Department, to deny plaintiff to have his appeals held in
> abeyance while his 440 motion was considered by County Court,
> which if denied, could have been properly before the Appellate
> Division consolidated with his direct appeals.

Second Amended Complaint (Dkt. No. 52) ¶ 23.  However skeptical the court

may be regarding plaintiff's ability to substantiate this allegation and adduce

evidence to substantiate that he was truly prejudiced, at this juncture I am

unable to conclude that he has failed to state a plausible court access claim,

and therefore recommend that this portion of defendants' motion be denied.

### E.   Excessive Force/Failure To Intervene

Defendants' dismissal motion also challenges the sufficiency of Phillips' excessive force claims.  The primary focus of the motion appears to be on plaintiff's cause of action against defendants Henderson, Kirkpatrick, and Marinaccio based upon their alleged failure to intervene and protect him from harm.

A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers.  *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

In order to establish liability on the part of a defendant under this

25

theory, a plaintiff must prove the use of excessive force by someone other

than the individual, and that the defendant under consideration 1) possessed

actual knowledge of the use by another corrections officer of excessive force;

2) had a realistic opportunity to intervene and prevent the harm from

occurring; and 3) nonetheless disregarded that risk by intentionally refusing

or failing to take reasonable measures to end the use of excessive force.

*See Curley*, 268 F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp. 2d

544, 555 (S.D.N.Y. 2007).  Mere inattention or inadvertence, it should be

noted, does not rise to a level of deliberate indifference sufficient to support

liability for failure to intervene.  *See, e.g., Schultz v. Amick*, 955 F. Supp.

1087, 1096 (N.D. Iowa 1997) (noting that "liability in a § 1983 'excessive

force' action cannot be founded on mere negligence") (citing, *inter alia*,

*Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S. Ct. 662, 667 (1986)).

In his complaint, plaintiff alleges that defendants Henderson,

Kirkpatrick, and Marinaccio witnessed an attack upon him by defendants

Lebel and Doyle.  Second Amended Complaint (Dkt. No. 52) ¶ 8.  Plaintiff

further asserts his belief that defendant Henderson momentarily assessed

the situation and ordered that defendants Lebel and Doyle cease their attack,

which they did.  *Id.*  Defendants Kirkpatrick and Marinaccio were then

directed to take photographs of the plaintiff and prepare reports regarding the incident. *Id.* A reasonable factfinder, when presented with a fully developed record, could conclude from the facts set forth in plaintiff's complaint, as the defendants now argue, that the three defendants now implicated did not have a realistic opportunity to intervene and prevent harm to the plaintiff by the use by other corrections officers of excessive force. Nonetheless at this juncture, accepting plaintiff's allegations as true and drawing all inferences in his favor, the allegations that those three defendants "watched plaintiff being attacked" suffices to plead a plausible claim for failure to intervene. Accordingly, I recommend against dismissal of plaintiff's second cause of action, asserting a claim of failure to intervene against defendants Kirkpatrick, Marinaccio, and Henderson.

### F.   First Amendment Religious Exercise Claim

In his complaint, as amended, plaintiff asserts that on December 26, 2006 he filed requests with the Deputy Superintendent of Security, defendant Racette, and a local facility rabbi, defendant Alec Friedmann, seeking permission to attend congregate religious ceremonies approximately ten times per year and to "smudge" within his cell.[15] Second Amended Complaint

---

[15] According to the plaintiff the act of smudging involves the burning of sacred herbs, identified as sage and sweet grass, prior to and during periods of prayer. Second

(Dkt. No. 52) ¶ 15.  Plaintiff contends that his requests were ignored,

although he acknowledges having later been permitted to purchase the

required herbs and being provided with a cigarette lighter and disposable ash

tray to facilitate his smudging.  *Id.* at ¶¶ 15-17.  In his seventh and eighth

causes of action, plaintiff asserts First Amendment violation claims against

defendants Racette and Friedmann, and also interposes such claims against

defendant Hicks in his ninth and twenty-seventh causes of action.  Amended

Complaint (Dkt. No. 52) Seventh, Eighth, Ninth and Twenty-Seventh Causes

of Action.

While inmates confined within prison facilities are by no means entitled

to the full panoply of rights guaranteed under the United States Constitution,

including its First Amendment, the free exercise clause of that provision does

afford them at least some measure of constitutional protection, including of

their right in appropriate circumstances to participate in congregate religious

services.[16]  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804

---

Amended Complaint (Dkt. No. 52) ¶ 15.

[16]   Although his complaint does not contain such a cause of action, plaintiff's
factual allegations could support a claim under the Religious Land Use and
Institutionalized Persons Act of 2000 ("RLUIPA"), which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to an
> institution . . . . even if the burden results from a rule of general

(1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases).  That First Amendment right, however, is limited by valid penological concerns, including those relating to institutional security.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987); *Salahuddin*, 993 F.2d at 308.  As the Second Circuit has observed, the determination of whether a refusal to permit attendance at a religious service impinges upon an inmates's First Amendment free exercise right is "one of reasonableness, taking into account whether the particular [act] affecting [the] right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin v. Coughlin,* 905 F.2d 571, 574

---

applicability, unless the government demonstrates that imposition of a burden on that person – 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The familar principles which inform the analysis of plaintiff's free exercise claim are similar to those applicable to the potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks.  *See Salahuddin v. Goord,* 467 F.3d 263, 264 (2d Cir. 2006).

(2d Cir.), *cert. denied*., 498 U.S. 951, 111 S. Ct. 372 (1990) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987)); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir. 1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S. Ct. at 2404).

In their motion, defendants question plaintiff's ability to demonstrate that the reasons for their refusal to permit his attendance at congregate religious services are unrelated to legitimate penological interests or concerns.  Defendants' Memorandum (Dkt. No. 76-1) p. 23.  While it may be true that in the end plaintiff cannot, defendants' motion hinges upon an issue that is not susceptible of resolution at this procedural juncture.  In their motion defendants do not dispute plaintiff's assertion that he was denied the opportunity to participate in congregate religious services.  Although it seems plausible that there are legitimate penological concerns that preclude plaintiff from participating in religious services, this issue can only be determined on a more fully developed and robust record, and I therefore recommend against dismissal of plaintiff's seventh and eighth causes of action.

Plaintiff's claims regarding smudging are similarly sufficient to pass muster at this early stage.  By his own admission, plaintiff was provided with

necessary herbs and materials to permit smudging.[17]  Second Amended

Complaint (Dkt. No. 52) ¶ 15-17.  Plaintiff also alleges, however, that on July

2, 2008 defendant Hicks confiscated his lighter, thereby making it impossible

for him to continue the religious exercise of smudging.  Second Amended

Complaint (Dkt. No. 52) ¶ 18.  Accepting this allegation as true and drawing

all inferences in plaintiff's favor, the court is unable to conclude that plaintiff's

religious exercise claims concerning smudging as against defendant Hicks as

set forth in plaintiff's ninth and twenty-seventh causes of action are not

plausible.

### G.    Deliberate Medical Indifference

Plaintiff's tenth cause of action alleges that defendants Nurse

Administrator Brian LeCuyer and Nurse Practitioner Amber Lashway were

deliberately indifferent to his serious medical needs.  Second Amended

---

[17]    Pursuant to DOCS Directive No. 4202, certain prison facilities have opted to prohibit smudging in individual cells but to permit the practice at congregate services.  *See Auleta v. Goord*, No. 9:07-CV-0307 (TJM/GJD), 2007 WL 2471728, at *2 n.5 (N.D.N.Y. Aug. 28, 2007) (noting that smudging in individual cells at the Mohawk Correctional Facility is not permitted).  DOCS regulations address the practice of smudging, providing that "[o]n request, a Native American inmate [confined to SHU] will be provided one facility-issued disposable ashtray for smudging, to be replaced on a one-for-one basis."  7 N.Y.C.R.R. § 302.2(e)(2).  These regulations also provide that an inmate may be deprived of such property upon issuance of a deprivation order if it is determined that such property would present a threat to the safety or security.  7 N.Y.C.R.R. § 302.2(f).  There is no indication in the scant record now before the court as to the position of administration at Clinton regarding smudging, or whether there was a deprivation order issued with regard to plaintiff's smudging.

Complaint (Dkt. No. 52) Tenth Cause of Action.  That claim is based upon the

denial of plaintiff's request that he be provided with Neurontin for a back

condition, for which Ibuprofen was instead prescribed.  *Id.* at ¶¶ 19-21.

Claims that prison officials have intentionally disregarded an inmate's

medical needs fall under the umbrella of protection from the imposition of

cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v.*

*Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976).  The Eighth

Amendment prohibits punishment that involves the "unnecessary and wanton

infliction of pain" and is incompatible with "the evolving standards of decency

that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,*

475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*

While the Eighth Amendment does not mandate comfortable prisons, neither

does it tolerate inhumane treatment of those in confinement.  *Farmer v.*

*Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v.*

*Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).  To satisfy their

obligations under the Eighth Amendment, prison officials must "ensure that

inmates receive adequate food, shelter, and medical care, and must take

reasonable measures to guarantee the safety of inmates."  *Farmer*, 511 U.S.

at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27,

104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

1.   Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and

centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin*, 467 F.3d at 279.  A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious.  *Id*. at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged

deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).  Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

In this case, when accepting its allegations as true, plaintiff's complaint suffices to meet the requirements of the objective element.  Plaintiff alleges that he suffers from a back condition that has caused him severe and chronic pain and challenges defendants' failure to provide him with a prescription pain medication in lieu of the Ibuprofen prescribed.  While plaintiff ultimately

may not be able to support his Eighth Amendment claim, at this juncture it is plausibly stated, at least for purposes of meeting the objective element of the medical indifference inquiry.  *See Guarneri v. Hazzard*, No. 9:06-CV-985, 2010 1064330, at * 15 (N.D.N.Y. Mar. 22, 2010) (Mordue, C.J.) ("The question of whether persistent back rises to a level of constitutional significance depends upon the circumstances of the particular case presented.") (citation omitted).

      2.   <u>Subjective Element</u>

     The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)).  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-

36

1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted).  Accordingly, mere disagreement with prison officials about a course of treatment does not give rise to a constitutional right or sustain a claim under section 1983.  *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).  If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference.  *Harrison,* 219 F.3d at 138;  *Kearsey v. Williams,*

37

No. 99 Civ 8646, 2005 WL 2125874, at *5  (S.D.N.Y. Sep. 1, 2005).

Acknowledging that plaintiff's complaints of chronic pain can implicate a serious medical need, defendants nonetheless assert that his claim represents nothing more than a disagreement over proper treatment.  From the record now before the court it appears likely that plaintiff's deliberate indifference claim does in fact implicate nothing more than a disagreement over the course of treatment, and in particular the type of pain medication to be supplied to address his back condition.  In his complaint, plaintiff alleges that he advised defendants LeCuyer and Lashway that he was experiencing severe pain due to an old back injury and in the past was prescribed Neurontin, which resolved his pain.  Plaintiff further alleges that defendants gave him Ibuprofen instead; that his continued complaints of pain were ignored; and that he was denied Neurontin for over a year and half.  Given these allegations and affording plaintiff the benefit of all favorable inferences, it is conceivable that defendants acted with deliberate indifference, and I am unable to conclude that plaintiff has not established a plausible claim under the Eighth Amendment based upon defendants' denial over a lengthy period of time of plaintiff's request for stronger, prescription pain medication instead of the Ibuprofen provided.  *See Rivera v. Federal Bureau of Prisons*, No. 08

38

Civ 5590, 2009 WL 585828, at *4-5 (S.D.N.Y. Mar. 5, 2009); *see also Brown v. DeFrank*, No. 06 Civ. 2235 (AJP), 2006 WL 3313821, at * 23 (S.D.N.Y. Nov. 15, 2006).

> ### H.   Retaliation

Certain of plaintiff's claims, including his twenty-second, twenty-third, and twenty-sixth causes of action, allege that various actions were taken against him in retaliation for his having filed grievances or otherwise complained to prison officials regarding the conditions to which he was subjected.[18]   Defendants maintain that those claims are deficient since there is no showing in plaintiff's complaint that the allegedly retaliatory conduct had the effect of deterring Phillips from exercising his constitutional rights.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco*, 854 F.2d at 588-90.  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action,

---

[18]      I have construed plaintiff's fifteenth and nineteenth causes of action as also making potential claims of retaliation and have addressed those causes of action separately to the extent they also allege Eighth Amendment violations.  *See pp*. 45-50, *post.*

including the issuance of misbehavior reports, to retaliatory animus; courts

must therefore approach such claims "with skepticism and particular care."

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v.*

*Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds,*

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d

346, 352 (2d Cir. 2003) (same).

  In order to state a *prima facie* claim under section 1983 for retaliatory

conduct, a plaintiff must advance non-conclusory allegations establishing that

1) the conduct at issue was protected; 2) the defendants took adverse action

against the plaintiff; and 3) there was a causal connection between the

protected activity and the adverse action – in other words, that the protected

conduct was a "substantial or motivating factor" in the prison officials'

decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd.*

*of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v.*

*Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir.

2001).  If the plaintiff carries this burden, then to avoid liability the defendants

must show by a preponderance of the evidence that they would have taken

action against the plaintiff "even in the absence of the protected conduct."

*Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper

40

and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

The focus of defendants' challenge to plaintiff's retaliation claims is upon the potential chilling effect of the allegedly retaliatory conduct.  In making the argument, defendants focus upon the specific characteristics of the plaintiff as "a murderer and escapee sentenced to prison life without parole, relegated to administrative segregation, serving a year in punitive confinement for threats, harassment, solicitation, violent conduct[.]". Defendants' Memorandum (Dkt. No. 76-1) p. 26.

Defendants' argument in this regard overlooks the teachings of the Second Circuit's decision in *Gill v. Piplypchak,* 389 F.3d 379 (2d Cir. 2004), in which the court rejected use of a subjective, inmate–specific approach when analyzing a retaliation claim, and instead mandated consideration of whether a similarly situated individual of ordinary firmness would be deterred from complaining of prison conditions by the actions allegedly taken in retribution for protected activity.  *Gill,* 389 F.3d at 381 ; *see also Espinal v, Goord*, 558 F.3d 119, 129 n.7 (2d Cir. 2009); *Lugo v. Van Orden*, No. 9:07-CV-879, 2008 WL 2884925, at *4-5 (N.D.N.Y. Jul. 23, 2006) (McAvoy, S.J.).

41

"The question of whether a given action is sufficiently adverse to deter someone of "'ordinary firmness' from exercising his rights' . . . is a question of fact." *Sanchez v. Valez*, No. 08 Civ. 1519, 2009 WL 2252319, at * (S.D.N.Y. Jul. 24, 2009) (citing *Espinal*).  Accordingly, while it may be true, as defendants suggest, that such a person would not be deterred based upon the conduct alleged, at this juncture the court is not positioned to find that plaintiff has failed to state a plausible claim of retaliation.  I therefore recommend against dismissal of plaintiff's retaliation claims, as alleged in the twenty-second, twenty-third and twenty-fourth causes of action, on this basis.

      I.     <u>Property Loss Claim</u>

Plaintiff's eighteenth cause of action asserts violations of his rights under the Eighth and Fourteenth Amendments, based upon the loss of certain of his personal property.  That claim surrounds alleged confiscation by defendants Allan, Martin, and Saunders of various items of personal property including implements for personal hygiene, writing materials, and photographs.  *Id.* at ¶ 31.  Defendants argue that such a claim is not cognizable under 42 U.S.C. § 1983.

As defendants correctly contend, the claim of alleged destruction or loss of personal property on the part of a prison inmate does not support a

claim redressable under 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194 (1984).  In New York such remedies are available, *see* N.Y.C.R.R. § 1700.3(b)(4), and their availability has been held by the Second Circuit to be adequate and to preclude a prisoner's commencement of a section 1983 action asserting due process claim based upon the loss of personal property. *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983).  Accordingly, I recommend dismissal of plaintiff's eighteenth cause of action.

> J.    Mail Tampering

In their motion, defendants seek dismissal of any cause of action purporting to be based upon alleged tampering with plaintiff's mail by defendants Allan and Artuz.  *See* Defendants' Memorandum (Dkt. No. 76-1) p. 28.  Plaintiff's twenty-fourth cause of action alleges that Allan tampered with plaintiff's mail.  Plaintiff"s Second Amended Complaint (Dkt. No. 52) Twenty-Fourth Cause of Action.

The court notes that among the protections enjoyed by prison inmates, though not unfettered, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment.  *LeBron v. Swaitek*, No. 05-CV-172, 2007 WL 3254373, at *6 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Davis*,

320 F.3d at 351).   That right, however, gives way to the legitimate

penological interests of prison officials when mail is monitored for the

purpose of ensuring order in the prison by preventing illegal activities, in

which case no constitutional violation has occurred.  *United States v.

Workman*, 80 F.3d 688, 699 (2d Cir. 1996), *cert. denied*, 519 U.S. 938, 117

S. Ct. 319 (1996).

Actions taken by prison administrators directed toward inmate mail are

subject to the overarching consideration that a prison regulation infringing on

an inmate's constitutional rights is valid so long as the regulation is

"reasonably related to the legitimate penological interests."  *Turner v. Safely*,

482 U.S. at 89, 107 S. Ct. at 2261.  Applying this precept, and for obvious

reasons, "[c]ourts have constitutionally afforded greater protection . . . to

outgoing mail than to incoming mail."  *Davis*, 320 F.3d at 351 (citations

omitted).  Nonetheless, the Second Circuit has held that "'where good cause

is shown, outgoing mail can be read' without violating inmates' First

Amendment rights."  *Workman*, 80 F.3d at 698 (quoting *Wolfish v. Levi*, 573

F.2d 118, 130 n.27 (2d Cir. 1978)*, rev'd in part on other grounds sub nom.,

Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979)).

Plaintiff's mail tampering claim is not readily disposable on motion to

44

dismiss, since, as can be seen, the relevant inquiry requires a balancing of the legitimate penological interest offered as a justification for the mail watch against the extent to which the free flow of mail is impeded as a result of the mail watch. *Workman*, 80 F.3d at 699. As a result, I find dismissal of plaintiff's twenty-fourth cause of action for mail tampering in violation of his First Amendment rights inappropriate at this juncture.

### K.    Conditions of Confinement

In addition to the more specific Eighth Amendment claims based upon an alleged assault, plaintiff's placement in administrative segregation, denial of contact visits, theft of property, and deliberate medical indifference, plaintiff generally asserts that the conditions to which he has been exposed while incarcerated, principally at Clinton, are grossly substandard and violate his right under the Eighth Amendment to be free from cruel and unusual punishment. *See, e.g.,* Second Amended Complaint (Dkt. No. 52) ¶¶ 25, 29, 32, 33-34 and Fifteenth,  Nineteenth, Twenty-First and Twenty-Fifth Causes of Action. Those claims are asserted against defendants Allan, Bosco, Artus, and Hicks, and are based upon allegations, *inter alia*, of excessive noise, unsanitary living conditions, and the deprivation of adequate hygiene

45

products, such as toilet paper and toothpaste.[19]  *Id.* at ¶¶ 33-34.

As was previously noted, the Eighth Amendment does not mandate comfortable prisons, though it does prohibit conditions of confinement that are inhumane.  *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001).  Like plaintiff's medical indifference claim, his claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach,* 103 F. Supp. 2d at 546) (citation omitted); *Waldo,* 1998 WL 713809, at *2; *see also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

Plaintiff's fifteenth cause of action alleges that Allan and Bosco placed

---

[19]      Some of plaintiff's causes of action, including the fifteenth and nineteenth, seem to implicate both claims of retaliation and exposure to cruel and unusual punishment in violation of the Eighth Amendment due to the conditions of his confinement.

him in a mental health cell for observation for a period of three days,

subjecting him to a cell that was "bitter" cold and filthy, infested with

cockroaches, and with walls smeared with feces, a sink filled with feces,

urine in puddles on the floor, a toilet "full of shit" that was inoperable and

without running water, and no toilet paper, soap, or other hygiene products.

Plaintiff's Second Amended (Dkt. No. 52) Fifteenth Cause of Action and ¶¶

28-29.  Plaintiff further alleges that the cell was barren, and defendants

required him to surrender his clothing, including his sneakers and socks, and

provided him with only a smock to wear.  *Id.*  Courts have recognized that

proof of conditions similar to those alleged by plaintiff may be sufficient to

establish an Eighth Amendment claim.  *Gaston*, 249 F.3d at 164-66

(reversing dismissal of Eighth Amendment claims that plaintiff was subjected

to freezing temperatures throughout the winter and exposure to corridor filled

with sewage and excrement for several days); *see also Trammell v. Keane*,

338 F.3d 155, 164-65 (2d Cir. 2003) (noting that exposure to bitter cold for

prolonged periods and deprivation of hygiene products, especially toilet

paper, could rise to the level of unconstitutional conditions of confinement)

(citing cases); *Cagle v. Gravlin*, No. 9:09-CV-0648, 2010 WL 2088267,

(N.D.N.Y. Apr. 29, 2010) (Lowe, M.J.) (finding plaintiff's allegations that he

was subjected to feces on the wall and gate sufficient to plausibly suggest that he was subjected to unconstitutional conditions of confinement), *Report and Recommendation Adopted*, 2010 WL 2087437 (N.D.N.Y. May 25, 2010) (Scullin, S.D.J.); *Hamilton v. Conway*, No. 03-CV-527S, 2008 WL 234216, *12-13 (W.D.N.Y. Jan. 28, 2008) (recognizing that allegations of excessive noise and inmates throwing feces in SHU may support an Eighth Amendment claim) (citing *McClary*, 4 F. Supp. 2d 195).

Although it seems to present a close case in light of the limited three-day period of exposure, considering the severity of the conditions alleged and affording plaintiff all favorable inferences, at this procedural crossroad the court concludes that to the extent that plaintiff's fifteenth cause of action endeavors to state an Eighth Amendment violation, his claim is at least plausible.[20] *Benitez v. Mailloux*, No. 9:05-CV-1160, 2009 WL 1953752, at * 2 (N.D.N.Y. Jul. 2, 2009) (Mordue, C.J.) (finding plaintiff claims that his SHU cell was grossly unsanitary, with fecal matter and dead insects on the floor and walls, and that he was deprived of cleaning supplies, preventing him from cleaning the cell, and deprived of toilet paper during the same time

---

[20]     I express no opinion as to whether the plaintiff's allegations, if proven, are sufficient to withstand a motion for summary judgment or establish a cognizable Eighth Amendment claim at trial.

period, although occurring only during a limited period, along with allegations

of lack of running water and bitter cold for a longer period sufficient to survive

summary judgment).

Plaintiff's nineteenth cause of action alleges only that defendant Allan,

by moving him from one cell location to another, exposed him to "excessive

noise and unsanitary confinement conditions" in violation of the Eighth

Amendment, but refers back to paragraph thirty-two of the body of the

complaint, wherein plaintiff alleges that on December 26, 2007 he was

moved from cell number twenty-three, an open cell, to a shielded cell in "I-

Company", which is used for assaultive and disruptive inmates such as the

seriously mentally ill.  Plaintiff's Second Amended Complaint (Dkt. No. 52) ¶

32.  Plaintiff further alleges that the cell was filthy and feces-smeared and

was in close proximity to the seriously mentally ill, who created an

atmosphere of continuous noise and unsanitary living conditions to which he

was exposed.  *Id.*  The essence of that cause of action seems to hinge upon

plaintiff's contention that defendant Allan transferred him into a cell where he

was exposed to more adverse conditions, in retaliation for letters the plaintiff

wrote complaining of conditions at Clinton.  *Id.*  Accepting plaintiff's

allegations as true and drawing all inferences in his favor, and overlooking

the fact that the cause of action does not reference the First Amendment in

view of plaintiff's *pro se* status, I find that the nineteenth cause of action could

be regarded as alleging that plaintiff was exposed to adverse action in

retaliation for having engaged in protected activity in violation of the First

Amendment.[21]  I therefore recommend against dismissal of plaintiff's

nineteenth cause of action.

Plaintiff's twenty-first cause of action also alleges that plaintiff was

exposed to cruel and unusual punishment in violation of the Eighth

Amendment.  There plaintiff asserts that he was subjected to unsanitary

conditions, cross-referencing allegations described earlier in the complaint.

*See* Second Amended Complaint (Dkt. No. 52) ¶ 34.  Within this cause of

action is the assertion that plaintiff was only provided with hygiene products,

including toilet paper and toothpaste, every two weeks.  *Id.*  Standing alone

these allegations do not support a plausible claim of cruel and unusual

punishment in violation of the Eighth Amendment.  *Powell v. Beilien*, No. 04-

CV-0926A(SR), 2005 WL 1000040, at *3 (W.D.N.Y. Apr. 25, 2005) (noting

that while lengthy denial of personal hygiene products could constitute an

---

[21]     Furthermore, insofar as this cause of action is intended to assert an Eighth
Amendment claim generally complaining of the conditions of his confinement, though
noting that the facts supporting this particular cause of action are sparse, for the reasons
set forth above I conclude that the claim is plausible.  *See* pp. 45 -48, *ante*.

unconstitutional denial of basic necessities, a two-week deprivation is insufficient).  I therefore recommend dismissal of that the twenty-first cause of action.

Plaintiff's last general prison condition claim appears to be set forth in his twenty-fifth cause of action, which alleges that defendant Artus violated his Eighth Amendment rights by failing to repair inadequate fresh water pipes, resulting in noise causing interruption of his sleep.  This claim is further detailed in the body of plaintiff's second amended complaint, which alleges that as a result of faulty pipes a loud banging noise occurs whenever a toilet is flushed.  Second Amended Complaint (Dkt. No. 52) ¶ 38.  This allegation is conclusory and falls far short of the type of deprivation that would implicate a "denial of the minimal civilized measure of life's necessities."  *Salahuddin v. Goord*, 467 F.3d at 279 (internal quotation and citation omitted).  It should be noted that a truly *de minimis* deprivation will rarely support a finding of an Eighth Amendment violation.  *See, e.g., Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000); *Govan v. Campbell*, 289 F. Supp. 2d 289, 298 (N.D.N.Y. 2003) (Sharpe, M.J.).  Objectively, plaintiff's allegations are not sufficiently serious, revealing serious risk of harm, to constitute a constitutional deprivation and support that required element of an Eighth

Amendment violation.  *See, e.g., Brown v. McElroy*, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (allegation that plaintiff was kept in a room which was extremely cold, without clean linens for the bed, toiletries, and clean clothing, found insufficient to state a constitutional claim); *Mabery v. Keane*, No. 95 Civ. 1093, 1998 WL 148386, at *8 (S.D.N.Y. Mar. 30, 1998) (allegations of unsanitary conditions of confinement, including nearby running of raw sewage requiring inmates to breathe the fumes associated with that burning, found insufficient to state an Eighth Amendment violation); *Giglieri v. New York City of Dep't of Corrections*, No. 95 CIV 6853, 1997 WL 419250, at *2, 4 (S.D.N.Y. July 25, 1997) (allegation of pre-trial detainee that he was exposed to second-hand tobacco smoke was insufficient to state a claim under the Fourteenth Amendment or the Eighth Amendment).  Accordingly, I recommend dismissal of the twenty-fifth cause of action.

L.    Procedural Due Process

Plaintiff's twentieth cause of action alleges that on or about December 28, 2007 defendant Miller violated his constitutional right to procedural due process by conducting a Tier II hearing in his absence.  Second Amended Complaint (Dkt. No. 52) ¶ 33 and Twentieth Cause of Action.  Defendants seek dismissal of this claim based upon plaintiff's failure to plead the

deprivation of a cognizable liberty interest without due process.

In order to sustain a claim procedural due process deprivation, a prison inmate must establish that he or she has been deprived of a liberty or property interest.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).  In this instance plaintiff's complaint alleges in mere conclusory terms that he suffered a deprivation of due process, without elaborating on the consequences flowing from the Tier II hearing. This is particularly significant since at the time Phillips appears to have been serving a one-year period of disciplinary SHU confinement commencing on October 1, 2007 and, consequently it does not seem that the Tier II hearing likely resulted in a deprivation rising to a level of constitutional significance.

As was previously noted, the DOCS conducts three types of inmate disciplinary hearings.  See 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes ,* 143 F.3d at 655.

The maximum period of disciplinary SHU or keeplock confinement that can be included  as a part of penalty imposed after conducting a Tier II hearing is 30 days. 7 N.Y.C.R.R. § 253.7(a)(iii).  Absent the pleading of special circumstances that would arise to a level of a significant and atypical deprivation in relation to the ordinary incidents of prison life, a period of disciplinary SHU or keeplock confinement of thirty days or less does not represent a cognizable liberty interest sufficient to trigger the due process requirements of the Fourteenth Amendment.  *See Palmer v. Richards*, 364 F.3d 60, 65-66 (2d Cir. 2004) ("[W]e have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short-less than the 30 days . . . and there was no indication that the plaintiff endured unusual SHU conditions."  *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 248 (S.D.N.Y. 1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*.") (quoting *Williams v. Keane*, No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997)).

Because plaintiff's complaint lacks any allegations regarding the penalty imposed as a result of the Tier II hearing and a showing of the

54

conditions he endured as a result thereof, I recommend dismissal of plaintiff's twentieth cause of action against defendant Miller.

    M.   <u>Personal Involvement</u>

In their motion defendants also challenge the sufficiency of plaintiff's allegations of wrongdoing against DOCS Commissioner Fischer, DOCS Inspector General Roy and DOCS Deputy Commissioner LeClair, alleging that his complaint fails to disclose the requisite degree of their personal involvement in the conduct giving rise to plaintiff's claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Each of the three defendants implicated in this portion of defendants' motion serves in a supervisory capacity within the DOCS.  A supervisor

cannot be liable for damages under section 1983 solely by virtue of being a

supervisor; there is no *respondeat superior* liability under section 1983.

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at

501. Culpability on the part of a supervisory official for a civil rights violation

can, however, be established in one of several ways, including when that

individual 1) has directly participated in the challenged conduct; 2) after

learning of the violation through a report or appeal, has failed to remedy the

wrong; 3) created or allowed to continue a policy or custom under which

unconstitutional practices occurred; 4) was grossly negligent in managing the

subordinates who caused the unlawful event; or 5) failed to act on information

indicating that unconstitutional acts were occurring.  *Iqbal*, 490 F.3d at 152-

53; *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865,

873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Defendants Fischer, Roy and LeClair are named only in plaintiff's

fourteenth cause of action, in which plaintiff alleges in conclusory terms that

the three conspired to maintain plaintiff in administrative segregation based

upon the nature of his conviction.  Second Amended Complaint (Dkt. No. 52)

Fourteenth Cause of Action.  Plaintiff provides only slightly more

particularization of this claim in the body of his complaint, alleging that he

"has continually petitioned defendants Brian Fischer, Richard Roy and Lucian LeClaire [sic] concerning the unconstitutional confinement of Administrative Segregation in SHU. . .."  *Id.* at ¶ 25.  These allegations, even if true, are nonetheless insufficient, without more, to establish the requisite degree of personal involvement on the part of those defendants in the constitutional violations alleged.  *Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F. Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

Additionally, to sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and internal quotation marks omitted).  Conclusory, vague or general

allegations of a conspiracy to deprive a person of constitutional rights do not

state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709 F.2d

173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).  No

facts are alleged from which one could infer the existence of an agreement

comprising involving those three supervisory DOCS employees.

Plaintiff's allegations fail to meet the requirement of alleging the

elements of a conspiracy in more than mere conclusory and vague terms.

Plaintiff's complaint similarly fails to set forth a proper basis for holding

defendants Fischer, Roy and LeClair accountable for the deprivations

alleged.  I therefore recommend dismissal of plaintiff's fourteenth cause of

action on this basis.[22]

N.    Leave to Replead

The last issue to be addressed is the question of whether plaintiff

should be permitted to further amend his complaint in this action in order to

cure the deficiencies and salvage the claims for which I have recommended

dismissal.  Courts must construe *pro se* pleadings broadly, and interpret

---

[22]    Even if plaintiff were otherwise to have alleged a plausible conspiracy claim,
his claim would nonetheless still be subject to dismissal on the basis of the intra-agency
conspiracy doctrine since the claim is asserted against three DOCS employees.  *See,
e.g., Everson v. New York City Transit Auth.*, 216 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2002);
*Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:05CV1453, 2005 WL 1460424, at
*10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).

them "to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)) (internal quotation marks omitted).  Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).

   I find that amendment of plaintiff's claims premised solely on the issuance of a false misbehavior report (seventeenth cause of action) and for lost property (eighteenth cause of action) would be futile since neither presents even a potentially cognizable constitutional claim.   With regard to the remaining claims for which I have recommended dismissal, the court has significant reservations as to plaintiff's ability to successfully plead plausible claims.  Nonetheless, in deference to his *pro se* status I recommend that plaintiff be given one final opportunity to amend, if he so chooses, to seek

reinstatement of all or some of the claims for which I recommended dismissal.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff's second amended complaint in this action asserts a litany of claims regarding the conditions he experienced as a prison inmate relegated first to administrative SHU confinement and later to SHU confinement for disciplinary reasons.  That complaint sets forth twenty-eight causes of action, many of which are stated in wholly conclusory terms.  When measured against the relevant yard stick, requiring that sufficient facts be articulated in order to demonstrate the existence of plausible constitutional claims, I conclude that many of the causes of action are subject to dismissal, but nonetheless recommend, in deference to his *pro se* status, that the plaintiff be giving one final opportunity to amend his complaint to eliminate the procedural shortcomings.[23]

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 76) be

GRANTED, in part, and that the seventeenth and eighteenth causes of action

---

[23]     In light of my recommendations as set forth herein as well as the procedural posture of this matter, I have declined to address defendants' argument that they are protected by the doctrine of qualified immunity with regard to some of the plaintiff's claims as alleged in the second amended complaint.

be dismissed without a further opportunity to replead those claims, and that

the fifth, eleventh, thirteenth, fourteenth, twentieth, twenty-first, and twenty-

fifth causes of action and all claims against defendants Ano, Pucelli, Miller,

Fischer, Roy, and LeClair be DISMISSED, with leave to amend as to those

claims, but that the motion otherwise be DENIED, and it is further

RECOMMENDED that plaintiff be permitted the opportunity to file an

amended complaint, if desired, within fourteen days of any order adopting

this report and recommendation, and that the defendants' obligation to

answer plaintiff's second amended complaint be held in abeyance during that

time period, and if plaintiff timely serves an amended complaint, that

defendants shall be required to respond or otherwise move within thirty days

thereafter.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed with

the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72;

*Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

local rules.

_____

David E. Peebles
U.S. Magistrate Judge


Dated:        September 27, 2010
              Syracuse, NY

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). In adherence to this rule, the Court of Appeals has previously held that a "New York state court affirmation of the [SDHR's] finding of no probable cause would preclude federal litigation based on the same facts." *Yan Yam Koo v. Dep't of Bldgs. of the City of New York,* 218 Fed. Appx. 97, 98 (2007) (Summary Order), affirming *Yan Yam Koo v. NYC Dep't of Bldgs.,* No. 04 Civ. 9628, 2006 WL 963883 (S.D.N.Y. Apr. 12, 2006) (Summary Order). Therefore, a "judgment pursuant to Article 78 may preclude relitigation of issues already decided in that earlier judgment." *LaFleur v. Whitman,* 300 F.3d 256, 272 (2d Cir.2002).

New York law applies collateral estoppel "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur,* 300 F.3d at 271. In *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), the Supreme Court held that an Article 78 proceeding that affirmed the SDHR's determination of no probable cause was entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comported with due process. 456 U.S. at 483-485. *See Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552 (2d Cir.1986) ("Since [plaintiff's] administrative proceeding before the state labor department was judicially confirmed in the Article 78 proceeding, we are required by *Kremer* to apply New York's law on collateral estoppel.").

Here, Plaintiff filed a Verified Complaint with the SDHR on April 25, 2005. FN1 Following the SDHR finding of no probable cause on October 10, 2007 (Ex. I to the Amended Complaint ("Am.Compl.")), Plaintiff commenced an Article 78 proceeding seeking "to overturn [the] decision of the [SDHR] as well as investigate ministerial acts which delayed this case for 31 months." (Verified Petition, attached to the Article 78 Decision.) As noted in the Article 78 Decision, a hearing was held in that proceeding on May 19, 2008 at which both parties presented evidence.

FN1. The entire administrative record from the SDHR is attached to the June 27, 2008 Decision in *Wilson v. Victoria's Secret, et al* Supreme Court of the State of New York, County of Bronx, Index No. 34095707 (the "Article 78 Decision") which, in turn, is attached as Exhibit A to Defendants' moving papers. The Court may consider these papers and the documents attached to the Amended Complaint herein on this motion. *See Stewart v. Transp. Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 435-36 (S.D.N.Y.2008) (noting that a district court may rely on matters of public record of which the court may take judicial notice in resolving a Rule 12(c) motion); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006) (district court may rely on documents incorporated in a complaint on a Rule 12(c) motion).

On June 27, 2008, the State Court determined that "based upon the hearing held on May 19, 2008 and review of the file of the New York State Division of Human Rights the court finds that the determination of respondent of October 10, 2007 was not arbitrary or capricious." Accordingly, the State Court dismissed Plaintiff's Article 78 petition.

*2 The Amended Complaint was filed in this Court on July 25, 2008, and this motion followed.

*Same Issues Raised*

Plaintiff claims national origin discrimination in both the SDHR and in her Amended Complaint in this Court. Plaintiff admits that the claims raised in both fora were claims of national origin discrimination raised under Title VII:

Plaintiff "agrees that she filed a Verified Complaint against Victorias Secret [sic] ('VSS') with the New York State Division of Human Rights ('SDHR') ... and agrees that the charge was based on National Origin." *See* Pl. Opposition at 10.FN2 The charge filed with the SDHR alleged a violation of both state law and Title VII. *See* Pl.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

Opposition, at 15; Amended Complaint, Exh. I. The SDHR determined that there was "no probable cause to believe that [VSS] has engaged in or is engaging in the unlawful discriminatory practice complained of." *See* Am. Compl., Exh. I.

FN2. Reference is to Plaintiff's Affirmation in Opposition to Motion dated February 11, 2009.

Plaintiff "agrees that on December 5, 2007 an Article 78 [proceeding] was filed in the Bronx County New York State Supreme Court ... to overturn the decision of the SDHR." *See* Pl. Opposition at 15. That Court held that "the SDHR actions/determination was not arbitrary and capricious and dismissed the Article 78 petition." *Id.* at 17.

Finally, Plaintiff "agrees that an amended complaint was filed on July 25, 2008 in this [federal] court based on national origin discrimination in violation of Title VII." *Id.* at 19.

More specifically, a comparison of Plaintiff's pleadings in the Article 78 proceeding and in this action confirms that the two claims are based on precisely the same facts and circumstances. For example, in both fora, Plaintiff complains of:

Harassment by management by their cutting her hours and putting false write ups in her personnel files, *compare* letter of 1/3/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 9, p. 5, ll. 1-4.

Unfair or "un-American" working conditions, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) with Am. Compl., ¶ 2E, p. 2 l. 8.

Transfer of sales to favored associates, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 16.

Management's failure to inform her of late night cab

reimbursement policy, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p.4, ll. 8-10.

Management's refusal to grant her time off to attend a funeral, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 1-2.

Retaliation for reporting sexual harassment, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 6-7, ll. 15-16.

Management's insulting remarks, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl ., ¶ 2E, p. 3, l. 9.

**\*3** Retaliation of the April 13, 2005 incident which led to her termination, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 8, l. 1.

The issues raised in the SDHR proceeding were, of course, necessarily decided by the State Court in the Article 78 Decision.

*Full Opportunity to Litigate Had*

A "full and fair opportunity to litigate" means that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer,* 456 U.S. at 481. As noted above, the Supreme Court has clearly stated that an Article 78 proceeding that affirms the SDHR's determination of no probable cause is entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comport with due process. *Id.* at 483-485. Thus, the Article 78 proceeding here provided Plaintiff with a full and fair opportunity to litigate her claims. That she might have been unaware of the administrative appeal process, *see* Pl. Op. at 5-6, is of no import. Plaintiff's failure to avail herself of the full range of available procedures does not render those procedures inadequate under the Due Process Clause.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

*Kremer,* 456 U.S. at 485. ("The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.")

*Plaintiff's Other Arguments Against Collateral Estoppel Without Merit*

To the extent that Plaintiff suggests that her naming VSS in her SDHR proceeding and Limited Brands in this action somehow avoids the application of collateral estoppel, she is mistaken. Identity of defendants is not required. *See, e.g., LaFleur,* 300 F.3d at 274 (holding that the proper inquiry with respect to collateral estoppel is *"not whether the respondent-defendants were identical in both cases"*); *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 555, n. 1 (2d Cir.1967) (explaining that "collateral estoppel may bar relitigation of an issue even against different defendants," provided that the issue in contention was necessary to the result reached in the prior proceeding); *Yan Yam Koo,* 218 Fed. Appx. at 99 (holding that the fact "[t]hat the plaintiff did not name the identical parties in the state and federal actions does not disturb our finding of [issue] preclusiveness").

In any event, the party defendants are sufficiently closely related to permit preclusion. Victoria's Secret Stores, L.L.C.-Plaintiff's actual employer (*see* Am. Compl. at ¶ 11E)-is a wholly-owned subsidiary of Limited Brands Store Operations, Inc., a Delaware corporation that is a wholly-owned subsidiary of Intimate Brands, Inc. Intimate Brands, Inc. is a Delaware corporation that is a wholly-owned subsidiary of LBI, which is also a publicly traded Delaware corporation.[FN3]

> **FN3.** The Court may take judicial notice of this fact, as this information is attached to the LBI Form 10K that is filed with the Securities and Exchange Commission. Accordingly, it is a matter of public record. *See Stewart,* 561 F.Supp.2d at 435-36.

Finally, to the extent that Plaintiff argues that she did not raise all her federal causes of action in her Article 78 proceeding, she is nevertheless barred from raising them now pursuant to the doctrine of *res judicata.*[FN4] Under New York law, the doctrine of *res judicata* bars a "later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Because Plaintiff's claims indisputably arise from the same set of facts, *res judicata* applies to bar any legal theories she now raises that are different from those raised in the state court proceeding. *See Kremer,* 456 at 465 n. 3, 481 n. 22 (noting that *res judicata* has been taken to bar claims arising from the same transaction even if brought under different statutes; also noting that a " 'party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding' " (quoting *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n,* 455 U.S. 691, 710, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982))).

> **FN4.** Although Plaintiff named VSS as the defendant in the state court case and LBI in this case, the identity of the parties is nonetheless the same for purposes of determining *res judicata.* LBI has a sufficiently close relationship to VSS and both defendants were known to Plaintiff at the time she filed her first lawsuit. *See, e.g., Official Publ'ns, Inc. v. Kable News Co.,* 811 F.Supp. 143, 147 (S.D.N.Y.1993) (holding that the "doctrine of *res judiciata* also bars litigation of the same causes of action against defendants who were known to plaintiff at the time the first action was filed but were not named where the newly-added defendants have a sufficiently close relationship to the original defendant"); *Alpert's Newspaper Delivery Inc. v. The New York Times Co.,* 876 F.2d 266, 270 (2d Cir.1989) (noting that in determining privity for *res judicata* purposes, the issue is one of substance rather than the names of the caption of the case). Because LBI is merely a holding company of which VSS is a wholly-owned subsidiary, and the defenses raised by VSS sufficiently represented LBI's interests, VSS and LBI are in privity for *res judicata* purposes. *See G & T Terminal Packaging Co. v. Consol. Rail Corp.,* 719 F.Supp. 153, 159 (S.D.N.Y.1989) (holding that "[s]ubsidiaries are in privity with their principal for res judiciata purposes when, as here, they sufficiently represent the principal's interests").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

Additionally, the same counsel who represented VSS in the prior state court litigation represents LBI and VSS in the current litigation. *See Melwani v. Jain,* No. 02 Civ. 1224, 2004 WL 1900356, *2 (S.D.N.Y. Aug. 24, 2004) (stating that "the fact that the parties in the prior and current litigation had the same attorney is of singular significance in the privity analysis" (quotation marks omitted)).

*Conclusion*

**\*4** For the reasons set out above, Defendants' motion for judgment on the pleadings [dkt. no. 14] is granted.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

S.D.N.Y.,2009.
Wilson v. Limited Brands, Inc.
Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

> FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at \*3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, *5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by others. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003)* (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)
(Cite as: 2007 WL 2471728 (N.D.N.Y.))

possess and display the shrine, or that the personnel at Mohawk have not honored the permit.[FN2] Dkt. No. 15, Exhibit 4.

> FN2. Plaintiff has been at Mohawk since May 3, 2005. Dkt. No. 19, Harding Affidavit, paragraph 5; Finkelstein Affidavit, Exhibit A.

Plaintiff further alleges that the Wiccan holy days are determined based upon solstices and equinoxes. Plaintiff alleges that the DOCS calendars for other religions taken these variances into account and they are reflected on the DOCS' schedules (e.g. for Native Americans and Wotanism), but are not reflected on the schedules for Wiccans.[FN3] Thus, Plaintiff alleges he is not being permitted to properly observe his holy days. Plaintiff does not identify which holy days he has been prevented from observing, when these interruptions allegedly occurred, or how his worship or observance of the holy day was interrupted or prevented by the Defendants to this action. Despite Plaintiff's allegation that he has "little to no choice when he is scheduled to work on a holy day, but to work as scheduled," the Court notes that both the August 2004 and May 2005 permits issued to Plaintiff granted Plaintiff permission to observe all holy days as "Non-program days." Dkt. No. 15, Exhibits 2 and 4. Plaintiff does not allege that his permit is not being honored at Mohawk.

> FN3. Plaintiff alleges that this requires him to consult with the coordinating Chaplain as to the correct date and makes it impossible for him to observe independent of the recognized group.

**\*2** Plaintiff also alleges that sage and other herbs, or incense, should be burned on his personal altar for the purpose of cleansing the ritual space. Plaintiff apparently seeks to burn the herbs or incense in his cell twice per day. Plaintiff alleges that Defendant Leonard applies a "what is mandatory" review to his requests in this regard, but does not apply that same standard to his requests. Dkt. No. 15, paragraph 27. Plaintiff alleges that he "managed to get an outside source, (The founder of the Church of the World Tree), to send written verification of this practice" but it was ignored. Dkt No. 15, paragraph 25.[FN4] Plaintiff alleges that such burning is permitted during the Wiccan group service at Mohawk, but is not permitted in

individual cells. Plaintiff alleges that Native Americans, as a result of a settlement, are permitted to engage in the practice of **smudging** [FN5] and, therefore, he should be permitted to burn herbs or incense in his **cell**. [FN6]

> FN4. Plaintiff did not present any such letter on this Motion or his Reply in support of this Motion. Rather, the letter from Deacon Edwards, with respect to sage/sweetgrass for burning, states "If your outside source says you must have them we can use that to argue your point. I am still waiting to have contact with your outside advisor." Dkt. No. 15, Exhibit 1. Plaintiff attached to his Reply the first page of a letter from Gail Wood, a priestess of Wicca, stating that "While one tradition and teachings might not stress the importance of specific herbs, others will. It is a highly individual, eclectic, and creative religion." Dkt. No. 24, Exhibit 12.

> FN5. Plaintiff acknowledges that the practice of **smudging** is not permitted in individuals **cells** at Mohawk, where Plaintiff is presently housed. Dkt. No. 24, paragraphs 7-8. The Court notes that each facility is charged with the responsibility of identifying appropriate locations within the facility where smudging may be safely performed in such facility. Dkt. No. 19, DOCS Directive 4202.

> FN6. Plaintiff takes exception with the use of the term "cell" in his Reply, suggesting that the Defendants are trying to mischaracterize the setting. Dkt. No. 24, paragraph 7. However, the Court uses the term to address individual living quarters within a correctional facility without implying anything regarding the physical characteristics of that living space, and the Court read Defendants' usage in the same manner. Plaintiff also took exception with the Defendants' use of the word incense in describing the items he seeks to burn in his cell. However that is exactly one of the allegations in Plaintiff's Affidavit. *See* Dkt. No. 15, paragraph 22. Finally, Plaintiff claims that Defendants are attempting to mischaracterize the exchange regarding the use of oils as a "ritual space

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)
(Cite as: 2007 WL 2471728 (N.D.N.Y.))

cleansing option." Dkt. 24, paragraph 6. However, the Court notes that a letter signed by Plaintiff stated "I am contacting you today regarding Ritual Space Cleansing options.... I can use, and offered to use, natural oils ..." Plaintiff then requests that particular vendors of such oils be approved and noted that, if they were approved and noted on his permit, "the matter would be finished." Dkt. No. 19, Exhibit D.

Plaintiff also seeks to possess his own set of Tarot cards. Plaintiff alleges that he was advised by Defendant Leonard that such a request must be addressed by each individual facility, and that the Deputy Superintendent for Security at Mohawk [FN7] has denied such a request. Plaintiff was advised by the Deputy Superintendent for Security at Mohawk that the cards could be used to scare or intimidate other inmates. The denial of tarot cards was allegedly grieved, and the grievances denied. Plaintiff alleges that this denial may result in additional harm because many of the books and magazines relating to Wicca contain information on, or references to, Tarot cards. Plaintiff alleges that the current policy could result in Plaintiff being denied access to such books or magazines. Plaintiff seeks an order directing DOCS to permit him to possess tarot cards.

FN7. This individual is not a party to this action.

Finally, Plaintiff alleges that he is likely to be transferred in retaliation for his exercise of his First Amendment rights. He seeks an Order from this Court enjoining such future transfer.

**B. Defendants' Response.**

Defendants assert that over the course of the past several years there has been ongoing contact between defendant Leonard, Director of Ministerial Services for DOCS, and Plaintiff. Leonard states that he also sought guidance from a Wiccan priestess, Gail Wood, "whose authority Mr. Auleta claimed to accept." Dkt. No. 19, Leonard Affidavit, paragraph 20. *See also* Dkt. No. 19, Exhibit D, Letter from Auleta to Leonard (stating "Thank you for calling Ms. Wood, this shows beyond a doubt that you are sincere.")

In his Affidavit, Leonard states that, over the course of several years, he has approved almost every request Plaintiff has made including the ability to have a shrine on display in his cell, the ability to possess a religious medallion, non-burning candles, a prayer rug, a prayer robe, Wiccan oils, a chalice, plastic knife, altar tile, a wand, a small stone, and a gris-gris bag. The only requests that Leonard has not been able to approve were for tarot cards and the burning of herbs in individual cells. Leonard states that such request are not within his authority due to the related safety and security issues they present. Leonard further states that he revised the Wiccan Holy Day calendar at Plaintiff's suggestion. Leonard Affidavit, paragraph 19. Leonard states that he has no role in decisions relating to the transfer of inmates, and that such decisions "are not subject to a religious veto." *Id.,* paragraph 28.

**\*3** Defendants also submitted an Affidavit from Rick Harding, the Superintendent of Programming at Mohawk Correctional Facility detailing the requests that Plaintiff has made with respect to religious accommodation issues and the series of approvals that have been issued. Harding states that the only two requests that have been denied were the requests for in cell burning of herbs or incense and for tarot cards. Harding states those request were denied after balancing Plaintiff's requests with the safety of the facility, staff and other inmates. Dkt. No. 19, Harding Affidavit, paragraph 29. Harding stated that administrative and monetary limitations also impacted on those determinations. *Id.,* paragraph 20. Specifically, with respect to the Tarot cards, Harding states that the safety and security concern is that the may be used as a mechanism for one inmate to frighten, control or influence other inmates. *Id.* at paragraph 22.

Defendants submitted the Affidavit of Donald Selsky, DOCS Assistant Commissioner for Facility Operations. Dkt. No. 19, Selsky Affidavit. Selsky stated that burning of materials in cells can not be permitted without seriously compromising the safety and security of inmates and staff. *Id.,* paragraph 4. The concerns include the threat of fire in the facilities, the health and safety issues related to indoor or environmental smoke, and the potential for abuses such as using the materials to cover the odor of prohibited indoor smoking activity. Selsky confirmed that "[a]ll inmates who are members of incense burning religious faith groups (including Catholics, Muslims, Rastifarians,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)
(Cite as: 2007 WL 2471728 (N.D.N.Y.))

Buddhists, etc.) are absolutely prohibited from burning incense in their individual cells. *Id.,* paragraph 6. However, Selsky confirmed that burning of incense and other religious material is permitted at congregate religious services. *Id.,* paragraph 3.

With respect to the holy day calendar, Defendants submitted a copy of the DOCS 2007 religious holy day calendar, along with a November 10, 2006 transmittal memo to all superintendents and deputy superintendents for Program Services. Dkt. No. 19, Exhibit B to Finkelstein Affirmation. The calendar lists all 2007 holy days by religion, and also contains a chronological listing of all holy days for all religions that DOCS presently recognizes. With respect to Plaintiff's allegations that the calendaring of the Wicca holy days is different than the Wotans and the Native Americans, the Court notes that, although the holy days for all three religions are associated with solstices and equinoxes, the calendar affixes the specific 2007 dates for both Wotanism and Wicca,[FN8] and the specific dates for the Native Americans are to be selected after consultation with the Native American group at each facility and the facility staff. Thus, religious groups other than Wicca have had their holy day dates set and calendared for them, despite the need to coordinate with the solstices and equinoxes, and others have been required to consult with the facility staff to establish the appropriate dates. Nevertheless, the Wiccan holy days were calendared, and the need for special considerations was noted on the calendar.[FN9] Accordingly, Defendants assert that the issue relating to the holy days was addressed by DOCS prior to the filing of this Motion.

> FN8. The same is true for the calendar for Islam.

> FN9. Plaintiff apparently complains that the Wicca holy day calendar does not relieve his from his programing. However, priestess Wood advised Defendant Leonard that "being excused from work assignments during Wiccan holy days does not constitute a central or important aspect of the Wiccan faith." Dkt. No. 19, Leonard Affidavit, paragraph 26. Nevertheless, as noted previously, Plaintiff's permit does excuse him from programming on holy days, and has since 2004. Dkt. No. 15, Exhibits 2-3

**B. The Standards.**

**\*4** The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. As the Second Circuit noted in *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), the movant must show: (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Id.* at 77 (affirming district court's denial of inmate's request for preliminary injunction); *see also Roucchio v. LeFevre,* 850 F.Supp. 143, 144 (N.D.N.Y.1994) (McAvoy, C.J.).

However, by this Motion, Plaintiff seeks substantially all of the relief he seeks in his underlying action. Accordingly, he must make a showing of **"substantial** likelihood of success on the merits." *Eng v. Smith,* 849 F.2d 80, 82 (2d Cir.1988); *Hogan v. Russ,* 890 F.Supp. 146, 150 (N.D.N.Y.1995).

**(a) Irreparable Harm.**

"The showing of irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction.' " *Brown v. Middaugh,* 1998 WL 566791 at \*1 (N.D.N.Y. Sept. 3, 1998) (Munson, S.J.) (citations omitted). "The mere possibility of harm is not sufficient: the harm must be imminent and the movant must show he is likely to suffer irreparable harm if equitable relief is denied." *Id.* "Nor will a preliminary injunction be granted if the movant can be compensated adequately by money damages ." *Id.*

As to this first factor, with respect to (1) the request that Plaintiff not be transferred out of Mohawk, (2) the request that the tarot card policy not be extended to magazines and books that mention tarot cards, and (3) the request for an Order from this Court declaring that any permit issued to Plaintiff shall be enforced on a state-wide basis, Plaintiff does not seek to prevent ongoing conduct. Rather, he seeks to avoid the possibility of such an event occurring in the future. The Court notes that allegations of future injury without more do not establish a real threat of injury.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)
(Cite as: 2007 WL 2471728 (N.D.N.Y.))

*Gibson v. Walker*, 95-CV-1649, (N.D.N.Y. Dec. 7, 1995) (DiBianco, M.J.) (Docket No. 6), *adopted,* (Docket No. 8) (Feb. 2, 1996) (citing *Garcia v. Arevalo,* No. 93-CV-8147, 1994 WL 383238 (S.D.N.Y. June 27, 1994)). Therefore, the Court finds that, for purposes of the application currently before the Court, the plaintiff has failed established that he may suffer irreparable harm with respect to (1) the request that Plaintiff not be transferred out of Mohawk,[FN10] (2) the request that the tarot card policy not be extended to magazines and books that mention tarot cards, and (3) the request for an Order from this Court declaring that any permit issued to Plaintiff shall be enforced on a state-wide basis.

> FN10. The law is also clear that an inmate does not have a right to be confined to the prison of his own choosing. *Mendez v. Mantello,* No. 93-CV-0908, (N.D.N.Y. September 1, 1994) (citing *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989).

With respect to the remaining requests, this Court will presume irreparable harm for purposes of this Decision and Order only. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984); *see, e.g.,* *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991)

**(b) Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits and a Balance of Hardships Tipping Decidedly Toward the Plaintiff.**

*5 As noted above, a party is not entitled to injunctive relief unless there is also proof of likelihood of succeeding on the merits of a claim, or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *See Covino,* 967 F.2d at 77; *Hogan,* 890 F. Supp at 150. As noted above, because Plaintiff seeks mandatory relief, he must make a substantial showing on this issue.

**1. Plaintiff's Claims.**

"Prison regulations alleged to infringe constitutional rights

are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988). To succeed on a First Amendment Free Exercise claim, Plaintiff must demonstrate that the Defendants have substantially burdened the exercise of his religion for reasons that are not related to a legitimate penological interest or concern. The Second Circuit has recognized that when addressing Free Exercise claims the Court must balance the constitutional rights of the inmates with "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). "The standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is 'reasonably related to a legitimate penological interest. *Burgess v. Friedman* 9:05-CV-0379, 2005 WL 3531459, *2 (N.D.N.Y. December 22, 2005) (Mordue, D.J.) *citing Turner v. Safley,* 482 U .S. 78, 81 (1987). Once a legitimate penological interest has been proffered "the prisoner bears the burden of showing that these concerns 'were irrational.' " *Id., citing Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989); *Rahman v. Goord,* 2007 WL 1299408, *5 (W.D.N.Y.2007).

With respect to Plaintiff's claims under RLUIPA, Plaintiff must make a showing that the Defendants have placed a substantial burden on his exercise of his religion "unless the burden furthers 'a compelling governmental interest and does so by the least restrictive means." *Rahman, supra.* at *5. The Untied States Supreme Court has made it clear that prison security is a compelling state interest and "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson,* 544 U.S. 709, 722 (2005).

Finally, the Equal Protection Clause requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). To establish an equal protection claim, plaintiff must show the existence of a similarly situated group who has been treated differently than plaintiff. *Brown v. City of Oneonta,* 911 F. Supp 580, 587, modified 106 F.3d 1125 (2d Cir.1997).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)
(Cite as: 2007 WL 2471728 (N.D.N.Y.))

**2. Substantial Burden.**

**\*6** This Court has carefully reviewed Plaintiff's
submissions, and Defendants' response thereto. The Court
finds that Plaintiff has not established that the Defendants'
actions have substantially burdened the exercise of his
religion with respect to the denial of the tarot cards, the in
cell burning prohibition or the alleged deficiencies in the
holy day calendar. [FN11] Clearly, Plaintiff has not made a
substantial showing that he is unable to practice his
religion due to the burning, tarot card and calendar issues
presented in this Motion.

> FN11. It appears to this Court that the holy day
> calendar was a moot claim before this Motion
> was filed. Plaintiff has pointed to no impediment
> in his exercise of his religion associated with the
> alleged deficiencies in the calendar.

**3. Reasonableness of the Religious Restrictions.**

Turning to the reasonableness of the limitations, in *Turner,*
the Court directed that a court consider four factors in
determining the reasonableness of a prison regulation.
Those factors include (1) whether there is a valid and
rational connection between the regulation and a
legitimate governmental interest offered to justify it; (2)
whether there are alternative means for exercising the right
that remain available to the inmate; (3) the impact on
guards and other inmates in making the accommodation,
as well as the impact on prison resources; and, (4) the
absence of ready alternatives evidencing the
reasonableness of the regulation. *Turner, supra.* at 89-90.

The penological interests asserted by the Defendants are
substantial and compelling. The collective well being,
safety and health of all staff and inmates addressed in
Defendants' moving papers, as well as the security issues
raised by Defendants, compel this Court to find that the
Defendants' interests are compelling.

Plaintiff has not pointed to any alternative means to
address his requests that would have *de minimis* adverse
effect on the asserted penological interest and the prison

resources. Viewed from the RLUIPA perspective, Plaintiff
has not shown that there is any less restrictive means to
meet the concerns of the compelling state interest and his
request for accommodation.

The impact on other inmates, as well as staff members was
addressed by the Defendants in the discussion of the safety
and security issues, and the Affidavits submitted in
support of their opposition to this Motion. It is clear that
the potential harm on staff, inmates and the facility
presented with the in cell burning is significant and
serious. With respect to the issue of the tarot cards, a
similar factual case arose in *Reese v. Coughlin,* 1996 WL
374166 (S.D.N.Y.1996). Like the case before this Court,
the *Reese* plaintiff made no showing that he could not
practice his religion without using tarot cards. The *Reese*
Court considered, in detail, the options available to the
facility in trying to accommodate the plaintiff's request
and, applying *Turner,* found that the defendants had acted
reasonably. Significantly, the *Reese* Court noted that "[t]he
threat posed by the cards is predicated on their possession.
It would be entirely unreasonable, if not impossible, to
allow possession of the cards with monitoring on a
day-to-day, cell-by-cell basis against their misuse." *Reese,*
at \*5.[FN12] The same analysis is equally applicable to this
case.

> FN12. Auleta also sought the accommodation of
> being permitted to possess the cards for use only
> in his living quarters and class. Dkt. No. 15,
> paragraph 35.

**\*7** With respect to ready alternatives, it is uncontroverted
that the Defendants have permitted Plaintiff to engage in
herb burning and use of tarot cards at congregate services.
With respect to the issue of burning, that is the same
privileges extended to all religious groups at Mohawk,
including the one group that has permission to smudge.
Plaintiff's November 12, 2004 letter to Leonard, which he
has attempted to distinguish on this Motion, clearly states
that certain oils would suffice to meet his needs with
respect to "ritual space cleansing." Finally, as the *Reese*
case highlights, there is not easy alternative, to possession
of the tarot cards that would satisfy Plaintiff, protect other
inmates from abuse, and not unreasonably burden the
correctional facility's resources and staff.

Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)
(Cite as: 2007 WL 2471728 (N.D.N.Y.))

**iv. Equal Protection Claim.**

With respect to Plaintiff's equal protections claims, Plaintiff has not shown that similarly situated religious groups have been treated differently. Plaintiff has pointed to no other group that has sought, and been granted permission to possess tarot cards at Mohawk. Likewise, from the evidence presented, it is clear that all groups at Mohawk, including those permitted to smudge, are not permitted to participate in such activity in their individual cells. Finally, with respect to the calendar issue, it appears that DOCS deals with calendaring in at least two different manners. One is to calendar the dates when the events occur in a particular year (Muslim, Wotan, and Wicca) and the other is two require the group to consult with facility staff to establish a proper date. Plaintiff appears to have complaints about both methods, but he has not demonstrated that the other groups are similarly, or that there has been any disparate treatment that violates his constitutional or statutory rights. With respect to the ability to be excused from his programing, the evidence is overwhelming that plaintiff has enjoyed that privilege since 2004, even though DOCS was advised by a Wiccan priestess that "being excused from work assignments during Wiccan holy days does not constitute a central or important aspect of the Wiccan faith." *Supra* at Note 9. Thus, even though an excuse from programming it is not noted on the calendar, Plaintiff has failed to establish that he has been actually treated any differently than any similarly situated inmate faith group, or that he has suffered any constitutional injury. Therefore, this Court must deny Plaintiff's request for injunctive relief.

WHEREFORE, based upon the above, it is hereby

ORDERED, that Plaintiff's Motion for injunctive relief (Dkt. No. 15) is denied, and it is further

ORDERED, that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

IT IS SO ORDERED.

N.D.N.Y.,2007.

Auleta v. Goord
Not Reported in F.Supp.2d, 2007 WL 2471728 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ☞ 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ☞ 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ☞ 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ☞ 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ☞ 313

310 Prisons

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 ☞ 1319

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[10] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

[12] Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

[13] Prisons 310 ☞ 192

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** &#x1F511;   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** &#x1F511;   192

310 Prisons
    310II Prisoners and Inmates
       310II(D) Health and Medical Care
          310k191 Particular Conditions and Treatments
             310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** &#x1F511;   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** &#x1F511;   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** &#x1F511;   192

310 Prisons
    310II Prisoners and Inmates
       310II(D) Health and Medical Care
          310k191 Particular Conditions and Treatments
             310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** &#x1F511;   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** &#x1F511;   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
       170AXVII(C) Summary Judgment
          170AXVII(C)2 Particular Cases
             170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test, precluded
summary judgment in inmate's § 1983 action alleging
officials' deliberate indifference to his medical needs, in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1546 k. Medical care and treatment. Most
Cited Cases
An inmate's chronic pain can constitute a "serious medical
condition" for purposes of claim of deliberate indifference
to a serious medical need under the Eighth Amendment.
U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
       170AXVII(C)2 Particular Cases
         170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition, and
whether prison medical staff acted with deliberate
indifference by failing to prescribe pain medication or take
x-rays, despite inmate's ongoing complaints, precluded
summary judgment, in inmate's § 1983 Eighth Amendment
claims against medical staff. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.

**[20]** Civil Rights 78 ☞ 1355

78 Civil Rights
   78III Federal Remedies in General
     78k1353 Liability of Public Officials
       78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most
Cited Cases
Supervisor liability in § 1983 action can be shown in one
or more of the following ways: (1) actual direct
participation in the constitutional violation, (2) failure to
remedy a wrong after being informed through a report or
appeal, (3) creation of a policy or custom that sanctioned
conduct amounting to a constitutional violation, or
allowing such a policy or custom to continue, (4) grossly
negligent supervision of subordinates who committed a
violation, or (5) failure to act on information indicating
that unconstitutional acts were occurring. 42 U.S.C.A. §
1983.

**[21]** Civil Rights 78 ☞ 1358

78 Civil Rights
   78III Federal Remedies in General
     78k1353 Liability of Public Officials
       78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate
indifference to medical needs of inmate related to inmate's
end stage renal disease or chronic shoulder pain; there was
no showing that sheriff was personally involved in denying
medical treatment to inmate, or that there was a custom or
policy at prison of allowing alleged constitutional
violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §
1983.

**[22]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
       170AXVII(C)2 Particular Cases
         170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether registered
nurse on prison medical staff was personally involved in
prison's alleged failure to arrange for inmate's kidney
transplant test precluded summary judgment in inmate's §
1983 action alleging officials' deliberate indifference to his
medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23] Civil Rights 78** 🔑 **1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A** 🔑 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

Pro se plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

**I. FACTS**

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. See Capobianco v. City of New York, 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." Jessamy v. City of New Rochelle, 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); see

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **\*349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> **FN4.** Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> **FN5.** This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> **FN6.** Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> **FN7.** Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **\*351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**\*352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the ***356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*357 _Hayes,_ 84 F.3d at 620 (internal citation omitted); _see also Phelps v. Kapnolas,_ 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In _Salahuddin v. Goord,_ the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); _see also Jones v. Westchester County Dep't of Corr. Medical Dep't,_ 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware *358 of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also* *Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also* *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **359** of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See* *Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See* *Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier."). [FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain and questions of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' a few hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365 C. Individual Defendants**

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

### 1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. See McKenna, 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing McKenna, 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
 (Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994).* The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)* (*quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)*).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' " *Id.* (*quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (*quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)*).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle, 429 U.S. at 103, 97 S.Ct. at 290.* The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

### FACTUAL BACKGROUND

The facts in this case, unless otherwise noted, are undisputed.[FN1] The Schoharie County Sheriff's Department ("SCSD") operates the Schoharie County Jail Facility ("SCJ") in Schoharie County, New York. At the relevant time period, James Hazzard ("Lt.Hazzard") was employed as a lieutenant in the SCSD. In 2006, Lt. Hazzard was the Chief Administrative Officer for the SCJ and was responsible for reviewing **inmate** grievances. Allen Nelson ("Nelson") was employed by the SCSD as a Corrections Officer and acted as the SCJ **Inmate** Grievance Coordinator with responsibilities that included receiving, investigation and making determinations on **inmate** grievances.[FN2] Paul Marsh ("Marsh") was employed as a Corrections Officer at SCJ. However, Officer Marsh was injured on November 5, 2005 and, as of December 2008, had not returned to work. James Grippin ("Grippin") was employed as a Corrections Officer at SCJ from February 2003 through August 2006. Donald Mace ("Mace") was employed as a Corrections Officer at SCJ and was employed in that capacity for 19 years. Dr. Weitz ("Weitz") is board certified in internal medicine and rheumatology and licensed to practice medicine in the State of New York. Dr. Weitz began working at SCJ in January 2004. Defendant Weitz has submitted a twenty page affidavit which details his contacts with plaintiff and comments on all of plaintiff's visits for sick call.[FN3] Defendant Weitz's affidavit chronologically details all of the dates and states whether plaintiff was seen by other medical personnel or treated by defendant Weitz.

> FN1. The facts set forth in this section are taken from: (1) the Second Amended Complaint; (2) the Answer; (3) Defendants' Statements of Material Facts; (4) the exhibits and evidence submitted by Defendants in support of their Motions for Summary Judgment; (5) plaintiff's deposition transcript; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment. Plaintiff does not dispute the accuracy of the facts. In opposition to the motion, plaintiff provided copies of several grievances filed in 2008. The Court has reviewed those submissions and determines that they are not relevant to the issues at hand and therefore, will not be

considered within the context of these motions.

> FN2. Officer Nelson is not a defendant in this action but provided an affidavit in support of defendants' motion.

> FN3. Defendant Weitz summarizes plaintiff's medical treatment from January 2004 until July 2006. The relevant portions of plaintiff's medical records are sealed medical records on file with the court. As plaintiff has not objected to the admissibility of these records, the Court accepts the medical records as evidence and the statements contained therein as true. See *Jackson v. Onondaga County,* 1998 WL 713453, at *5 (N.D.N.Y.1998).

Plaintiff has been arrested over 70 times in the past 20 years and has spent most of his adult life in and out of correctional facilities on various charges and convictions. Since 2000, plaintiff has been housed at SCJ on 16 separate occasions.[FN4] Plaintiff claims that he suffers from herniated discs in his neck and lower back, torn ligaments in his knee, post-traumatic stress disorder ("PTSD"), bi-polar disorder and depression.

> FN4. Plaintiff was incarcerated at SCJ from 2000-2005. However, for the purposes of the within motion, only he relevant dates of his confinement and medical treatment are summarized herein.

### Plaintiff's Incarceration from 2004 until 2005

Plaintiff was incarcerated at SCJ from January 2004 until January 2005. On January 29, 2004, plaintiff was evaluated by a social worker at SCJ. Plaintiff denied suicidal and homicidal ideation and was found not to be an "imminent risk" to himself or others. On February 27, 2004, a nurse practitioner examined plaintiff and prescribed Flexeril for his back pain.[FN5] At plaintiff's request, the nurse agreed to discuss plaintiff's mental health complaints with Dr. Weitz. On March 2, 2004, Dr.Weitz evaluated plaintiff's mental health condition and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

consulted with Kelly Farnum, N.P., at Schoharie County Mental Health Clinic.[FN6] Dr. Weitz and Nurse Farnum discussed plaintiff's medical condition and agreed that Dr. Weitz would prescribe Prozac and Depakote.[FN7] On March 23, 2004, plaintiff was seen Nurse Farnum upon Dr. Weitz's request. Nurse Farnum noted that plaintiff was cooperative, his thoughts were organized and goal directed and plaintiff denied any suicidal or homicidal tendencies. Nurse Farnum noted that plaintiff's impulse was "intact during interview" but that his insight and judgment were "poor" and his intelligence was, "below average". Nurse Farnum suggested that plaintiff continue with his current medication.

FN5. Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 725 (31st ed.2007).

FN6. Kelly Farnum treated plaintiff prior to his incarceration.

FN7. Prozac is used in the treatment of depression and obsessive-compulsive disorder. *Id.* at 730, 1562. Depakote is used in the treatment of manic episodes associated with bipolar disorder. *Id.* at 497, 565.

**\*2** In April 2004, the medical staff at SCJ noted that plaintiff requested a transfer to "Mercy" or another "psychiatric hospital". The staff denied this request concluding that plaintiff had "adequate care" and that he was "manipulating for psychiatric hospitalization". In May 2004, plaintiff demanded to be seen by a psychiatrist. The medical staff discussed plaintiff's request with Dr. Weitz and an appointment was made for plaintiff to see Dr. Warren Becker at Schoharie County Mental Health Clinic.

On May 18, 2004, plaintiff was treated by a nurse practitioner after complaining that he hurt his right knee playing basketball. The nurse noted that plaintiff's range of motion was intact but his patella was tender. The nurse diagnosed plaintiff with a right knee strain and prescribed Bextra.[FN8]

FN8. Bextra is an anti-inflammatory used for symptomatic treatment of osteoarthritis or rheumatoid arthritis. *Dorland's* at 215, 2048.

On June 15, 2004, Nurse Practitioner Nancy McDonald at SCJ noted that plaintiff was refusing to take his medication including Bextra, Wellbutrin, Flexeril, Depakote and Amoxicillin.[FN9] Plaintiff reported that he did not take his medications because they "masked the problems".

FN9. Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

On June 25, 2004, plaintiff was taken to Bassett Hospital with a prescription from Dr. Weitz for x-rays of his cervical spine, thoracic spine and lumbar spine. The x-rays revealed mild degenerative changes in the lumbar spine. Plaintiff was advised to avoid playing basketball and other outdoor recreation.

On July 28, 2004, plaintiff was examined by Dr. Warren Becker, a psychiatrist at Schoharie County Mental Health Clinic.[FN10] Dr. Becker found that plaintiff did not display any psychiatric disorder that required medication but noted that the medication would make him "feel calmer". Dr. Becker found plaintiff to be polite and cooperative and did not conclude that he was suffering from PTSD.

FN10. Plaintiff made a request for his own psychiatrist and that request was denied. Plaintiff did not file a grievance with respect to that denial.

On August 24, 2004, plaintiff requested a knee brace so that he could play basketball. Plaintiff was seen by a nurse practitioner on August 30, 2004 and complained that he "went to jump up and when he came down, the right knee buckled". Plaintiff was diagnosed with a right knee strain. The nurse practitioner told plaintiff to avoid basketball and ordered a knee brace. On September 27, 2004, plaintiff requested a different knee brace claiming that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

neoprene knee brace he was wearing did not allow for the proper lateral movement of his knee. Nurse McDonald advised plaintiff that his brace was sufficient but stated she would discuss the issue with Dr. Weitz. Dr. Weitz stated that plaintiff needed an orthopedic evaluation to determine his need for a brace. Plaintiff was advised that an appointment would be made for a consultation.

On November 4, 2004, plaintiff was examined by Dr. Shep Friedman, an orthopedist at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament ("ACL") tear. Dr. Friedman suggested exercise and possible surgery. Dr. Friedman indicated that a brace was medically necessary and that he would speak with someone at the jail to discuss a more supportive brace that would meet jail guidelines. The medical staff told plaintiff that if the facility paid for the brace, it would become facility property when he was transferred. Sgt. Newman and Sgt. Santoro gave Nurse McDonald permission to purchase the brace.[FN11]

> FN11. On December 14, 2004, the brace arrived at SCJ but did not comply with the facility's standards.

**\*3** In December 2004, plaintiff refused to wear a neoprene knee brace. In January 2005, Dr. Friedman re-examined plaintiff and found a normal gait and normal range of motion with some tenderness in the right knee. Dr. Friedman diagnosed plaintiff with a chronic ACL tear and noted that the jail would not permit plaintiff to use a brace with metal stays outside of his cell. Dr. Friedman suggested surgical intervention or conservative measures including physical therapy.

**Plaintiff's Incarceration in 2006**

Plaintiff was incarcerated at SCJ in June 2006 and remained there until August 24, 2006 for a parole violation.[FN12] During the three months that he was incarcerated at SCJ in 2006, plaintiff filed 102 separate **inmate** requests and approximately 12 medical requests.

> FN12. Defendants allege that plaintiff was

admitted on June 7, 2006. Plaintiff claims he was admitted on June 5,

In June 2006, upon plaintiff's arrival at SCJ, Sgt. Newman noted that plaintiff had an "old black knee brace in his personal property. Issued a new blue knee brace-must be returned upon release".

**Plaintiff's Medical Treatment-2006**

On June 9, 2006, plaintiff completed a medical request form complaining of dizziness and insomnia. The same day, plaintiff was prescribed Prozac. On June 10, 2006, plaintiff completed another medical request complaining of pain in his right leg. Plaintiff was seen by a member of the medical staff and prescribed 800 mg of Motrin.

On June 15, 2006, Dr. Weitz examined plaintiff and noted a history of low back pain and degenerative disc disease of his lower spine. Upon examination, Dr. Weitz found that plaintiff could walk without limping, had no motor sensory loss and no symptoms with straight leg raises. Dr. Weitz diagnosed plaintiff with low back pain and prescribed Flexeril. On the same day, plaintiff completed a medical request asking for medication called "trigosamine", a consultation with a neurosurgeon, a back brace and back surgery. Plaintiff also refused to see Dr. Weitz. Plaintiff was seen by Melissa Becker, a nurse practitioner, who noted that plaintiff's request was for an herbal remedy that was not FDA regulated. Nurse Becker noted, "I am not ordering unnecessary testing. I am trained medically to make judgment decisions."

On June 16, 2006, plaintiff submitted a grievance claiming that he was denied a back brace and adequate x-rays for herniated discs. On June 21, 2006, after an investigation, Officer Nelson concluded that plaintiff was unwilling to follow the course of action recommended by the medical staff and refused to take prescribed medication and Motrin. Therefore, Officer Nelson responded to the grievance stating, "I have no choice but to deny this grievance". Plaintiff appealed the decision to Lt. Hazzard who found that, "[y]ou again are refusing any course of action by medical. They have a plan set up which they discuss with you and you refuse to abide by it. Grievance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

denied". Plaintiff appealed Lt. Hazzard's decision to the Citizens Policy and Complaint Review Council ("CPCRC") and on August 10, 2006, CPCRC issued a decision denying plaintiff's grievance.

**\*4** On June 18, 2006, plaintiff complained of severe pain in his lower back. Plaintiff was treated on June 19, 2006 and advised to continue with his medications. On July 19, 2006, plaintiff requested a hinged knee brace. On July 20, 2006, plaintiff's medications were increased.

On July 21, 2006, at approximately 2:00 a.m., plaintiff allegedly sustained a knee injury when his knee, "gave out" while he was in the medical holding cell.[FN13] Officer Nelson claims that he went to plaintiff's cell at approximately 3:00 a.m. and that plaintiff demanded to be taken to the emergency room immediately and refused to wear his knee brace. Officer Nelson claims that at approximately 3:12 a.m., he spoke with Dr. Weitz by telephone who directed Officer Nelson to put the brace on plaintiff's knee for the rest of the evening. Dr. Weitz further advised Officer Nelson that the medical staff would examine plaintiff the next morning at the facility. Plaintiff claims that he did not put his brace on because his knee "swelled up".

> FN13. Plaintiff refers to this incident as the "give way" episode.

Later the same day, plaintiff was seen by Nurse Becker who noted that plaintiff's knee was tender to the touch with minimal swelling. Nurse Becker convinced plaintiff to use the brace but plaintiff insisted that he be taken to the emergency room to be fitted for a metal brace.[FN14] The nurse recommended that plaintiff be evaluated and "scanned".

> FN14. Plaintiff claims that he was not examined by any member of SCJ medical staff prior to being seen at the emergency room. Officer Nelson claims that when he advised plaintiff that he would be examined in the morning, plaintiff requested, completed and submitted a Pre-Grievance form. Sgt. Newman claims that he denied the grievance on July 24, 2006 because

plaintiff was taken to the hospital on July 21, 2006 and July 24, 2006. Sgt. Newman asserts that plaintiff accepted the decision and that plaintiff took no further action with respect to that grievance.

On July 21, 2006, at approximately 1:45 p.m., plaintiff was seen in the Bassett Hospital Emergency Room. Plaintiff claims he was in "severe" pain. The doctors in the emergency room prescribed Tylenol, wrapped the knee in an ace bandage and advised plaintiff to rest. The doctors also suggested that plaintiff follow with Dr. Friedman. Plaintiff claims he was able to walk out of the hospital because he was "injected" with pain medication. Plaintiff testified that within an hour or two, he was "feeling no pain". On July 21, 2006, upon plaintiff's return from the hospital, plaintiff was involved in an incident with the SCJ correctional staff. Plaintiff admitted to engaging in a verbal exchange with the staff and also admitted that he kicked one of the Corrections Officers.[FN15]

> FN15. On August 10, 2006, Sgt. Newman presided over a disciplinary hearing and issued an **Inmate** Hearing Disposition sanctioning plaintiff to 40 days punitive segregation. Plaintiff was transferred out of SCJ on August 24, 2006 and did not complete his sentence.

On July 24, 2006, plaintiff was examined by Dr. Friedman at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament tear with some arthritic change and limited range of motion. Dr. Friedman noted that plaintiff was fitted for a "Genu ACL brace" which plaintiff was "comfortable with".

From July 24, 2006 through August 24, 2006, plaintiff was permitted to wear the hinged knee brace. On August 24, 2006, Officer Mace escorted plaintiff to the Elmira Correctional Facility ("ECF") and upon arrival, advised ECF staff that the brace needed to be returned to SCJ. The ECF staff removed the brace from plaintiff, outside of Officer Mace's presence. Officer Mace returned the brace to the SCJ.

**Plaintiff's Request for a Catholic Priest**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

On June 9, 2006, plaintiff submitted an **Inmate** Request seeking "religious assistance" from a Catholic priest. Plaintiff received a response from Cpl. Rodriguez-Stanley which stated, "I contacted our jail Chaplain Rev. Ferenczy, and he will try to reach the local Catholic priest to see when he could come out and see you". According to Lt. Hazzard, the SCJ staff, including the facility Chaplain, Reverend Paul Ferenczy, made efforts to obtain the services of a Catholic priest. Plaintiff testified that he previously met with Rev. Ferenczy. On June 26, 2006, plaintiff filed a grievance claiming that he was being denied his, "First Amendment of not having his Catholic religion for 'no' reason at all". Plaintiff claimed that SCJ was deliberately violating the "Religious Freedom Restoration Act". Plaintiff sought to have "Catholic servicers [sic]". Lt. Hazzard explained to plaintiff that ongoing efforts were being made to obtain the services of a Catholic priest. According to Lt. Hazzard, plaintiff accepted that explanation. On June 29, 2006, plaintiff's request for rosary beads was granted. In August 2006, Lt. Hazzard denied plaintiff's grievance noting that, "[e]very attempt was made to get [ ] Catholic priest into facility, our own Chaplain had been trying to assist us. **Inmate** was sent back to state on August 24, 2007".[FN16]

FN16. According to the record, plaintiff was transferred to ECF in August 2006.

**Plaintiff's Access to Courts**

*5 Plaintiff testified that while incarcerated at SCJ, he filed four lawsuits. Moreover, his requests for addresses, supplies and a notary were routinely granted. On June 13, 2006, plaintiff submitted an **Inmate** Request seeking, "[l]egal reference material called Chapter on Parole and on Article 78 from the Jailhouse Lawyer Manual New Edition". On June 15, 2006, plaintiff filed a second **Inmate** Request with respect to the materials. On June 16, 2006, plaintiff was advised that the Jailhouse Lawyer Manual, "is not required library material set forth in minimum standards as outline by Commission of Corrections". On June 16, 2006, plaintiff filed two grievances with regard to this issue. Plaintiff sought to have all forms and chapters referenced in his prior request provided immediately and sought copies from the

Jailhouse Lawyer Manual on Article 78 and parole and all legal forms from that book, "when requested in the future". Officer Nelson claims that Cpl. Wood investigated the issues and prepared a report. After reviewing the report, Officer Nelson concluded that SCJ was not required to maintain the requested information. On June 21, 2006, Officer Nelson issued a decision stating that, "[a]ll legal reference materials required by NYSCOC minimum standards are available for your review in the facility library and case law copies are available, as you well know, by request. Grievance Denied". Lt. Hazzard reviewed Officer Nelson's decisions and upheld the denial. In July 2006, plaintiff made at least three requests for extended library time and all requests were granted. Plaintiff appealed the determination to the CPCRC and on August 10, 2006, the CPCRC denied plaintiff's grievance.

**Prior Litigation**

On May 11, 2005, plaintiff filed an Amended Complaint in an action entitled *Joseph Paul Guarneri v. John Bates, Jr., Lt. Hazzard, Mr. Santoro, Mr. Newman, Roland Hirot, Mr. Gordon, Paul Marsh, Jr., Schoharie County Jail Medical Department, Dr. Weitz, Nancy McDonald, State Commission of Correction, Frederick C. Lamy, Frank T. Sullivan and Eliot Spitzer,* 05-CV-444 (GLS/DRH) (Dkt. No. 5) (*"Guarneri I"*).[FN17] That action involved plaintiff's medical treatment while he was incarcerated at SCJ from January 2004 until January 2005. Plaintiff alleged that the defendants violated his right to medical care under the Eighth Amendment. Specifically, plaintiff alleged that during the course of his arrest on January 5, 2004, he sustained from a rotator cuff tear in his shoulder that caused him severe pain. Plaintiff claimed that the defendants were deliberately indifferent to his medical needs with regard to the shoulder injury. Further, plaintiff alleged that he suffered from knee injuries and that the defendants were deliberately indifferent to his needs as they refused to allow plaintiff to wear his hinged knee brace outside his cell.

FN17. Plaintiff's original complaint was filed on April 15, 2005. On May 3, 2005, Judge Sharpe issued a Decision and Conditional Order of Dismissal directing plaintiff, *inter alia,* "to set forth a short and plain statement of the alleged wrongdoing or misconduct committed by each

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

defendant, the date of the conduct complained of
and the nexus between that conduct and
plaintiff's constitutional and statutory rights in
order that the Court can properly assess the
sufficiency of plaintiff's claims." *See Guarneri v.
Bates,* 05-CV-444 (Dkt. No. 3).

On May 31, 2007, the defendants filed motions for
summary judgment seeking dismissal of plaintiff's
complaint. *See Guarneri v. Bates,* 05-CV-444, (Dkt. No.
72). The matter was referred to U.S. Magistrate Judge
David R. Homer for a Report and Recommendation. In his
report, Magistrate Judge Homer provided a factual
"Background" that included a discussion of plaintiff's
medical treatment from August 2004 through January
2005. Magistrate Judge Homer found that plaintiff's
shoulder injury may constitute a serious medical need,
however, plaintiff failed to establish that the defendants
were deliberately indifferent. (Dkt. No. 86). Moreover,
Magistrate Judge Homer found that plaintiff failed to offer
evidence that his knee injury was serious or that the
defendants were deliberately indifferent. Accordingly
Magistrate Judge Homer recommended that the Court
grant the defendants' motions for summary judgment and
dismissal of all claims. (Dkt. No. 86).

**\*6** On March 10, 2008, District Judge Gary L. Sharpe
issued a Memorandum-Decision and Order accepting and
adopting Magistrate Judge Homer's Report and
Recommendation in its entirety. (Dkt. No. 88).

## SECOND AMENDED COMPLAINT AND
## PROCEDURAL HISTORY

On August 14, 2006, plaintiff filed a complaint in this
action.[FN18] On February 7, 2007, plaintiff filed a Second
Amended Complaint. Specifically, plaintiff alleges two
causes of action under the First Amendment: (1) denial of
meaningful access to courts; and (2) denial of religious
freedom. Plaintiff also asserts causes of action with regard
to his religious freedom pursuant to the RFRA and the
Fourteenth Amendment. Plaintiff also alleges that
defendants violated the Eighth Amendment claiming that:
(1) defendants did not allow him to keep his hinged knee
brace upon arrival at ECF; (2) defendants delayed in
providing adequate emergency treatment in July 2006; (3)

plaintiff received inadequate emergency care in 2000 and
2003 for herniated discs; and (4) defendants denied
plaintiff proper medical care by refusing to provide a back
brace.

> **FN18.** On August 14, 2006, plaintiff filed a
> complaint in this action. (Dkt. No. 1). Plaintiff
> was named as a "co-plaintiff" with another
> **inmate**, Ryan McNamee. On November 9, 2006,
> this Court issued a Decision and Order severing
> plaintiff's action from the action of Ryan
> McNamee and directing plaintiff to file an
> amended complaint that, "sets forth only his
> claims for relief and the facts in support of his
> claims". (Dkt. No. 9).

On June 13, 2007, defendant Weitz filed a motion
pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6) seeking
dismissal of plaintiff's complaint arguing that: (1) he was
not personally involved in the deprivation of plaintiff's
knee brace and in plaintiff's medical care; (2) the
complaint failed to state a cause of action; (3) the
complaint was barred by res judicata and collateral
estoppel; and (4) the claims relating to plaintiff's back
were barred by the statute of limitations. (Dkt. No. 19).
The motion was referred to Magistrate Judge Homer for a
Report and Recommendation. On February 6, 2008,
Magistrate Judge Homer concluded that plaintiff failed to
allege how Dr. Weitz was involved in the deprivation of
his knee brace upon his arrival at ECF and recommended
granting Weitz's motion for summary judgment based
upon lack of personal involvement with the confiscation of
the knee brace. However, Magistrate Judge Homer also
found that plaintiff sufficiently alleged that Dr. Weitz was
personally involved in his medical care for mental health
issues and back and neck injuries sustained in 2003.

Magistrate Judge Homer also found that plaintiff
sufficiently alleged an Eighth Amendment violation with
respect to his knee injury, mental health and 2003 back
injury and recommended denial of Weitz's motion on that
ground.[FN19] However, plaintiff's claims relating to medical
indifference occurring in 2000 were "clearly outside the
three-year [statute of limitations] period". With regard to
Weitz's res judicata argument, Magistrate Judge Homer
concluded that there had not been a final determination in
the pending federal case (09-CV-444) against Dr. Weitz

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

and therefore, that aspect of the motion should be denied without prejudice. On February 27, 2008, this Court adopted Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 55).

> FN19. In the Conclusion portion of the recommendation, Magistrate Judge Homer did not address defendant's motion with respect to plaintiff's Eighth Amendment claim with regard to his knee injury. However, in the text of the Report and Recommendation, Judge Homer discussed plaintiff's knee injury. Judge Homer noted:
>
> > [C]onstruing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.
>
> > Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.
>
> > Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.
>
> (Dkt. No. 54).

**\*7** Presently before the Court are two motions for summary judgment. Defendant Weitz moves for summary judgment and dismissal of plaintiff's complaint arguing that: (1) plaintiff's claims are precluded under the doctrine

of res judicata and collateral estoppel; (2) plaintiff cannot establish that defendant was deliberately indifferent to any serious medical condition relating to plaintiff's knee, back or mental health treatment; (3) plaintiff cannot demonstrate defendant's personal involvement in medical decisions concerning plaintiff's emergency medical treatment in 2003 for herniated discs; (4) plaintiff's claim of mistreatment of a back injury in 2003 is precluded by the statute of limitations; and (5) Dr. Weitz is entitled to qualified immunity. (Dkt. No. 70). Defendants Hazzard, Marsh, Grippin, Mace, Howland, Cronk and the County of Schoharie move for summary judgment arguing: (1) plaintiff did not suffer from a serious medical need with respect to his knee, back and mental health and even assuming plaintiff suffered from serious medical need(s), defendants were not deliberately indifferent to plaintiff's condition(s); (2) plaintiff was not denied the ability to freely exercise his religious beliefs; (3) plaintiff was not denied equal protection on account of his religious beliefs; (4) plaintiff was not denied meaningful access to the courts; (6) defendants were not personally involved in the alleged constitutional deprivations; and (7) defendants are entitled to qualified immunity. (Dkt. No. 71). Plaintiff opposes the motions. (Dkt. No. 77).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts ("Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that those facts are supported by the evidence in the record. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 243 (2d Cir.2004)* (holding that the court may not rely solely on the movant's statement of undisputed facts contained in its Rule 56.1 statement and must be satisfied that the movant's assertions are supported by the evidence in the record). Although a plaintiff is *pro se*, bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment. *See Higgins v. Davis, 2001 WL 262930, at *2 (S.D.N.Y.2001)*.

**\*8** "Defendants can meet their burden of establishing their entitlement to motion for summary judgment by relying on plaintiff's medical records to establish the absence of any evidence supporting deliberate indifference to his mental health needs." *Mills v. Luplow, 2009 WL 2579195, at *8 (W.D.N.Y.2009)*. Though conventional wisdom might dictate the submission of affidavits from the primary actors ... [the] defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's claims, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims." *Id.*

## II. Collateral Estoppel/Res Judicata

Defendant Weitz seeks dismissal of plaintiff's claims based upon res judicata arguing that plaintiff should be precluded from "splitting" his claims into separate actions when he had, "a full and fair opportunity to litigate his claims in the previous lawsuit".[FN20]

> **FN20.** Plaintiff does not respond to this argument.

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits in an action "precludes the parties or their privies from relitigating issues that were or could have been raised in that action". *Computer Assoc. Int'l v. Altai, Inc., 126 F.3d 365, 369 (2d Cir.1997)*. "It must first be determined that the second suit involves the same 'claim' or 'nucleus of operative fact' as the first suit". *Interoceanica v. Sound Pilots, Inc., 107 F.3d 86, 90 (2d Cir.1997)* (citation omitted). New York law follows a transactional approach which bars the relitigation of not only matters that were litigated between parties in a preceding action, but also any matters that could have been litigated in that action. *Ramsey v. Busch, 19 F.Supp.2d 73, 83 (W.D.N.Y.1998)*. To ascertain whether the two actions arise from the same claim, courts look to whether the underlying facts are "related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations". *Interoceanica, 107 F.3d at 90* (citations omitted). A plaintiff cannot avoid claim preclusion by " 'splitting' his claim into various suits based on different legal theories (with different evidence 'necessary' to each suit)". *Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 110 (2d Cir.2000)* (citing *Woods v. Dunlop Tire Corp., 972 F.2d 36, 39 (2d Cir.1992)*).

"As a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play." *Maharaj v. Bankamerica Corp., 128 F.3d 94, 97 (2d Cir.1997)* (citing *S.E. C. v. First Jersey Secs., 101 F.3d 1450, 1464 (2d Cir.1996)*); *see also Waldman, 207 F.3d at 113* (res judicata will not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was itself based on earlier acts). "Claims arising after the prior action need not, and often perhaps could not, have been brought in that action and are not barred by res judicata unless they represent a continuance of the same 'course of conduct' ". *Stewart v. Transport Workers Union of Greater New York, Local 100, 561 F.Supp.2d 429, 443 (S.D.N.Y.2008)* (citing *Green v. Illinois Dep't of Transp., 609 F.Supp. 1021, 1026 (N.D.Ill.1985)*) (the court declined to read the doctrine of res judicata to require the plaintiff to amend his first complaint to allege a claim that arose after the suit had been filed). A party may file a supplemental pleading but it not required to do so and may file a new suit if he chooses. *Garcia v. Scoppetta, 289 F.Supp.2d 343, 350 (E.D.N.Y.2003)*. In *Maharaj,* the Second Circuit held:

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

**\*9** If, after the first suit is underway, a defendant engages in actionable conduct, plaintiff may-but is not required to-file a supplemental pleading setting forth defendant's subsequent conduct. Plaintiff's failure to supplement the pleadings of his already commenced lawsuit will not result in a res judicata bar when he alleges defendant's later conduct as a cause of action in a second suit.

*Maharaj,* 128 F.3d at 97.

Res judicata, if applied too rigidly, could work considerable injustice. *Reilly v. Reid,* 45 N.Y.2d 24, 28, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978) (holding that claim preclusion is tempered by recognition that two or more different and distinct claims or causes of action may often arise out of a course of dealing between the same parties) (citations omitted). "A party's choice to litigate two such claims or causes of action separately does not bar his assertion of the second claim or cause of action." *Id.* at 29, 407 N.Y.S.2d 645, 379 N.E.2d 172 (citation omitted).

In May 2005, plaintiff filed his complaint in *Guarneri I* alleging constitutional violations relating to medical care for his shoulder and knee injuries.[FN21] On August 14, 2006, while *Guarneri I* was pending, plaintiff filed a complaint in the instant action alleging constitutional violations relating to medical care for his knee, back, neck and mental health issues. Defendant argues that plaintiff is attempting to "split" his claims and that he "could have raised the claims at issue here in the previous action". Defendant contends that "most of the complaints and treatment relating to [plaintiff's] back and mental health complaints occurred in 2004, the same period of time at issue in his previous lawsuit".

    FN21. Plaintiff has made no claims with regard to his shoulder in this action.

It is undisputed that a final judgment on the merits was entered in *Guarneri I.* However, in *Guarneri I,* plaintiff did not allege any violations with respect to his back, neck or mental health issues. Applying the "transactional" approach for res judicata purposes, the Court finds that the claims and factual circumstances in the present action pertain to a different time period and are not sufficiently related in time, space and origin. In both actions, plaintiff alleged constitutional violations relating to medical treatment for his knee. However, plaintiff was examined by Dr. Weitz in June 2006 and the "give way" incident occurred in July 2006. Thus, these "legally significant" acts occurred after the complaint was filed in *Guarneri I* and are not precluded under res judicata. Defendants argue that when plaintiff testified at his deposition in *Guarneri I,* the medical treatment about which plaintiff complained in the instant action had already occurred. While the record supports that assertion, the appropriate analysis involves the date of the filing of the first complaint, not the date of the deposition. Based upon the record before the Court in *Guarneri I* and the record in the present action, the factual scenarios and evidence relevant to *Guarneri I* and the present action are sufficiently different such that a judgment in the present action will not destroy or impair the rights or interests established in *Guarneri I. See Ramsey v. Coughlin,* 94 F.3d 71, 83 (2d Cir.1996). Accordingly, Weitz's motion for summary judgment and dismissal of plaintiff's claims based upon res judicata is denied.

**III. Eighth Amendment**

**\*10** Defendants claim that they are entitled to summary judgment and dismissal of plaintiff's § 1983 claims because plaintiff cannot demonstrate that any defendant was deliberately indifferent to any serious medical need.

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."[FN22] *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

FN22. Plaintiff claims that he was a pretrial detainee and enjoyed greater privileges than a convicted **prisoner**. However, plaintiff offers no support for this allegation. "As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by **inmates** serving prison sentences." *McQueen v. County of Albany*, 2010 WL 338081, at *10 (N.D.N.Y.2010) (citing *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir.2003)). However, the Second Circuit has held that, "[c]laims for deliberate indifference to a serious medical condition of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.2009).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). A medical condition is considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996). If unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the **inmate** to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir.2000)). "Because there is no distinct litmus test, a serious medical condition is determined by factors such as '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain.' " *Whitcomb v. Todd*, 2008 WL 4104455, at *10 (N.D.N.Y.2008) (citing *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir.2003)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent

failure to provide adequate medical care. *Sonds*, 151 F.Supp.2d at 310 (citing *Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the **inmate's** health or safety. *Sonds*, 151 F.Supp.2d at 310 (citing *Chance*, 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*11** Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Jones v. Lindblad*, 2009 WL 804155, at *6 (W.D.N.Y.2009) (citing *Estelle*, 429 U.S. at 104). Culpable intent requires the **inmate** to establish both that a prison official "has knowledge that an **inmate** faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* (citing *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir.1996)). Delays must be purposeful or intended or the plaintiff must establish that the deprivation of not having treatment in the stated period was sufficiently serious. *Woods v. Goord*, 1998 WL 740782, at * 12 (S.D.N.Y.1998).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds*, 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to **inmates**. *Id.* An **inmate** does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986). The fact that a plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id; see also Whitcomb*, 2009 WL 4104455, at *10 (noting that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a § 1983 claim). Even if medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an **inmate**. *Dean*, 804 F.2d at 215.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

**A. Knee Injury**

Defendants argue that plaintiff did not suffer from a serious knee injury and further, that plaintiff received prompt medical attention after the "give way" episode in his cell. Plaintiff claims that the "give way" episode occurred at 2:00 a.m. and that he did not receive medical treatment until five hours later. Plaintiff alleges that defendants deliberately and intentionally denied plaintiff emergency medical care after the episode.

**1. Serious Medical Need**

A plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *Lowman v. Perlman,* 2008 WL 4104554, at *5 (N.D.N.Y.2008) (citing *Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y.2006)). Generally, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection". *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a **prisoner's** torn meniscus suffered in a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D.N.Y.2006)) (holding that a "medial meniscal tear, with joint effusion" which did not render the plaintiff immobile was not a serious medical need); *see also Williamson,* 2006 WL 1977438, at *9-16 (knee injuries such as a torn meniscus, arthritis, degenerative joint disease and ligament tears are not serious injuries under the Eighth Amendment).

*12 In this matter, plaintiff alleges that he suffers from severe pain and torn ligaments in his knee. Plaintiff's claim that he suffers from an ACL tear is supported by Dr. Friedman's diagnosis. However, in *Guarneri I,* Magistrate Judge Homer concluded that, "the allegations of pain and chronic ACL tear do not constitute a serious medical need in these circumstances". The record in *Guarneri I* included medical records from 2004 through 2005. In the instant action, plaintiff has not produced any additional evidence demonstrating that he suffers from a serious medical condition with respect to his knee. Plaintiff never exhibited any limitations in his range of motion and never complained of an inability to ambulate. Indeed, plaintiff

continued to played basketball even after he was advised, on more than one occasion, by medical staff to avoid outdoor recreation. *See Price v. Engert,* 589 F.Supp.2d 240, 245-46 (W.D.N.Y.2008) (citing *Chatin v. Artuz,* 28 F.App'x. 9, 10 (2d Cir.2001)) (two weeks after receiving alleged injuries, the plaintiff was able to play basketball, suggesting that he was not in serious pain and that his injuries did not interfere with his daily activities); *see also Lowman,* 2008 WL 4104554, at *5 (the fact that the plaintiff was able to walk and play basketball suggested that the plaintiff did not suffer from a serious medical need). Plaintiff's claim that he suffered from "severe pain" as a result of his knee injury is contradicted by the medical records wherein plaintiff exhibited a "normal gait" and "no swelling or difficulty walking".

On July 21, 2006, the "give-way" episode occurred in plaintiff's cell. Plaintiff was evaluated by a nurse practitioner who noted that plaintiff ambulated without a limp and found minimal swelling in the knee with tenderness upon palpation. Plaintiff testified that he was in severe pain prior to being treated in the emergency room but that after he received an injection of pain medication, he was "feeling no pain". Indeed, within an hour or two of his return to SCJ, plaintiff had a physical altercation with Correction Officers and kicked "multiple sealed doors off the hinges". Thus, even assuming plaintiff suffered extreme pain after the "give way" episode, such a short period of pain is de minimis and does not constitute a serious medical condition under the Eighth Amendment. The medical evidence pertaining to plaintiff's knee injury/complaints fails to establish that plaintiff suffered from a serious or urgent medical condition. Plaintiff failed to provide any medical evidence, either with affidavits or medical records, that defendants' failure to provide treatment caused serious harm.

**2. Deliberate Indifference**

Even assuming plaintiff had a "serious medical need", plaintiff cannot establish that defendants were deliberately indifferent. This court has carefully outlined the extensive attention that plaintiff received for his complaints. From January 2004 until August 2006, plaintiff was examined and/or treated by the medical staff at SCJ or outside medical personnel approximately thirty times. In addition, after plaintiff made a request for a knee brace, Dr. Weitz

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

arranged for an orthopedic consultation with Dr. Friedman. During the relevant time period, plaintiff had three appointments with Dr. Friedman-including an appointment three days after the "give way" episode. Plaintiff's complaints were never ignored, and in most instances, plaintiff only waited a few days to see medical personnel.

*13 Plaintiff's complaints of deliberate indifference are also contradicted by the fact that he received several prescription medications including Bextra, Flexeril and Motrin for knee pain. According to the record, plaintiff was non-compliant and refused to take the medications claiming that they "masked his symptoms". Plaintiff's history of refusing to comply with the directions of the medical staff and physicians undermines his claims of deliberate indifference. See Wright v. Genovese, 2010 WL 890962, at *15 (N.D.N.Y.2010) (citing Jones v. Smith, 784 F.2d 149, 151-52 (2d Cir.1986)). In addition to medication, during his incarceration in 2004, the medical staff also offered plaintiff support for his knee including a neoprene brace. Plaintiff refused to wear the brace. Upon his arrival at SCJ in June 2006, plaintiff presented with an "old knee brace" and was provided with a new knee brace on the same day.

Plaintiff claims that his requests for physical therapy and injections were intentionally denied. Based upon the record, the medical staff deemed the requests "not medically necessary" as plaintiff did not exhibit objective signs of a serious injury. The fact that plaintiff disagreed with the course of treatment does not rise to a level of deliberate indifference and provides no basis for relief under § 1983.

Even crediting plaintiff's claim that he waited five hours for medical care after the "give way" episode, the timing of these events does not establish a disregard of a risk to plaintiff or "deliberate indifference" to his medical needs. Shankle v. Andreone, 2009 WL 3111761, at *6 (E.D.N.Y.2009) (citations omitted). Although the record contains conflicting accounts with regard to how quickly the medical staff responded to plaintiff's needs, by his own admission, plaintiff was treated within five hours of the incident. Courts have held that delays longer than five hours were insufficient to implicate the Eighth Amendments. See Rodriguez v. Mercado, 2002 WL

1997885, at *9 (S.D.N.Y.2002) (the plaintiff was seen within eight or nine hours of the incident); see also Davidson v. Harris, 960 F.Supp. 644, 648 (W.D.N.Y.1997) (holding that even assuming that the plaintiff's factual allegations were true and that he was forced to wait six to eight hours before receiving oxygen and pain medication, the plaintiff has failed to demonstrate that the alleged deprivation was "a condition of urgency, one that may produce death, degeneration or extreme pain", and therefore, failed to state a cause of action of deliberate indifference to serious medical needs).

Plaintiff's conclusory assertions that he received improper medical attention, absent other documentation, fails to constitute evidence sufficient to raise issues of fact to defeat summary judgment. See Williams v. Coughlin, 650 F.Supp. 955, 957 (S.D.N.Y.1997) (granting summary judgment where "plaintiff's affidavit and deposition ... [did] not contain facts involving manifestations of ... deliberate indifference ..."). Indeed, plaintiff's complaints are contradicted by the record which establishes that plaintiff received more than adequate medical care for his knee complaints.

*14 Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claims that defendants violated his Eighth Amendment rights with regard to his knee injury is granted.

**B. Knee Brace**[FN23]

> **FN23.** This Court previously granted Weitz's motion to dismiss plaintiff's claim with regard to the confiscation of the knee brace due to lack of personal involvement. (Dkt.Nos.54, 55).

Defendants argue that they did not interfere with plaintiff's medical treatment when they confiscated the knee brace provided to plaintiff by SCJ.

Where a "**prisoner** is receiving appropriate on-going treatment for his condition" and brings a claim for denial of adequate medical care for an "interruption in treatment," the Second Circuit has stated that the "serious

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the **prisoner**." *Smith,* 316 F.3d at 186. Plaintiff must submit some evidence that a defendant interfered with his prescribed course of treatment and caused plaintiff to suffer pain. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 270 (W.D.N.Y.1998) (holding that the plaintiff submitted evidence that the defendant's repeatedly took his cane from him on a number of occasions thereby creating an issue of fact as to whether the defendant acted with wantonness); *see also Williamson,* 2006 WL 1977438, at *18 (finding that the defendants refusal to renew the plaintiff's permit for crutches did not threaten to produce death, degeneration or extreme pain). A single, isolated occurrence, might not support an Eighth Amendment claim. *Id.*

This portion of plaintiff's claim belies his argument that defendants were deliberately indifferent to his knee condition. Plaintiff concedes that defendants provided him with a hinged knee brace after the "give way" episode in July 2006 and further, that he was permitted to wear the brace until his transfer to ECF in late August 2006. Under these circumstances, the record does not support a finding of deliberate indifference. Plaintiff has not provided evidence of any additional adverse effects or injuries stemming from the time he was forced to return the brace to SCJ to the present. There is no evidence that the deprivation of the hinged knee brace created or had the potential to create serious harm to plaintiff. Moreover, plaintiff has failed to establish that defendants "maliciously took away" his brace. *Cf. Hemmings v. Gorczyk,* 134 F.3d 104, 107 (2d Cir.1998). According to Mace's affidavit, he confiscated the knee brace upon plaintiff's transfer at the request of Lt. Hazzard. Plaintiff has failed to establish that Mace acted out of anything other than a reasonable belief that the brace was "SCJ property". Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's complaint with regard to the confiscation of the knee brace is granted.

**C. Back Injury**

Defendants allege that plaintiff's activities and refusal to take medication or adhere to the recommended course of treatment by his physicians demonstrates that he did not suffer from a serious medical need with regard to his back.

Defendants also claim that they were not deliberately indifferent to his medical needs as plaintiff was prescribed pain medication and muscle relaxants. Plaintiff alleges that defendants: (1) should have provided him with a back brace; (2) refused to provide emergency medical care for plaintiff's back injuries in 2000 and 2003 [FN24]; and (3) defendants refused to allow him to obtain treatment with a neurosurgeon [FN25].

> FN24. This Court previously determined that any allegations from 2000 were barred by the applicable statute of imitations.

> FN25. The allegations with regard to the neurosurgeon are not contained in the Second Amended Complaint. Rather, plaintiff raised the issue for the first time in his opposition to defendants' motions.

**\*15** The question of whether persistent **back pain** rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Williams v. Smith,* 2009 WL 2431948, at *8 (S.D.N.Y.2009) (although the plaintiff may have difficulty meeting the seriousness issue at trial, all inferences must be drawn in his favor at the summary judgment stage). As this Court stated in the prior Memorandum-Decision and Order:

> Other courts have held that "[s]evere **back pain**, especially if lasting an extended period of time, can amount to a 'serious **medical** need' under the **Eighth Amendment**." *Nelson v. Rodas,* 2002 WL 31075804, at *14 (S.D.N.Y.2002) (citations omitted); *see also Farraday v. Lantz,* 2005 WL 3465846, at *5 (D.Conn.2005) (holding that "persistent[ ] complain[ts] of lower **back pain** caused by herniated, migrated discs [and] sciatica ..." leading to severe **pain** constitutes a serious **medical** need).

(*See* Dkt. No. 55).

Back pain does not constitute a serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

concerns regarding pain, nor did he request pain medication beyond simple **Ibuprofen** and similar over-the-counter medications." *Jackson v. Fairchild,* 2007 U.S. Dist. LEXIS 17497, at *5-9, 2007 WL 778133 (N.D.N.Y.2007).

Based upon the record, there is an issue of fact with respect to whether plaintiff suffered from a serious back injury. Dr. Weitz noted that plaintiff complained of back pain "since his arrival to jail". Plaintiff continued to complain of back pain throughout 2004 and underwent x-rays in June 2004 which revealed mild degenerative changes in the lower spine. Conversely, the record indicates that plaintiff was prescribed Tylenol, Bextra and Flexeril for his pain but that he was not compliant with his medication and disobeyed doctor's orders by playing basketball.

Even assuming plaintiff suffered from a serious medical need, plaintiff has not submitted competent evidence demonstrating that defendants were deliberately indifferent and disregarded his health or safety. As noted previously, plaintiff's request for medical treatment were routinely granted and in most cases, within 2 days of such requests. Plaintiff was evaluated by an orthopedic specialist, was prescribed several medications for his back pain and underwent x-rays of his back at an outside facility at Dr. Weitz's request. Accordingly, plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Plaintiff alleges that defendants ignored his requests for a back brace and refused to allow him to consult with a neurosurgeon based upon non-medical concerns. Upon a review of the record, it is clear that plaintiff's requests were denied due to plaintiff's refusal to adhere to the medical staff's prescribed course of action and his unwillingness to accept medication for his complaints of pain. The record establishes that defendants were responsive to plaintiff's request but did not provide plaintiff with the specific treatment he requested. Plaintiff was provided with muscle relaxants and other prescription medication. Plaintiff clearly disagreed with defendants course of treatment. However a disagreement, without further evidence, is insufficient to sustain a cause of action for violations of plaintiff's Eighth Amendment right. Plaintiff was treated by a number of different medical

professionals who are afforded wide discretion in their treatment of **prisoners**. *See Aquino v. Kooi,* 2007 WL 201169, at *4 (N.D.N.Y.2007).

**\*16** Finally, plaintiff claims that defendants' deliberately refused to provide "emergency care" in 2003 after a slip and fall in the shower area and assault by another **inmate** at the SCJ.[FN26] As a result of the incident(s), plaintiff claims that he sustained herniated discs in his neck and lower back. Plaintiff has not provided any competent, admissible evidence to support that allegation. Indeed, the record does not contain any evidence or medical records relating to any of plaintiff's medical treatment in 2003 either within or outside of SCJ. The record is also devoid of any medical requests for treatment or any other complaints by plaintiff of pain in his neck.

> FN26. From a review of the complaint, the Court is unable to determine which event occurred in 2000 and which occurred in 2003. The Court has already determined that plaintiff's claims with respect to any injury in 2000 are precluded by the statute of limitations.

Dr. Weitz argues that he is entitled summary judgment and dismissal of plaintiff's claims relating to the denial of "emergency care" 2003 because he did not begin treating plaintiff until January 2004. The record establishes that Dr. Weitz did not treat plaintiff until January 2004 and plaintiff does not dispute this contention. Accordingly, summary judgment and dismissal of this cause of action as against Dr. Weitz is appropriate on this basis as well.[FN27]

> FN27. The Court has determined that Weitz was not personally involved in plaintiff's complaints of inadequate emergency care in 2003. Thus, the Court declines to engage in an analysis of Weitz remaining argument that any cause of action arising from the 2003 injury is barred by the statute of limitations.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claim that defendants were deliberately indifferent to his medical needs for back and neck injuries is granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

**D. Mental Health**

Defendants argue that plaintiff did not suffer from a serious mental health condition. Further, defendants claim that plaintiff cannot establish that they were deliberately indifferent to his medical needs as defendant responded to plaintiff's requests for mental health treatment and plaintiff never filed any grievance with respect to the issue. Plaintiff claims that he suffers from mental illness and that the, "psychiatric care he received can be such a substantial deviation from accepted standard as to constitute deliberate indifference". Plaintiff claims he was denied supportive therapy and follow up interviews with mental health providers.

The denial of mental health care may constitute a violation of the Eighth Amendment if plaintiff alleges "pain, discomfort or risk to health". _Mills,_ 2009 WL 2606240, at * 16 (citation omitted). Support for the claim of mental illness may be presented in the form of "medical evidence, such as a physician's diagnosis". _Selah v. N.Y.S. Docs Com'r,_ 2006 WL 2051402, at *5 (S.D.N.Y.2006) (citing _Aswegan v. Henry,_ 49 F.3d 461, 464 (8th Cir.1995)). Plaintiff must provide evidence that a condition is of urgency. See _Beckford v. Portuondo,_ 151 F.Supp.2d 204, 218 (N.D.N.Y.2001) (holding that even if the plaintiff's mental health care was "far from optimum", he was provided significant psychotropic medication, bi-weekly individual therapy sessions, and monthly medical reviews while incarcerated). Disagreements with the treatment offered or allegations that he should have received more time with a psychiatrist do not constitute deliberate indifference. _Id._ Moreover, plaintiff cannot establish a "serious medical need" when he is offered but refuses medication that may alleviate his mental anguish. _Sims v. Daley,_ 1997 WL 33608, at *5 (S.D.N.Y.1997).

**\*17** In this case, plaintiff alleges that he suffers from post-traumatic stress disorder, severe depression, anti-social disorder and bipolar disorder. Plaintiff presents conclusory allegations and fails to submit medical records or an affidavit from any physician or mental health provider to support his assertions. In fact, plaintiff's allegations are wholly inconsistent with the record. Dr. Becker opined that plaintiff did not suffer from PTSD.

Moreover, according to the record, the mental health staff at SCJ and Schoharie Mental Health Clinic continually noted that plaintiff was not a risk to others, not a suicide risk and did not display homicidal ideation.

Even assuming plaintiff could establish that his mental health condition was serious, plaintiff cannot establish that defendants were deliberately indifferent to his condition. When plaintiff began complaining of mental health issues, Dr. Weitz contacted Schoharie Mental Health Clinic and consulted with Kelly Farnum and arranged for an evaluation by Dr. Becker. The record demonstrates that each time plaintiff requested a mental health evaluation, he was seen and treated within days of the request. See _Mills_ 2009 WL 2606240, at * 17 (holding that the record demonstrated that the plaintiff received adequate care for his mental health condition while incarcerated as the plaintiff was seen by the prison's mental health staff each time he requested). In 2004, Dr. Weitz and Dr. Becker prescribed Depakote, Welbutrin and Prozac. Moreover, within a few days of arriving at SCJ in June 2006, plaintiff received a prescription for Prozac from SCJ's medical staff. Based upon the record, plaintiff cannot establish that defendants were deliberately indifferent to his mental health needs and therefore, defendants' motions for summary judgment and dismissal of plaintiff's Eighth Amendment claims with respect to his mental health is granted.

**IV. Plaintiff's Request for a Catholic Priest**[FN28]

> **FN28.** This cause of action has not been asserted against Weitz.

Plaintiff has alleged causes of action under the Religious Freedom Restoration Act ("RFRA") and the First Amendment.[FN29] Plaintiff claims that defendants "tried to pass off Rev. Ferenczy as a Catholic Priest" and thus, committed fraud. Defendants claim that plaintiff was not inhibited from practicing any sincerely held religious belief.

> **FN29.** Plaintiff asserted a cause of action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Hamilton v. Smith,* 2009 WL 3199531, at *1 (N.D.N.Y.2009) (citation omitted). Therefore, the Court construes plaintiff's RFRA claim as a RLUIPA cause of action.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc-1), imposes duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009) (citation omitted). Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion. *Redd v. Wright,* 2010 WL 774304, at *3 (2d Cir.2010). "The state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id.*

**\*18** Under the First Amendment, "a generally applicable policy will not violate a plaintiff's right to free exercise of religion if the policy is 'reasonably related to legitimate penological interests' ". *Id.* (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). To succeed on a claim under the First Amendment, the plaintiff must prove that defendants conduct substantially burdened his sincerely held religious beliefs. *Pugh v. Goord,* 571 F.Supp .2d 477, 497 (S.D.N.Y.2008). The defendant must then establish that legitimate penological interests justify the impinging conduct. *Id.*

In order to be considered a "substantial burden", the plaintiff must demonstrate that the government's action pressured him to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Muhammed v. City of New York Dep't of Corrections,* 904 F.Supp. 161, 188 (S.D.N.Y.2005) (citations omitted). The burden must be more than an inconvenience, it must be substantially interfere with a tenet or belief that is central to the religious doctrine. *Id.* (citations omitted); *see also Jones v. Shabazz,* 2009 WL 3682569, at *2 (5th Cir.2009) (holding that a government action or regulation only

creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs). If the plaintiff demonstrates a substantial burden, the onus shifts to the government to prove that an action or policy is the least restrictive means of furthering a compelling state interest. *See Pugh,* 571 F.Supp.2d at 503. A court must consider whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant. *Kikumura v. Hurley,* 242 F.3d 950, 962 (10th Cir.2001). Prison security and penological institutional safety goals are unquestionably compelling state interests. *Muhammed,* 904 F.Supp. at 189. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience ... of prison [ ] administrators in establishing necessary regulations ... to maintain security and discipline ..." *Jova,* 582 F.3d at 415 (citing *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)).

While an **inmate** has a constitutional right to practice his religion, the prison staff "is not under an affirmative duty to provide each **inmate** with the spiritual counselor of his choice". *Davidson v. Davis,* 1995 WL 60732, at *5-6 (S.D.N.Y.1995) (citing 42 U.S.C. § 2000bb-1(b)); *see also Reimers v. Oregon,* 863 F.2d 630, 632 (9th Cir.1988) (an **inmate** does not have the right under the Free Exercise Clause to have the particular clergyman of his choice provided to him). The Constitution does not require that a religious advisor be provided for every sect in a penitentiary. *Weir v. Nix,* 114 F.3d 817, 820-821 (8th Cir.1997) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)) (prison officials need not provide exactly the same religious facilities or personnel to **prisoners** of every faith). A plaintiff cannot demonstrate that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for coordinating visits with spiritual advisors. *See Pogue v. Woodford,* 2009 WL 2777768, at *8 (E.D.Cal.2009) ("[i]f the rule were to the contrary, prisons would have to fund any other religion facilitating request within which an **inmate** could claim a substantial burden") (citations omitted). Only when a **prisoner's** sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the **prisoner's** free exercise rights are substantially burdened in this manner. *Id.* (citing *SapaNajin v. Gunter,* 857 F.2d 463, 464 (8th

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

Cir.1988)).

**\*19** In the case at hand, defendants do not dispute that plaintiff had sincerely-held religious beliefs. Accordingly, the Court analyzes whether defendants' conduct created a substantial burden upon those beliefs. Plaintiff makes the conclusory allegation that defendants attempted to perpetrate a fraud by "passing Rev. Ferenczy off as a Catholic". However, plaintiff has provided no factual basis for these assertions. Plaintiff testified that SCJ provided him with a Bible and rosary beads, upon request. Further, plaintiff admits that he had access to the facility Chaplain, Rev. Ferenczy and testified that he actually met with the Reverend on at least one occasion. As part of the motion herein, Sgt. Newman provided a copy of the SCJ's **Inmate** Rules and Regulations which were in effect during plaintiff's incarceration. The Rules provided, *inter alia,* "[y]ou may request religious assistance. Every effort will be made to assist you with your request, starting with the Facility Chaplain". The Rules and Regulations clearly stated that the facility would make "every effort" to honor requests for religious assistance. Moreover, according to the Regulations, SCJ allowed outside clergy to visit. Defendants have provided evidence that the SCJ staff attempted to locate a Catholic priest to meet with plaintiff. Plaintiff has not submitted any evidence demonstrating that defendants' failure to provide a Catholic priest pressured him to commit an act forbidden by his faith. Plaintiff has not demonstrated that he was "prevented" from meeting with a spiritual advisor of his choice. Rather, plaintiff argues, without legal or factual support that defendants are obligated to provide him with such an advisor. Plaintiff's argument lacks merit. Defendants' failure to comply with plaintiff's request does not amount to either a constitutional or statutory violation. Based upon the record, plaintiff 's free exercise of religion was not substantially burdened by defendants' failure to provide him with a Catholic priest.

Even if plaintiff could establish that his rights were substantially burdened, plaintiff's claim would nonetheless fail because defendants actions were the least restrictive means in furtherance of a compelling interest. Construing plaintiff's complaints in a favorable light, plaintiff seemingly argues that he was denied visits with personal spiritual advisors. Plaintiff claims that SCJ personnel told him that Henry Eckerd, a Jehovah's Witness, would not come to see him. Plaintiff also claims that he asked to be

allowed to see his godfather, a Catholic priest, but that he wasn't allowed to have visitors. Plaintiff cannot prevail on this claim for two reasons. First, according to the SCJ **Inmate** Rules and Regulations, "[m]eetings with attorneys, counselors and clergy are not charged as visits". Plaintiff has not submitted evidence proving that he contacted his godfather and that defendants explicitly refused to allow visitation. Further, during his deposition, plaintiff admitted that he did not call Mr. Eckerd because he did not want to "run up his phone bill". Second, even assuming plaintiff was denied visits with clergy, based upon the record, defendants' had a compelling interest in revoking plaintiff's visitation privileges. Defendants do not dispute that plaintiff's visitation privileges were revoked. Throughout his deposition, plaintiff admitted that he was prone to violence indicating that he had kicked corrections officers during altercations and that he became, "physical with the staff to see medical". Plaintiff admitted that he, "assault[ed] the staff" to get them to take him to the medical unit. Plaintiff stated that this occurred on two or three occasions. There is no unqualified constitutional right to visitation, which may be regulated in keeping with legitimate penological objectives. *Smith v. Beatty,* 1996 WL 166270, at \*1 (7th Cir.1996) (citing *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Even assuming plaintiff could establish that he was denied the right to visit with clergy, based upon the record, plaintiff's violent outbursts and behavior resulted in the decision to restrict plaintiff's visitation privileges. Clearly, this was the least restrictive means of furthering a compelling governmental interest. Moreover, plaintiff admitted that even before his visitation privileges were revoked, he was not visited by a Catholic priest.

**\*20** Based upon the record, plaintiff was not deprived of the right to exercise the religion of his choice. Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's First Amendment claims and RLUIPA claims relating to religion is granted.

## VI. Fourteenth Amendment-Equal Protection[FN30]

FN30. This cause of action has not been asserted against Weitz.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

Plaintiff alleges that, "Lt. Hazzard deliberately and intentionally tried to force a different religion on plaintiff" and denied plaintiff the right to Equal Protection under the Fourteenth Amendment. Defendants contend that there is no evidence that plaintiff was treated differently on account of his religious beliefs.

"The equal protection clause directs state actors to treat similarly situated people alike." *Salahuddin v. Perez,* 2006 WL 266574, at *9 (S.D.N.Y.2006) (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)). To prove an equal protection violation, plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). "[T]he Equal Protection Clause does not require that "every religious sect or group within a prison must have identical facilities or personnel". *Allen v. Toombs,* 827 F.2d 563, 569 (9th Cir.1987) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). Rather, it entitles each **prisoner** to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow **prisoners** who adhere to conventional religious precepts.' " *Shakur v. Schriro,* 514 F.3d 878, 891 (9th Cir.2008) (quoting *Cruz,* 405 U.S. at 322.)

Plaintiff has failed to produce any evidence that defendants intentionally or purposefully discriminated against him on the basis of his faith. Plaintiff has not provided any evidence of bias, discriminatory remarks or evidence of comparable situations where fellow **inmates** were treated differently. Plaintiff's conclusory assertions that defendants committed "fraud" by attempting to "pass off" Rev. Ferenczy as Catholic are unsupported by facts or the record. Based upon the record, the Court finds that plaintiff has been provided with "reasonable opportunities" to practice his faith and therefore, has not been denied equal protection. *See Card v. Dugger,* 709 F.Supp. 1098, 1109 (M.D.Fla.1988).

**VII. Access to Courts**[FN31]

> [FN31.] This cause of action has not been asserted against Weitz.

Defendants argue that plaintiff was not denied meaningful access to the courts. Specifically, defendants contend that SCJ maintains a law library that complies with New York State's Minimum Standards and Regulations for Management of County Jails and Penitentiaries and provides all required texts. Plaintiff claims that defendants impeded his ability to do legal research and that the SCJ law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system. Further, plaintiff argues that his time in the library was "intentionally and unreasonably limited".

**\*21** Under the First Amendment, "**prisoners** have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist **inmates** in the preparation and filing of meaningful legal papers by providing **prisoners** with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828; *Bourdon,* 386 F.3d at 92. However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an **inmate** cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351-54, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The government does not have to afford **inmates** unlimited access to a library. *Bounds,* 430 U.S. at 828; *see also Shell v. Brun,* 585 F.Supp.2d 465, 468 (W.D.N.Y.2008) (holding that a prison law library may not be to an **inmate's** liking but that does not make it constitutionally inadequate). The plaintiff must prove that the "alleged shortcomings in the library [ ] hindered his efforts to pursue a legal claim". *Davis v. Buffardi,* 2005 WL 1174088, at *1-2 (N.D.N.Y.2005) (citing *Lewis,* 518 U.S. at 351); *see also Santiago v. James,* 1998 WL 474089, at *4-5 (S.D.N.Y.1998) (holding that the plaintiff failed to offer specific facts regarding the type of materials requested, who allegedly denied him the materials or when/frequency of these alleged occurrences).

In order to survive a motion for summary judgment, the plaintiff must present evidence showing that: (1) the defendants acted deliberately and maliciously; and (2) that he has suffered actual injury. *Lewis,* 518 U.S. at 351-54. Where it is alleged that access to a law library or necessary materials has been denied, plaintiff must

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

establish that the deprivation proximately causes some prejudice or denial of a legal claim. *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204-05 (W.D.N.Y.1998) (citing *Lewis,* 518 U.S. at 351).

If the plaintiff cannot articulate any actual injury as a result of purported efforts by the defendants to prevent him from litigating his case, his access claim can not survive scrutiny. *Odom v. Kerns,* 2002 WL 31059341, at *4 (S.D.N.Y.2002). "The underlying action that the plaintiff alleges being denied access to must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope". *Key v. Fischer,* 2007 WL 2522352, at *4-5 (S.D.N.Y.2007) (citing *Christopher v. Harbury,* 536 U.S. 403, 416, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)) (holding that the complaint should state the underlying claim in accordance with Fed.R.Civ.P. 8(a)). A plaintiff must offer specific references to the injury and must demonstrate that he sustained dismissal of or prejudice to a lawsuit because of the lack of law books. *Gill v. Pact Org.,* 1997 WL 539948, at *4-6 (S.D.N.Y.1997). When the plaintiff fails to provide the court with the case number of the habeas petition that was allegedly dismissed due to the defendants' alleged actions, he has failed to demonstrate how he was actually injured or prejudiced by the alleged denial of access to the courts. *Bolton v. King,* 2008 WL 2952769, at *5 (S.D.Miss.2008); *see also Smith v. Henderson,* 2007 WL 142765, at *4 (S.D.Ga.2007) (holding that the plaintiff failed to establish a genuine issue of fact regarding whether he suffered an actual injury as the plaintiff was not specific about his previous case).

**\*22** Based upon the record, plaintiff has failed to show that a reasonable factfinder could conclude that his access to the courts was caused by defendants' deliberate misconduct. Conversely, the record demonstrates that plaintiff was routinely given extended library time and that his requests for addresses, pens, notebooks and a notary were all approved. Plaintiff admittedly has filed a multitude of lawsuits and testified that he filed four lawsuits while incarcerated at SCJ including an Article 78 petition filed on April 7, 2004. *See Hopper v. John Doe Myers Recreational Coach Northwest Detention Center,* 2006 WL 3337388, at *5 (W.D.Wash.2006) (holding that the numerous civil suits, pleadings, and motions the plaintiff was able to successfully bring and vigorously prosecute in District Court, showed that he had sufficient access to the courts while detained).

Even assuming that defendants intentionally denied plaintiff access to the library and legal materials, plaintiff has not submitted evidence that he sustained any actual injury. Specifically, plaintiff testified that he was denied access to Article 78 documents and that he was prevented from filing a writ of habeas corpus. However, when plaintiff was asked about missing deadlines for filing papers due to the inadequacy of the library, plaintiff could not recall the deadline dates. Plaintiff could only state that his "divorce, my visitation and [ ] a couple Article 78s against the defendants" were dismissed based upon the fact that the complaints were insufficiently drafted. Plaintiff failed to provide any details about his Article 78 submissions or habeas petition other than the fact that he made such a petition. *See Waters,* 2009 WL 750217, at *5; *see also Swift v. Tweddell,* 2008 WL 4615053, at *9 (W.D.N.Y.2008) (holding that the plaintiff failed to identify any judicial proceeding that the plaintiff attempted to pursue that was hindered by the alleged deficiencies of the law library). Plaintiff has failed to offer any evidence establishing that the alleged deficiencies in the SCJ law library impeded his efforts to bring a viable legal claim. Plaintiff has not produced copies of petitions or lawsuits that were allegedly dismissed nor plaintiff provided case numbers for these alleged submissions. Plaintiff has failed to submit evidence that the dismissal of any cause of action was proximately caused by his alleged denial of access to the courts. Based upon the lack of evidence, plaintiff has not established that his underlying Article 78 filing(s) or habeas petition(s) were nonfrivolous.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's cause of action alleging that his First Amendment right to access to the courts was violated is granted.

**VIII. Personal Involvement**

Defendants Cronk, Marsh, Grippin, Howland and Mace move for summary judgment arguing that they were not personally involved in the alleged constitutional violations.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

**\*23** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U. S .C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. Polk County v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). In other words, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that the violation was occurring. Colon v. Coughlin, 58 F.3d 865, 973 (2d Cir.1995).

"In order to defeat the portion of [the] defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon [the] plaintiff to present evidence to support an inference that the defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care." Mendoza v. McGinnis, 2008 WL 4239760, at \*8 (N.D.N.Y.2008) (citations omitted). Personal involvement is generally a question of fact and summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law. Williams v. Smith, 781 F.2d 319, 323 (2d Cir.1986) (citing Fed .R.Civ.P. 56(c) and cases)).

In the complaint, plaintiff referred only once to Cpl. Cronk claiming that he deliberately denied plaintiff appropriate mental health care by not allowing plaintiff speak to

mental health counselors when having mental health episodes. Plaintiff failed to offer any evidence with regard to Cpl. Cronk's alleged involvement in his mental health care or such "episodes". Indeed, plaintiff testified that Cpl. Cronk was "one step of supervision before a sergeant" and that he improperly reacted to plaintiff's mental health crisis. The fact that Cpl. Cronk may have had some supervisory authority is insufficient to create liability under § 1983. Plaintiff has failed to submit any proof demonstrating that Cpl. Cronk was personally involved in any of his alleged constitutional violations. Accordingly, the Court grants Cronk's motion for summary judgment and dismissal of plaintiff's complaint for lack of personal involvement, in addition to the reasons that the Court has previously discussed.

**\*24** With respect to the remaining defendants, plaintiff has provided sufficient evidence to raise a triable issue of fact with regard to defendants involvement in the alleged constitutional violations. Plaintiff testified that Deputy Howland and Deputy Grippin refused to communicate his medical needs to the medical staff. Defendant Howland failed to submit an affidavit setting forth facts that would be admissible into evidence. See Davis v. Goode, 995 F.Supp. 82, 91 (E.D.N.Y.1998) (holding that the defendants failed to carry their burden of presenting affidavits or other evidence to support their claim that no material issues of fact exist as to the personal involvement of these individual defendants). Thus, Howland has failed to sustain his burden on a motion for summary judgment on this issue.

Defendants Grippin and Mace provided affidavits admitting that they were employed at SCJ at the relevant time. Although Grippin and Mace deny any wrongdoing in the matter, there are triable issues of fact regarding Grippin and Mace's personal involvement in plaintiff's alleged constitutional violations.

Finally, plaintiff alleges that Deputy Paul Marsh denied him adequate emergency medical care after an incident that occurred at SCJ in 2003. On the motion, Marsh provided an affidavit and stated that he was injured on the job on November 7, 2005 and did not return to work. Deputy Marsh does not deny that he was working at SCJ prior to November 2005. Therefore, plaintiff has sufficiently alleged personal involvement as against

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

Deputy Marsh. Thus, the Court denies Marsh's motion for summary judgment on this basis.

## IX. Qualified Immunity

Public officials enjoy qualified immunity from liability under § 1983 "so long as their conduct does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Second Circuit has held that "[a] right is clearly established if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003)).

In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

**\*25** Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation, defendants are entitled to summary judgment on this ground. *Dorcely v. Wyandanch Union Free Sch. Dist.,* 665 F.Supp.2d 178, 219 (E.D.N.Y.2009) (citing The *Cathedral Church of the Intercessor v. The Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005)) ("[w]ithout an underlying constitutional violation, qualified immunity cannot attach").

## CONCLUSION

To summarize, the Court denies defendant Weitz's motion for summary judgment on the basis of res judicata. Weitz's motion for summary judgment and dismissal of plaintiff's Eighth Amendment claims relating to plaintiff's knee, back and mental health is granted as plaintiff has failed to establish that Weitz was deliberately indifferent to any serious medical need. Moreover, Weitz's motion for summary judgment and dismissal of plaintiff's claim that Weitz deliberately and wilfully denied "emergency care" for plaintiff's back injury in 2003 is granted based upon Weitz's lack of involvement. Accordingly, plaintiff's complaint as against defendant Weitz is dismissed in its entirety and Weitz is awarded summary judgment.

Defendant Cronk's motion for summary judgment and dismissal of plaintiff's Eighth Amendment, First Amendment and Fourteenth Amendment claims based upon lack of personal involvement is granted.[FN32]

> **FN32.** In the alternative, Cronk's motion for summary judgment is also granted for the reasons discussed in the context of defendants Hazzard, Marsh, Grippin, Howland and Mace's motions for summary judgment.

Defendants Hazzard, Marsh, Grippin, Howland, and Mace motions for summary judgment and dismissal of plaintiff's Eighth Amendment causes of action are granted as plaintiff has failed to establish that defendants were deliberately indifferent to any serious medical need. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment right to free exercise of religion are granted as plaintiff has failed to establish that defendants prevented him from engaging in religious activities without any reasonably related penological interest. Defendants motions for summary judgment and dismissal of plaintiff's Fourteenth Amendment Equal Protection cause of action is granted as plaintiff has failed to submit evidence that defendants intentionally discriminated against plaintiff on the basis of his faith. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment access to courts cause of action is granted as plaintiff has failed to demonstrate that defendants intentionally deprived him of access to courts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1064330 (N.D.N.Y.)
(Cite as: 2010 WL 1064330 (N.D.N.Y.))

and further, that he sustained an actual injury as a result of such denial.

In the alternative, all defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, based upon qualified immunity.

**Accordingly, it is hereby**

**ORDERED,** that defendant Weitz's motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 70) is **GRANTED,** and it is further;

**ORDERED,** that defendants Hazzard, Marsh, Grippin, Howland, Mace and County of Schoharie's motions for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 71) are **GRANTED,** and it is further;

**\*26 ORDERED,** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order upon the parties by regular or electronic mail, and it is further;

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED,** as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.
Guarneri v. Hazzard
Slip Copy, 2010 WL 1064330 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability under the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

*2 Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

II. DISCUSSION

A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose.*" *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see also *Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is arguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see *Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703; *see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

**\*5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id .* at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton, 483 U.S. 635, 640 (1987)*). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

Carolina ("FCI Butner").[FN2] Defendants now move for partial dismissal of the Complaint pursuant to Rules 12(b)(1) and 12( b)( 6) of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion is granted in part and denied in part.

> FN1. *See* Complaint ("Compl.") at 2.

> FN2. *See id.* ¶¶ 15, 25.

## II. BACKGROUND[FN3]

> FN3. The following recitation of facts is drawn from the Complaint and presumed to be true for the purpose of this motion.

Rivera, a federal **prisoner** convicted of robbery in the early 1990s,[FN4] has been diabetic for over fifteen years.[FN5] On January 6, 2002, Rivera was transferred from the United States Penitentiary in Beaumont, Texas to FCI Otisville.[FN6] Prior to arriving at FCI Otisville, the creatinine level in Rivera's blood-an indicator of kidney function-was normal.[FN7] Rivera provided a blood-test report showing that on February 27, 2002, his creatinine level was 1.5 milligrams/deciliter (mg/dL), a level within the normal range of 0.6 mg/dL-1.6 mg/dL.[FN8] By June 12, 2002, Rivera's creatinine level rose above 1.6 mg/dL to 2.2 mg/dL, which is outside the normal range.[FN9] On May 25, 2004, Rivera's creatinine level was 2.0 mg/dL, also outside the normal range.[FN10] His creatinine level eventually reached 3.8 mg/dL,[FN11] but Rivera does not provide a blood-test result or any other support for this allegation, nor does he provide creatinine levels or results from any other blood tests.

> FN4. *See id.* ¶ 1.

> FN5. *See id.* ¶ 9.

> FN6. *See id.* ¶ 1.

> FN7. *See id.* ¶ 9.

> FN8. *See* 2/27/02 Blood-Test Report, Ex. 2 to Compl., at US14.

> FN9. *See* 6/12/02 Blood-Test Report, Ex. 3 to Compl., at US15.

> FN10. *See* 5/25/04 Blood-Test Report, Ex. 5 to Compl., at US19.

> FN11. *See* Compl. ¶ 13.

On April 10, 2007, Rivera was transferred from FCI Otisville to FCI Burner.[FN12] After his arrival at FCI Butner, Rivera learned that "he was transferred to obtain medical attention for renal failure, i.e. kidney failure" and that he will need to begin dialysis treatment in two to three years.[FN13] Rivera believes that his kidneys have failed or are failing because he received inadequate medical care at FCI Otisville.

> FN12. *See id.* ¶¶ 15, 18.

> FN13. *Id.* ¶ 17.

Rivera provides the following additional support for his conclusion of inadequate medical care. *First,* on September 8, 2003, Dr. Williams relied on another **inmate's** albumin/creatinine ratio in diagnosing Rivera.[FN14] *Second,* defendants failed to monitor Rivera's albumin/creatinine ratio and other indicators of kidney failure for possibly up to five years.[FN15] *Third,* Rivera's kidney damage is irreversible and his creatinine level cannot be lowered-at least not with medication.[FN16]

> FN14. *See id.* ¶¶ 10, 11 (alleging that Dr. Williams relied upon the blood-test report of a Rodney Baldwin and that this report was placed in Rivera's medical file); 9/08/03 Blood-Test Report, Ex. 3 to Compl., at US16 (Baldwin's

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

blood-test report).

FN15. Rivera explains that "[a]t no time was the Plaintiff ordered to complete blood work to determine the cause of a high Creatinine Level, nor was he ordered to see a Nephrologist or to complete a 24 urine collection to determine the amount of protein in Plaintiff's urine." Compl. ¶ 13. Rivera claims he was never given any medication to help prevent kidney failure and that he never received a blood glucose test after fasting, a creatinine clearance test, a blood urea nitrogen test, a PTH test, an ultrasound of his kidneys, a duplex doppler study, or a biopsy of the kidney. See 7/21/07Attachment to Attempt at Informal Resolution, Ex. 1 to Compl., at US07.

Defendants did, however, monitor some indicators of kidney failure while Rivera was confined at FCI Otisville. For example, Rivera describes a creatinine test taken on May 25, 2004. See Compl. ¶ 14. Nonetheless, the issue in this case is not whether defendants were testing Rivera but whether defendants used the information obtained from the tests to *properly* monitor and treat him.

FN16. See Compl. ¶ 17; 10/28/07Attachment to B.P. 8, Ex. 7 to Compl., at US30.

## III. LEGAL STANDARDS

### A. Lack of Subject Matter Jurisdiction

**\*2** A district court may exercise subject matter jurisdiction if the action "arises under" federal law. FN17 An action "arises under" federal law if " 'in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law.' " FN18 "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate the case." FN19

FN17. *Bracey v. Board of Educ. of City of Bridgeport,* 368 F.3d 108, 113 (2d Cir.2004) (citing 28 U.S.C. § 1331).

FN18. *Id.* at 114 (quoting *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1993) (superseded by statute on other grounds)).

FN19. *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996).

### B. Failure to State a Claim

In reviewing a motion to dismiss pursuant to Rule 12( b)( 6) of the Federal Rules of Civil Procedure, a court must " 'accept as true all of the factual allegations contained in the complaint' " FN20 and "draw all reasonable inferences in the plaintiff's favor ." FN21 Moreover, as Rivera is appearing *pro se,* this Court will " 'construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s].' " FN22 A complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level' " FN23 in order to survive a motion to dismiss. Although the complaint need not provide "detailed factual allegations," FN24 it must nonetheless "amplify a claim with some factual allegations ... to render the claim plausible." FN25 "[B]ald assertions and conclusions of law will not suffice." FN26

FN20. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

FN21. *Ofori-Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

FN22. *Weixel v. Board of Educ.,* 287 F.3d 138, 146 (2d Cir.2002) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

**FN23.** *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 555). *Accord Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (noting that plaintiffs must " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests' ") (quoting *Twombly,* 550 U.S. at 555).

**FN24.** *Twombly,* 550 U.S. at 555.

**FN25.** *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original).

**FN26.** *Law Offices of Curtis V. Trinko, LLP v. Bell Atl. Corp.,* 309 F.3d 71, 74 (2d Cir.2002) (citation omitted).

## C. Exhaustion of Administrative Remedies

The PLRA mandates that a **prisoner** exhaust all administrative remedies before bringing an action in federal court regarding prison conditions.[FN27] Failure to exhaust is an absolute bar to an **inmate's** action in federal court: "[section] 1997e(a) *requires* exhaustion of available administrative remedies *before* **inmate**-plaintiffs may bring their federal claims to court *at all.* "[FN28] Because the plain language of section 1997e(a) states "no action shall be brought," an **inmate** must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient."[FN29] Moreover, the exhaustion of administrative remedies must be *proper*-that is, in compliance with a prison grievance program's deadlines and other procedural rules-in order to suffice.[FN30] The United States Supreme Court has held that "the PLRA's exhaustion requirement applies to all **inmate** suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[FN31]

**FN27.** *See* 42 U.S.C. § 1997e(a) (2006) (providing that: "No action shall be brought with

respect to prison conditions under § 1983 of this title, or any other Federal law, by a **prisoner** confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

**FN28.** *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

**FN29.** *Id.*

**FN30.** *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

**FN31.** *Porter,* 534 U.S. at 532.

The Second Circuit has explained that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion."[FN32] Further, "notice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' "[FN33] Nonetheless, "[e]xhaustion is not per se inadequate simply because an individual later sued was not named in the grievances."[FN34] Whether identification is required depends on the prison system's grievance requirements.[FN35] For example, when the prison's "grievance procedures d[o] not require the **prisoner** to specifically identify in his grievance those officials responsible for alleged misconduct" and when the "**inmate** grievance forms d[o] not prompt **prisoners** to name the responsible parties," identification is not required for exhaustion.[FN36]

**FN32.** *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN33. *Macias,* 495 F.3d at 44 (citing *Woodford* 548 U.S. at 95).

FN34. *Jones v. Bock,* 549 U.S. 199, 219, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ("[T]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation.") (citing *Johnson v. Johnson,* 385 F.3d 503, 522 (5th Cir.2004)).

FN35. *See Espinal v. Goord,* 554 F.3d 216, 223 (2d Cir.2009).

FN36. *Id.* (explaining *Jones* ).

**D. Deliberate Indifference to Serious Medical Needs**

*\*3* The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment on **prisoners**. In *Estelle v. Gamble,*[FN37] the Supreme Court held that "deliberate indifference to serious medical needs of **prisoners** constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."[FN38]

FN37. 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976).

FN38. *Id.* at 104 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have

a sufficiently culpable state of mind.... In prison-conditions cases that state of mind is one of 'deliberate indifference' to **inmate** health or safety ....") (quotation marks and citations omitted).

To sustain a claim of deliberate **indifference** to **medical** needs, a plaintiff must satisfy a two-part test containing both an objective and a **subjective** component. The objective component requires the alleged deprivation to be sufficiently serious.[FN39] Accordingly, "only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an **Eighth Amendment** violation."[FN40] This standard contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain."[FN41] A serious medical need arises where "the failure to **treat** a **prisoner's** condition could result in further significant injury or the unnecessary and wanton infliction of **pain.**"[FN42]

FN39. *See Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("Because society does not expect that **prisoners** will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' ").

FN40. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

FN41. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)).

FN42. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quotation marks and citation omitted).

To satisfy the subjective prong of the deliberate indifference test, prison officials must have acted with a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

sufficiently culpable state of mind, *i.e.,* deliberate indifference.[FN43] "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.' "[FN44] Plaintiff must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with necessary medical treatment.[FN45] "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' "[FN46] Accordingly, recklessness can satisfy the deliberate indifference standard where the official "knows that **inmates** face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."[FN47] However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a **prisoner**."[FN48] Similarly,

FN43. *See Farmer,* 511 U.S. at 834.

FN44. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Hathaway,* 99 F.3d at 553).

FN45. *See Farmer,* 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an **inmate** humane conditions of confinement unless the official knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

FN46. *Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 835) (ellipsis and brackets in original).

FN47. *Farmer,* 511 U.S. at 847.

FN48. *Estelle,* 429 U.S. at 106.

Disagreements over medications, diagnostic techniques

(e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.[FN49]

FN49. *Sonds v. Saint Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (citing *Estelle,* 429 U.S. at 97). *Accord Candelaria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) ("A difference of opinion between an **inmate** and medical professionals ... as to the appropriate course of treatment does not in and of itself constitute an Eighth Amendment violation.").

**E. Personal Involvement**

It is "the government's obligation to provide medical care for those whom it is punishing by incarceration. An **inmate** must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."[FN50] "[I]n [deliberate indifference] actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation."[FN51] A supervisory defendant's personal involvement is established when evidence shows that he:

FN50. *Estelle,* 429 U.S. at 103.

FN51. *Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006).

**\*4** (1) directly participated in the constitutional violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; (4) was grossly negligent in supervising subordinates who caused the violation; or (5) failed to act on information indicating that unconstitutional acts were occurring.[FN52]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

FN52. *Id.* at 496-97.

Informal communications do not satisfy the second prong.[FN53]

    FN53. *See, e.g., Sealey v. Giltner,* 116 F.3d 47 (2d Cir.1997) (two letters were insufficient); *Johnson v. Wright,* 234 F.Supp.2d 352, 363-64 (S.D.N.Y.2002) (listing cases "holding that an official may not be held liable for ignoring an **inmate's** letter of complaint").

**F. Federal Tort Claims Act**

The FTCA provides a limited waiver of the United States's sovereign immunity, authorizing suits against the government for damages

    for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[FN54]

    FN54. 28 U.S.C. § 1346(b) (2006); *see also id.* § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances ....").

"This waiver is subject to a number of exceptions, one of which is that the government has not consented to be sued on 'any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.' " [FN55] When this discretionary exception applies, courts lack jurisdiction over an FTCA claim.[FN56] The discretionary exception

applies to "day-to-day management decisions if those decisions require judgment as to which of a range of permissible courses is wisest."[FN57]

    FN55. *Fazi v. United States,* 935 F.2d 535, 537 (2d Cir.1991) (quoting 28 U.S.C. § 2680(a)).

    FN56. *See, e.g., id.; Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

    FN57. *Fazi,* 935 F.2d at 538 (citing *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)).

Regarding injuries resulting from alleged negligent medical care "[p]rison officials have a duty to provide **prisoners** with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN58] However, a prison cannot be required to meet the same standard of medical care found in non-prison hospitals.[FN59] Moreover, a **prisoner** has no right to the treatment of his choice.[FN60]

    FN58. *Candeleria,* 1996 WL 88555, at *7 (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at *8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

    FN59. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984).

    FN60. *See McKenna v. Wright,* No. 01 Civ. 6571, 2002 WL 338375, at *7 (S.D.N.Y. Mar.4, 2002).

"When a federal employee is sued for a wrongful or negligent act, the [FTCA] empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose ....' " [FN61] "Upon certification, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

employee is dismissed from the action and the United States is substituted as defendant." [FN62]

> FN61. *Gutierrez De Martinez v. Lamagno*, 515 U.S. 417, 419-20, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995) (quoting 28 U.S.C. § 2679(d)(1)).

> FN62. *Id.* at 420.

## IV. DISCUSSION

### A. Rivera States a Cognizable Deliberate Indifference Claim for His Treatment at FCI Otisville

Even though Rivera provides a frustratingly incomplete version of his medical history, he nonetheless provides ample facts and plausible allegations to support his claims of deliberate indifference and reckless inattention to his kidney problems. Viewed in the light most favorable to Rivera, he states the following: (1) he is diabetic; (2) his creatinine level rose above the normal range after he arrived at FCI Otisville and remained high until his kidneys began to fail; and (3) his kidney problems are a direct result of defendants' failure to provide adequate care. Connecting the dots, Rivera suggests that defendants were willfully indifferent to performing sufficient testing, interpreting the test results properly, and determining Rivera's treatment from those results. Based on these facts and allegations, Rivera has adequately pleaded a claim of deliberate indifference to his medical needs.

**\*5** Defendants first contend that Rivera's claim of deliberate indifference to his serious medical needs be dismissed because this claim amounts to no more than either medical malpractice or disagreement with medical staff about the proper course of treatment. Based on the facts and allegations in the Complaint, Rivera has alleged a prima facie and plausible claim of deliberate indifference-kidney failure is sufficiently serious and defendants may have acted with reckless indifference toward Rivera's medical needs. Thus, full discovery is required to ascertain whether Rivera's claim can survive summary judgment.

Defendants alternatively contend that Rivera admitted that the medical staff was negligent, not reckless, in providing medical treatment. To support this proposition, defendants quote Rivera's Complaint, which speaks of the medical staff's "negligent failure" and not their "reckless failure." [FN63] But Rivera is a *pro-se* plaintiff and is not expected to understand, let alone employ, such linguistic subtleties. Moreover, other portions of Rivera's Complaint support the proposition that the medical staff behaved recklessly.

> FN63. Compl. ¶ 26.

Defendants finally contend that Rivera's transfer from FCI Otisville to FCI Butner to receive improved medical care undercuts Rivera's claim that the medical staff was indifferent to his medical needs. While the decision to transfer Rivera to FCI Butner to treat his kidney problems may be commendable, it cannot erase defendants' alleged indifference in diagnosing and treating Rivera while he was at FCI Otisville.

### B. Rivera's Deliberate Indifference Claim Is Dismissed as to Defendants Menifee, Sullivan and Apker

Rivera's deliberate indifference claim is dismissed against Menifee and Sullivan because Rivera did not sufficiently allege their personal involvement. Rivera states in his Complaint that Menifee failed to correct Rivera's medical treatment. This is a conclusory statement devoid of any factual support. Moreover, Rivera's only administrative complaint to Menifee had nothing to do with Rivera's kidney problems or diabetes-it dealt with prison employees mishandling Rivera's "personal papers and information." [FN64]

> FN64. 4/19/03 Request for Administrative Remedy, Ex. 4 to Compl., at US18.

Rivera's Complaint states that Sullivan transferred Rivera to FCI Butner after she and Dr. Somer "assigned Plaintiff a classification of care level III." [FN65] Rivera does not allege that Sullivan knew of Rivera's medical needs prior to the reclassification. Because FCI Burner is a care level III institution and FCI Otisville is a care level II

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

institution, Sullivan presumably transferred Rivera to FCI Butner to receive care that FCI Otisville simply could not provide. Rivera makes no other allegations concerning Sullivan's personal involvement.

>    FN65. Compl. ¶ 13.

Rivera's deliberate indifference claim against Apker must also be dismissed. While Rivera alleges that he told Apker during a meeting about the lack of medical attention he was receiving and that Apker failed to take any remedial action,[FN66] these allegations do not satisfy any of the five factors for establishing a supervisory defendant's involvement in a constitutional violation. First, Rivera does not allege that Apker directly participated in providing inadequate medical treatment. *Second,* the oral communication was too informal to be considered a report. *Third,* Rivera's allegation does not connote a custom or policy of medical indifference. *Fourth,* the Complaint does not suggest that Apker was grossly negligent in supervising the medical staff. *Fifth,* Rivera's communication did not suggest a constitutional violation; at most Rivera claimed he was a victim of medical malpractice.

>    FN66. *Id.* ¶ 14.

**C. Rivera Does Not State a Cognizable Deliberate Indifference Claim for His Treatment at FCI Butner**

*6 By the time Rivera arrived at FCI Butner, his kidneys were failing or had failed. Therefore, whether Rivera received appropriate medical treatment at FCI Butner is completely distinct from the inquiry into his medical care at FCI Otisville. Typically, severe kidney problems are treated with dialysis or transplant. The choice of appropriate treatment, however, is for FCI Burner's medical staff to make, not Rivera. Moreover, while Rivera prefers a transplant, he has not alleged nor explained how receiving dialysis would constitute deliberate indifference to his medical needs.

**D. The Transfer to FCI Butner Was Lawful**

Rivera's claim that he was unlawfully transferred from FCI Otisville to FCI Butner, in violation of the Constitution and/or the FTCA, is dismissed.

Ill **prisoners** need proper medical treatment. Rivera is a diabetic who has serious kidney problems. Thus, Rivera cannot base a claim on his transfer from a facility that cannot properly care for him-FCI Otisville-to a facility that can-FCI Butner-because leaving him at FCI Otisville, would affect the quality of his medical care.[FN67]

>    FN67. **Prisoner** transfers are typical, day-to-day decisions for prison supervisors. Therefore, the discretionary exception to the FTCA applies and this court lacks subject-matter jurisdiction over a transfer claim under the FTCA.

**E. Rivera Exhausted His Administrative Remedies**

Rivera exhausted his remedies with respect to receiving inadequate medical treatment after learning that his kidneys were failing. Rivera appealed his grievance describing inadequate treatment to the General Counsel of the Federal Bureau of Prisons.[FN68] Although this grievance does not explicitly mention defendants' names, the grievance is not insufficient on this ground. As was the case in *Jones v. Bock,*[FN69] here, the prison system's grievance requirements do not require identification of the individual responsible for alleged misconduct [FN70] and the **inmate** grievance forms do not prompt such identification.[FN71]

>    FN68. *See* 11/17/07 Central Office Administrative Remedy Appeal, Ex. 1 to Compl., at US01; 01/28/08 Central Office Administrative Remedy Response, Ex. 1 to Compl., at US02.

>    FN69. 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

>    FN70. *See* Administrative Remedy Program, 28 C.F.R. § 542.14(1) (2009) ("The **inmate** shall obtain the appropriate form ...."); *Id.* § (3) ("The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)
(Cite as: 2009 WL 585828 (S.D.N.Y.))

> **inmate** shall complete the form with all requested identifying information ....").

> FN71. *See, e.g.,* 7/21/07 Attempt at Informal Resolution, Ex. 1 to Compl., at US06 (wherein the portion "to be completed by the **Inmate**" requests only that the **inmate** state the "nature of the problem" and "what action or resolution" he expects).

**F. The United States Cannot Be Substituted for the Individual Defendants Under the FTCA Claims**

Defendants suggest that the United States be substituted as the sole defendant on the surviving FTCA claims (*i.e.,* medical malpractice) because a suit against the United States is the sole remedy for claims arising under the FTCA. In order to substitute the United States for the individual defendants under the FTCA claims, however, the Attorney General must certify that the defendants were acting within the scope of their duties when the injury occurred. The Court has not received such a certification, and therefore, cannot grant defendants' substitution request at this time.

**V. CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. The Clerk of the Court is directed to close this motion (docket nos. 14, 17). A conference is scheduled for March 30, 2009 at 4:30 pm.

SO ORDERED.

S.D.N.Y.,2009.
Rivera v. Federal Bureau of Prisons
Not Reported in F.Supp.2d, 2009 WL 585828 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

without use of the preamble "Brown alleges."

**\*2** Brown was incarcerated at Woodburne Correctional Facility ("Woodburne") at the time he filed his amended complaint (Dkt. No. 3: Am. Compl. at 2), but has since been released (Dkt.Nos.7, 8, 9, 12).

***The Defendants***

Defendant Janice DeFrank is a registered nurse at Woodburne whose responsibilities are to "(a) monitor **inmate's** physical signs & symptoms; (b) address **inmates** health problems & complaints; and (c) implement the nursing intervention parameters at said encounters, e.g., (d) make referrals for **inmates** to be seen by the facilities medical doctor's and (e) make referrals for **inmates** to be seen at the in house clinics, e.g., asthma clinic, podiatry clinic, blood pressure clinic etc." (Dkt. No. 3: Am. Compl. at 2-3.)

Defendant Denise F. Boyd is a nurse administrator at Woodburne and is responsible for "implementing and maintaining quality nursing practices within the facility ... [i]ncluding all aspects of the nursing process, e.g., (a) screening direct health care services, and (b) taking analysis of all **inmate's** health problems." (Am. Compl. at 3.)

Defendant Dr. Frank Lancellotti is a facility physician at Woodburne and is responsible for providing "primary health care to **inmate** patients." (Am. Compl. at 3.)

Defendant Dr. Mervat Makram is Woodburne's Facility Health Service Director and is "the medical authority at the facility functioning as the supervisor to all health unit staff and is responsible for all aspects of **inmate** health care services." (Am. Compl. at 3.)

Defendant P.D. Early is a Corrections Captain at Woodburne and "exercises judgment on all special permits requiring security clearance at the facility." (Am. Compl. at 3.)

Defendant Jean G. King is the Woodburne Deputy Superintendent for Programs and serves as the "designated individual who over sees compliance of reasonable accommodations for **inmates** with disabilities within the facility." (Am. Compl. at 4.)

Defendant Raymond J. Cunningham is Woodburne's Superintendent and serves as "the chief administrative officer, who directs the work and defines the duties of all officers and subordinates of the facility." (Am. Compl. at 4.)

Defendant Pedro Diaz is DOCS' Regional Health Service Administrator, whose "primary function is to promote constitutionally adequate health care; detect & resolve **inmate's** health care needs and/or problems within the facilities of this region ...; assist in decision making on health related activities; advise the Superintendent on health care policy; and monitor facility compliance with all facially valid health care directives & policies." (Am. Compl. at 4, emphasis omitted.)

Defendant Jayne Molloy is DOCS' Senior Utilization Review Nurse, responsible for "contract[ing] hospitals for DOCS use for specialty care patients; mak[ing] referrals for **inmates** who have been clinical[ly] approved for outside specialty care treatment; organiz[ing] the use of, and allocat[ing] department funds for the specific purposes thereof." (Am. Compl. at 4.)

**\*3** Defendant Dr. Lester Wright is DOCS' Associate Commissioner and Chief Medical Officer, and "is the medical authority for DOCS and directly responsible for implementing constitutionally adequate medical practice throughout the department." (Am. Compl. at 5.)

***Brown's Bunions and Osteoarthritis of the Right Hip***

Brown was diagnosed with "bilateral hallux valgus," commonly known as bunions in both feet, and degenerative osteoarthritis of the right hip. (Dkt. No. 3: Am. Compl. ¶ 2 & Exs. A-2, B-1, B-7.) Because of these conditions, Brown had "difficulties with activities of daily living, 'especially stair climbing,' " and needed to use a

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

walking cane. (Am. Compl. ¶ 2 & Exs. B-5, B-6, B-7, B-9, B-12.)

### 2004 Medical Records and Grievances

On August 27, 2004, Brown was diagnosed with "[m]oderate degenerative osteoarthritic changes of right hip." (Am. Compl. ¶ 27 & Ex. B-1.) An August 27, 2004 X-Ray Requisition and Report noted that Brown complained of pain in his right hip "since bike accident > 30 yrs ago." (Am.Compl.Ex.B-1.)

On September 30, 2004, Brown went to sick call because he was experiencing bunion pain in his feet. (Am.Compl.¶ 9.) Brown told defendant Nurse DeFrank about the pain he was experiencing and requested a referral to a podiatrist and "medical boots." (Am.Compl.¶ 9.) After examining his feet, Nurse DeFrank told Brown: " 'nothing is wrong with your feet, you don't have bunions that's just the way your feet are. Besides there is nothing we can do because no foot doctor comes to Woodburne.' " (Am.Compl.¶ 10.) After this meeting with Nurse DeFrank, Brown submitted a formal grievance seeking medical treatment. (Am.Compl.¶ 12.)

On October 7, 2004, Brown went to sick call, again complaining of bunion pain in his feet. (Am.Compl.¶ 13.) Non-defendant Nurse Reddish ordered x-rays to be taken of Brown's feet. (Am.Compl.¶ 13.)

On October 13, 2004, the **Inmate** Grievance Review Committee ("IGRC") responded to Brown's grievance, stating: "Depending on X-ray results, grievant will be reviewed for further treatment. Grievant is advised to follow-up at sick-call for any future problems with his feet." (Am. Compl. ¶ 15 & Ex. A1a.) Brown appealed this response to the Superintendent. (Am. Compl. ¶ 15 & Ex. A1a.)

On October 14, 2004, Brown's x-ray report showed "[b]ilateral hallux valgus with angle 30 degrees bilaterally. Remainder studies both feet unremarkable." (Am. Compl. ¶ 16 & Ex. A-2.) On October 15, 2004, Brown wrote a letter to defendant Nurse Administrator Boyd complaining

of continuing bunion pain in his feet. (Am. Compl. ¶ 17 & Ex. A-3.) Nurse Administrator Boyd did not respond to Brown's letter. (Am.Compl.¶ 17.)

On October 22, 2004, Brown went to sick call and complained about the continuing bunion pain in his feet. (Am.Compl.¶ 18.) Later that day, Brown received the Superintendent's response to his grievance appeal. (Am. Compl. ¶¶ 18-19 & Ex. A-4.) The Superintendent responded: "Grievant's medical care is proper and ongoing. Treatment plan implemented and pending results of x-rays. A new treatment regimen would be prescribed if necessary. At present there is no medical indication that grievant see a foot doctor. Grievant is advised to follow the treatment plan provided." (Am. Compl. ¶ 19 & Ex. A-4.) Brown appealed this response to the Central Office Review Committee ("CORC"). (Am. Compl. ¶ 20 & Ex. A-4.)

**\*4** On November 2, 2004, Brown met with defendant Dr. Makram and told her of the pain in his feet. (Am.Compl.¶ 103.) Dr. Makram reviewed Brown's medical records, acknowledged the bunion diagnosis, and recommended that Brown get orthotics, " 'providing approval of the Regional Medical Director.' " (Am.Compl.¶ 103.)

On November 10, 2004, the Central Office Review Committee upheld the Superintendent's decision: "Contrary to the grievant's assertions, CORC has not been presented with evidence of discrimination by medical staff. The grievant is receiving necessary treatment and appropriate care." (Am. Compl. ¶ 21 & Ex. A-5.)

Brown's foot condition became progressively worse over the next few months, causing him more pain and "emotional distress." (Am.Compl.¶ 23.) On November 19, 2004, Brown's health record states that he received ibuprofen to take until a prescription was received. (Am.Compl.Ex.B-2.)

On November 29, 2004, Brown went to sick call to complain of pain in his right hip and in his feet. (Am. Compl. ¶ 28 & Ex. B-2.) Brown told defendant Nurse DeFrank about the pain he was experiencing, and requested a referral to a medical doctor so that he could

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

request first floor housing. (Am.Compl.¶ 30.) Brown explained to Nurse DeFrank that first floor housing would help him avoid stair climbing and therefore reduce his "pain, stress and strain" on Brown's arthritic right hip and the bunions in his feet. (Am.Compl.¶ 31.) Nurse DeFrank denied Brown's request to refer him to a medical doctor. (Am. Compl. ¶ 32 & Ex. B-2.) Brown asserts that Nurse DeFrank denied this request in retaliation for his earlier grievance against her. (Am.Compl.¶ 32.) Brown asked Nurse DeFrank why she would not refer him to a medical doctor, and she said " 'I ... don't need a reason, I'm the nurse and you're ... only an **inmate**.' " (Am.Compl.¶ 33.) Brown suggested that Nurse DeFrank read his medical file, and Nurse DeFrank became "very 'repulsive' and 'obnoxious' and responded in a 'hostile tone of voice', telling Plaintiff ... 'listen **inmate**, don't tell me how to do my job.' " (Am.Compl.¶ 34.) Brown explained to Nurse DeFrank that he experiences pain when walking up and down stairs and "pleaded" with her for the medical doctor referral so that he could request first floor housing. (Am.Compl.¶ 35.) Nurse DeFrank replied " 'I ... don't feel you need to see the doctor, or be housed on the first (1st) floor just because your hip & feet are hurting, so I'm not referring you to the doctor. You're not stupid, learn to deal with the pain.' " (Am.Compl.¶ 36.) As Brown was on his way out, Nurse DeFrank said " 'the only way you ... will be moved down stairs to a first (1st) floor housing unit, is if your feet are amputated.' " (Am.Compl.¶ 37.) Brown experienced a "significant degree of emotional distress" from this comment. (Am.Compl.¶ 37.)

On November 30, 2004, Brown submitted a formal grievance regarding Nurse DeFrank's comments. (Am.Compl.¶ 39.) On December 3, 2004, Nurse DeFrank responded:

**\*5 Inmate** Brown 02A5006 was seen by MD 11.2.04 for pain [in right] hip. He is going out for PT [physical therapy] and he is scheduled to see Podiatry. I did not tell Brown he did not have bunions, as I do not diagnose. Brown requested to see MD to lock on the lower level because his feet hurt.[ ] I did not feel as the sick call triage nurse [that] **inmate** Brown needs to see the doctor at this time. I did not tell Brown as he stated "his feet would have to be amputated to move to a flat gallery.["]

(Am. Compl. ¶ 39 & Ex. B-3.) By memo dated December

3, 2004, Nurse Administrator Boyd responded:
The grievant's complaints have been investigated and found to be unvalidated.

Grievant wants to lock on the flats [*i.e.,* to house on the first floor]. He has no medical indication to lock on the flats. The grievant's medical record was reviewed by Dr. Makram after his sick call encounter. His pain medication was increased and an additional medical was added. The grievant should take his medications as ordered. Nurse DeFrank was not insensitive nor totally disregarded the grievant's medical concerns for a lock on flats permit. Grievant was never told by Ms. DeFrank that his feet would have to be amputated to move to a flat gallery. (See memo from Ms. DeFrank.)

Regarding Action Requested:

The grievant has an appointment to see the Podiatrist for his feet. He is currently seeing the Physical Therapist for his right hip pain. The grievant has reported to the Physical Therapist that he feels better especially after a PT session but still complains of right hip cracking and pain. This **inmate** must continue with his physical therapy and medications as ordered.

(Am. Compl. ¶ 40 & Ex. B-3a.) Brown disputes the statement in Nurse Administrator Boyd's memo that his medical record was reviewed by a doctor and that he has no medical indication to have first floor housing. (Am. Compl. at ¶ 40 n. 3.)

On December 14, 2004, the IGRC responded to Brown's grievance, stating: "Grievant is advised to write facility MD about his medical concerns for a permit to lock on flats. In addition, Committee recommends grievant be scheduled for an MD appt. to address his concerns for a flat medical permit. Moreover, grievant is advised that grievance program is not an adversary process." (Am. Compl. ¶ 42 & Ex. B-4.)

On December 22, 2004, Brown was taken to Sullivan Correctional Facility ("Sullivan") for physical therapy. (Am.Compl. ¶ 43.) The physical therapist at Sullivan,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

non-defendant Mohed Botroth, filled out a Request and Report of Consultation which was reviewed by defendant Dr. Frank Lancellotti, the facility physician. (Am. Compl. ¶ 43 & Ex. B-5.) The Request and Report of Consultation noted that Brown "still feels pain, sudden sever[e] pain during walking or climbing stairs ... pain radiates to medial side and lower back too ... all movement with pain," and that Brown had a "limping gait." (Am. Compl. ¶ 43 & Ex. B-5.) Physical therapist Botroth also requested that the doctor check the procedure regarding a hot pack for Brown to use in his cell and also for getting an assistive device such as a cane or crutch to decrease the load on Brown's right hip. (Am. Compl. ¶ 43 & Ex. B-5.) The document noted that Brown requested an MRI or a referral to an orthopedist for more evaluation. (Am. Compl. ¶ 43 & Ex. B-5.)

**6** On December 23, 2004, Brown's hip condition "adversely progressed very rapidly" and he suffered pain during walking and climbing stairs. (Am.Compl.¶ 78.) Brown was issued a walking cane and a temporary permit to use it from December 23, 2004 until March 15, 2005. (Am.Compl.¶ 78.)

On December 27, 2004, Brown again was taken to Sullivan for physical therapy. (Am.Compl.¶ 44.) The physical therapist filled out another Request and Report of Consultation during the physical therapy session, which was reviewed by Dr. Lancellotti. (Am. Compl. ¶ 44 & Ex. B-6.) The physical therapist noted on the report that Brown "still feels pain and clicking in the [right] hip during walking and climbing stairs. Please check as the [patient] suffer[s] from climbing stairs so lock on a lower gallery if it's possible." (Am. Compl. ¶ 44 & Ex. B-6.) Brown claims that Dr. Lancellotti was deliberately indifferent to his serious medical needs because he "intentionally ignored" the physical therapist's recommendation. (Am.Compl.¶ 45.)

Later on December 27, 2004, Brown received the Superintendent's response to his grievance appeal concerning his request for first floor housing:

Grievant's medical care is proper and ongoing. Appointments are scheduled and medication has been prescribed. Per review of medical chart by the Nurse Administrator, there is no medical indication that the grievant needs to lock on "flats" (first floor).

As per the attending nurse, accusation made by grievant was totally refuted by staff member.

(Am. Compl. ¶ 46 & Ex. B-6a.)

On December 30, 2004, Brown asked Nurse Liciaga during sick call about the status of his medical boots, and she noted in the record that Brown had been told on November 2, 2004 that he would get medical boots. (Am. Compl. ¶ 104 & Ex. E-1.) She requested the boots and referred Brown to orthopedics. (Am. Compl. ¶ 104 & Ex. E-1.)

*2005 Medical Records and Grievances*

On January 13, 2005, Brown was taken to Coxsackie Correctional Facility ("Coxsackie") to be examined by non-defendant orthopedic specialist Dr. Rubinovich. (Am.Compl.¶ 48.) Dr. Rubinovich wrote a letter to Dr. Lancellotti regarding Brown's condition, stating in part:

[Brown] is a 45-year-old gentleman with 3 problems. The first is Osteoarthritis of his Right Hip. The second and third are Bilateral Bunions, which are quite painful. In actuality, the Bunions are the things that bother Sherman [Brown] the most right now. He has had these for quite some time and it is getting progressively worse. He has trouble wearing shoes. His hip has been going on for about 8 months now. It is getting progressively worse. The pain is in the groin and radiates down the leg, especially with walking and stairs.

...

Sherman [Brown] would like to start with his right foot. My plan would be to do a Metatarsal Osteotomy for him. This can be done as an outpatient at Alice Hyde. We will eventually get to the left foot. He feels he can live with his hip right now, but I think that at some point in the future,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

he is going to require a Total Hip Arthroplasty. If we can get clearance for the right foot, I would appreciate it.

**\*7** (Am. Compl. ¶ 48 & Ex. B-7.) A notation dated January 28, 2005 at the bottom of the letter states: "Procedure under review." (Am.Compl.Ex.B-7.)

On January 19, 2005, the CORC responded to Brown's grievance requesting first floor housing, stating:

Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

CORC notes that the grievant was seen by the physician after his sick call encounter. CORC also notes that there is currently no medical necessity for the grievant to lock on flats. CORC further notes that the grievant was provided with medication and referrals for physical therapy and podiatry were posted. Contrary to the grievant's assertions, CORC has not been provided with sufficient evidence to substantiate that the Nurse in question was insensitive toward the grievant and his needs. CORC advises the grievant to continue to address his health care concerns via sick call.

(Am. Compl. ¶ 50 & Ex. B-8.)

On January 31, 2005, Brown met with defendant Dr. Mervat Makram, the Woodburne health service director. (Am.Compl.¶ 60.) Brown's health record from that meeting notes that Dr. Makram spoke with Jayne Molloy, from DOCS "central office," and that Brown would be referred to podiatry at Coxsackie for bunion surgery. (Am. Compl. ¶¶ 60-63 & Ex. C-1.) The record also notes that the previously scheduled orthopedic procedure to correct Brown's bunions at Hyde Hospital was cancelled; Brown was told that was because Hyde Hospital was too far away from Woodburne. (Am. Compl. ¶¶ 60-63 & Ex. C-1.)

On February 15, 2005, while Brown was going to get his

medication, his hip gave out on him, causing him to fall down the staircase from the second floor landing of the B-2 housing unit. (Am.Compl.¶ 51.) Brown slammed into the wall at the bottom of the staircase, aggravating his hip condition. (Am.Compl.¶ 51.) Brown was in pain and was transported to the medical unit on a stretcher. (Am. Compl. ¶ 52 & Ex. B-9.) The medical staff took x-rays of Brown's right hip, issued him crutches and ibuprofen for pain, and instructed him to be on bed rest to recuperate from the fall. (Am.Compl.¶ 52.) During the days following the fall, Brown experienced pain in his left shoulder, collarbone, and neck areas, and went to sick call on February 16, 17, 24, and 28, 2005, at which the medical staff prescribed analgesic balm and warm compresses, and scheduled an MRI of his hip. (Am. Compl. ¶ 53 & Exs. B-10, B-11.)

On March 2, 2005, the medical staff reviewed Brown's "locking location" and determined that his current locking location was "acceptable [at] this time. If MRI abnormal, locking will be re-evaluat[ed]." (Am.Compl.Ex.B-11.)

On March 10, 2005, five days before Brown's permit for his walking cane was to expire, Brown's request for a renewal or extension of the permit was entered in his Ambulatory Health Record. (Am. Compl. ¶ 80 & Ex. D-1.) Brown later found out that someone wrote on the health record that Brown had "no need for cane." (Am. Compl. ¶ 84 & Ex. D-1.)

**\*8** On March 8, 2005, Brown wrote a letter to Nurse Administrator Boyd, stating:

Yesterday 3/7/05 I went out on medical trip for an M.R.I. for my right hip. For some unknown reason the M.R.I. was not taken, I stayed shackled for approximately 13 hours and received no medical treatment. The pain in my hip is unbearable and I continue to suffer from the injuries. My bunions are very painful also.

When am I gonna have the surgeries that were recommended by the specialist? With these delays I suffer more each day. I'm in a great deal of pain Nurse Boyd, can you please make sure that I get these surgeries done.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

(Am. Compl. ¶ 64 & Ex. C-2.)

In March 2005, Brown learned that other **inmates** with medical conditions similar to his were provided with transportation from Woodburne to a correctional facility near Alice Hyde Hospital, driven the short distance to Alice Hyde Hospital to be treated with orthopedic surgical procedures, and returned to Woodburne. (Am. Compl. ¶ 65 & Ex. C-3.) After learning this, on March 9, 2005, Brown wrote a letter to Dr. Rubinovich at Hyde Hospital, stating:

It was a pleasure meeting you January 13th, 05. I was looking forward to having you do my surgery, on my feet and hip.

I know we decided to begin with my feet but Doc my hip is killing me, it hurts real bad. I can't take this pain no more. "Feet or hip."

Something must be done because I'm suffering, the medication I'm taking does not alleviate the pain.

You said back in January you were gonna do the surgery soon. What's taking so long? Are you still gonna do my surgery?

This delay is causing me to suffer each day, please let me know what you're gonna do Doc.

(Am. Compl. ¶ 66 & Ex. C-3a.) Brown's pain and suffering was " 'exasperated' by the unreasonable delay on part of the Defendant[s] ..., taking apparently four (4) months, ... as they 'shopped around' for a local surgeon." (Am.Compl.¶ 66.)

On March 17, 2005, Brown went to sick call to complain of pain in his hip and recurring headaches. (Am.Compl.¶ 81.) During this visit, Brown made another request for his walking cane permit to be renewed or extended. (Am. Compl. ¶ 81 & Ex. D-2.)

On March 18, 2005, Brown was moved to first floor housing. (Am.Compl.¶ 57.)

On March 22, 2005, Brown was taken from Woodburne to Albany Medical Center for an MRI on his right hip. (Am.Compl.¶ 82.) Dr. Makram's preliminary report after the MRI stated: "There is severe degenerative arthrosis of the right hip with marked joint space narrowing superiorly with complete loss of the articular cartilage, subchondral cyst formation, marrow edema, and moderate marginal osteophytosis arising from the femoral head." (Am. Compl. ¶ 82 & Ex. D-3.) Dr. Makram handwrote a note on the preliminary report that stated "[ i]nmate doesn't want to take care of [right] hip now, wants to fix feet 1st." (Am. Compl. ¶ 82 & Ex. D-3.) Brown received a copy of this preliminary report and wrote to Dr. Makram requesting the definition of a certain medical term used in the report, but Dr. Makram did not respond. (Am.Compl.¶ 82.)

**\*9** On March 24, 2005, Brown was stopped in the corridor by a corrections officer who requested Brown's permit for the walking cane. (Am.Compl.¶ 83.) Brown explained that his walking cane permit was in the process of being renewed, and the officer let Brown go with a "stern warning to produce authorization 'next time' or face disciplinary action for unauthorized use." (Am.Compl.¶ 83.) On April 15, 2005 another corrections officer stopped Brown to ask him for his cane permit. (Am.Compl.¶ 85.) Brown went to the IGRC to ask the IGRC Supervisor to investigate the matter regarding the permit renewal. (Am.Compl.¶ 85.) When Brown found out that his permit had not been renewed or extended, he returned his cane to the medical unit to avoid disciplinary action. (Am.Compl.¶ 86.) Brown submitted a grievance regarding the non-renewal of his cane permit. (Am. Compl. ¶ 87 & Ex. D-4.)

On April 18, 2005, Brown went to sick call complaining about his right hip and feet, and requested that he be allowed to use a walking cane again. (Am.Compl.¶ 88.) The nurse checked Brown's records and told him that Dr. Makram had discontinued the authorization for a cane, and made an entry in Brown's records regarding his request for a cane. (Am. Compl. ¶ 88 & Ex. D-5.)

On April 22, 2005, Brown went to sick call complaining

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

of pain in his right hip and feet and asked for a cane. (Am.Compl.¶ 89.) Nurse DeFrank told Brown that Dr. Makram indicated that he could have the cane back. (Am.Compl.¶ 90.) Before handing the cane to Brown, Nurse Defrank "made a remark relating to the grievance complaint Plaintiff submitted regarding the cane." (Am.Compl.¶ 90.) Brown asked Nurse DeFrank for a permit for use of the cane, recounting his experiences of being stopped by corrections officers. (Am.Compl.¶ 91.) Nurse DeFrank told Brown that there was not a permit in the medical folder and said " 'either you take the cane, or you don't.' " (Am.Compl.¶ 92.) Because Brown needed the cane, he took it and then " 'immediately' wrote a letter to security requesting a permit for authorization to use the needed walking cane ." (Am. Compl. ¶ 92 & Ex. D-6a.)

On April 25, 2005, Nurse Administrator Boyd wrote a memo to the IGRC Supervisor, stating: "The grievant's complaints have been investigated and found to be unsubstantiated. On the grievant's medical record on 3/10/05 entry, MD wrote no need for cane & signed her name. MD reevaluated this request on 4/18/05 and okayed it ... **Inmate** has permit for a cane at this time." (Am. Compl. ¶ 93 & Ex. D-7.) On April 26, 2005, the IGRC responded to Brown's grievance about the cane permit, stating that "[g]rievant's action requested has been met." (Am. Compl. ¶ 98 & Ex. D10.) On May 2, 2005, the Superintendent responded to the grievance appeal, stating: "The cane was issued by the Medical Department and a notation was made in grievant's medical folder. A new permit was written and received by grievant." (Am. Compl. ¶ 98 & Ex. D-11.) On May 4, 2005, Brown appealed these decisions, stating that the cane and heating pad "should have never been taken away from grievant," and requesting a permanent permit for a cane and a heating pad. (Am. Compl. ¶ 98 & Ex. D-12.) On May 25, 2005, CORC upheld the determinations of the Superintendent and the IGRC. (Am. Compl. ¶ 98 & Ex. D-13.)

**\*10** On April 27, 2005, a form was signed by a physician and a security officer stating that Brown had permission to permanently lock on the first floor in a lower bunk, to permanently use a cane, and temporarily use a heating pad until September 30, 2005. (Am. Compl. ¶ 96 & D-9.)

On April 29, 2005, Brown had "<u>bunionectomy</u>" surgery.

(Am. Compl. ¶ 113 & Ex. E-5.)

On June 20, 2005, Brown met with Dr. Makram, complaining of pain in his feet. (Am.Compl.¶ 107.) During this meeting, Brown inquired as to when he would get the referral to orthotics for medical boots. (Am.Compl.¶ 108.) Dr. Makram told Brown that she did not make that referral and that he " 'has no need' " for medical boots. (Am.Compl.¶ 108.) Dr. Makram noted in Brown's medical file that Brown had requested special shoes but that the request was denied because of "lack of medical necessity in the middle of operations on both feet." (Am. Compl. ¶ 109 & Ex. E-2.) Brown claims that Dr. Makram "ignored Plaintiff's course of direction and told Plaintiff ... [']You're getting surgery, what more do you want? You're not getting any medical boots, so stop bothering me about it and deal with the pain.[']" (Am.Compl.¶ 110.) During the next few days, Brown reviewed his medical files and noticed that someone had crossed out an entry from November 2, 2004 stating that Brown "needs other boots, will refer to orthotics if approved by RMD." (Am. Compl. ¶ 111 & Ex. E-3.)

On June 24, 2005, Brown submitted a grievance over the crossed-off entry regarding special boots. (Am. Compl. ¶ 112 & Ex. E-4.)

On July 6, 2005, Nurse Administrator Boyd responded to the grievance in a memo to the IGRC, stating:

The grievant's complaints have been investigated and found to be unsubstantiated.

Grievant had a <u>bunionectomy</u> on 4/29/05. He was seen by DR Makram on 6/20/05. He only had mild swelling over the area of his surgery. Per FHSD **inmate's** request for medical boots was denied due to lack of medical necessity. Dr Makram did not order boots for grievant on 11/2/04 as she requested an appointment for him to see the foot specialist. Per podiatry consult 12/17/04, podiatrist "discussed treatment options including wide footwear, injection surgery/ patient refuses treatment other than surgery." Grievant had the surgery (<u>bunionectomy</u>) and now has no medical need for medical boots.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

(Am. Compl. ¶ 113 & Ex. E-5.) On July 7, 2005, the IGRC responded to Brown's grievance, stating: "The Committee finds, as per Nurse Administrator Boyd's response, that there is no need for medical boots." (Am. Compl. ¶ 114 & Ex. E-6.) On July 20, 2005, the Superintendent denied Brown's appeal, stating: "Grievant's action(s) requested were addressed appropriately by Nurse Administrator Boyd. As she stated, grievant was submitted to see the foot specialist. Treatment (surgical procedure) was administered and alleviated the need for medical boots." (Am. Compl. ¶ 115 & Ex. E-7.) On July 22, 2005, Brown appealed the Superintendent's decision to CORC. (Am. Compl. ¶ 116 & Ex. E-8.) On August 10, 2005, the CORC denied Brown's appeal, stating:

**11** Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employee referenced in this complaint.

CORC notes that the FHSD [Dr. Makram] crossed off an earlier entry in the grievant's [medical records] in front of him when she determined that a referral for surgical intervention was the best course of action to treat his symptoms instead. CORC also notes that, although the grievant is undergoing physical therapy and has a referral for another surgical procedure pending, the FHSD has determined that there is no medical necessity for prescription boots indicated at this time.

(Am. Compl. ¶ 117 & Ex. E-9.)

On September 7, 2005, Brown submitted a grievance about the cancellation of his surgery by the orthopedist at Hyde Hospital. (Am. Compl. ¶ 67 & Ex. C-4.) The grievance noted that instead of being sent back to Dr. Rubinovich at Hyde Hospital, Brown was referred to Dr. Lentini, which caused a three month delay in his surgery. (Am. Compl. ¶ 67 & Ex. C-4.) On September 14, 2005, Nurse Administrator Boyd responded to Brown's grievance, stating:

The grievant's complaints have been investigated and found to be unsubstantiated.

Grievant was seen by DR Rubinovich 1/05. Dr Rubinovich did not state the grievant's feet were em[ ]ergent in nature.

He stated "We will eventually get to his left foot." Grievant had surgery on his right foot 7/13/05. He is currently attending PT for it & will have surgery on the left afterward.

Regarding Action Requested:

1. Bunionectomy surgery can be performed by local Orthopedic Specialists. This saves the grievant from excessive traveling to go to a hospital that the previous surgeon uses. The facility has no control over where the grievant is scheduled.

(Am. Compl. ¶ 68 & Ex. C-5.) Brown admits that the round trip distance between Woodburne and Hyde Hospital is approximately 625 miles, while the round trip distance between Woodburne and the local hospital in Albany where he eventually went for his surgery is approximately 180 miles. (Am. Compl. at ¶ 68 n. 5.)

On September 14, 2005, Brown wrote a letter to defendant Dr. Lester Wright, DOCS' Associate Commissioner and Chief Medical Officer, "to complain about on going medical issues at [Woodburne] and to voice Plaintiff's concerns for the needed meaningful access permit," *i.e.,* a permit that would allow Brown to walk through the courtyard on his way to the Medical Unit instead of walking "the long way around." (Am. Compl. ¶ 124 & Ex. F-1.)

On September 16, 2005, the IGRC responded to Brown's September 7, 2005 grievance, stating:

The Committee finds that according to Nurse Administrator Boyd's response the scheduling of grievant's surgery is beyond the facility's control. We advise grievant to obtain copies of his medical records pertaining to the surgeon's recommendations and notes in his Ambulatory Health Record referring to his bunionectomy surgery. Grievant will be better informed about the actions being taken by the medical department concerning his medical problems.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

**\*12** (Am. Compl. ¶ 69 & Ex. C-6.)

On September 18, 2005, Brown wrote to Dr. Makram, requesting a medical access permit "allowing use of the court yard when I must go for medication or to the Medical Unit. Due to my disability the access permit is deemed necessary." (Am. Compl. ¶ 125 & Ex. F-2.) On September 22, 2005, Brown at sick call again requested a medical access permit. (Am.Compl.¶ 126.) Dr. Makram denied Brown's request for a medical access permit because "bunions are not going to prevent him from walking." (Am. Compl. ¶ 127 & Ex. F-3.)

On September 29, 2005, the Superintendent responded to Brown's grievance appeal regarding the cancellation of his bunion surgery, stating:

The status of grievant's bunionectomy surgery is considered non-emergent by Dr. Rubinovich. Surgery has not been cancelled, but do to nature of ailment it will be considered at a later date. Per Nurse Administrator Boyd the right foot did have surgery in July 2005 and that the left foot would be done in the future.

Medical care is proper and ongoing.

(Am. Compl. ¶ 70 & Ex. C-7.)

On October 1, 2005, Brown appealed the Superintendent's decision " 'specifically requesting' justifiable reasons and/or an explanation, as to why, Plaintiff was not temporarily moved to a facility near Alice Hyde Hospital in order to gain access to treatment from the orthopedic specialist, as was done for other **inmate's** 'similarly situated.' " (Am. Compl. ¶ 71 & Ex. C-8.) Brown only mentioned the problems with his left foot, which had not yet been operated on, but did not mention his hip. (Am. Compl. ¶ 71 & Ex. C-8.)

On October 2, 2005, Brown filed a formal grievance regarding the medical access (to the courtyard) permit denial. (Am. Compl. ¶ 128 & Ex. F-4.)

On October 5, 2005, Brown received a response to his September 14 letter from Pedro Diaz on behalf of Dr. Lester Wright, stating:

The Division of Health Services has investigated your concern regarding your allegation that you are receiving inadequate health services at Woodburne Correctional Facility. A review of your medical records indicates that you have repeatedly expressed the desire to have your bunions addressed prior to having your hip addressed. Since your left foot surgery you have been back to the specialist for follow-up, you are scheduled for physical therapy and have been referred to the specialist for your right foot problem. You have been seen and evaluated by the facility physician, who has determined that you do not require a permit for access through the courtyard. You have been provided a feed-in-cell permit through December 2005. Your medical needs are apparently being addressed.

You, also, allege that RNs DeFrank and Reddish are hostile towards you when you go to sick call. These health care staff have categorically denied your allegation and indicated that they have provided you with appropriate and necessary health care. Your allegations are unfounded.

**\*13** You are urged to consult with the health care staff using the existing sick call procedures. I am certain they will make every effort to address your medical needs.

(Am. Compl. ¶ 129 & Ex. F-5.)

On October 11, 2005, Nurse Administrator Boyd wrote a memo in response to Brown's grievance about the courtyard access permit, stating:

The grievant's complaints have been investigated and found to be unsubstantiated.

Grievant saw Orthopedic specialist on 1/13/05. **Inmate** told MD that he wants his feet taken care of first & that "He feels he can live with his hip right now." Specialist gives recommendations not orders. Grievant is locking on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

the first floor, has a feed in cell permit till 12/1/05 & is attending Physical Therapy. Facility Health Services Director denied **inmate's** request for permit to access medical through court yard.

Regarding Action Requested:

Denied, no medical need at this time per Facility Health Services Director.

(Am. Compl. ¶ 130 & Ex. F-6.) On October 12, 2005, the IGRC responded to Brown, stating: "[T]he Facility Health Services Director has sole responsibility for grievant's health care. Hence, it is beyond the purview of this Committee to recommend a Court Yard permit. Grievant should write Deputy Superintendent for Programs, Ms. J. King, to request reasonable accommodations for the Court Yard crosswalk." (Am. Compl. ¶ 131 & Ex. F-7.) On October 13, 2005, Brown wrote to Ms. King requesting a court yard permit. (Am. Compl. ¶ 131 & Ex. F-8.) On October 14, 2005, Ms. King responded, stating: "My office is not in a position to grant this request. I will address your concerns to the Acting Deputy Superintendent for Security to inquire the possibility of obtaining such a permit." (Am. Compl. ¶ 132 & Ex. F-9.) On October 19, 2005, Captain and Acting Deputy Superintendent P.D. Early denied Brown's request, stating "Per Dr. Makram, a courtyard access permit is not medically necessary. As a result, your request is denied." (Am. Compl. ¶ 133 & Ex. F-10.) On October 24, the Superintendent responded to Brown's grievance appeal relating to the medical access permit, stating: "Grievant's requested action for a medical courtyard permit is not accepted. The Facility Health Services Director (FHSD) has denied the request and deemed it not warranted." (Am. Compl. ¶ 134 & Ex. F-11.) Brown appealed this decision to CORC. (Am. Compl. ¶ 134 & Ex. F-11.)

On October 26, 2005, CORC responded to Brown's appeal, stating in part: "CORC notes that the grievant's medical issues are being appropriately addressed. He has had surgery on his right foot and is going out for physical therapy ... CORC asserts that Coordinated Specialty Care determines which surgeon will be used based on availability and other factors." (Am. Compl. ¶ 72 & Ex. C-9.)

On November 4, 2005, Brown received the final bunion surgery on his feet. (Am.Compl.¶ 26.)

On November 16, 2005, CORC unanimously denied Brown's request for a medical access permit. (Am. Compl. ¶ 135 & Ex. F-12.)

**\*14** Nevertheless, on December 15, 2005, Brown was issued a temporary pass (valid through June 30, 2006) that would allow him to pass through the F-wing on his way to the medical unit. (Am. Compl. ¶ 136 & Ex. F-14.)

*2006 Medical Records*

On February 10, 2006, Dr. Rubinovich wrote a letter to Dr. Makram that stated in part:

Mr. Brown is a 46 year old gentleman who presents with pain in his right hip. I followed him previously with a diagnosis of degenerative change in the right hip post slipped epiphysis as a child. Sherman [Brown] is getting more and more pain in his hip. He is having difficulties with activities of daily living especially going up and down stairs. He does get around using a cane at this time. He has had both of his bunions fixed previously by the podiatrist. His general health is otherwise good. He has recently started on medication for hypertension. Additionally, he is on Risperdal, Celexa, and one other mood altering medication.

...

I have had a long chat with Sherman [Brown] with regards to treatments. He feels that this time he would like to proceed with a hip arthroplasty. I have gone over risks, complications, and options with him and he agrees. I am going to get this organized for him as an inpatient at Rome Hospital. He will require 3 days of in house care and then be discharged back for rehabilitation. If we can get clearance from Department of Corrections I will get this scheduled for him.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

against certain defendants fail for lack of their personal involvement (Defs. Br. at 10-14); and (6) defendants are entitled to qualified immunity (Defs. Br. at 14-16).

(Am.Compl.Ex.B-12.)

### ANALYSIS

### *Brown's Claims and the Relief Sought*

Brown asserts that defendants: (1) were deliberately indifferent to his serious medical needs; (2) retaliated against him; (3) discriminated against him; (4) ignored risks to his health and safety; (5) intentionally submitted false official reports and/or tampered with medical records; (6) denied and/or unreasonably delayed medical treatment and specialty care recommendations; and (7) deprived him of a transporting medical service and a meaningful access permit that was afforded to other **prisoners** similarly situated. (Dkt. No. 3: Am. Compl. ¶ 4.)

Brown's Amended Complaint requested, *inter alia,* the following relief: (1) a preliminary or permanent injunction prohibiting defendants from retaliating against him; (2) an order that Brown be issued a "meaningful access permit" authorizing him to use alternative routes to get to the Medical Unit; (3) a declaratory judgment that Brown's rights were violated under the ADA and the Eighth and Fourteenth Amendments; and (4) compensatory and punitive damages for deliberate indifference to Brown's medical needs in the sum of $6,168,000.00. (Dkt. No. 3: Am. Compl. at 31.)

### *Defendants' Motion to Dismiss*

Defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and **12( b)( 6) of the Federal Rules of Civil Procedure** (Dkt. No. 24: Defs. Notice of Motion at 2), on the grounds that: (1) the Court lacks subject matter jurisdiction over Brown's claims for injunctive relief because he is no longer incarcerated in any DOCS facility (Dkt. No. 25: Defs. Br. at 4-5); (2) the Court lacks subject matter jurisdiction over Brown's claims against defendants in their official capacities (Defs. Br. at 6); (3) Brown's claims fail because he did not suffer from a sufficiently serious medical condition (Defs. Br. at 6-9); (4) Brown fails to state a claim under the ADA or Rehabilitation Act (Defs.Br.9-10); (5) Brown's claims

### I. *THE STANDARD GOVERNING A MOTION TO DISMISS* [FN1]

FN1. For additional decisions by this Judge discussing the standard governing a motion to dismiss in language substantially similar to that in this section of this Opinion, *see, e.g., Zhang v. U.S. Citizenship & Immigration Serv.,* 05 Civ. 4086, 2005 WL 3046440 at *3-4 (S.D.N.Y. Nov. 8, 2005) (Peck, M.J.); *Hseuh v. Bank of New York,* 05 Civ. 5345, 2005 WL 2842069 at *2-3 (S.D.N.Y. Oct. 31, 2005) (Peck, M.J.); *Brooks v. Von Lenthe,* 05 Civ. 3655, 2005 WL 2679716 at *8-9 (S.D.N.Y. Oct. 21, 2005) (Peck, M.J.), *report & rec. adopted,* 2006 WL 177146 (S.D.N.Y. Jan. 24, 2006) (Berman, D.J .); *Wong v. Health First,* 04 Civ. 10061, 2005 WL 1676705 at *1-3 (S.D.N.Y. July 19, 2005) (Peck, M.J.), *report & rec. adopted,* 2006 WL 2457944 (S.D.N.Y. Aug. 23, 2006) (Batts, D.J.); *Chase v. Czajka,* 04 Civ. 8228, 2005 WL 668535 at *4-5 (S.D.N.Y. Mar. 23, 2005) (Peck, M.J.), *report & rec. adopted,* 2005 WL 1352983 (June 8, 2005) (Kaplan, D.J.); *Amadasu v. Bronx Lebanon Hosp. Ctr.,* 03 Civ. 6450, 2005 WL 121746 at *3 (S.D.N.Y. Jan. 21, 2005) (Peck, M.J.), *report & rec. adopted,* 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005) (Kaplan, D.J.); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *5-6 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1080-81 (S.D.N.Y.1996) (Knapp, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 93 Civ. 0180, 1995 WL 571888 at *11 (S.D.N.Y. Sept. 20, 1995) (Peck, M.J.), *report & rec. adopted,* 936 F.Supp. 126 (S.D.N.Y.1996) (Knapp, D.J.).

**\*15** A district court should deny a Rule **12( b)( 6)** motion to dismiss "unless it appears to a certainty that a plaintiff

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

can prove no set of facts entitling him to relief." *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994).[FN2] A court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party-here, the plaintiff. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).[FN3]

FN2. *Accord, e.g., Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004); *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001); *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.), *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678 (2001); *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998).

FN3. *Accord, e.g., Freedom Holdings, Inc. v. Spitzer,* 357 F.3d at 216; *Weinstein v. Albright,* 261 F.3d at 131; *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 69.

The "standards for dismissal under [Rule] 12( b)( 6) and 12(b)(1) are substantively identical." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.), *cert. denied,* 540 U.S. 1012, 124 S.Ct. 532 (2003); *see also, e.g., Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999); *Bishop v. Porter,* 02 Civ. 9542, 2003 WL 21032011 at *3 (S.D.N.Y. May 8, 2003); *Tennant v. United States Bureau of Prisons,* 02 CV 00558, 2003 WL 1740605 at *1 (D.Conn. Mar. 29, 2003).[FN4]

FN4. The only substantive difference is "that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12( b)( 6) motion, in which the defendant has the burden of proof." *Lerner v. Fleet Bank, N.A.,* 318 F.3d at 128 (citing *Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir.1994)); *see also, e.g., Langella v. Bush,* 306 F.Supp.2d 459, 463 (S.D.N.Y.2004) ("On a motion to dismiss pursuant to Rule 12(b)(1), plaintiff carries the burden of establishing that subject matter jurisdiction exists over his complaint."); *Bishop v. Porter,* 2003

WL 21032011 at *3.

The other difference is that on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court "may refer to evidence outside the pleadings." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986)); *see also, e.g., Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, the court may inquire, by affidavits or otherwise, into the facts as they exist."); *Exchange Nat'l Bank v.. Touche Ross & Co.,* 544 F.2d 1126, 1130-31 (2d Cir.1976); *Masters v. Wilhelmina Model Agency, Inc.,* 02 Civ. 4911, 2003 WL 145556 at *1 (S.D.N.Y. Jan. 17, 2003).

A Rule 12( b)( 6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l Ltd.,* 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir.1991)).[FN5] The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. *E.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); *Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 1125 S.Ct. 1561 (1992)); *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference...."); *see also, e.g., Paulemon v. Tobin,* 30 F.3d 307, 308-09 (2d Cir.1994); *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

FN5. *Accord, e.g., Faulkner v. Beer,* 463 F.3d 130, 2006 WL 2588014 at *2 (2d Cir. Sept. 8, 2006); *Aniero Concrete Co. v. New York City Constr. Auth.,* 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 97 Civ. 5499, 2000 WL 264295 at *12 (S.D .N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12( b)( 6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12( b)( 6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b); *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000); *Fonte v. Board of Managers of Cont'l Towers Condos,* 848 F.2d 24, 25 (2d Cir.1988).

"However, before materials outside the record may become the basis of a dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document." *Faulkner v. Beer,* 2006 WL 2588014 at *3 (citations omitted).

*16 In this case, the medical records and grievance documents that Brown attached to the amended complaint may be considered on the motion to dismiss, whether under Rule 12(b)(1) or 12( b)( 6), subject to the *Faulkner v. Beer* proviso. (*See* cases cited in the immediately prior paragraphs.)

The Court's role in deciding a motion to dismiss " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Saunders v. Coughlin,* 92 Civ. 4289,

1994 WL 88108 at *2 (S.D .N.Y. Mar. 15, 1994) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)); *accord, e.g., Watson v. McGinnis,* 964 F.Supp. 127, 130-31 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.). " '[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Saunders v. Coughlin,* 1994 WL 88108 at *2 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974)). A Rule 12( b)( 6) motion will be granted " 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Saunders v. Coughlin,* 1994 WL 88108 at *2 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)).

When reviewing a pro se complaint, the Court must use less stringent standards than if the complaint had been drafted by counsel. *See, e.g., LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Watson v. McGinnis,* 964 F.Supp. at 131; *Saunders v.. Coughlin,* 1994 WL 88108 at *2 (citing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173 (1980)). However, "[d]ismissal under Rule 12( b)( 6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief...." 2 *Moore's Federal Practice* § 12.34[4][a], at 12-72.7 (2005). Thus, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.' " *Id.,* § 12.34[1][b], at 12-61; *see also, e.g., Joyner v. Greiner,* 195 F.Supp.2d 500, 503 (S.D .N.Y.2002) (action dismissed because pro se plaintiff "failed to allege the facts tending to establish" that defendants violated his constitutional rights).

**II. *BROWN'S* § 1983 *CLAIMS FOR DAMAGES AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE DISMISSED ON ELEVENTH AMENDMENT GROUNDS***

" 'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment....' " *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (quoting *Jackson v. Johnson,* 30 F.Supp.2d 613, 618 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein); *accord, e.g., Dunn v. Carrier,* 137 Fed. Appx. 387, 389 (2d Cir.2005); *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *Davis v. New York,* 316 F.3d

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

93, 101 (2d Cir.2002) (second hand smoke case); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *12 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); *Johnson v. Goord,* 01 Civ. 9587, 2004 WL 2199500 at *4 (S.D.N.Y. Sept. 29, 2004) ("Employees of DOCS and its facilities, when sued in their official capacities, have been held to be subject to the state's Eleventh Amendment immunity. Thus, to the extent that these plaintiffs assert section 1983 damage claims against defendants in their official capacities, they are dismissed from this action.") (citations omitted); *Baker v. Welch,* 03 Civ. 2267, 2003 WL 22901051 at *6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *5 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.).

*17 Accordingly, Brown's § 1983 claims for damages against the individual defendants in their official capacities are dismissed. Brown's § 1983 claims against the individual defendants in their official capacities for injunctive relief and in their individual capacities for damages, which are not barred by the Eleventh Amendment, are addressed below. *See, e.g., Davis v. New York,* 316 F.3d at 101-02 (Eighth Amendment deliberate indifference "claims for declaratory and injunctive relief and damages against defendants, in their individual capacities" for exposure to ETS not barred by Eleventh Amendment); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *12; *Johnson v. Goord,* 2004 WL 2199500 at *4 ("The Eleventh Amendment does not bar the claims against defendants in their official capacities for declaratory and injunctive relief.").

### III. BROWN'S CLAIMS FOR INJUNCTIVE RELIEF ARE DISMISSED AS MOOT

Because Brown is no longer incarcerated and under the supervision of any of the defendants, Brown's request for injunctive relief "[p]rohibiting the Defendant's from taking any form of retaliation (disciplinary, or otherwise), against Plaintiff," and ordering the defendants to "issue Plaintiff a meaningful access permit authorizing Plaintiff use of alternative routes to F-Wing & Medical Unit to accommodate Plaintiff's disability" (Dkt. No. 3: Am. Compl. at 31) are moot. "Because plaintiff is no longer incarcerated and under the supervision of any of the

named defendants, ... [Brown's] claims for injunctive relief are moot and the Court lacks jurisdiction to consider them." *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878 at *3 (S.D.N.Y. Nov. 17, 1997) (Sotomayor, D.J.).[FN6] Accordingly, the Court will review Brown's claims only to the extent they seek damages against the defendants.

FN6. *See also, e.g., Salahuddin v. Goord,* No. 04-3470, ---F.3d ----, 2006 WL 3041934 at *3 (2d Cir. Oct. 27, 2006) ("In this circuit, an **inmate's** transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Hill v. Zenk,* 115 Fed. Appx. 97, 97 (2d Cir.2004) ("Because [plaintiff] brought his action for relief against the warden of a facility in which he concedes he is no longer incarcerated, his petition for relief is moot."); *Thompson v. Carter,* 284 F.3d 411, 415-16 (2d Cir.2002); *Colman v. Goord,* 2 Fed. Appx. 170, 171 (2d Cir.2001); *Smith v. Westchester County,* No. 97-2371, 152 F.3d 920 (table), 1998 WL 433008 at *2 (2d Cir. May 20, 1998); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976) ("In view of the fact that appellant is no longer incarcerated at Auburn, his request for an injunction restraining the officials at Auburn from violating his civil rights is moot."); *Claudio v. Goord,* 03 Civ. 1234, 2006 WL 2290822 at *7 (S.D.N.Y. Aug. 8, 2006) ("It is well settled in this Circuit that being transferred from a prison moots any actions for injunctive relief available at that prison."); *Cain v. Jones,* 05 Civ. 3914, 2006 WL 846722 at *2 (S.D.N.Y. Mar. 30, 2006); *Kee v. Hasty,* 01 Civ. 2123, 2004 WL 807071 at *7 (S.D.N.Y. Apr. 14, 2004) ("[A]n incarcerated plaintiff's transfer out of the prison facility at which the cause of action arose moots his claim against that facility, insofar as it seeks injunctive and declaratory relief."); *Verley v. Goord,* 02 Civ. 1182, 2004 WL 526740 at *9 (S.D.N.Y. Jan. 23, 2004); *Moore v. Keane,* 01 Civ. 1139, 2002 U.S. Dist. LEXIS 1439 at *1 (S.D.N.Y. Jan. 31, 2002) ("[P]laintiff's request for injunctive relief is now moot because he has

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

been released from prison."); *Courts v. Coombe, 95 Civ. 2350, 1996 WL 312357 at *2 (S.D.N.Y. June 11, 1996)* ("The mere possibility that [plaintiff] may be returned to Woodburne at some point in the future does not present a sufficient case or controversy that the Court can presently adjudicate.").

**IV. *LEGAL STANDARDS GOVERNING § 1983 EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS CLAIMS*** [FN7]

FN7. For additional decisions by this Judge discussing the governing standard in § 1983 deliberate medical indifference claims, in language substantially similar to that in this entire section of this Opinion, *see, e.g., Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *12-15 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); *Doe v. Goord,* 04 Civ. 0570, 2005 WL 3116413 at *10-13 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.); *Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *13-15 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at * 12-13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J .); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *4-7 (S.D.N .Y. May 13, 2004) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *10-13 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v.. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory

right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994).

The Eighth Amendment protects **prisoners** from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976).

**\*18** To establish an Eighth Amendment violation based on a claim that a prison official has placed an **inmate's** health in danger, the **inmate** must show that the prison official acted with "deliberate indifference" to the **inmate's** serious medical needs. *E.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291. [FN8]

FN8. *See also, e.g., Salahuddin v. Goord,* No. 04-3470, ---F.3d ----, 2006 WL 3041934 at *10 (2d Cir. Oct. 27, 2006); *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* 17 Fed. Appx. 36, 37 (2d Cir.2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *Perkins v. Obey,* 00 Civ. 1691, 2004 WL 238036 at *8 (S.D.N.Y. Feb. 10, 2004).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a **subjective** prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [FN9] "Objectively, the alleged deprivation must be 'sufficiently serious.' " *Hathaway v. Coughlin,* 99 F.3d at 553; *see, e.g., Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that **prisoners** will have unqualified access to health care, deliberate **indifference** to **medical** needs

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

amounts to an **Eighth Amendment** violation only if those needs are 'serious' "); *Smith v. Carpenter,* 316 F.3d at 183-84 ("The objective "**medical** need' element measures the severity of the alleged deprivation ...").[FN10] " 'The Constitution does not command that **inmates** be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an **Eighth Amendment** violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, **Eighth Amendment** protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [FN11] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to **treat** a **prisoner's** condition could result in further significant injury or the unnecessary and wanton infliction of **pain**.' ").

FN9. *Accord, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *10-11; *Smith v. Carpenter,* 316 F.3d at 183; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

FN10. *See also, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *10; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702; *Lumaj v. Williams,* 03 Civ. 1849, 2004 WL 1207894 at *4 (S.D.N.Y. June 2, 2004); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 339 (S.D.N.Y.2003).

FN11. The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and

substantial pain.' " 143 F.3d at 702.

The Second Circuit recently reiterated that determining whether a deprivation is objectively serious entails two inquiries:

Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the **prisoner** was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an **inmate** health risk] cannot be found liable under the Cruel and Unusual Punishments Clause," and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the **prisoner**. For example, if the unreasonable medical care is a failure to provide any treatment for an **inmate's** medical condition, courts examine whether the **inmate's** medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the **prisoner** is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the **prisoner's** underlying medical condition alone." Thus although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

**\*19** *Salahuddin v. Goord,* 2006 WL 3041934 at *10 (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

"Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553; *accord, e. g., Salahuddin v. Goord,* 2006 WL 3041934 at *11; *Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that the official ' "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994))).[FN12]

> FN12. *See also, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *11 ("Deliberate indifference is a mental state equivalent to subjective recklessness.... This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious **inmate** harm will result."); *Smith v. Carpenter,* 316 F.3d at 184; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702; *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger."); *Lumaji v. Williams,* 2004 WL 1207894 at *5.

Deliberate indifference may be "manifested by prison doctors in their response to the **prisoner's** needs or by prison [officials or] guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an **inmate** access to needed medical care.").[FN13] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate

indifference." *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S.Ct. at 292; *accord, e.g., Burton v. New York State Dep't of Corr.,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 21, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292.[FN14] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a **prisoner**." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Smith v. Carpenter,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corr.,* 1994 WL 97164 at *2.

> FN13. *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from **prisoner's** hip despite nearly seventy complaints of pain), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious **inmate** for three days); *Archer v. Dutcher,* 733 F.2d 14, 15-17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

> FN14. *Accord, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *11; *Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Corr. Servs.,* No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N .Y. Apr. 10, 1998) (Pooler, D.J.).

An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

*Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But][c]onsciously disregarding an **inmate's** legitimate medical needs is not 'mere medical malpractice.' "); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

**\*20** "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a **prisoner** might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Culp v. Koenigsmann,* 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct. 15, 1999) ("a **prisoner's** disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 250 F.Supp.2d 299, 308 (S.D.N.Y.1999) (citing cases), *aff'd,* 29 Fed. Appx. 762 (2d Cir.2002); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug. 11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14, 1999).[FN15]

> FN15. Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

> Although a delay in providing necessary medical care may in some cases constitute

deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.* That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

*Demata v. New York State Corr. Dep't of Health Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); *accord, e.g., Smith v. Carpenter,* 316 F.3d at 185 ("When the basis for a **prisoner's** Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay or interruption* in treatment rather than the person's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.") (emphasis in original); *Freeman v. Strack,* 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled **inmate** with appendicitis requiring appendectomy for appointment two hours later rather than seeing **inmate** immediately where "[t]here was nothing in the **inmate**'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); *Culp v. Koenigsmann,* 2000 WL 995495 at *7-8 (rejecting claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

based on fact that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

"Just as the relevant 'medical need' can only be identified in relation to the specific factual context of each case, the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances. The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the **prisoner** to a significant risk of serious harm." _Smith v. Carpenter_, 316 F.3d at 187 (citations omitted).

A risk of future harm also is actionable under the Eighth Amendment. _Helling v. McKinney_, 509 U.S. 25, 33-36, 113 S.Ct. 2475, 2480-82 (1993) (exposure to second hand smoke); _Warren v. Keane_, 196 F.3d 330, 332-33 (2d Cir.1999) (same). Determining whether "conditions of confinement violate the Eighth Amendment requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by the exposure to [the harmful condition]. It also requires a court to assess whether society considers the risk that the **prisoner** complains of to be so grave that it violates contemporary standards of decency to expose _anyone_ unwillingly to such a risk. In other words, the **prisoner** must show that the risk of which he complains is not one that today's society chooses to tolerate." _Helling v. McKinney_, 509 U.S. at 36, 113 S.Ct. at 2482. The threatened health problems must be " 'sufficiently imminent' and 'sure or very likely to cause serious illness and needless suffering in the next week or month or year.' " _Atkins v. County of Orange_, 372 F.Supp.2d 377, 408 (S.D.N.Y.2005).

**V. BROWN'S § 1983 CLAIMS RELATING TO HIS BUNIONS ARE DISMISSED FOR FAILURE TO STATE A CLAIM FOR DELIBERATE**

**INDIFFERENCE**

**\*21** Brown has specified three deliberate indifference claims relating to his bunions: (1) defendants unreasonably delayed referral for needed podiatry services (Dkt. No. 3: Am. Compl. ¶¶ 9-26); (2) defendants intentionally cancelled and unreasonably delayed his bunion surgery because they prevented him from getting transport to Hyde Hospital (Am.Compl.¶¶ 58-76); and (3) defendants intentionally denied him a referral for prescription footwear (Am.Compl.¶¶ 102-22). None of these claims support a finding of deliberate indifference to his serious medical needs.

Brown's bunions are not a sufficiently serious medical issue as to warrant Eighth Amendment protection under a deliberate indifference theory. Unlike cases where injuries demonstrate the requisite urgency leading to "death, degeneration or extreme pain," the case law holds that **prisoner** complaints about bunions or other foot problems do not establish the objective prong of the deliberate indifference standard. _See, e.g., Hernandez v. Goord_, 02 Civ. 1704, 2006 WL 2109432 at *1, 5-6 (S.D.N.Y. July 28, 2006) (plaintiff's painful injured left foot diagnosed as hammertoe with an overlap not severe enough for deliberate indifference claim); _McKinnis v. Williams_, 00 Civ. 8357, 2001 WL 873078 at *3-4 (S.D.N.Y. Aug. 1, 2001) (painful toe injury did not "rise to the level of 'serious medical need' "); _Veloz v. New York_, 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (plaintiff's fracture, bone cyst and degenerative arthritis in feet not "sufficiently serious" medical condition); _Alston v. Howard_, 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (ankle injury not sufficiently serious to establish a constitutional violation); _Cole v. Scully_, 93 Civ.2066, 1995 WL 231250 at *1, 5-6 (S.D.N.Y. Apr. 18, 1995) (bunions and tender feet after bunion surgery not a sufficiently serious medical condition). Brown's bunions are therefore not sufficiently serious to establish a claim for deliberate indifference as a matter of law.

Additionally, based on the medical records attached to the complaint, no reasonable jury could find that defendants were subjectively deliberately indifferent to Brown's needs. Brown was examined and treated for his foot problems on numerous occasions by defendants. DOCS' medical personnel ordered x-rays to be taken of Brown's

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

feet, gave him non-prescription and prescription pain medication, referred him to a podiatrist, and arranged for bunion surgery to be performed on both of his feet, which, once healed, relieved any need Brown had for special footwear. (*See* pages 5-25 above.) Brown does not deny that he has received all of this treatment, and appears to be complaining merely about the type of treatment he was receiving or the speed at which he was scheduled for specialist appointments and surgery. *See, e.g., Davidson v. Scully,* 155 F.Supp.2d 77, 83-84 (S.D.N.Y.2001) (No subjective deliberate indifference to plaintiff's foot problems where "plaintiff was examined and treated ... on numerous occasions by DOCS medical personnel as well as by outside orthopedic doctors to whom plaintiff was referred by DOCS."); *Williams v. M.C.C. Inst.,* 97 Civ. 5352, 1999 WL 179604 at *9 (S.D.N.Y. Mar. 31, 1999) (No subjective deliberate indifference where plaintiff was examined for dental problems on eight separate occasions during one year and five different occasions the next year and was always given treatment when he sought it.), *aff'd,* 101 Fed. Appx. 862 (2d Cir .2004); *Keyes v. Strack,* 95 Civ. 2367, 1997 WL 187368 at *4 (S.D.N.Y. Apr. 16, 1997) ("The record shows that defendants were not deliberately indifferent to [plaintiff's] medical needs. The Fishkill medical staff made continual efforts to treat and care for plaintiff," with thirty visits to the facility's clinic over an eleven month period.); *Alston v. Howard,* 925 F.Supp. at 1040 (No deliberate indifference where plaintiff "was afforded consistent, attentive surgical and therapeutic medical care on about a weekly basis in a comprehensive attempt to remedy the source of [plaintiff's] ankle pain."); *Johnson v. Dep't of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar. 21, 1995) (No deliberate indifference where "[d]uring the nine month period that plaintiff was in DOC custody he was examined and treated on numerous occasions for his hip condition and a myriad of other ailments."). As discussed on page 40 above, disagreement over or delays in treatment do not create a constitutional claim. Because Brown has failed to adequately plead any constitutional deliberate indifference, objective or subjective, to his medical needs relating to his bunions, those claims relating to his bunions are dismissed.[FN16]

FN16. Since the only claim against defendant Nurse Molloy relate to bunion treatment (*see* page 13 above), all claims against her are dismissed.

**VI. DEFENDANTS' MOTION TO DISMISS IS DENIED AS TO BROWN'S ARTHRITIC HIP CONDITION § 1983 CLAIM**

**\*22** Brown has specified three § 1983 deliberate indifference claims relating to his arthritic hip condition: (1) that his requests for first floor housing were denied (Dkt. No. 3: Am. Compl. ¶¶ 27-57); (2) that he was denied a walking cane (Am.Compl.¶¶ 77-101); and (3) that he was denied an access permit that would allow him to take an alternative route to the medical unit (Am.Compl .¶¶ 123-137). While defendants contend that they could not be found to have acted with deliberate indifference because Brown's hip condition was not a sufficiently serious medical condition, Brown's complaint adequately alleges that his hip condition was (objectively) very severe and that defendants (subjectively) acted with deliberate indifference with regard to that condition.

First, although there is an indication in Brown's medical records that he has had pain in his right hip since a bicycle accident thirty years ago (Am.Compl.Ex.B-1), and notations from his doctors suggesting that Brown told them that "[h]e feels he can live with his hip right now" (Am. Compl. ¶ 48 & Ex. B-7), Brown's complaint disputes the accuracy of certain of the DOCS' records about his hip that are attached as exhibits to his complaint (*see* Am. Compl. ¶¶ 4, 19, 40 n. 3, 47, 95-97, 100, 118, 120). The Court therefore cannot fully accept all of the exhibits to Brown's complaint as true in considering the dismissal of these claims. *See Faulkner v. Beer,* --- F.3d ----, No. 05-1568-CV, 2006 WL 2588014 at *3 (2d Cir. Sept. 8, 2006). As a result, the medical evidence regarding Brown's arthritic hip in the exhibits attached to Brown's complaint are unclear as to the exact severity of his condition.

Additionally, Brown's complaint demonstrates that he was living with a great deal of pain in his hip for several months during 2004 and 2005, particularly after his fall down the stairs on February 15, 2005 (Am.Compl.¶¶ 51-53). Between August 27, 2004, when DOCS medical personnel first diagnosed the arthritis in his hip (Am. Compl. ¶ 27 & Ex. B-1), and December 15, 2005, when Brown was issued a medical access permit (Am. Compl. ¶ 136 & Ex. F-14), Brown complained about severe pain in his hip at least thirteen times (Am.Compl.¶¶ 27, 28, 43,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

44, 51-53, 64, 78, 81, 88, 89, 124-26). Brown alleges that
he informed defendants that pain in his hip was
particularly acute when he was walking or climbing stairs.
(Am.Compl.¶¶ 28-31, 43, 44,51-53, 78.) Therefore,
Brown's complaint adequately alleges that his arthritic hip
condition was sufficiently serious to satisfy the objective
prong of a deliberate indifference inquiry. *See, e.g.,*
*Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994)
(degenerative hip condition prior to surgery and broken
pins in hip after surgery, was sufficiently serious medical
condition); *Rhames v. Fed. Bureau of Prisons,* 00 Civ.
4338, 2002 WL 1268005 at *6 (S.D.N.Y. June 6, 2002)
(Plaintiff's "arthritic hip" was a "serious medical
condition[ ] that demanded attention"); *Woods v. Goord,*
01 Civ. 3255, 2002 WL 731691 at *4 (S.D.N.Y. Apr. 23,
2002) (plaintiff's leukemia, degenerative joint disease, and
rheumatoid arthritis were conceded to be sufficiently
serious medical conditions).

*23 Brown also has adequately alleged subjective
deliberate indifference on defendants' part. Brown's
complaint specifies that, knowing that Brown's arthritic
hip condition caused him severe pain when walking and
climbing stairs, defendants Nurse DeFrank, Nurse
Administrator Boyd, Dr. Makram, and Dr. Lancellotti
refused to grant him first floor housing, which would have
eliminated Brown's need to climb stairs and therefore
would have eased some of his hip pain. (Am. Compl. ¶¶
27-57; *see* pages 7-15 above.) Brown was without first
floor housing for approximately three and a half months
after requesting it in November 2004, and was without
first floor housing for approximately one month after the
fall down the stairs injured his hip further. (Am. Compl. ¶¶
27-57; *see* page 13 above.) Brown's complaint also
specifies that, knowing of his painful hip condition, Nurse
DeFrank, Nurse Administrator Boyd, and Dr. Makram did
not allow Brown to have a cane, which would have greatly
reduced Brown's hip pain when walking, for
approximately one week, and allowed Brown's cane
permit to lapse for approximately a month and a half,
making Brown subject to discipline if he were caught with
the cane but without a permit. (Am. Com pl. ¶¶ 77-101;
*see* page 16 above.) Lastly, Brown's complaint asserts that,
knowing of his painful hip condition, Dr. Makram and
Nurse Administrator Boyd denied his requests for a
medical access permit allowing him to use a shorter route
to the medical unit, thereby decreasing the amount of hip
pain associated with walking. (Am.Compl.¶¶ 123-37.)
Brown was without a medical access permit for

approximately three months after he initially requested it.
(Am. Com pl. ¶¶ 123-37; *see* pages 20-24 above.) *See*
*Rhames v. Fed. Bureau of Prisons,* 2002 WL 1268005 at
*7 (dismissal denied where plaintiff needed a cane to ease
the pressure on his degenerated hip, but no cane was
provided); *Brady v. Griffith,* 95 Civ. 2364, 1998 WL
814630 at *3-4 (S.D.N.Y. Nov. 23, 1998) (summary
judgment denied where facts tended to show that
defendants deprived plaintiff of wheelchair even though
plaintiff needed wheelchair to get around and to transport
herself to the medical unit for treatment). Brown has stated
a claim for deliberate indifference to his medical needs
with regard to his arthritic hip condition against
defendants Nurse DeFrank, Nurse Administrator Boyd, Dr.
Makram and Dr. Lancellotti, and therefore these
defendants' motion to dismiss Brown's claims relating to
his hip are denied.

**VII. *THE COURT DENIES THE MOTION OF
SUPERVISORY DEFENDANTS EARLY, KING,
CUNNINGHAM, DIAZ AND WRIGHT TO DISMISS
DUE TO ALLEGED LACK OF PERSONAL
INVOLVEMENT***

**A. *Legal Standard*** FN17

FN17. For additional decisions authored by this
Judge discussing the supervisory liability
standard for § 1983 claims in language
substantially similar to that in this entire section
of this Opinion, *see, e.g., Dawkins v. Jones,* 03
Civ. 0068, 2005 WL 196537 at *10-11
(S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Hall v.
Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *9
(S.D.N.Y. May 13, 2004) (Peck, M.J.);
*Muhammad v. Pico,* 02 Civ. 1052, 2003 WL
21792158 at *16 (S.D.N.Y. Aug. 5, 2003) (Peck,
M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL
664040 at *10 (S.D.N.Y. Apr. 23, 2002) (Peck,
M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL
476070 at *10 (S.D.N.Y. May 7, 2001) (Peck,
M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001
WL 417119 at *8 (S.D.N.Y. Apr. 3, 2001)
(Peck, M.J.) ( & cases cited therein); *Freeman v.
Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7
(S.D.N.Y. Sept. 29, 2000) (Peck, M.J.);
*Djonbalic v. City of New York,* 99 Civ. 11398,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

2000 WL 1146631 at *11 (S.D.N.Y., Aug 14, 2000) (Peck, M.J.); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *6 (S.D.N.Y. June 13, 2000) (Peck, M .J.); Ali v. Szabo, 81 F.Supp.2d 447, 462 (S.D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994); accord, e.g., Farrell v. Burke, 449 F.3d 470, 484 (2d Cir.2006); Gill v. Tuttle, 93 Fed. Appx. 301, 302 (2d Cir.2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir.2004); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003), cert. denied, 543 U.S. 1093, 125 S.Ct. 971 (2005); Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir.1999); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995); Torres v. Mazzuca, 246 F.Supp.2d 334, 338-39 (S.D.N.Y.2003); Zamakshari v. Dvoskin, 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of respondeat superior does not apply to § 1983 actions.").

*24 "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Colon v. Coughlin, 58 F.3d at 873. [FN18]

FN18. Accord, e.g., Samuels v. Selsky, 166 Fed. Appx. 552, 556 (2d Cir.2006); Patterson v. County of Oneida, 375 F.3d 206, 229 (2d Cir.2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir.2004); Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir.2003); Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir.2003), cert. denied, 543 U.S. 1093, 125 S.Ct. 971 (2005); Wright v. Smith, 21 F.3d at 501; Torres v. Mazzuca, 246 F.Supp.2d at 339; Zamakshari v. Dvoskin, 899 F.Supp. at 1109; see also, e.g., Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002).

**B. Application of the Legal Standards to The "Supervisory Defendants"**

While the "supervisory defendants" may prevail on summary judgment, the Court cannot say on a motion to dismiss that plaintiff Brown can prove no facts as to his arthritic hip entitling him to relief against the "supervisory defendants." Dr. Wright is DOCS' Chief Medical Officer, and plaintiff may be able to prove that Dr. Wright failed to remedy the (alleged) wrongs in Brown's medical treatment, or that Dr. Wright created the medical policies at issue, or was grossly negligent in supervising the prison medical staff. Similarly, while defendant Diaz's only involvement appears to be responding to Brown on behalf of Dr. Wright (see pages 22-23 above), the Court cannot say that there is no set of facts Brown can prove to show Diaz's involvement and liability. Defendants King and Early were involved in denial of Brown's request for a courtyard permit, and thus they effectively were directly involved in that aspect of Brown's hip claim. (See pages 23-24 above.) Supt. Cunningham denied all of Brown's grievances, and thus may prove to have failed to remedy wrongs or failed to adequately supervise subordinates. See, e.g., McKenna v. Wright, 386 F.3d 432, 437 (2d Cir.2004) (Prison officials who allegedly participated in denial of crucial medical treatment and rejected prisoner's administrative grievance were not entitled to qualified immunity at motion to dismiss stage from prisoner's claim of deliberate indifference to medical needs.); Smart v. Goord, 441 F.Supp.2d 631, 643-44 (S.D.N.Y.2006) (denying motion to dismiss on basis of qualified immunity; prisoner successfully alleged supervisory personnel's personal involvement in the violation of her due process rights by alleging, inter alia, Superintendent's failure to release prisoner from involuntary protective custody); James v. Aidala, 389 F.Supp.2d 451, 452-53 (W.D.N.Y.2005) (motion to dismiss on qualified

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

immunity grounds denied where **prisoner** stated claim of personal involvement of Commissioner where **prisoner** alleged that Commissioner created and upheld unconstitutional policy and failed to provide adequate training and supervision to corrections employees).

**VIII.** ***BROWN HAS FAILED TO ALLEGE FACTS DEMONSTRATING RETALIATION UNDER*** *SECTION 1983*

**A.** *Legal Standard Governing a* **§ 1983** *Retaliation Claim* [FN19]

> **FN19.** For additional decisions authored by this Judge discussing the plaintiff's burden of proof for a § 1983 retaliation claim in language substantially similar to that in this entire section of this Opinion, *see, e.g., Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *11-12 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.).

**\*25** The Second Circuit has clearly set forth a plaintiff's burden of proof in proving a § 1983 retaliation claim, as follows:

The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). [FN20]

> **FN20.** *See, e.g., Gill v. Tuttle,* 93 Fed. Appx. 301, 303 (2d Cir.2004); *Bennett v. Goord,* 343

F.3d 133, 137 (2d. Cir.2003); *Ebron v. CTO Huria,* No. 99-0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb. 1, 2000); *Davidson v. Chestnut,* 193 F .3d 144, 148-49 (2d Cir.1999); *Duamutef v. Hollins,* No. 97-2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir. July 7, 1998); *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Davidson v. Kelly,* No. 96-2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov. 24, 1997); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984); *see also, e.g., Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001), *aff'd,* 131 Fed. Appx. 775 (2d Cir .2005); *Williams v. Muller,* 98 Civ. 5204, 2001 WL 936297 at *3 (S .D.N.Y. Aug. 17, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363-64 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Campbell v. Kuhlmann,* 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15,1998).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* 2001 WL 936297 at *3 (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)); *see, e.g., Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002); *Gill v. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov. 1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

"While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a **prisoner's** exercise of a constitutional right gives rise to a retaliation claim. Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001) (citations omitted); *accord,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

e.g., _Morales v. Mackalm,_ 278 F.3d at 131; _Davidson v. Chestnut,_ 193 F.3d 144, 150 (2d Cir.1999); _Thaddeus-X v. Blatter,_ 175 F.3d 378, 396-98 (6th Cir.1999) (to be actionable, retaliation against a **prisoner** must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); _Crawford-El v. Britton,_ 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), rev'd on other grounds, 523 U.S. 574, 118 S.Ct. 1584 (1998).[FN21]

> FN21. _See also, e.g., Walker v. Keyser,_ 2001 WL 1160588 at *6; _Wagnon v. Gatson,_ 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); _Rivera v. Goord,_ 119 F.Supp.2d at 340.

  **Prisoners'** claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since **prisoners** can claim retaliation for every decision they dislike." _Graham v. Henderson,_ 89 F.3d at 79 (quoting _Flaherty v. Coughlin,_ 713 F.2d 10, 13 (2d Cir.1983)); accord, e.g., _Dawes v. Walker,_ 239 F.3d at 491; _Colon v. Coughlin_ 58 F .3d at 872; _Jackson v. Johnson,_ 15 F.Supp.2d at 364 ( & cases cited therein).

**B.** _Application to Brown's Retaliation Allegations_

**\*26** Brown's amended complaint asserts that defendant Nurse DeFrank retaliated against him after he filed a grievance relating to her treatment of his bunions. (Dkt. No. 3: Am. Compl. ¶¶ 4, 32-37.) However, Brown has failed to allege any retaliatory acts sufficiently serious to rise to a constitutional violation, i.e., acts that would deter a **prisoner** of ordinary firmness from exercising constitutional rights. Indeed, Brown himself was not deterred, because he filed several more grievances against DOCS' staff, including Nurse DeFrank, after the alleged retaliation. (See pages 8-24 above.) Brown's § 1983 retaliation claim is dismissed.

## IX. BROWN'S CLAIMS UNDER THE ADA AND REHABILITATION ACT

**A.** _Brown's ADA and Rehabilitation Act Claims for Damages Against the Individual Defendants In Their Individual Capacity Are Dismissed_

Damage claims against state officials in their individual capacities brought under the ADA and the Rehabilitation Act are not actionable. _Garcia v. S.U.N.Y. Health Sciences Ctr.,_ 280 F.3d 98, 107 (2d Cir.2001); accord, e.g., _Doe v. Goord,_ 04 Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10, 2004)(Peck, M.J.). "Insofar as [plaintiff] is suing the individual defendants in their individual capacities, neither Title II of the ADA, nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." _Garcia v. S.U.N.Y. Health Sciences Ctr .,_ 280 F.3d at 107 (citing cases); accord, e.g., _Doe v. Goord,_ 2004 WL 2829876 at *15. Accordingly, Brown's ADA and Rehabilitation Act damage claims against the individual defendants in their individual capacities are dismissed.

"Insofar as [plaintiff] is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent it shields [the State or State agencies]." _Garcia v. S.U.N.Y. Health Sciences Ctr.,_ 280 F.3d at 107; _Doe v. Goord,_ 2004 WL 2829876 at *15. The Court therefore turns in the next subsections to the availability of ADA and Rehabilitation Act claims against the State under the Eleventh Amendment.

**B.** _Brown's ADA Damage Claims Against the Individual Defendants In Their Official Capacity Are Not Barred By the Eleventh Amendment_

"[I]nsofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that _actually_ violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." _United States v. Georgia,_ 546 U.S. 151, 126 S.Ct. 877, 882 (2006) (emphasis in original).

A damage claim under the ADA against a state (or state agency or official) that covers conduct that violates the Fourteenth Amendment is not barred by the Eleventh Amendment as long as the "plaintiff can establish that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 112 (2d Cir.2001); *accord, e.g., Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.). The Second Circuit, in *Garcia,* recognized that "direct proof of this will often be lacking: smoking guns are rarely left in plain view," and that plaintiffs may establish "discriminatory animus" by relying on a "burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252-58, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 112; *accord, e.g., Doe v. Goord,* 2004 WL 2829876 at *15.

**C. *Doe's Rehabilitation Act Damage Claims Against the Individual Defendants In Their Official Capacity Are Not Barred By The Eleventh Amendment***

**\*27** Congress enacted Section 504 of the Rehabilitation Act pursuant to its authority under the Spending Clause of Article I of the Constitution. *See Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 113 (2d Cir.2001). When Congress provides federal funding, it may require that a state agree to waive its sovereign immunity as a condition of accepting the funds. *Id.* The Second Circuit in *Garcia* recognized that Congress expressly intended such a condition to apply for Section 504 of the Rehabilitation Act, *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 113 (citing 42 U.S.C. § 2000d-7), but ruled that a state may only effectively waive its sovereign immunity through an " 'intentional relinquishment or abandonment of a *known* right or privilege.' " *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 114 (quoting *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 682, 119 S.Ct. 2219, 2229 (1999)). *Garcia* held that SUNY had not effectively waived its sovereign immunity because at the time it accepted federal funds, the Second Circuit had held that states did not have sovereign immunity under the essentially-similar provisions of the ADA. *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 114 (citing *Killcullen v. New York State Dep't of Labor,* 205 F.3d 77, 82 (2d Cir.2000) ( "Congress has validly abrogated the States' immunity from suit under both the ADA and

Section 504 of the Rehabilitation Act."), *overruled by Garcia v. S.U.N.Y. Health Sciences Ctr.*

Since *Garcia,* state agencies in New York including DOCS have continued to accept federal funds and, therefore, waived immunity from suit under Section 504 of the Rehabilitation Act. (*See* cases cited immediately below.) The district court decisions in this Circuit disagree as to whether New York effectively waived its sovereign immunity only by accepting federal funds after *Garcia* was decided, on September 25, 2001, or whether the waiver occurred as early as February 25, 2001, when the U.S. Supreme Court handed down its decision in *Bd. of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955 (2001) (holding Title I of the ADA exceeded Congress' authority under § 5 of the Fourteenth Amendment and therefore suits against states were barred by the Eleventh Amendment). *Compare, e.g., Cardew v. New York State Dep't of Corr. Servs.,* 01 Civ. 3669, 2004 WL 943575 at *8 (S.D.N.Y. Apr. 30, 2004) (holding sovereign immunity waived as of the decision in *Garrett); with Kilcullen v. New York State Dep't of Labor,* No. 97-CV-484, 2003 WL 1220875 at *3 n. 1 (N.D.N.Y. Mar. 13, 2003) (collecting cases holding sovereign immunity waived as of *Garcia); and with Wasser v. New York State Office of Vocational & Educ. Servs. for Individuals with Disabilities,* No. 01-CV-6788, 2003 WL 22284576 at *10 (E.D.N.Y. Sept. 30, 2003) (dicta; finding an "arguable" basis that sovereign immunity may have been waived as of April 17, 2000, when the Supreme Court granted certiorari in *Garrett* ).

**\*28** This Court need not decide the exact date that sovereign immunity was effectively waived because Brown's claims arise out of conduct in 2004 through 2006, by which time New York was clearly subject to suit under Section 504 of the Rehabilitation Act. *See, e.g., Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.).

**D. *The ADA and Rehabilitation Act Standards***

To prove a violation of Title II of the ADA,[FN22] a plaintiff must demonstrate: "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont,* 340 F.3d 27, 34-35 (2d Cir.2003); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); *K.M. v. Hyde Park Cent. Sch. Dist.,* 381 F.Supp.2d 343, 357-58 (S.D.N.Y.2005); *Blatch v. Hernandez,* 360 F.Supp.2d 595, 629 (S.D.N.Y.2005). Since "[t]hese requirements apply with equal force to plaintiffs' Rehabilitation Act claims," the Court will analyze the claims in tandem. [FN23] *See Hargrave v. Vermont,* 340 F.3d at 35; *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 85 (2d Cir.2004) ("Since the standards adopted by Titles II and III of the ADA are, in most cases, the same as those required under the Rehabilitation Act, ... we consider the merits of these claims together."); *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273 (2d Cir.2003) ( "[U]nless one of those subtle distinctions [between the Rehabilitation Act and the ADA] is pertinent to a particular case, we treat claims under the two statutes identically."), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658 (2004); *Doe v. Goord,* 2004 WL 2829876 at *18; *K.M. v. Hyde Park Cent. Sch. Dist.,* 381 F.Supp.2d at 357; *Blatch v. Hernandez,* 360 F.Supp.2d at 630.

FN22. Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

FN23. Section 504 of the Rehabilitation Act provides in pertinent part: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

Pursuant to the ADA, a "qualified individual with a disability" means

an individual with a disability who, with or without

reasonable modifications to rules, policies, or practices, ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

**E.** *Application to Brown's Claims*

Because Brown's Eighth Amendment claims relating to his bunions fail to state a claim for a deliberate indifference (*see* discussion at Point V above), those claims similarly fail under the ADA and Rehabilitation Act. Defendants' motion to dismiss Brown's ADA and Rehabilitation Act claims relating to his bunions is therefore GRANTED.

Because Brown's constitutional claims relating to his arthritic hip condition survive and the ADA and Rehabilitation Act claims relating to his arthritic hip condition do not expand the scope of discovery, it makes sense to let these claims proceed at this stage and revisit them after discovery via a summary judgment motion. *See Doe v. Goord,* 04 Civ. 0570, 2004 2829876 at *7 n. 13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.) (denying defendant's motion to dismiss **prisoner's** ADA claims where decision on the motion would not affect scope of discovery); *Metallia U.S.A. LLC, v. Stulpinas,* 98 Civ. 3497, 1998 WL 1039103 at *2 n. 3 (S.D.N.Y. Dec. 16, 1998) (Peck, M.J.) (citing cases). Defendants' motion to dismiss Brown's ADA and Rehabilitation Act claims relating to his arthritic hip condition is therefore DENIED.

**X.** *DEFENDANTS' MOTION TO DISMISS ON QUALIFIED IMMUNITY GROUNDS IS DENIED*

**\*29** Defendants have raised the affirmative defense of qualified immunity because, they contend, their actions were objectively reasonable and did not violate any clearly established rights. (Dkt. No. 25: Defs. Br. at 14-16.)

A Rule 12( b)( 6) motion to dismiss is usually not the appropriate pleading in which to raise an affirmative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)
(Cite as: 2006 WL 3313821 (S.D.N.Y.))

defense. *See, e.g., McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004). However, the Second Circuit has recently recognized a caveat to this general rule; "we see no reason why even a traditional qualified immunity defense may not be asserted on a Rule **12( b)( 6)** motion as long as the defense is based on facts appearing on the face of the complaint." *McKenna v. Wright,* 386 F.3d at 436.

The right to be free from deliberate indifference to serious medical needs is well established and was at the time of defendants' conduct. The issue thus is whether defendants' actions (or failure to act) with respect to Brown's hip condition were subjectively unreasonable so as to constitute deliberate indifference. The Court cannot say on a motion to dismiss that any defendant's actions were so clear as to entitle them to dismissal on qualified immunity grounds at this stage of the case. Defendants' motion to dismiss on qualified immunity grounds is denied. *See, e.g., Field Day, LLC v.. County of Suffolk,* 463 F.3d 167, 195 (2d Cir.2006) (County officials did not demonstrate an entitlement to qualified immunity at the motion to dismiss stage.); *Golio v. City of White Plains,* --- F.Supp.3d ----, 2006 WL 3199140 at *3 (S.D.N.Y. Nov. 2, 2006); *Roper v. Hynes,* 05 Civ. 7664, 2006 WL 2773032 at *6 (S.D.N.Y. Sept. 27, 2006); *see also* cases cited on page 51 above.

## CONCLUSION

For the reasons discussed above, defendants' motion to dismiss is GRANTED with respect to (1) Brown's claims under § 1983 against defendants in their official capacity; (2) all of Brown's claims for injunctive relief; (3) Brown's § 1983 deliberate indifference to medical needs claims relating to his bunions; (4) Brown's § 1983 retaliation claims; and (5) Brown's ADA and Rehabilitation Act claims relating to his bunions. Defendants' motion to dismiss is DENIED with respect to (1) Brown's § 1983 deliberate indifference to medical needs claims relating to his arthritic hip condition; (2) Brown's ADA and Rehabilitation Act claims relating to his arthritic hip condition; and (3) defendants' claim of qualified immunity.

S.D.N.Y.,2006.
Brown v. DeFrank

Not Reported in F.Supp.2d, 2006 WL 3313821 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2008 WL 2884925 (N.D.N.Y.)
(Cite as: 2008 WL 2884925 (N.D.N.Y.))

about the opening of the cells on June 11, 2006.

**2. *Summary Judgment***

**\*2** Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

In this case, both parties have moved for summary judgment. (Dkt.Nos.12, 15). Thus, both parties claim that the facts are undisputed and that judgment may be rendered as a matter of law.

**3. *Exhaustion of Administrative Remedies***

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a) requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. See e.g. *Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). In this case, plaintiff did bring a grievance and appealed the grievance to the highest level available. Defendant does not claim that plaintiff failed to bring a grievance or did not appeal the grievance to the highest level, rather, defendant argues that plaintiff did not **properly** exhaust his administrative remedies because he did not mention the word "retaliation" in his grievance. Def. Mem. of Law at 7 (Dkt. No. 15-6).

In *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 922-23, 166 L.Ed.2d 798 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103. However, the Court in *Jones* held that proper exhaustion does *not* necessarily include a requirement that an inmate name all the defendants, unless the state procedure required it. In *Jones,* the lower court had imposed a "name all defendants requirement," when the rules governing the grievance procedure simply required the plaintiff to be "as specific as possible." 127 S.Ct. at 922.

In this case, a review of the plaintiff's grievance shows that he raised the identical fact pattern, stating that defendant Van Orden falsely accused plaintiff of misbehavior, and improperly confined plaintiff to his cell for five days. Plaintiffs Ex. D at 1-3. The plaintiff did not use the word "retaliation." The Inmate Grievance Resolution Committee [FN2] was deadlocked, with one group stating that there was no evidence to support plaintiff's claim that the officer falsified evidence. *Id.* at 2. The response from the Superintendent states that "[s]taff are on record denying that any harassment occurred." *Id.* at 4. Plaintiff appealed, and the Central Office Review Committee stated that there was insufficient evidence to support any "malfeasance" by the employee in question. *Id.* at 6. It is clear that plaintiff was making the *same* claim as he makes in this case, and the fact that he did not use the word "retaliation" does not lead this court to find that plaintiff failed to exhaust his administrative remedies.

FN2. The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2008 WL 2884925 (N.D.N.Y.)
(Cite as: 2008 WL 2884925 (N.D.N.Y.))

**4. Retaliation**

*3 Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). The law is well-settled that an inmate has no right to be free from false accusations or false misbehavior reports, unless they are made in retaliation for the exercise of a constitutional right. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco,* 854 F.2d at 588-90). In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The filing of prisoner grievances has been held to constitute conduct protected by the First Amendment. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). This First Amendment right has been extended by some courts to the making of "oral complaints" against corrections officers. *Smith v. Woods,* 03-CV-48, 2006 U.S. Dist. LEXIS 29745, *46 n. 69, 2006 WL 1133247 (N.D.N.Y Mar. 17, 2006) (Lowe, M.J.), *app'd,* 2006 U.S. Dist. LEXIS 29744, 2006 WL 1133247 (N.D.N.Y. Apr. 24, 2006) (Hurd, D.J.), *aff'd,* 219 Fed. Appx. 110 (2d Cir.2007). Defendants in this case do not contend that plaintiff's conduct in speaking to Officer Santiago was not constitutionally protected speech, [FN3] and thus, this court will assume for the purposes of this order, that plaintiff did ***complain*** [FN4] to Officer Santiago about defendant Van Orden, and that this conduct was protected.

FN3. The court would simply note that although there are cases extending an inmate's First Amendment rights to verbal conduct

complaining of an officer's actions, it is not as "clearly established" as the right to file grievances, and there is at least one case in which a verbal confrontation, complaining about an officer's conduct has not been found entitled to First Amendment protection. *See Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989). When the Second Circuit affirmed the District Court in *Smith, supra,* the court specifically stated that it was "assuming arguendo" that plaintiff had a constitutionally protected right to his verbal complaint. *See Smith v. Woods,* 219 Fed. Appx. 110 (2d Cir.2007). The court in this case also points out that defendants do not allege qualified immunity.

FN4. The First Amendment right involved in this case is grounded upon plaintiff's right to petition the government for "redress of grievances." *Colon v. Coughlin,* 58 F.3d at 872. A simple discussion with a corrections officer would not be protected speech unless that discussion was in the form of a complaint or concern about the officer or some policy involved. New York law also protects inmates from being disciplined for making "written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAW § 138(4).

Plaintiff alleges that defendant Van Orden wrote a false misbehavior report against plaintiff in retaliation for plaintiff's protected conduct. Plaintiff claims that defendant Van Orden attributed a statement to plaintiff that plaintiff did not make. Compl. at 4. Plaintiff claims that he was confined to his cell pending the misbehavior report, and that the charges were ultimately dismissed at the disciplinary hearing, thus, he was improperly confined for approximately five days as a result of the alleged retaliatory conduct. Plaintiff claims that this conduct constitutes "adverse action."

Defendant argues that there was no adverse action in this case because plaintiff was not deterred from exercising his constitutional rights. It has been held that "[o]nly retaliatory conduct that would deter a similarly situated

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2008 WL 2884925 (N.D.N.Y.)
(Cite as: 2008 WL 2884925 (N.D.N.Y.))

individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Odom v. Dixion,* 04-CV889, 2008 U.S. Dist. LEXIS 11748, *62-63, 2008 WL 466255 (W.D.N.Y. Feb. 15, 2008) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003)). Defendant argues that plaintiff in this case was not deterred because he filed a grievance regarding defendant Van Orden's alleged conduct.

**\*4** This court disagrees with defendant's analysis in this regard. In *Gill v. Pidlypchak,* **389 F.3d 379, 383 (2d Cir**.2004), the Second Circuit held that although a plaintiff must allege some sort of harm resulting from the adverse action, it does not always have to be a "chilling" of his protected speech. Additionally, the Second Circuit specifically stated that the defendants could not argue that just because plaintiff was not deterred from bringing a lawsuit, his speech was not "chilled." *Id.* Such a finding would result in no plaintiff being able to prevail if he was not deterred from bringing the lawsuit. *Id.* at 383-84. This finding should be contrasted with a plaintiff who continued to speak or write after the adverse action, apart from bringing the suit challenging that retaliation. *Id.*

Defendant in this case argues that plaintiff filed a grievance regarding the behavior and filed a lawsuit, thus, claiming that plaintiff could not show an adverse action. As stated above, however, since the PLRA was enacted, exhaustion of administrative remedies has been a **requirement** for bringing a lawsuit challenging all forms of prison conditions. 42 U.S.C. § 1997e(a). Therefore, the **Gill** reasoning would apply to any claim that plaintiff's grievance regarding the alleged retaliation would prevent the finding of "adverse action," because plaintiff was not deterred from bringing the grievance. If plaintiff did not exhaust his remedies, he could never challenge defendant's actions. Thus, defendant cannot argue that the fact that plaintiff brought a grievance regarding the issue means that he was not sufficiently "deterred."

In any event, plaintiff also claims that the adverse action included his improper confinement for five days. Defendant cites **Gill** for the proposition that in order for the defendant's conduct to be considered "adverse action," plaintiff's confinement "must have lasted for weeks." Def. Mem. of Law at 6. This court does not read **Gill** as making such a statement. The court in **Gill** stated that "**defendants**

are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech.... In the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks."** 389 F.3d at 383. This statement by the Second Circuit was an example of adverse action. There is absolutely no finding that in order to be adverse, the keeplock [FN5] *must* have lasted for weeks.

> FN5. "Keeplock" is a form of disciplinary confinement where the inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

Having said the above, it is unclear whether five days in keeplock would be enough to deter a similarly situated inmate of ordinary firmness from complaining. There are case in which seemingly less "adverse action" has been held to be sufficient to state a claim for retaliation. *See Allah v. Poole,* 506 F.Supp.2d 174, 186-87 (W.D.N.Y.2007) (citing cases in which a transfer to another housing unit and other less "harsh" actions may be sufficient to constitute adverse action). In *Allah,* the court pointed out that retaliation may be actionable even when the retaliatory action does not involve a "liberty" interest. *Id.* (citing *Allah v. Seiverling,* 229 F.3d 220, 224 (3d Cir.2000)).

**\*5** In *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), the Second Circuit recognized that there are situations in which *de minimis* retaliation is "outside the ambit of constitutional protection." *Id.* (citing *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999)). The court in *Dawes* held that verbal harassment was insufficient to rise to the level of adverse action. *Id.* In *Dawes,* the court stated that prisoners may be required to tolerate more than either public employees or average citizens before a retaliatory action can be considered "adverse." *Dawes,* 239 F.3d at 493 (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (2d Cir.1999)). The court in *Dawes* cited *Allah v. Seiverling. Id.* (citing 229 F.3d at 225). In *Allah,* the Third Circuit held that in certain circumstances, "placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights," however, the court was not prepared to hold that such action could never amount to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 5
Not Reported in F.Supp.2d, 2008 WL 2884925 (N.D.N.Y.)
(Cite as: 2008 WL 2884925 (N.D.N.Y.))

adverse action. 229 F.3d at 225.

In this case, while it is a close question with the facts presently before the court, this court is not prepared to hold in a summary judgment context, that plaintiff's five days of keeplock would never deter a prisoner of ordinary firmness from exercising his rights.

Assuming that the five day keeplock may constitute adverse action, plaintiff must then show that the protected conduct was the "substantial motivating factor," resulting in the adverse action. Bennett v. Goord, 343 F.3d at 137. Defendant argues that plaintiff cannot survive summary judgment if the defendant can show that he would have taken the same action "even in the absence of the protected conduct." Def. Mem. of Law at 4 (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)). While the defendant's citation of the law is correct, this court cannot find that there is no question of fact regarding defendant's conduct and whether he would have taken the same action regardless of the plaintiff's complaint to Officer Santiago. Defendant argues that he charged the plaintiff with misbehavior because plaintiff lied to Officer Santiago about the opening of the cell doors, and plaintiff was "out of place." Plaintiff argues that defendant charged him with misbehavior because plaintiff complained about defendant Lugo's failure to open the door. Defendant maintains that he did open the doors at the proper time.

These differing statements appear to raise a question of fact regarding whether defendant Lugo would have taken the same action regardless of any "protected behavior." [FN6] Defendant's argument hinges on the claim that plaintiff lied to Officer Santiago. While it is true that plaintiff's grievance was dismissed because "the CORC [was] not presented with sufficient evidence to substantiate any malfeasance by the employee," plaintiff's misbehavior report was dismissed because "the misbehavior report does not support the charges." Plaintiff's Ex. D at 6 & Ex. C. No party has submitted the transcript of the hearing, and thus, this court has before it only the fact that plaintiff was exonerated of any misbehavior. Clearly, defendant Lugo charged plaintiff with misbehavior because of what plaintiff said to Officer Santiago. If plaintiff was lying, then his conduct would not have been protected in the first place, and defendant would have had a basis for filing the

misbehavior report that was unrelated to any protected activity. However, if plaintiff was telling the truth, and defendant Lugo charged him with lying and being out of place because defendant Lugo wished to retaliate against plaintiff for complaining, then plaintiff might have a claim for retaliation. As plaintiff points out, Officer Santiago did not sign the misbehavior report, and the court has no idea what happened at the disciplinary hearing.

FN6. The court must note, however, that if plaintiff did lie to Officer Santiago, then his conduct would not have been protected in the first place. Once again, this is not an issue that can be resolved on summary judgment.

*6 It is not the function of this court on a summary judgment motion to resolve questions of fact, it is to determine whether there are genuine issues of fact to be tried. Fitzgerald v. Henderson, 251 F.2d 345, 360 (2d Cir.2001) (citing inter alia Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In this case, the court has not been presented with sufficient evidence from either party to justify granting summary judgment.

WHEREFORE, based on the findings above, it is

ORDERED, that plaintiff's motion for summary judgment (Dkt. No. 12) is DENIED, and it is further

ORDERED, that defendant's cross-motion for summary judgment (Dkt. No. 15) is DENIED.

Not Reported in F.Supp.2d, 2008 WL 2884925 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2252319 (S.D.N.Y.)
(Cite as: 2009 WL 2252319 (S.D.N.Y.))

of a *pro se* litigant should be liberally construed in his favor and that *pro se* papers should be interpreted "to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). We also consider here certain documents related to plaintiff's administrative grievances that he filed with the New York State Department of Correctional Services ("DOCS") that have been submitted to the Court in support of the instant motion. Because plaintiff's grievances are referenced in the complaint, the grievance documents are incorporated by reference and properly considered on a motion to dismiss. *See, e.g., Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *2 n. 9 (S.D.N.Y. Oct.31, 2006) (noting that grievances by **prisoner** plaintiff were incorporated into the complaint by reference).

Plaintiff, who was convicted of first-degree assault, was an **inmate** at Sing Sing during the time period relevant to this action. Plaintiff alleges that on October 24, 2007, Velez "came close to me [and] push me on the wall, hurt me on my Face [and] kick me on my legs and call me Fucking Homosexual." (Ltr. at 1-2; *see also* Compl. at 3.) Plaintiff also alleges that on November 18, 2007:

I have assault from C.O. Mendez on A-Block Front gate because I was on B Block and Sergeant Depasquale move me to A-Block that date and I told him I can't go to A-Block because I have a problem with a [correction officer] and him told me, him don't care, now when I get there CO. Mendez Jump on me and kick on my Face and told me this is not B-Block Homo, I report the incident to Sergeant Potante and I told I need to go to the clinic because CO. Mendez hurt [ ] me and hurt me the nurse will come to see you and I never saw the nurse. (Ltr. at 2; *see also* Compl. at 3.) Plaintiff goes on to claim that subsequent to the alleged November 18, 2007 incident, "I wrote a letter to Superintendent Mr. Marshall and Mr. Lee, Deputy Superintendent Security move[d] me to [involuntary protective custody] and came to my cell and told me Homo stop write to Superintendent or I will lock you up in the Box." (Ltr. at 2.) Plaintiff also alleges that "Sgt. Depasquale and Sgt. Potante Harass[ ] me and call me Homo." (Compl. at 3.)

Plaintiff states in his complaint that he filed grievances with prison officials with regard to both the alleged October 24, 2007 incident and the alleged November 18, 2007 and describes those grievances as "pending." (Compl. at 4.) The Central Office Review Committee ("CORC"-DOCS' final arbiter of **inmates'** administrative grievances-denied plaintiff's grievance with respect to the alleged October 24, 2007 incident on December 26, 2007. (October 17, 2008 Declaration of Inna Reznick ("Reznick Decl.") Ex. D.) The CORC denied plaintiff's grievance with respect to the alleged November 18, 2007 incident on January 30, 2008. (*Id.* Ex. C.)

Plaintiff delivered his complaint initiating this action to prison authorities on January 22, 2008. (Compl. at 7.) The complaint was formally filed on February 14, 2008. Acting on plaintiff's behalf, the U.S. Marshals Service served all defendants except Mendez, who had retired and thus was not at Sing Sing on the day the Marshals attempted to effect service upon him there.

**\*2** Pursuant to the Court's individual practices, Velez, Depasquale, Potante and Lee ("moving defendants") submitted a pre-motion letter on June 9, 2008 in anticipation of filing a motion to dismiss. In response to that letter, we wrote to plaintiff on June 13, 2008 giving plaintiff the opportunity to amend and supplement his complaint and warning plaintiff that "having been afforded the opportunity to amend the complaint in response to defendants' submission, Mr. Sanchez *should not anticipate being granted a further opportunity to amend,* should we find that there is merit in some or all of defendants' arguments." (June 13, 2008 letter (emphasis in original).) We further directed the Pro Se Office to send a letter to plaintiff explaining the procedures by which he could amend his complaint. Plaintiff never filed an amended complaint, but he did submit a letter dated June 18, 2008 describing the alleged incidents in greater detail. The instant motion followed.

## DISCUSSION

As a threshold matter, plaintiff's suit against Mendez is dismissed without prejudice pursuant to Rule 4(m) because more than 120 days have passed since the complaint was filed, but Mendez has not yet been served.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2252319 (S.D.N.Y.)
(Cite as: 2009 WL 2252319 (S.D.N.Y.))

As for the instant motion, moving defendants argue, *inter alia,* that plaintiff's complaint should be dismissed because (1) plaintiff failed to exhaust his administrative remedies and (2) plaintiff has failed to state a federal claim upon which relief can be granted. (Defendants' Memorandum of Law in Support of Defendants Velez's, Depasquale's, Potante's and Lee's Motion to Dismiss the Complaint ("Mem.") at 1.)

**I. Exhaustion**

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under **section 1983** of this title, or any other Federal law, by a **prisoner** confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). To satisfy the PLRA exhaustion requirement in this jurisdiction, an **inmate** must comply with DOCS' well-established, three-step **Inmate** Grievance Program prior to filing his complaint. *Verley v. Wright,* No. 02 Civ. 1182(PKC), 2007 WL 2822199, at \*5-\*6 (S.D.N.Y. Sept.27, 2007). This process requires an aggrieved **inmate** to: (1) file a grievance with the **Inmate** Grievance Resolution Committee ("IGRC"); (2) appeal, if he disagrees with the IGRC's decision, to the superintendent of the facility; and (3) seek review of the superintendent's decision, if it is adverse, with the Central Office Review Committee. 7 N.Y.C.R.R. § 701.5; *see also Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir.2009). The **inmate** must file his complaint within twenty-one days of the alleged grievance. 7 N.Y.C.R.R. § 701.5(a)(1).

There are three ways in which a **prisoner** may overcome the exhaustion requirement of the PLRA: (1) he can show that administrative remedies were not actually "available" to him, (2) he can show that the defendants should be estopped from raising the plaintiff's failure to exhaust as an affirmative defense, or (3) he can show that special circumstances exist that excuse the plaintiff's non-compliance with official procedural requirements. *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004).

**\*3** Here, moving defendants concede that plaintiff did

exhaust his DOCS administrative remedies with respect to the alleged October 24, 2007 incident prior to filing his complaint. (Mem. at 4-5.) His administrative remedies with respect to the alleged November 17, 2007 incident were not exhausted when he signed his complaint on January 22, 2008 because his application to the CORC was still pending. However, the CORC rejected plaintiff's application on January 30, 2008, meaning that his remedies were exhausted by the time plaintiff's complaint was formally filed on February 14, 2008. Given that plaintiff exhausted his administrative remedies for one of the alleged incidents forming the basis for plaintiff's complaint prior to him initiating this lawsuit, and given that his remedies for the other incident were exhausted just over a week after he submitted his complaint (and before it was formally filed), we conclude that this action does not run afoul of the PLRA's exhaustion requirements.

**II. Failure to State a Federal Claim**

Moving defendants also argue that plaintiff's complaint should be dismissed because he has failed to state a federal claim. (Mem. at 7-12.) Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," and Rule 8(e)(1) requires that each averment of a pleading be "simple, concise, and direct." A complaint must give the court and the defendants "fair notice of what that plaintiff's claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), so as to enable the adverse party to answer and prepare for trial and to allow for the application of the doctrine of *res judicata.* 2A Moore's Federal Practice ¶ 8.13, at 8-61 through 8-62 (2d ed.1987). Civil rights complaints, in particular, "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under **§ 1983**." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987).

**A. Excessive Force Claims Against Velez, Depasquale and Potante**

To state an Eighth Amendment excessive force claim, a plaintiff must allege conduct that is objectively serious

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2252319 (S.D.N.Y.)
(Cite as: 2009 WL 2252319 (S.D.N.Y.))

enough to rise to the level of a constitutional injury, and that the defendants acted with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Here, with respect to Velez, we conclude that plaintiff's allegations meet Rule 8's low pleading threshold. Plaintiff claims that Velez used excessive force in violation of plaintiff's Eighth Amendment rights when he "came close to me [and] push me on the wall, hurt me on my Face [and] kick me on my legs." (Ltr. at 1-2.) As such, plaintiff's submissions describing this alleged incident are sufficient to survive a motion to dismiss.[FN2] We hasten to add, however, that we come to this conclusion without reaching, in any way, the ultimate merits of plaintiff's case and without considering whether moving defendants' submissions in support of their motion to dismiss would have justified summary judgment against plaintiff.[FN3] As moving defendants note, and as the Second Circuit has explained, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a **prisoner's** constitutional rights. Indeed, not even every malevolent touch by a prison guard gives rise to a federal cause of action." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (internal citations and quotation marks omitted).

> FN2. Plaintiff also alleges that defendants called him a "Faggot" and "Fucking Homo." (Compl. at 3.) Given our conclusion that plaintiff's allegations of physical abuse by Velez are sufficient to state a federal excessive force claim, we need not reach the question of whether the alleged name-calling is actionable under § 1983.

> FN3. Indeed, we might have been inclined to convert moving defendants' instant motion to dismiss into a motion for summary judgment, but for moving defendants' surprising failure to include the following crucial language from S.D.N.Y. Local Rule 12.1 in their Notice to Pro Se Litigants Opposing Motion to Dismiss or Motion for Summary Judgment: "You are warned that the Court may treat this motion as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure." This omission, combined with the fact that moving

defendants styled their motion as a motion to dismiss only, precluded us from converting their motion into a motion for summary judgment pursuant to Rule 12(d).

**\*4** Although we have found that plaintiff's allegations against Velez suffice to withstand a motion to dismiss, we conclude that plaintiff's excessive force allegations with regard to Depasquale and Potante fail to state a federal claim and must be dismissed. Even construing his submissions liberally, plaintiff asserts-at most-that Depasquale refused to grant plaintiff's request not to be moved to a particular cellblock, and that that although Potante promised to summon the prison nurse for plaintiff, the nurse never arrived. Beyond these accusations, plaintiff alleges only that Depasquale and Potante "harass[ed]" him. (Compl. at 3.) Such allegations are too non-substantive to indicate a deprivation of constitutional rights actionable under § 1983.

**B. First Amendment Retaliation Claim Against Lee**

Moving defendants suggest, and we agree, that the most favorable way to construe plaintiff's allegations against Lee is as a First Amendment retaliation claim, rather than as an excessive force claim. (Mem. at 12-14.) To state a claim for First Amendment retaliation, an **inmate** must allege (1) that he engaged in speech or conduct that was protected by the First Amendment, (2) that he suffered an adverse action by the defendant, and (3) "that there was a causal connection between the protected speech and the adverse action." *Espinal,* 554 F.3d at 227 (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)).

Plaintiff alleges here: "I wrote a letter to Superintendent Mr. Marshall and Mr. Lee, Deputy Superintendent Security move[d] me to [involuntary protective custody] and came to my cell and told me Homo stop write to Superintendent or I will lock you up in the Box." (Ltr. at 2.) It seems clear that plaintiff's letter to the superintendent related to the alleged incidents, and as such is entitled to First Amendment protection. *See, e. g., Pidlypchak,* 389 F.3d at 381, 383-84 (treating the filing of prison grievances as protected First Amendment activity). However, moving defendants argue that plaintiff has failed both to allege that he was subjected to adverse actions and

Slip Copy, 2009 WL 2252319 (S.D.N.Y.)
(Cite as: 2009 WL 2252319 (S.D.N.Y.))

to plead a causal connection between the protected activity and any adverse action. (Mem. at 13.) We disagree on both points.

Although the Second Circuit has defined "**adverse action**" somewhat differently in prison and non-prison contexts, when an **inmate** asserts such a claim, he must plead and prove that he was subjected to **retaliatory actions** "that would deter a **similarly situated** individual of ordinary firmness from exercising, constitutional rights." *Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). He may do so either by alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the **retaliation**. *See id.* at 380-84. The **question** of whether a given **action** is sufficiently **adverse** to deter someone of " 'ordinary firmness' from exercising his rights" under the First Amendment is a **question** of **fact**. *See, e.g., Espinal,* 554 F.3d at 227-28.

**\*5** Here, the alleged adverse action was that plaintiff was moved to involuntary protective custody without cause and threatened by a senior prison official with being placed in "the box"-which, although not defined in plaintiff's submissions, in prison parlance typically refers to punitive segregation. Considered together, and depending on the circumstances, these alleged adverse actions could be found sufficiently serious to deter an **inmate** "of ordinary firmness" from exercising his right to complain about staff misconduct, and thus are sufficient for pleading purposes. *See Smith v. Maypes-Rhynders,* No. 07 Civ. 11241(PAC), 2009 WL 874439, at \*4-\*5 (S.D.N.Y. May 31, 2009) (finding that alleged adverse action of corrections officers filing false disciplinary charges against plaintiff, resulting in a one-year term in the Special Housing Unit, was sufficient to state a retaliation claim).

We likewise find that the causal connection between plaintiff's protected conduct and the alleged adverse action is set forth adequately in plaintiff's *pro se* submissions. Indeed, plaintiff alleges that Lee threatened him specifically to prevent him from writing further letters to the superintendent. Accordingly, we conclude that plaintiff has stated a valid First Amendment retaliation claim against Lee.[FN4]

[FN4.] Moving defendants also argue that they are entitled to Eleventh Amendment immunity and qualified immunity. (Mem. at 16-17.) These arguments are unpersuasive, however. Plaintiff's complaint, liberally construed, can be read to reflect that he is suing moving defendants in both their individual and official capacities. Where defendants are sued in their individual capacities, the Eleventh Amendment is not implicated. *See Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003) ("the eleventh amendment does not extend to a suit against a state official in his [or her] individual capacity, even when the conduct complained of was carried out in accordance with state law" (citation omitted) (brackets in original)). As for moving defendants' argument that they are protected by the doctrine of qualified immunity, we believe for the reasons set forth above that plaintiff has adequately alleged that Velez's and Lee's conduct violated plaintiff's constitutional rights. *See Herman v. City of New York,* 261 F.3d 229, 236 (2d Cir.2001).

### CONCLUSION

For the foregoing reasons, plaintiff's suit against Mendez is dismissed without prejudice pursuant to Rule 4(m). Moving defendants' motion to dismiss is granted as to Depasquale and Potante and denied as to Velez and Lee. Velez and Lee are directed to notify the Court by letter within ten (10) days of this Memorandum and Order whether they intend to file a motion for summary judgment in this matter, and to provide a proposed briefing schedule for any such motion.

**IT IS SO ORDERED.**

S.D.N.Y.,2009.
Sanchez v. Velez
Slip Copy, 2009 WL 2252319 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2009 WL 2252319 (S.D.N.Y.)
(Cite as: 2009 WL 2252319 (S.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

LeBron has filed several specific objections to Judge Homer's Report-Recommendation. *See generally Dkt. 130.* First, LeBron objects to Judge Homer's recommendation that Claims One and Two be dismissed as untimely.[FN2] Second, LeBron objects to Judge Homer's determination that LeBron was not subjected to the type of atypical and significant confinement that is required to establish a due process claim. Third, LeBron argues that Judge Homer erroneously concluded that the named defendants lacked the authority to expunge his disciplinary record. Finally, LeBron asserts that Judge Homer failed to consider his First Amendment claims, and that the Report-Recommendation erroneously recommended dismissal of Claim Four in spite of Judge Homer's determination that said claim was not barred by the statute of limitations. In light of LeBron's specific objections, the court has reviewed the foregoing determinations *de novo.* The court has reviewed the remainder of Judge Homer's Report-Recommendation for clear error.

> FN2. LeBron also argues that Claim Five is not barred by the statute of limitations. However, Judge Homer did not hold that Claim Five was time-barred.

### III. *Discussion*

#### A. *Equal Protection and Fourth Amendment Claims*

*2 LeBron asserts seven claims in his amended complaint, each alleging "First Amendment, due process, and equal protection violations." *See Dkt. 6 at ¶¶ 38, 84, 112, 200, 251, 291, 352* . Judge Homer determined that LeBron's amended complaint is devoid of any allegations that would support an equal protection claim. LeBron has not challenged this determination, and this court agrees with Judge Homer's conclusion. Accordingly, LeBron's equal protection claims are dismissed.

On its face, LeBron's amended complaint asserts no Fourth Amendment claims. However, reading the amended complaint liberally, Judge Homer recognized that LeBron may have alleged a deprivation of his Fourth Amendment protection against unreasonable searches and seizures. Even assuming that LeBron had alleged a Fourth Amendment violation, Judge Homer concluded that LeBron had no viable claim on that ground. *See Dkt. 127, p. 15, n. 14.* LeBron has not objected to this conclusion, and the court is in full agreement with Judge Homer. Accordingly, LeBron's Fourth Amendment claims, if any, are dismissed.

#### B. *Due Process Claims*

Judge Homer has recommended that the due process claims asserted in Claims One, Two, Five, Six, and Seven be dismissed in their entirety. The Report-Recommendation may also be construed as recommending dismissal of the due process claim asserted in Claim Four, although it mentions this claim only in passing. *See Dkt. 127, p. 12, n. 11.*[FN3]

> FN3. As to Claim Three, Judge Homer construed this claim as asserting only a violation of LeBron's right of access to the courts. Thus, neither Judge Homer's Report-Recommendation, nor this opinion, should be read as ignoring the purported "due process" claim asserted in Claim Three. Rather, as discussed below, Claim Three is dismissed in its entirety, because LeBron has failed to state a claim for denial of access to the courts.

Upon *de novo* review, the court agrees with and adopts Judge Homer's recommendation that the due process claims asserted in Claims One, Two, Five, Six and Seven should be dismissed. With respect to Claim Four, the court concludes that the due process claim asserted therein should survive dismissal only with respect to those defendants whose personal involvement is alleged.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

**1. Claims One and Two are Barred by the Statute of Limitations**

Judge Homer recommended dismissal of Claims One and Two on statute of limitations grounds. In his objections to the Report-Recommendation, LeBron asserts that a prisoner must exhaust his state remedies as well as his administrative remedies before bringing a § 1983 claim. Thus, with respect to Claim Two, he argues that his state action tolled the running of the statute of limitations until January 14, 2002, the date that the results of the subject disciplinary proceedings were administratively reversed. *See Dkt. 130, p. 1.* FN4

> FN4. LeBron also argues that Claims Five, Six, and Seven are not time-barred. *See Dkt. 130, p. 1.* However, Judge Homer did not base his dismissal of these claims on the statute of limitations. LeBron also argues that Claim One constituted an ongoing violation for which the statute of limitations did not accrue until July 2, 2000. *Id.* Even accepting this as true, the complaint, deemed filed on January 13, 2005, was still untimely with respect to Claim One.

LeBron's contention that pursuit of state remedies tolls the statute of limitations in a § 1983 action is an incorrect statement of law. *See Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983."). Thus, under the three year statute of limitations applicable to LeBron's § 1983 claims, FN5 Claims One and Two are time-barred. As Judge Homer noted, the statute of limitations began to run on these claims when LeBron knew his rights were violated. *See Singleton v.. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). As such, LeBron's first and second causes of action accrued, at the latest, on June 19, 2000 and August 24, 2000, respectively, the dates that his administrative appeals were denied. Therefore, LeBron's objections based on tolling of the statute of limitations are without

merit.

> FN5. *See Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

**\*3** Accordingly, defendants' motion to dismiss is granted as to the due process claims asserted in Claims One and Two. Moreover, to the extent that Claims One and Two assert equal protection and First Amendment claims, such claims are dismissed as untimely as well.

**2. Claims One, Two, Five, Six and Seven Fail to State a Due Process Claim**

In Claims One, Two, Five, Six and Seven, LeBron asserts due process violations arising out of procedurally improper disciplinary hearings. As a threshold matter, in order to establish a due process violation, a prisoner must demonstrate that a liberty interest has been infringed. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

With respect to Claims One, Two, Five, and Seven, Judge Homer determined that LeBron could not establish, as a matter of law, that the confinement to which he was subjected was "atypical and significant," because in each case LeBron was sentenced to keeplock of 30 days or less. *See Dkt. 127, pp. 11-12.* The court concurs with Judge Homer's conclusion-which LeBron does not contest-that, absent additional allegations of atypicality, keeplock of 30 days or less is not alone "atypical and significant" confinement. *See Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *Davidson v. Murray,* 371 F.Supp.2d 361, 368-69 (W.D.N.Y.2005). FN6 Therefore, LeBron has not established that a liberty interest has been infringed.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Accordingly, the due process claims asserted in Claims One, Two, Five, and Seven are dismissed.

> **FN6.** LeBron's amended complaint contains no allegations that would indicate that the keeplock confinement to which he was sentenced was atypical and significant. In his objections to the Report-Recommendation, LeBron has attempted to supplement the allegations in his amended complaint by setting forth a laundry list of deprivations to which he was subjected. The court will not consider these belated allegations. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (noting that it is within the district court's discretion to refuse to allow supplementation of the record upon its review of a Report-Recommendation); *Bester v. Dixion,* No. 03-cv-1041, 2007 WL 951558, *3 (N.D.N.Y. March 27, 2007)* ("Allowing Plaintiff to raise in his objections legal and factual arguments not presented to the Magistrate Judge defeats the very purpose of the report and recommendation procedure ....").

With respect to Claim Six, LeBron has alleged that he was sentenced to 180 days in the special housing unit ("SHU"). The court need not decide whether a sentence of this length is "atypical and significant," because, as Judge Homer noted, LeBron's sentence was administratively reversed before he had served any portion of it. *See Dkt. 127, pp. 12-14.* LeBron has not contested Judge Homer's finding in this regard. The court agrees with Judge Homer that LeBron suffered no interference with a liberty interest with respect to Claim Six, and, accordingly, the due process claim asserted in Claim Six is dismissed.

**3. Claim Four States a Due Process Claim With Respect to Certain Defendants**

The court agrees with Judge Homer that Claim Four is not barred by the statute of limitations. *See Dkt. 127, pp.*

*10-11.* Since LeBron has alleged a loss of good time credit as a result of the subject disciplinary hearing, LeBron's cause of action did not accrue until October 23, 2002, when the disciplinary hearing was administratively reversed.[FN7] *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999).

> **FN7.** Moreover, it appears that the last event giving rise to Claim Four occurred on January 21, 2002, *see Dkt. 6, ¶ 164,* within three years of the deemed filing of LeBron's complaint on January 13, 2005.

Although Claim Four survives dismissal on statute of limitations grounds, it fails to adequately allege the personal involvement of many of the defendants. It is axiomatic that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citation and quotation omitted).[FN8]

> **FN8.** In assessing whether Claim Four states a due process claim, the court has considered only the issue of personal involvement. The parties have not briefed the issue of whether the disciplinary hearing conducted on or about January 16, 2002, was, in fact, procedurally improper, and the court will not address that issue at this time.

**\*4** Under a liberal construction of LeBron's amended complaint, defendants Mehrmann, Faulkner, and McLaughton are the only defendants who are alleged to have conducted or participated in the allegedly procedurally defective disciplinary hearing conducted on or about January 16, 2002. *See Dkt. 6, ¶¶ 149-162.* Accordingly, LeBron has stated a due process claim with respect to these three defendants.[FN9]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

FN9. However, as discussed below, these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron has also alleged that certain defendants failed to reverse his sentence upon being notified of the due process violations that occurred at his disciplinary hearing. *See Dkt. 6, ¶¶ 166-198.* The Second Circuit has held that an official has the requisite personal involvement for liability under § 1983 when, *inter alia,* "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A number of district courts have held that the language in *Colon* should not be construed so broadly as to impose liability on any and all officials to whom a prisoner complains. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (collecting cases). This makes eminent sense; certain officials, even those in supervisory positions, simply may not have the authority to review and redress a prisoner's complaints. However, personal involvement will be found "where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Id.* LeBron's amended complaint adequately alleges, for purposes of withstanding a motion to dismiss under Rule 12(b)(6), that the following defendants reviewed his appeals, and declined to rectify the alleged constitutional violations: L. Leclaire,[FN10] Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, LeFevre, Pasquil, Annucci, Murphy, and McCoy. *See Dkt. 6, ¶¶ 166-198.* Accordingly, LeBron has stated a due process claim with respect to these defendants.[FN11]

FN10. LeBron's amended complaint does not specify which of the three "LeClaire" defendants is alleged to have denied his grievances; however, the defendants have indicated that it was "L. LeClaire." *See Dkt. 112, p. 14.*

FN11. However, as discussed below, several of

these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron also alleges that certain defendants planted evidence and wrote misbehavior reports prior to the January 16, 2002, disciplinary hearing. *See Dkt. 6, ¶¶ 134-147.* However, the filing of a misbehavior report-even a false one-"does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams,* 781 F.2d at 324. Similarly, the act of planting evidence does not, of itself, violate due process. Due process is implicated only at the point that a prisoner is denied the procedural protections that would enable him to prove that the evidence against him has been fabricated. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law."). Accordingly, LeBron fails to state a due process claim with respect to those defendants who are only alleged to have engaged in conduct prior to the disciplinary hearing.

**\*5** In summary, Claim Four states a due process claim only with respect to the following 18 defendants: Mehrmann, Faulkner, McLaughton, L. LeClaire, Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Lefevre, Pasquil, Annucci, Murphy, and McCoy. Accordingly, with the exception of these 18 defendants, the due process claims asserted in Claim Four are dismissed *with prejudice* as to all other defendants. Moreover, the due process claims asserted in Claim Four are dismissed *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, Lefevre, and Pasquil, for failure to serve.[FN12]

FN12. The docket indicates that John Mehrmann has been served. *See Dkt. 80.* However, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

acknowledgment of service indicates that, in fact, a "James Meehan" was served. *Id.*

### C. *First Amendment Claims*

In his objections to the Report-Recommendation, LeBron notes that Judge Homer failed to analyze his First Amendment claims.[FN13] This is only partly correct. Judge Homer did address LeBron's claim of denial of access to courts, which is a species of First Amendment claim. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001).* Nevertheless, to the extent that LeBron's amended complaint may also be read as alleging First Amendment retaliation claims and claims of interference with outgoing mail, the court will address the merits of such claims in the first instance herein.

> FN13. Each of LeBron's seven claims may be read as asserting some form of First Amendment claim. However, as noted above, Claims One and Two are barred by the statute of limitations. Thus, in this section, the court discusses only the First Amendment claims asserted in Claims Three through Seven.

### 1. *Retaliation Claims*

With respect to Claims Four, Five, and Six, LeBron's objections to the Report-Recommendation clarify that he believes that defendants retaliated against him after he had engaged in protected speech. *See Dkt. 130, p. 3.* To survive dismissal, a plaintiff asserting a First Amendment retaliation claim must advance non-conclusory allegations "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis,* 320 F.3d at 352 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In regards to causation, "the temporal

proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citation omitted).

In Claim Four, LeBron alleges that his complaints of harassment and his filing of a "facility claim" led to multiple acts of retaliation, including random searches of his cell, the planting of contraband in his cell, and the fabrication of misbehavior reports. *See Dkt. 6, ¶¶ 115-141.* With respect to the first prong of a retaliation claim, LeBron's complaints of harassment constituted protected speech. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). As to the second prong, LeBron has alleged that the defendants took adverse action against him, in the form of retaliatory misbehavior reports and the retaliatory planting of evidence. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239-240 (S.D.N.Y.2005).[FN14] Finally, LeBron has sufficiently alleged the causation element of a First Amendment retaliation claim by showing a temporal proximity between his protected speech and the adverse actions taken against him. *See Dkt. 6, ¶¶ 132-147.*

> FN14. By contrast, the alleged searches of LeBron's cell provide no support for a First Amendment retaliation claim. Inmates have no reasonable expectation of privacy in their prison cells, and thus "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005) (collecting cases).

**\*6** Thus, Claim Four states a claim for First Amendment retaliation. Accordingly, the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is denied with respect to all defendants, with the exception of defendants Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment retaliation claim asserted in Claim Four is dismissed with respect to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

defendants Woodroof, Olson, M. LeClaire, and Bushie, because LeBron has not alleged that these defendants participated in any prohibited retaliatory conduct.[FN15]

> **FN15.** Additional defendants named in Claim Four have also moved for dismissal, arguing lack of personal involvement. *See Dkt. 112, pp. 13-15.* However, the court is unable to conclusively determine, at this stage, that these additional defendants were not involved in the alleged retaliatory conduct (or the failure to redress). Hence, the retaliation claim alleged in Claim Four is dismissed only with respect to Woodruff, Olson, M. LeClaire, and Bushie.

Turning now to Claims Five and Six, LeBron has failed to state a retaliation claim. There are, quite simply, no allegations of retaliation in Claim Five. LeBron asserts that he was issued a misbehavior report, *see Dkt. 6, ¶ 217,* but nowhere in the amended complaint does he state that this misbehavior report was issued in retaliation for his exercise of First Amendment rights.[FN16] The same is true of Claim Six; the claim does not allege, even in conclusory terms, that any retaliatory conduct occurred.

> **FN16.** In his opposition to the motion to dismiss, LeBron makes conclusory allegations of retaliation. *See Dkt. 121, p. 7.* However, unlike Claim Four, discussed above, the allegations in Claim Five of the amended complaint provide no basis for believing that circumstantial evidence might exist that would support LeBron's bare allegations of retaliation. *See Boddie v. Schnieder, 105 F .3d 857, 862 (2d Cir.1997)* (dismissing, upon motion pursuant to Rule 12(b)(6), allegations of retaliation that were "unsupported, speculative, and conclusory").

## 2. *Access to Courts Claims*

Construing LeBron's amended complaint broadly, Judge Homer interpreted Claims Three and Five as alleging a denial of access to courts. Judge Homer recommended that these claims be dismissed. LeBron has not objected to this recommendation. The court agrees with Judge Homer's conclusion that Claims Three and Five do not state a claim for denial of access to courts, because LeBron has failed to allege any actual injury. *See Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir.1997)* ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ") (citing *Lewis v. Casey, 518 U.S. 343, 349-51 (1996)*) (internal citations omitted). Accordingly, to the extent that Claims Three and Five allege a denial of access to courts, these claims are dismissed.[FN17] Moreover, to the extent that Claim Six may be read as alleging a denial of access to courts, this claim is dismissed as well, for the same reasons.

> **FN17.** The court declines to provide LeBron the opportunity to amend his complaint, yet again, to include allegations of injury. In a Conditional Order of Dismissal, dated March 7, 2005, the court explicitly advised LeBron that his allegations regarding denial of access to courts were inadequate, and that "[i]n order to establish standing for a claim for denial of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials." *See Dkt. 4, p. 5.* The court accepted LeBron's amended complaint because it cured many of the defects of the original complaint. *See Dkt. 7.* However, upon closer review, at least insofar as the denial of access to courts claims are concerned, LeBron's amended complaint suffers from the same infirmities as his original complaint.

## 3. *Interference With Mail Claim*

In Claim Seven, LeBron alleges that two of his outgoing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

letters were confiscated. *See Dkt. 6, ¶¶ 296, 299.* LeBron does not assert that the confiscation of the two letters interfered with his access to the courts, and, indeed, does not even allege that the letters constituted legal mail. Thus, he has not stated a claim for denial of access to courts. Accordingly, to the extent that Claim Seven may be read as asserting a claim of denial of access to courts, such claim is dismissed.

However, apart from the right of access to courts, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351; *see Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002) ("Although prisoners' First Amendment mail claims are often intertwined with claims for denial of court access, they may exist separately."). Thus, the court will address whether LeBron has stated a claim for the violation of his First Amendment rights arising out of the confiscation of two pieces of outgoing mail.

**\*7** In short, for purposes of a Rule 12(b)(6) motion, he has. The Second Circuit has held that restrictions on a prisoner's mail are justified only if they further the substantial governmental interests of security, order, and rehabilitation. *Davis,* 320 F.3d at 351 (citation omitted). Moreover, "courts have consistently afforded greater protection ... to outgoing mail than to incoming mail." *Id.* (citations omitted). This is because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989).

It may be the case that the confiscation of LeBron's outgoing mail was justified by legitimate governmental interests. However, the defendants have not proffered any reasons for the confiscation,[FN18] and thus, it would be inappropriate to dismiss LeBron's claim at this time. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail, and noting that even two instances of mail interference

may be sufficient to suggest a continuing activity); *Knight v. Keane,* 247 F.Supp.2d 379, 384 (S.D.N.Y.2002) (affirming magistrate judge's determination that dismissal was inappropriate where the record evidence was insufficient to establish that inspection of plaintiff's mail was based on good cause). Accordingly, Claim Seven survives to the extent that it alleges a violation of LeBron's First Amendment right to send mail.[FN19]

FN18. The defendants' brief in support of their motion to dismiss did not address the First Amendment claim asserted in Claim Seven. *See Dkt. 112, pp. 23-25.*

FN19. In holding that the First Amendment mail claim asserted in Claim Seven survives, the court rejects the defendants' argument that LeBron has failed to exhaust his administrative remedies with respect to Claim Seven. The parties dispute the issue of exhaustion, and the court is not able to resolve this dispute on the basis of the facts before it. Moreover, LeBron has suggested that even if he did not exhaust his administrative remedies, such failure to exhaust may be attributed to inhibitions imposed by the defendants. *See Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) ("Defendants may ... be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.").

Additionally, the court rejects the defendants' argument that venue for Claim Seven is improper. As defendants correctly note, venue is proper in "a judicial district where any defendant resides ." 28 U.S.C. § 1391(b). In this case, at least one defendant named in Claim Seven resides in the Northern District of New York. *See Dkt. 11 (Acknowledgement of Service as to Anthony Annucci).* The defendants have not argued that Annucci was

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

not personally involved in the First Amendment violations asserted in Claim Seven; indeed, as stated above, the defendants' brief does not address Claim Seven insofar as it asserts a First Amendment claim. Moreover, for the reasons discussed above in connection with Claim Four, the court is unwilling to hold, at this stage of the proceedings, that LeBron's amended complaint does not state a claim with respect to defendants such as Annucci, who are alleged only to have failed to remedy a claimed constitutional violation.

**D. Injunctive Relief**

Judge Homer recommended that LeBron's request for injunctive relief be denied because LeBron has sued the defendants in their individual capacities only. LeBron has objected to this recommendation, arguing that "it is a given that the named defendants are in a position to expunge the disciplinary determinations made against plaintiff." *Dkt. 130, p. 3.* Notwithstanding LeBron's unsupported assertion to the contrary, the court agrees with Judge Homer that the injunctive relief LeBron seeks is unavailable because the defendants have been sued in their individual capacities. *See* Ziemba v. Armstrong, No. 3:02-cv-2216, 2004 WL 1737447, *2 (D.Conn. July 30, 2004) ("Injunctive relief may only be recovered from parties in their official capacities.") (citations omitted). Accordingly, LeBron's claims for injunctive relief are dismissed.

**IV. *Conclusion***

Having considered LeBron's objections and reviewed Judge Homer's findings of fact and conclusions of law, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of all of LeBron's equal protection and Fourth Amendment claims, as well as the due process claims asserted in Claims One, Two, Three, Five, Six, and Seven. The court rejects the

Report-Recommendation to the extent that it recommends the complete dismissal of the due process claim asserted in Claim Four. The due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy.

**\*8** As to the First Amendment claims, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of the denial of access to courts claims asserted in Claims Three and Five. Additionally, all First Amendment claims asserted in Claims One, Two, Three, Five, and Six are dismissed. The First Amendment retaliation claim asserted in Claim Four survives as to all defendants except Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment claim of interference with mail asserted in Claim Seven survives as to all defendants.

Finally, the court adopts the Report-Recommendation to the extent that it recommends dismissal of LeBron's requests for injunctive relief.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Homer's September 25, 2006 Report-Recommendation (*Dkt. No. 127* ) is accepted in part and rejected in part; and it is further

**ORDERED** that Claims One, Two, Three, Five, and Six are dismissed in their entirety; and it is further

**ORDERED** that the equal protection claims asserted in Claims Four and Seven are dismissed; and it is further

**ORDERED** that the Fourth Amendment claims asserted in Claims Four and Seven, if any, are dismissed; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
(Cite as: 2007 WL 3254373 (N.D.N.Y.))

**ORDERED** that the due process claim asserted in Claim Seven is dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy, and that such dismissal is *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, LeFevre, and Pasquil, but is *with prejudice* as to all other defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is DENIED as to all defendants *except* that the motion to dismiss the First Amendment retaliation claim asserted in Claim Four is GRANTED as to defendants Woodroof, Olson, M. LeClaire, and Bushie; and it is further

**ORDERED** that the denial of access to courts claim asserted in Claim Seven is dismissed as to all defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment claim of interference with outgoing mail asserted in Claim Seven is DENIED; and it is further

**ORDERED** that the defendants' motion to dismiss LeBron's claims for injunctive relief is GRANTED; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.
LeBron v. Swaitek

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2088267 (N.D.N.Y.)
(Cite as: 2010 WL 2088267 (N.D.N.Y.))

in the recreation area rather than his cell. (Dkt. No. 29 at 1.)

Plaintiff alleges that he was retaliated against "for ... filing a lot of complaints to the Department of Corrections in Albany ... and to **Inmate** Grievance Committee about the unsanitized cell." (Dkt. No. 8 ¶ 13.) Plaintiff alleges that he was "singled out for further harassment and retaliatory methods" when he complained about the conditions. (Dkt. No. 8 ¶ 15.) Plaintiff alleges that he was denied recreation, denied the right to register complaints, and that legal pleadings regarding his complaints were removed from his cell and never returned. (Dkt. No. 8 ¶¶ 18, 20.)

The complaint names Defendants in their individual and official capacities. (Dkt. No. 8 ¶¶ 4-5.) Plaintiff requests $50,000 each from Defendants Belleinier, Lira, and Otis and $25,000 each from the other Defendants. (Dkt. No. 8 at 5.)

Defendants now move to dismiss the complaint. (Dkt. No. 27.) Plaintiff has opposed the motion. (Dkt. No. 29.) Defendants have filed a reply. (Dkt. No. 30.)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

**\*2** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12( b)( 6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12( b)( 6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

Defendants argue that (A) Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment; (B) Plaintiff has failed to state a retaliation claim; (C) Plaintiff has failed to state an access to the courts claim; (D) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (E) Plaintiff's allegations of verbal harassment are not actionable; and (F) Plaintiff has failed to allege personal involvement by Defendants Belleinier, Otis, and Lira. (Dkt. No. 27-1.)

### A. Eleventh Amendment Immunity

Defendants argue that Plaintiff's claims against them for damages in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 27-1 at 4.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp.,* 465 U.S. at 101-06 (1984).

***3** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[FN3] All employees of the New York State Department of Correctional Services ("DOCS") are state officials for the purposes of the Eleventh Amendment. *See, e.g., Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 U.S. Dist. LEXIS 11531, at *7, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Here, Defendants are all DOCS employees. (Dkt. No. 1 ¶¶ 4-5.) Any claim for damages against them is accordingly barred by the Eleventh Amendment. Therefore, I recommend that the Court dismiss these claims.

FN3. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a **§ 1983** action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under **Section 1983**] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under **§ 1983**."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.").

**B. Retaliation**

Plaintiff alleges that Defendants Van Orgrum and Bonds retaliated against him by filing a misbehavior report and that he was "singled out for further harassment and retaliatory methods" when he complained about unsanitary conditions. (Dkt. No. 8 ¶¶ 7, 9, 13, 15.) Defendants move to dismiss these claims. (Dkt. No. 27-1 at 7-8.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an **inmate's** exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted:

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, **prisoners**' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a **prisoner** by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2088267 (N.D.N.Y.)
(Cite as: 2010 WL 2088267 (N.D.N.Y.))

proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

**\*4** As to Plaintiff's retaliation claim against Defendants Van Orgrum and Bonds, Plaintiff has not pleaded facts plausibly suggesting that he was engaged in any protected conduct. Plaintiff alleges merely that these Defendants threatened him with a misbehavior report "in retaliation for an incident that happened [when] [P]laintiff refus[ed] to move [his] cell" and then issued a misbehavior report when he disobeyed a direct order to exit his cell. (Dkt. No. 8 ¶¶ 7-8.) I can find no case holding that a **prisoner** has a constitutional right either to the cell of his choice or to disobey a direct order. Moreover, even if Plaintiff had been engaged in protected conduct, he would not be able to establish that Defendants Van Orgrum and Bonds retaliated against him. Adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Here, Plaintiff admits that he refused a direct order. (Dkt. No. 8 ¶ 8.) Thus, even if Defendants Van Orgrum and Bonds had retaliatory motives for issuing the misbehavior report, their action would be upheld. Therefore, I recommend that the retaliation claims against Defendants Van Orgrum and Bond be dismissed.

As to Plaintiff's claims that he was placed in an unsanitary

cell and "singled out for further harassment and retaliatory methods" when he complained, nothing in the complaint ties any of the named Defendants to these alleged acts of retaliation. Plaintiff does not specify who placed him in the unsanitary cell, who 'singled him out' for harassment, or what form the "retaliatory methods" took. Therefore, I recommend that the Court grant Defendants' motion to dismiss Plaintiff's retaliation claims.

I recommend that these claims be dismissed with prejudice. Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Here, Plaintiff has already been given leave once to amend his complaint to allege personal involvement by Defendants in the alleged constitutional violations. (Dkt. No. 7.)

**C. Access to the Courts**

Plaintiff alleges that he was denied the right to register complaints and that legal pleadings regarding his complaints were removed from his cell and never returned. (Dkt. No. 8 ¶¶ 18, 20 .) Defendants argue that these claims should be dismissed because Plaintiff has not alleged that he suffered any harm as a result of these alleged incidents. (Dkt. No. 27-1 at 9.) Defendants are correct.

**\*5** "A **prisoner** has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F .2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2088267 (N.D.N.Y.)
(Cite as: 2010 WL 2088267 (N.D.N.Y.))

This right of access, however, guarantees a **prisoner** "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts requires that an **inmate** demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that he suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 351-353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not alleged that he suffered an actual injury as a result of the alleged incidents. Indeed, the body of the complaint sets forth no facts at all about these incidents. Rather, they are mentioned only in passing in the portion of the amended complaint listing Plaintiff's causes of action. (Dkt. No. 8 ¶¶ 18, 20.) Plaintiff says merely that he was "denied [the] right to register complaints" and that his "right of access to the courts was violated when his legal pleadings concerning grievances were taken from his cell and never returned." *Id.* Therefore, I recommend that the Court grant Defendants' motion to dismiss Plaintiff's access to the courts claim. Plaintiff has not previously been given an opportunity to amend this cause of action, so I recommend that the Court dismiss the claim without prejudice.

**D. Conditions of Confinement**

Plaintiff alleges that he was placed in a "very unsanitized" cell where he was "unprotected from feces" and that he noticed feces on the wall and gate bars when he went to recreation. (Dkt. No. 8 ¶¶ 10-11.) Defendants argue that Plaintiff's claims must be **dismissed** because "given the entirely **conclusory** nature of [P]laintiff's ... claim, [P]laintiff has failed to establish that the **conditions** of his confinement violated the **Eighth Amendment** or that the defendants were deliberately indifferent." (Dkt. No. 27-1 at 10.)

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as

a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for **prisoners**. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that **inmates** receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the **inmates**.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

*6 A viable Eighth Amendment claim contains both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a **prisoner** must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)."

Here, Plaintiff alleges that his cell was "unsanitized" and that he was "unprotected from feces." Regarding the allegation that the cell was "unsanitized," a general allegation that a **prisoner** was subjected to "unclean" conditions, without more particularized allegations of fact, is insufficient to state a conditions of confinement claim. *See Williams v. Carbello,* 666 F.Supp.2d 373, 379 (S.D.N.Y.2009). However, I find that Plaintiff's allegations that he was "unprotected from feces" and that there were feces on the wall and gate are sufficient to plausibly suggest that he was subjected to unconstitutional conditions of confinement. *See Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) (finding that triable issue of fact existed where **prisoner** alleged he was, *inter alia,* exposed to human feces in his cell). Although Plaintiff's allegations are not as specific or severe as those described

Slip Copy, 2010 WL 2088267 (N.D.N.Y.)
(Cite as: 2010 WL 2088267 (N.D.N.Y.))

in *Gaston,* they are sufficient to satisfy the minimal pleading standard he is required to meet.[FN4] Therefore, I find that Plaintiff has satisfied the objective prong.[FN5]

> **FN4.** I note that the section of Defendants' brief on this issue does not directly address Plaintiff's allegation that he was "unprotected from feces." (Dkt. No. 27-1 at 9-10.)

> **FN5.** I express no opinion as to whether Plaintiff's allegations are sufficient to withstand a motion for summary judgment.

To satisfy the subjective component of a conditions of confinement claim, a **prisoner** must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302-03 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Defendants do not address the subjective component except to say that Plaintiff "has failed to establish ... that the defendants were deliberately indifferent to the conditions of his confinement." (Dkt. No. 27-1 at 10.) I find that Plaintiff has sufficiently alleged that Defendants Demarse, Lira, Trombly, Otis, and Belleinier were deliberately indifferent because the complaint states that these Defendants "were well aware of the feces ... [and] refused to do anything about" it. (Dkt. No. 8 ¶ 12.) I find that Plaintiff has sufficiently alleged that Defendant Gravlin was deliberately indifferent because the complaint states that he "came to clean the feces and left it just like it was and never came back to finish." (Dkt. No. 8 ¶ 14.) Therefore, I recommend that the Court deny Defendants' motion to dismiss Plaintiff's conditions of confinement claim regarding the feces in his cell.[FN6]

> **FN6.** Defendants argue that they are entitled to qualified immunity because "[P]laintiff cannot demonstrate that ... they subjected him to ... cruel

and unusual punishment. Plaintiff's own admissions establish that he was allowed recreation." (Dkt. No. 27-1 at 13.) Defendants' qualified immunity argument does not address Plaintiff's allegations regarding feces. Therefore, I find that Defendants are not entitled to qualified immunity on the record currently before the Court.

**\*7** Plaintiff may also be asserting that he was subjected to unconstitutional conditions of confinement because he was denied recreation. (Dkt. No. 8 ¶ 18.) The complaint does not include any facts plausibly suggesting that any named Defendant denied Plaintiff recreation. In fact, the complaint specifically states that Plaintiff went to recreation on January 23, 2009. (Dkt. No. 8 ¶ 11.) Therefore, I recommend that this claim be dismissed. Plaintiff has not previously amended this cause of action, so I recommend that the claim be dismissed without prejudice.

**E. Verbal Harassment**

Plaintiff alleges that Defendants singled him out for harassment. (Dkt. No. 8 ¶ 15.) Defendants move to dismiss this claim to the extent that it is premised merely on verbal harassment. Defendants correctly note that "[v]erbal harassment, 'no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable under 42 U.S.C. § **1983**.' " (Dkt. No. 27-1 at 11, quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998).) I therefore recommend that the Court dismiss any claim that Defendants violated Plaintiff's constitutional rights by verbally harassing him. This cause of action could not be cured by better pleading, so I recommend that it be dismissed with prejudice.

**F. Personal Involvement**

Defendants argue that Plaintiff has failed to plead facts plausibly suggesting that Defendants Belleinier, Otis, and Lira were personally involved in any constitutional violation. (Dkt. No. 27-1 at 5-6.) These Defendants are,

Page 7

Slip Copy, 2010 WL 2088267 (N.D.N.Y.)
(Cite as: 2010 WL 2088267 (N.D.N.Y.))

respectively, the Superintendent, Deputy Superintendent of Administration, and Deputy Superintendent of Programming at Upstate Correctional Facility. (Dkt. No. 27-1 at 6 n. 2-3.) Defendants Belleinier, Otis, and Lira argue that Plaintiff has sued them "based on their supervisory positions." (Dkt. No. 27-1 at 5.)

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v.. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they hold a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN7]

FN7. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

*8 Here, the complaint states that these Defendants "were well aware of the feces ... [and] refused to do anything about" it. (Dkt. No. 8 ¶ 12.) This allegation is sufficient to plausibly suggest that Defendants failed to remedy a violation after learning of it through a report or appeal or that they failed to act on information indicating that a violation was occurring. Therefore, I recommend that the Court deny Defendants' motion to dismiss for lack of personal involvement.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 27) be *GRANTED IN PART AND DENIED IN PART.* I recommend that the following claims be dismissed with prejudice: (1) all claims against Defendants in their official capacities; (2) all claims against Defendants Van Orgrum and Bonds; (3) the claim that Defendants retaliated against Plaintiff; and (4) any claim that Defendants verbally harassed Plaintiff. I recommend that the following claims be dismissed without prejudice: (1) the claim that Defendants violated Plaintiff's right of access to the courts; and (2) the claim that Defendants subjected Plaintiff to unconstitutional conditions of confinement by denying him recreation. I recommend that Defendants Gravlin, Demarse, Lira, Trombly, Otis, and Belleinier be directed to answer Plaintiff's conditions of confinement claim regarding his exposure to feces.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.
Cagle v. Gravlin
Slip Copy, 2010 WL 2088267 (N.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2088267 (N.D.N.Y.)
(Cite as: 2010 WL 2088267 (N.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

excessive force or assault against Defendants Bauer and Pierce under Count Three.

FN4. While Plaintiff expressly states that he is not moving for summary judgment on his claims for denial of medical and mental health treatment (Plaintiff's Declaration, Docket No. 50, ¶ 2), Plaintiff also raises arguments with respect to those claims. This Court construes those arguments as opposition to Defendants' Motion for Partial Summary Judgment as to those claims.

For the following reasons, Plaintiff's Motions to Compel are denied. Defendants' Motion for Partial Summary Judgment is granted in part and denied in part. Plaintiff's Motion for Partial Summary Judgment is denied in its entirety.

## II. BACKGROUND

Plaintiff is an **inmate** in the New York DOCS and during the times relevant to this lawsuit was incarcerated at Attica. While Plaintiff's claims span a wide range of incidents allegedly occurring at Attica, many of his claims flow from two occurrences.

The first occurrence relates to Plaintiff's medical condition. Plaintiff has an enlarged prostrate and a urological condition known as Orchiditis that causes him to have an immediate urge to urinate and causes blood to flow from his penis if he fails to do so. (Plaintiff's Declaration, Docket No. 50, ¶¶ 11-12; Longo Declaration, Ex. A, Docket No. 45, 33:17-34:11). This condition started a chain of events beginning on June 14, 2003 that lead to several of Plaintiff's claims.

On June 14, 2003, Plaintiff noticed blood in his urine and notified Defendant Laskowski, a DOCS doctor. Laskowski allegedly ignored Plaintiff. Turton, a female DOCS nurse, offered to examine Plaintiff, but he declined to be examined by her purportedly because of his Muslim religious beliefs. (Amended Complaint, Docket No. 5, ¶¶ 23, 27, 33-36).

Thereafter, on June 15, 2003, Plaintiff's urological condition caused him to bleed from his penis and then be placed in a drug watch cell FN5 for reasons that the parties dispute. Plaintiff alleges that Defendants placed him in the cell merely as punishment for his urological condition. (Id. at ¶ 26). Defendants allege that they placed Plaintiff in the cell because his visitor put her hands inside his shorts and, shortly thereafter, Defendants observed blood on Plaintiff's shorts. FN6 (Conway Interrogatory Response, Docket No. 20, ¶ 3; Bea Interrogatory Response, Docket No. 35, ¶¶ 5, 7, Ex. A).

FN5. Defendants also refer to the drug watch cell as "the dry watch cell," "the special watch cell," and "the strip cell."

FN6. Defendants conclusion that Plaintiff violated visiting room rules was later reversed in an Article 78 proceeding for reasons not disclosed on the record before this Court. (See Plaintiff's Motion for Partial Summary Judgment, Docket No. 50, Appendix 6).

Plaintiff claims that Defendants denied medical treatment while he was in the drug watch cell and that the cell was covered in feces. (Amended Complaint, Docket No. 5, ¶ 26). In addition, Defendants Bauer and Pierce allegedly kicked Plaintiff and squeezed his penis and testicles, thereby further exacerbating his urological condition. (Id. at ¶¶ 28, 42-43).

**\*2** The second occurrence giving rise to several of Plaintiff's claims is his placement and confinement in the SHU. After allegedly falsely testing positive for marijuana, Plaintiff was placed in the SHU for two years beginning in March 2002. FN7 (Plaintiff's Declaration, Docket No. 50, ¶ 24). Plaintiff alleges that he was subjected to the constant banging and screaming of **inmates** and that the **inmates** threw feces into his cell. Plaintiff alleges that Defendants failed to address conditions in the SHU and denied him mental health treatment when these conditions caused him mental illness. (Amended Complaint, Docket No. 5, ¶¶ 20, 21, 56-60).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

FN7. Plaintiff's Amended Complaint does not provide a time for when these events allegedly took place. The March 2002 date is from the Declaration in Support of Plaintiff's Motion for Partial Summary Judgment, ¶ 24. Defendants challenge the accuracy of Plaintiff's assertions regarding the reasoning for his placement in the SHU, dates, and length of time spent in the SHU. (See Defendant's Response to Plaintiff's Statement of Undisputed Fact, Docket No. 58; Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, Docket No. 60, p. 6).

Plaintiff also raises numerous other claims that have no relation to each other or to the events described above, including claims challenging the enforcement of policies relating to recreation, bathroom use, and **inmate** monitoring. The facts relevant to those claims are detailed below.

Plaintiff raises § 1983 claims against Defendants for denial of medical (Count One), dental (Count Two), and mental health treatment (Count Six), as well as for various acts of cruel and unusual punishment (Count Three), FN8 denial of recreation (Count Four), and denial of the right to practice religion and the right to privacy (Count Five).

FN8. Plaintiff asserts several distinct claims for cruel and unusual punishment under Count Three. In addition, this Court construes Plaintiff's allegations of denial of medical, dental, and mental health treatment as also stating § 1983 claims for cruel and unusual punishment under the Eighth Amendment. For simplicity and consistency, this Court will analyze all claims according to the count titles given by Plaintiff.

**A. Count One: Denial of Medical Treatment**

To support his claims under Count One for deliberate indifference to his medical needs Plaintiff alleges that Defendants failed to treat two injuries. First, Plaintiff alleges that on June 14 and June 15, 2003, Defendants Laskowski and Turton denied medical treatment for

Plaintiff's urological condition. (Complaint, Docket No. 5, ¶ 23, 27, 33-36). Second, Plaintiff alleges that Laskowski's refusal to refer Plaintiff to a specialist to have a lump on his chest examined constitutes deliberate indifference to his medical needs. (*Id.* at ¶ 35). Defendants move for summary judgment on these claims.

**B. Count Two: Denial of Dental Treatment**

Plaintiff's § 1983 claims against Defendants Bea, Conway, and James arise from their denial of dental treatment. Bea, Conway, and James allegedly refused to provide Plaintiff with dental floss and refused to allow Plaintiff to have his teeth cleaned while he was in the SHU. (*Id.* at ¶¶ 38-39). Defendants move for summary judgment on this claim.

**C. Count Three: Cruel and Unusual Punishment**

Plaintiff raises three separate incidents under Count Three to support his claims for cruel and unusual punishment. First, he alleges that on June 15, 2003, Defendants Bauer and Pierce kicked him and squeezed his penis and testicles, thereby exacerbating his urological condition. (*Id.* at ¶¶ 28, 42-43). Neither party moves for summary judgment as to this claim.

Second, Plaintiff alleges that Defendants Bauer, Bea, James, Markowski, FN9 and Polak ignored Plaintiff's injuries and placed him in a drug watch cell for 48 hours because of his bleeding penis. (*Id.* at ¶ 43). Plaintiff further alleges that Defendants Bauer, Bea, Conway, James, and Polak left him in the drug watch cell after learning that his urological condition caused the bleeding. (*Id.* at ¶ 44). In addition, Plaintiff alleges that the drug watch cell was smeared in feces and that Defendants denied Plaintiff a toothbrush and water for bathing while in the cell. (*Id.* at ¶ 26).FN10 Both parties move for summary judgment as to this claim.

FN9. This Court notes that Markowski has never been served with a summons and complaint. As Plaintiff has not moved for an extension of time to effectuate service, all claims against Markowski can be dismissed for failure to

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

comply with FED. R. CIV. P. 4(m). See *Zapata v. City of New York,* 502 F.3d 192, 199 (2d Cir.2007) (affirming district court's dismissal of plaintiff's § 1983 claim for failure to ask for an extension of time for service within a reasonable time after the passing of the date for effectuation of service). However, even without this procedural flaw, all claims against Markowski are dismissed as without merit, as discussed below.

FN10. Plaintiff raises the facts concerning the condition of the cell under the fact discussion of his Complaint and does not explicitly raise them as a claim under Count Three. This Court liberally construes these facts as stating a claim for cruel and unusual punishment relating to the claims alleged under Count Three.

**\*3** Plaintiff's third claim under Count Three relates to Attica's bathroom policies as applied to Plaintiff. First, Plaintiff alleges that Defendants Bea, Conway, James, and Markowski violated § 1983 "by the failure to have a bathroom policy that allows adequate and immediate access to the urinal when needed by Plaintiff." (*Id.* at ¶ 45). Second, Plaintiff alleges that Defendants Bea, Conway, and James violated § 1983 by refusing to allow Plaintiff to use the bathroom in the first floor visiting area and requiring Plaintiff to wait for corrections officers from other floors to take plaintiff to use the bathroom. (*Id.* at ¶ 46). Plaintiff alleges that Defendants' adherence to these policies injured him because his urological condition required that he have immediate access to a bathroom. (*Id.* at ¶¶ 45, 46). Defendants move for summary judgment on this claim.

**D. Count Four: Denial of Recreation**

Plaintiff alleges that "Defendants Conway [and] Bea ... violated Plaintiff['s] Constitutional Right to Outside exercise by allowing recreation to run between 7 A.M. and 8:30 A.M.[,] the same time that hot breakfast meals and the mail program [are] run." (*Id.* at ¶ 48). Plaintiff alleges that he is forced to choose between attending recreation and eating a hot meal or receiving his legal mail. (*Id.* at ¶ 49, 50). As a result, Plaintiff has allegedly skipped

recreation for over ten months and suffered a decline in his health from the lack of exercise. (*Id.* at ¶ 51). Both parties move for summary judgment on these claims.

**E. Count Five: Denial of Right to Religion and Right to Privacy**

Plaintiff raises two separate privacy claims under Count Five. First, Plaintiff alleges that Defendants Bea, Conway, and James violated his right to privacy "by failing to provide shower curtains or removing the video camera from viewing the shower while plaintiff is naked." (*Id.* at ¶ 53). Second, Plaintiff alleges that Defendants Baker, Bea, James, and Stone "violated plaintiff's Constitutional right to privacy by designating the drug watch, dry cell room to be in a high traffic area and requiring plaintiff to defecate in front of **inmates**, staff, female employees and all sorts of hospital and mental health employees while naked in totality." (*Id.* at ¶ 54). Plaintiff alleges that being forced to expose his body to females violated his religious beliefs. (*Id.* at ¶¶ 29, 53). Both parties move for summary judgment on these claims.

**F. Count Six: Mental Health**

Plaintiff raises claims against Defendant mental health workers Barten and Clair for deliberate indifference to his mental health problems, which allegedly included insomnia, paranoia, thoughts of harming himself and others, and inability to concentrate. (*Id.* at ¶ 21, 56). Plaintiff argues that Defendants were obligated to provide him with group counseling or treatment by a psychiatrist. (*Id.* at ¶ 57).

**\*4** Plaintiff also raises claims against Defendants Barten, Bea, Clair, Conway, and James arising from conditions in the SHU. While in the SHU, Plaintiff allegedly suffered from a mental breakdown from having to listen to prolonged loud banging and screaming of mentally ill **inmates** and having feces thrown in his cell. Defendants allegedly refused to provide treatment to Plaintiff and failed to address conditions in the SHU. (*Id.* at ¶¶ 20, 58-60). The Defendants move for summary judgment on these claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

### III. DISCUSSION

#### A. Motions to Compel

This Court will first address Plaintiff's pending Motions to Compel (Docket Nos. 41, 54). On November 13, 2006, Plaintiff moved to compel, arguing that Defendant Bea failed to respond to a request for admissions and Defendants failed to produce a requested video log. (Docket No. 41). As noted by Defendants (Docket No. 45), Plaintiff made his request for the production of these documents after the close of discovery and this Court has not granted an extension on discovery. Furthermore, Defendants provided Plaintiff with answers to Bea's Interrogatories, as well as other documents describing the events allegedly contained in the video log, such that Plaintiff's additional requests are not necessary for him to prosecute his claim. Accordingly, Plaintiff's November 13, 2006 Motion to Compel (Docket No. 41) is denied.

On December 26, 2006, Plaintiff again moved to compel arguing that Defendants had not provided a requested videotape to him. (Docket No. 54). Defendants' counsel thereafter submitted an affidavit attesting that the delay was due to confusion over administrative procedures for obtaining the videotape from Attica and that he had mailed the videotape to Plaintiff on January 10, 2007. (Docket No. 57). Therefore, Plaintiff's motion will be denied as moot because Defendants have provided the requested item. Plaintiff's request for $5,000 for "time, frustration and effort spent in litigation" is denied.

#### B. Motions for Partial Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ford v. Reynolds,* 316 F.3d 351, 354

(2d Cir.2003). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248. In a case where the non-moving party bears the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to the absence of evidence supporting an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*5** At this stage, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Thus, summary judgment is not appropriate if "there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Ford,* 316 F.3d at 354.

When deciding a motion for summary judgment, a court must view the evidence and the inferences drawn from the evidence "in the light most favorable to the party opposing the motion." *Addickes v. S.H. Kress and Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, the party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).

Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. *See* 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. *See Graham v. Connor,* 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. *See Baker,* 443 U.S. at 140.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

Plaintiff's *pro se* Motion for Summary Judgment (Docket No. 50) contains numerous allegations unrelated to the claims asserted in his Amended Complaint. (Docket No. 5). Plaintiff also moves for summary judgment on due process violations, which he failed to state in his Amended Complaint. While this Court construes Plaintiff's Amended Complaint liberally, *see Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), this Court does not construe these new allegations as creating additional claims for which Plaintiff may move for summary judgment. Additionally, as Plaintiff's Amended Complaint makes no assertions that can be construed as stating a claim for violation of due process, this Court will not consider such claim at summary judgment. Accordingly, this Court reviews the respective motions for summary judgment with respect to the claims asserted in Plaintiff's Amended Complaint.

Prison conditions and the treatment **prisoners** receive while incarcerated are subject to scrutiny under the Eighth Amendment. *See DeShaney v. Winnebago County Dept. of Social Svcs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005-1006, 103 L.Ed.2d 249 (1989). The Supreme Court has recognized that a **prisoner's** claim that he was intentionally denied medical treatment is cognizable under the Eighth Amendment and § 1983:

> **\*6** We therefore conclude that deliberate indifference to serious medical needs of **prisoners** constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the **prisoner's** needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a **prisoner's** serious illness or injury states a cause of action under § 1983.

> ...

In order to state a cognizable claim, a **prisoner** must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 104, 106, 97 S.Ct. 285, 291, 292, 50 L.Ed.2d 25 (1976) (quotations and citations omitted).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (citing *Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)).

The subjective component "requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Sims,* 230 F.3d at 21 (citations omitted). The objective component is "contextual and responsive to contemporary standards of decency." *Id.* (quoting *Hudson,* 503 U.S. at 8).

With respect to a claim of deliberate indifference to a serious medical need, a **prisoner** must also show that he suffered from a "sufficiently serious" medical condition, *see Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), and that the defendants acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

"An official acts with the requisite deliberate indifference when he 'knows of and disregards an excessive risk to **inmate** health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' "

*Brown v. Picarelli,* No. 96 Civ. 1222, 2003 WL 1906180, at *6 (S.D.N.Y. Apr. 15, 2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

**1. Count One: Denial of Medical Treatment**

**a. *Plaintiff's Urological Condition***

In this case, Plaintiff provides no evidence other than his own assessment that his urological condition was "sufficiently serious" to support a denial of medical treatment claim. In addition, Plaintiff's own actions contradict his claim that his urological condition was sufficiently serious. Plaintiff stated at deposition:

**\*7** Q. We are still talking about June 14, 2003. Anyone ever give you a diagnosis?

A. Well, yes.

Q. What was wrong?

A. It was an enlarged prostrate and orchiditis.

Q. Orchiditis?

A. Yes. [A urologist] prescribed medication for it.

Q. Was medication to be taken all the time or just until it stopped?

A. I took it all the time.

Q. So the medication didn't seem to be working?

A. Well, there were times when I was not taking the medication. I'm not sure, so I don't say one day or the other. Right now I was going through things. I don't know if I was taking the medication when [the bleeding started on June 14].

(Longo Declaration, Ex. A, Docket No. 45, 33:17-34:11). Plaintiff also declined treatment from Turton, a female DOCS nurse, on the basis that it violated his religious beliefs. Plaintiff's failure to consistently take medication that would improve his condition and his willingness to decline treatment from Turton [FN11] contradict his claim of having a sufficiently serious medical condition requiring immediate treatment. In addition, Plaintiff received medical treatment the following day (Turton Interrogatory Responses, Docket No. 19, ¶ 10) and he submits no medical evidence of having experienced extreme pain or a decline in his condition from the delay.

FN11. While Plaintiff argues that he is prohibited by Islamic Law from showing his penis to any female other than his spouse, Plaintiff's interpretation of Islamic Law is questionable. In a prior case, an Islamic scholar conceded that this tenet may be waived in emergency circumstances. *See Rivera v. Smith, 63 N.Y.2d 501, 506, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (N.Y.1984)*. However, even if Plaintiff's interpretation of Islamic Law is correct, Plaintiff cannot establish that Defendants were deliberately indifferent to serious medical needs or had a sufficiently culpable state of mind while at the same time admitting that Defendants offered treatment. Plaintiff also fails to establish a constitutional right to receive medical treatment from a male doctor. *See Baker v. Welch*, 2003 WL 22901051, \*18 (S.D.N.Y.2003) (noting in dicta that "[a] male **prisoner** has no constitutional right to be treated by a male doctor.").

Plaintiff also has failed to provide evidence from which a reasonable jury could conclude that Defendants had a "sufficiently culpable state of mind." *See Hathaway*, 37 F.3d at 66. Plaintiff admits that Turton offered to examine him, but that he declined treatment for religious reasons. Plaintiff also previously received treatment and was receiving medication for his condition at the time of these incidents. In addition, Plaintiff received treatment for his condition the day after these incidents. Defendants willingness to provide Plaintiff with treatment for his urological condition contradicts Plaintiff's claim that Defendants were deliberately indifferent to his medical needs. Because no reasonable jury could conclude that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

Defendants were deliberately indifferent to a sufficiently serious medical need, this Court grants summary judgment to Defendants with respect to Plaintiff's claims for denial of medical treatment for his urological condition.

**b. Lump on Plaintiff's Chest**

Plaintiff also provides no evidence that the lump in his chest was sufficiently serious to support a § 1983 claim. While Laskowski refused to order a biopsy, Plaintiff did receive a mammogram. The examiner noted that the "findings are not highly suggestive of breast malignancy." (Wells Declaration, Docket No. 47, Ex A:000259). This evidence contradicts Plaintiff's claim that the lump was sufficiently serious to support a claim for denial of medical treatment. Plaintiff's claim amounts to little more than a disagreement over the type of treatment he should have received. As the Second Circuit has noted, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. Because no reasonable jury could conclude that Defendants were deliberately indifferent to a sufficiently serious medical need this Court grants summary judgment to Defendants with respect to Plaintiff's claims for denial of medical treatment for the lump in his chest.

**2. Count Two: Denial of Dental Treatment**

*8 Defendants argue that Plaintiff waived this claim and that the Court should dismiss it based on the following exchange with Plaintiff at deposition:

Q. All right. Now, you also had a claim about your dental care. Since April 2000, you weren't able to get your teeth cleaned properly or get floss?

A. No.

Q. Who's responsible for that?

A. It was the policy. If you are in S.H.U., you were canceling your dinner and they didn't want to take me

over there after I grieved it. I don't know whose position it is to see about this. That was cured actually by grieving it, and in regard to that claim, I don't think I'll be pursuing that claim. I think I'll be waiving that claim.

(Longo Declaration, Ex. A, Docket No. 45, 30:24-31:14). Plaintiff provides no evidence to support this claim and makes no opposition to Defendants' argument that he has waived this claim. Accordingly, this Court grants summary judgment to Defendants with respect to Plaintiff's claim that Defendants denied him dental treatment. *See Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (deeming plaintiff's claim "abandoned" and granting defendants' summary judgment where claim was alleged in the complaint but "not raised elsewhere in the record").

**3. Count Three: Cruel and Unusual Punishment**

**a. Denial of Medical Treatment in the Drug Watch Cell**

Plaintiff's claim that Defendants placed him in a drug watch cell for 48 hours because of his bleeding penis and denied him medical treatment largely reiterates his claim under Count One for denial of medical treatment and is similarly without merit for the reasons stated above. Defendants Laskowski and Turton visited Plaintiff during the 48 hours he spent in the drug watch cell. Turton offered to examine Plaintiff, but Plaintiff declined. Accordingly, this Court grants summary judgment to Defendants on that aspect of Count Three that restates his claim under Count One for denial of medical treatment because no reasonable jury could conclude that Defendants were deliberately indifferent to a sufficiently serious medical need

**b. Conditions in the Drug Watch Cell**

Count Three also contains allegations that Plaintiff's drug watch cell was smeared in feces and that Defendants denied Plaintiff a toothbrush and water for bathing during the 48 hours that he spent in the cell. Plaintiff argues that Defendant Bea admitted to these conditions and that the "placement in an isolation cell in very unclean conditions

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

violates the Eighth Amendment." (Memorandum in Support of Plaintiff's Motion for Partial Summary Judgement, Docket No. 50, p. 6). Defendants respond that Plaintiff is misconstruing Bea's interrogatory response, which states:

> I do not recall the date, but **inmate** Hamilton did claim that he had been deprived of toiletries following use of the bed pan. I spoke to the officers assigned to the area and the area supervisor to ensure proper amenities. I was told that the amenities were provided to but refused by **inmate** Hamilton. I heard no further complaints from Hamilton.

**\*9** (Docket No. 35, ¶ 7). Even accepting Plaintiff's version of events as true, Defendants denial of a toothbrush and water for bathing to Plaintiff for 48 hours is *de minimus* and fails to rise to the level of a constitutional violation because briefly denying hygienic materials does not violate contemporary standards of decency. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 210 (N.D.N.Y.2001) (holding denial of shower rights for one day does not violate the Eighth Amendment); *Chapple v. Coughlin,* 92-CV-8629, 1996 WL 507323, at \*2 (S.D.N.Y. Sept.5, 1996) (denial of shower and recreation for three days did not amount to an Eighth Amendment violation); *accord Markiewicz v. Washington,* 175 F.3d 1020 (7th Cir. March 25, 1999) (holding that prison official's refusal to allow a **prisoner** access to two showers did not state a claim of unconstitutional prison conditions); *Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) (holding that when a **prisoner** is allowed to shower once every seventy-two hours, the Eighth Amendment is not violated). Plaintiff also provides no evidence to support his allegation that the cell was unclean and contained feces. Accordingly, this Court grants summary judgment to Defendants on Plaintiff's claim under Count Three concerning conditions in the drug watch cell because no reasonable jury could find that conditions in the drug watch cell violate contemporary standards of decency.

### c. *Claims regarding Defendants' Bathroom Policy*

This Court also considers Plaintiff's remaining claims against Conway, James, Bea, and Markowski under Count Three concerning the bathroom policy. Plaintiff claims

that Defendants' enforcement of the bathroom policy prevented him from having immediate access to the bathroom. Defendants argue that Plaintiff admitted that his claims against Conway and James are solely for setting the policy. (See Longo Declaration, Docket No. 45, Ex. A, 57:24-58:10). However, as indicated by Conway's interrogatory responses and exhibits, the policies Plaintiff complains about were set by DOCS and not Conway and James. (See Docket No. 27, ¶¶ 20, 21, Ex. C, D). Plaintiff does not contest that the policies were set by DOCS. Therefore, because Plaintiff has failed to allege that Conway and James were personally involved in setting this policy, his claims against them must be dismissed. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."); *see also MacDonald v. Angelone,* 69 F.Supp.2d 787, 791-92 (E.D.Va.1999) (dismissing claim against Director of Virginia Department of Corrections because there was no showing that he had any personal involvement in the promulgation of the challenged policy).

To the extent that Plaintiff claims Defendants were deliberately indifferent to his medical needs in enforcing the bathroom policy, Plaintiff has failed to demonstrate that Defendants were aware of his urological condition [FN12] or that they acted culpably by intentionally delaying his use of the bathroom. Accordingly, this Court grants summary judgment to Defendants on that aspect of Count Three that raises claims related to Defendants enforcement of the bathroom policy.

> FN12. James denied having knowledge of Plaintiff's urological condition in his response to plaintiff's Interrogatories. (See James Interrogatory Response, Docket No. 18, ¶ 8).

### 4. Count Four: Denial of Recreation

**\*10** In the Complaint, Plaintiff alleges that Defendants Bea and Conway ran recreation at the same time that **inmates** received hot breakfast and legal mail. Plaintiff alleges that this forced him to choose whether to go to recreation or receive a *hot* breakfast and legal mail.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

Plaintiff's claim concerning hot breakfast fails to state a violation of the Eighth Amendment, which requires that **prisoners** be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the **inmates** who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). At his deposition, Plaintiff admitted that he still received food if he went to recreation, but that if he ordered hot food, it would be cold by the time he returned. (See Longo Declaration, Ex. A, Docket No. 45, 9:6-9:25). Denial of hot meals does not create a constitutional violation. *See Hoitt v. Vitek,* 497 F.2d 598, 601 (1st Cir.1974) ("deprivation of hot meals ... fails to state a claim of cruel and unusual punishment, given the stipulation that three meals were provided daily ...."); *Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) ("As for cold food, even if food was served cold from time to time, allegations of denial of hot meals do not state a cognizable claim, if **prisoners** are adequately fed.").

Plaintiff also fails to support his contention that he had to choose between going to recreation and receiving legal mail. Defendants' records show that Plaintiff signed for legal mail 132 times during the relevant period, including on 26 days when he also went to recreation. (See Prusak Declaration, Docket No. 46, Exs. A, C). Given this record, no reasonable jury could find that Plaintiff was deprived of recreation or access to legal mail in violation of the Eighth Amendment.

Plaintiff's claim that his health suffered from missing recreation is also wholly without merit. Defendants' records show that Plaintiff attended recreation 96 times during the relevant period. Plaintiff also provides no evidence to support his contention of declining health. Because no reasonable jury could find that Plaintiff was deprived of recreation, meals, or access to legal mail in violation of the Eighth Amendment, this Court grants summary judgment to Defendants on all claims raised under Count Four of Plaintiff's Amended Complaint.

**5. Count Five: Denial of Right to Religion and Right to Privacy**

Defendants argue that Plaintiff's privacy and religious

claims should be dismissed because Defendants had no involvement in setting the challenged policies. In the alternative, Defendants argue that they are entitled to qualified immunity as to these claims. While Plaintiff moves for summary judgment on these claims, he advances no arguments in support of his position.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Here, Plaintiff asserts liability against Defendants for the lack of privacy in the showers and drug watch cell and for allowing females to view him while in the showers and cell. However, Plaintiff fails to allege and provides no evidence to suggest that Defendants were personally involved in creating the conditions and procedures to which he objects. Similarly, Plaintiff asserts claims against Defendants for "designating [the location of] the drug watch cell ... in a high traffic area," but he presents no evidence that Defendants had any influence in the location of the cell. Plaintiff also provides no evidence to support his speculation that female employees were watching him through the video cameras in violation of his religious views.

***11** Even if Plaintiff could show that Defendants were personally involved in creating the conditions and procedures and that the conditions and procedures violate a constitutional right, Defendants would be protected by qualified immunity. Defendants are protected from § 1983 liability on the basis of qualified immunity if their actions (1) did not violate clearly established law or (2) it was objectively reasonable for the officials to believe that their actions did not violate the law. *See Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999).

Existing decisions are inconsistent on whether allowing prison employees to view **prisoners** using showers and bathrooms under similar conditions is a constitutional violation. *See, e.g., Baker v. Welch,* 2003 WL 22901051, *18 (S.D.N.Y.2003) (noting that close observation by a female officer of a male **prisoner** urinating for a urine test could violate the Constitution, but granting summary judgment to defendants on qualified immunity grounds); *Rogers v. Clark,* 94-CV-0444E, 1996 WL 328218 (W.D.N.Y.1996) (holding that a female corrections

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

officer's glance at a showering male **prisoner** did not present a constitutional injury and that "[b]ashfulness is not a protectable fundamental right or liberty interest."); *and Dawson v. Kendrick,* 527 F.Supp. 1252, 1316 (S.D.W.Va.1981) (holding that prison violated female **inmates'** rights when it enabled male **inmates** and prison staff to peer into female **inmates'** cells and view them undressing or using toilets); *see also MacDonald v. Angelone,* 69 F.Supp.2d 787, 793 (E.D.Va.1999) (attributing the differing results in similar cases to the close factual analysis that occurs when courts balance **prisoners'** limited privacy right and prison officials' security responsibility). Furthermore, in *Johnson v. Phelan,* 69 F.3d 144 (7th Cir.1995), the United States Court of Appeals for the Seventh Circuit concluded that Supreme Court precedent does not allow for any right to privacy for **prisoners**:

[In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court] assumed without deciding that **prisoners** retain some right of privacy under the fourth amendment. Five years later the Court held that they do not. *Hudson v. Palmer,* 468 U.S. 517, 526-30, 104 S.Ct. 3194, 3200-02, 82 L.Ed.2d 393 (1984), observes that privacy is the thing most surely extinguished by a judgment committing someone to prison. Guards take control of where and how **prisoners** live; they do not retain any right of seclusion or secrecy against their captors, who are entitled to watch and regulate every detail of daily life. After *Wolfish* and *Hudson* monitoring of naked **prisoners** is not only permissible-wardens are entitled to take precautions against drugs and weapons (which can be passed through the alimentary canal or hidden in the rectal cavity and collected from a toilet bowl)-but also sometimes mandatory. Inter-**prisoner** violence is endemic, so constant vigilance without regard to the state of the **prisoners'** dress is essential. Vigilance over showers, vigilance over cells-vigilance everywhere, which means that guards gaze upon naked **inmates**.

**\*12** *Id.* at 146. This Court cites these cases not in any attempt to resolve the inherent tension, but rather to highlight that there is no clearly established law in this area. While cases outside of the Seventh Circuit generally suggest that **prisoners** have a limited right to privacy, it is rarely found to be violated and Plaintiff's claims here clearly do not qualify. However, even assuming that

Plaintiff has a constitutional right to privacy in these circumstances, Defendants would be entitled to qualified immunity because there is no clearly established law. Accordingly, this Court grants summary judgment to Defendants on all claims raised under Count Five of Plaintiff's Amended Complaint.

**6. Count Six: Denial of Mental Health Treatment**

Plaintiff's complaint about his mental health treatment, including his belief that he should have received group counseling or treatment by a psychiatrist, is unsupported by the record. Defendants mental health records show that numerous mental health employees, including Defendant Barton, screened Plaintiff and concluded that he did not require further treatment. (See Barton Interrogatory Responses, Ex. B, Docket No. 50-12). Plaintiff provides no support beyond his own view that his treatment was deficient or that he was entitled to different treatment.

At bottom, Plaintiff's complaint is that he did not receive the level and form of care that he personally deemed appropriate. Plaintiff's preference for different treatment, however, does not raise a constitutional issue. As noted by the Second Circuit, "it is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a **prisoner** might prefer a different treatment does not give rise to an Eighth Amendment violation." *Armstrong,* 143 F.3d at 703.

With respect to Plaintiff's claims against Defendants Barten, Bea, Clair, Conway, and James regarding the conditions in the SHU, Plaintiff provides affidavits and cites to numerous cases in support of his motion for summary judgment. Plaintiff provides five affidavits from **inmates** all of which describe conditions in the SHU in essentially the same manner as plaintiff-excessively loud with **inmates** throwing feces into cells.[FN13]

FN13. While Plaintiff provides five **inmate** affidavits, only one of the affidavits is notarized and is, therefore, properly before this Court.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

To support his argument that excessive **noise** and unsanitary **conditions** violate the **Eighth Amendment**, Plaintiff cites to a string of cases including *McClary v. Kelly,* 4 F.Supp.2d 195 (W.D.N.Y.1998), which he alleges "best describe[s] the **conditions** [he] suffered while [in the SHU]". (Memorandum in Support of Plaintiff's Motion for Partial Summary Judgement, Docket No. 50, p. 3-4). In *McClary,* the Court conducted extensive fact-finding and concluded that **conditions** in the SHU-including loud **noise** and **inmates** throwing feces-constituted an "atypical and significant" hardship on the plaintiff. *Id.* at 204, 206-07, 213. The court also cautioned that its holding "is limited to the particular facts involving [the plaintiff]." *Id.* at 213. While this Court agrees that the **conditions** in *McClary* bear some similarity to the **conditions** that Plaintiff complains of here, *McClary* focused on a due process claim and the Court made conclusions only after extensive fact-finding. Each of the other cases cited by Plaintiff also involved extensive fact-finding well beyond what is currently available in this case.

**\*13** Plaintiff also claims that he should be granted summary judgment because Defendants Barten, Clair, Conway, and James admitted to the SHU conditions he described. (Hamilton Declaration, Docket No. 50, ¶ 6). The record demonstrates that Defendants admit to some instances of loud noise and **inmates'** throwing feces. (See, e.g., Conway Interrogatory Response, Docket No. 20, ¶¶ 6-7). However, while Defendants admit the existence of these conditions, they do not admit to the same level of continuous noise and unsanitary conditions to which Plaintiff complains. For instance, Defendant James explicitly denies that these conditions are a regular occurrence. (James Interrogatory Response, Docket No. 18, ¶ 10). As the parties dispute the extent to which Plaintiff was subjected to such conditions in the SHU, summary judgment is accordingly denied as to this aspect of Count Six. However, as there is no allegation that Barten and Clair, both mental health workers, were personally responsible for these conditions, this claim is dismissed as alleged against them. In addition, as Conway is the Director of Attica and is not alleged to have been personally involved in subjecting Plaintiff to these conditions, this claim is also dismissed as alleged against him. Therefore, Plaintiff's claim under Count Six regarding conditions in the SHU survives summary judgment only as alleged against Defendants Bea and James.

This Court has considered the parties' other arguments and finds them to be unavailing.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motions to Compel are denied and Defendants' Motion for Summary Judgment is granted in part and denied in part in accordance with the opinion above. Specifically, the claims that remain are as follows:

Plaintiff's claim against Bauer and Pierce for use of excessive force under Count Three.

Plaintiff's claims against Bea and James under Count Six relating to conditions in the SHU.

### V. ORDER

IT HEREBY IS ORDERED, that Plaintiff's Motions to Compel (Docket Nos. 41, 54) are denied.

FURTHER, that Defendants' Motion for Partial Summary Judgment (Docket No. 44) is granted in part and denied in part.

FURTHER, that Plaintiff's Motion for Partial Summary Judgment (Docket No. 50) is denied.

FURTHER, that the Clerk of the Court shall terminate Brian Baker [FN14], Bruce Barten, Scott Clair, James Conway, Stephen Laskowski, Sergeant Markowski [FN15], Ray Pierce [FN16], Anthony Polak [FN17], and Cathie Turton [FN18] as Defendants to this action.

> FN14. Defendant Baker's first name is not included in the Docket heading. Defendant's Answer to the Second Amended Complaint states that his first name is "Brian." (Docket No. 7, p. 1).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)
(Cite as: 2008 WL 234216 (W.D.N.Y.))

FN15. Defendant Markowski's first name is not stated in the record before this Court.

FN16. Defendant Pierce's first name is not included in the Docket heading. Defendant's Answer to the Second Amended Complaint states that his first name is "Ray." (Docket No. 7, p. 1).

FN17. Defendant Polak's first name is not included in the Docket heading. Defendant's Answer to the Second Amended Complaint states that his first name is "Anthony." (Docket No. 7, p. 1).

FN18. Defendant Turton's first name is incorrectly spelled "Cathy" in the Docket heading and in numerous documents. Her Response to Plaintiff's Interrogatories (Docket No. 19, p. 1, 7) indicates that her name is spelled "Cathie."

SO ORDERED.

W.D.N.Y.,2008.
Hamilton v. Conway
Not Reported in F.Supp.2d, 2008 WL 234216 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1953752 (N.D.N.Y.)
(Cite as: 2009 WL 1953752 (N.D.N.Y.))

Defendants move (Dkt. No. 144) for summary judgment dismissing this *pro se* prisoner section 1983 complaint. Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Randolph F. Treece issued a Report and Recommendation (Dkt. No. 174) dated March 25, 2009, recommending that the action be dismissed as against certain defendants. Plaintiff has submitted an objection (Dkt. No. 178). Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See Brown v. Peters,* 1997 WL 599355,*2-3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993). Accordingly, the Court conducts *de novo* review of the issues raised by plaintiff.

Upon *de novo* review, the Court agrees with and adopts most of the excellent and thorough Report and Recommendation of Magistrate Judge Treece. However, in his objection to the Report and Recommendation, plaintiff explains certain aspects of his case and evidence; partly for this reason, and due to plaintiff's *pro se* status, the Court does not adopt the recommendation to grant summary judgment in defendants' favor with respect to two issues. Regarding the first issue, the Court denies summary judgment dismissing the excessive force claim against C. Champagne stemming from the alleged beating of plaintiff on July 20, 2004. In view of plaintiff's *pro se* status, the Court finds that plaintiff's objection, in which he explains his deposition testimony and refers to the allegation in the complaint that Champagne struck him with his baton during the beating, is sufficient to withstand summary judgment. Thus, the Court denies summary judgment in Champagne's favor regarding this claim. The Court otherwise adopts Magistrate Judge Treece's Report and Recommendation on this issue, including the recommendation to deny summary judgment dismissing the conspiracy claim related to the alleged beating.

**\*2** The second issue concerns plaintiff's Eighth Amendment claim regarding the conditions in his cell in the Special Housing Unit ("SHU") from July 19, 2004, until the filing of the complaint on September 14, 2005. Although this is a close question, the Court finds sufficient

evidence in the complaint, deposition, opposition to summary judgment, and other papers to raise an issue of fact barring dismissal of the Eighth Amendment claim regarding the alleged cold temperature and lack of sink and toilet running water in plaintiff's SHU cell from July 19, 2004 to September 14, 2005, as well as other alleged deprivations for a much shorter period. Regarding the cold, plaintiff avers that a wide crevice in the cell wall adjacent to his outside exercise pen door was not repaired for a year and a half, permitting cold drafts, snow, and insects to enter and causing him to suffer from "bitter" cold in the winter, and that the exterior wall to which his bed was attached was so cold that he had to sleep on the floor. According to Superintendent R. Woods' response to plaintiff's grievance regarding the crevice, a work order to close the crevice was submitted on or before February 2, 2005. Plaintiff, however, claims the work was not done for over a year. Woods' affidavit does not establish whether or when anyone actually performed the repair work that was ordered. Further, the fact that the temperature in plaintiff's cell was checked once and found to be acceptable is not enough to warrant summary judgment on this issue. Deprivation of the basic human need of warmth can constitute an Eighth Amendment violation. *See, e.g., Benitez v. Straley,* 2006 WL 5400078, * 13 (S.D.N.Y. Feb.16, 2006); *Moore v. Gardner,* 199 F.Supp.2d 17, 36-38 (W.D.N.Y. Mar.12, 2002). Regarding unsanitary conditions, plaintiff avers that his cell lacked sink and toilet running water from July 19, 2004 to September 14, 2005. Woods' affidavit does not completely remove any question of fact regarding this allegation. In addition, plaintiff claims that when he was placed in the SHU cell on July 19, 2004, it was grossly unsanitary, with fecal matter and dead insects on the floor and walls, and that for some period of time thereafter, [FN1] he was deprived of cleaning supplies, preventing him from cleaning the cell, and that he was deprived of toilet paper during the same time period. The factfinder may properly consider these alleged conditions, although occurring only during a limited period, as well as the allegations of lack of running water and bitter cold for a longer period, in evaluating plaintiff's Eighth Amendment claim based on inhumane conditions of confinement. *See generally Gaston v. Coughlin,* 249 F.3d 156, 164-65 (2d Cir.2001) *and cases cited therein; Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967); *compare Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003). Plaintiff has adequately alleged liability on the part of Woods, who visited him in his cell on a number of occasions and was aware of his complaints of the cold, as well as B. Mailloux, T. Debyah, Grant, R.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1953752 (N.D.N.Y.)
(Cite as: 2009 WL 1953752 (N.D.N.Y.))

Richards, Smithers, N. Bezio, D. Quinn, J. Price, J. McGaw, Brown, Keating, and Burgess. Plaintiff may also proceed on his claims that defendants Mailloux, Smithers, and Woods conspired to subject him to these conditions; the conclusory conspiracy claim as to Sawyer is dismissed. As against the other defendants named in this cause of action, the record lacks a sufficient basis upon which a rational jury could find personal involvement, supervisory responsibility, and/or deliberate indifference.

> FN1. Plaintiff's complaint specifies three consecutive days during which this condition lasted, but the complaint is not sufficiently clear to warrant a definite finding that the situation lasted no longer than that three-day period. The Court notes that, although not in evidentiary form, plaintiff states in his Objection to the Report and Recommendation and his Memorandum of Law in opposition to summary judgment that this unsanitary condition and denial of cleaning supplies persisted for almost three weeks.

*3 Plaintiff also asserts an Eighth Amendment conditions-of-confinement claim alleging he was denied outdoor recreation. The Court agrees with Magistrate Judge Treece that-particularly when viewed in light of plaintiff's deposition testimony-this claim, as well as the claim of conspiracy to deny outdoor exercise, lacks sufficient factual basis to withstand summary judgment. The Court agrees that plaintiff may proceed on his Eighth Amendment claim of deprivation of food on numerous occasions from July 10, 2004 to September 14, 2005. Further, the Court adopts Magistrate Judge Treece's discussion and recommendation that summary judgment be granted dismissing plaintiff's claims that false misbehavior reports were issued against him in retaliation for his exercise of his First Amendment right to file grievances, that he was denied access to courts, and that he was denied copies of misbehavior reports.

The Court agrees with Magistrate Judge Treece's discussion and recommendation regarding plaintiff's claims of deliberate indifference to his medical needs, verbal harassment, denial of access to the inmate grievance system, and denial of due process in connection with his prospective disciplinary sentences to SHU under

Sandin v. Conner, 515 U.S. 472, 484-86, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Court further adopts the remainder of Magistrate Judge Treece's Report and Recommendation.

### ORDER TO SHOW CAUSE

The Report and Recommendation, filed March 25, 2009, contained an Order to Show Cause as follows:

> [W]ithin thirty (30) days of the filing date of this Report-Recommendation and Order, Plaintiff show cause why Defendants D. Lawrence, F. Kaufman, and John Does 1-3 should not be dismissed from this action due to Plaintiff's failure to effectuate service of process pursuant to Fed.R.Civ.P. 4(m). Plaintiff is warned that his failure to respond to this Order to Show Cause within thirty (30) days of the filing date of this Report-Recommendation and Order will result in this Court recommending dismissal of his claims against these Defendants.

On May 1, 2009 (Dkt. No. 176) plaintiff requested an extension of time to respond to the Order to Show Cause until May 20, 2009. Plaintiff also stated that officials refused to furnish writing supplies unless plaintiff provided a letter from the Court confirming plaintiff's court-imposed deadline.[FN2] The Court extended the due date for the responding declaration until May 20, 2009, and otherwise denied the request (Dkt. No. 177). As of the date of this Memorandum-Decision and Order, plaintiff has not submitted a declaration in response to the Order to Show Cause. Accordingly, the case is dismissed against D. Lawrence, F. Kaufman, and John Does 1-3 for failure to serve them with process.

> FN2. The "court-imposed" deadline for responding to the Order to Show Cause was set forth in Magistrate Judge Treece's Report and Recommendation, mailed to plaintiff on March 25, 2009. The Court notes that its May 28, 2009 order in Benitez v. Locastro (9:04-CV-423, Dkt. No. 131) set forth plaintiff's lawsuits, the matters pending, and the applicable deadlines. Plaintiff's time to respond to the summary judgment motion

Slip Copy, 2009 WL 1953752 (N.D.N.Y.)
(Cite as: 2009 WL 1953752 (N.D.N.Y.))

in *Benitez v. Locastro* was extended from February 17, 2009, to March 2, 2009, to April 20, 2009, to May 1, 2009, to June 8, 2009. In that case, since February 2009, plaintiff has written four letters to the Court requesting extensions of time (9:04-CV-423, Dkt.Nos.122, 125, 127, 133), filed the appeal to this Court (9:04-CV-423, Dkt. No. 123), and submitted opposition (9:04-CV-423, Dkt. No. 126) to defendants' motion to submit an exhibit *in camera.* In *Benitez v. Ham,* 9:04-CV-1159, plaintiff's time to respond to defendants' summary judgment motion has been extended five times, from November 18, 2008, to July 10, 2009; during that time he has made eight submissions to the Court. There is no pending motion in *Benitez v. Perry,* 9:07-CV-1089 (plaintiff responded to defendants' dismissal motion on July 2, 2008 after receiving one extension of time; that motion was granted in part and denied in part, Dkt. No. 85). Plaintiff has already responded to the only pending motion in the remaining case, *Benitez v. Duquette,* 9:03-CV-973 (plaintiff responded to defendants' summary judgment motion on December 4, 2008 after receiving five extensions of time). As is evident from this summary, the Northern District of New York has given plaintiff a great deal of consideration in the lawsuits he currently has pending in this district, and plaintiff has pursued them effectively. The Court notes also that in his most recent adjournment requests, plaintiff no longer claims he lacks sufficient writing materials. *See Benitez v. Locastro,* 9:04-CV-423, Dkt. No. 133, 6/12/09; *Benitez v. Ham,* 9:04-CV-1159, Dkt. No. 108, 6/18/09.

**CONCLUSION**

It is therefore

ORDERED that the Report-Recommendation (Dkt. No. 174) is hereby adopted in part and rejected in part as set forth above; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 144) is granted in part and denied in part as follows: summary judgment is granted dismissing the action against the following defendants: N. Smith, L. Wright, P. Sawyer, D. LaClair, C. Richards, R. Wright, G. LaFrance, E. Liberty, B. Kourofsky, D. King, T. Zerniak, G. Canning, R. Keith, J. Martin, A. Boucaud, S. Salls, D. Uhler, R. Bishop, D. Clancy, L. Peary, W. Crozier, K. Bellamy, T. Eagen, G. Bedard, C. Rowe, M. Lambert, K. Caron, J. Boulrice, J. Oropallo, M. McDonald, B. Meacham, W. Trombley, D. Riley, R. Legacy, G. Soucia, J. Anctil, D. Selsky, J. Bennett, and J. Botta, and otherwise denied; and it is further

**\*4** ORDERED that the action is dismissed without prejudice against D. Lawrence, F. Kaufman, and John Does 1-3 for failure to serve them with process; and it is further

ORDERED that the Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.
Benitez v. Mailloux
Slip Copy, 2009 WL 1953752 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1000040 (W.D.N.Y.)
(Cite as: 2005 WL 1000040 (W.D.N.Y.))

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. §§ 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. County of Fulton, 126 F.3d 400, 405 (2d. Cir.1997) (citing Eagleston v. Guido, 41 F.3d 865, 875-76 (2d Cir.1994)).

A. Plaintiff's Allegations

As noted, plaintiff alleges that there are no light fixtures or other lighting in his cell and that the heating in his cell block is not working. He also alleges that personnel at the Jail remove postage from inmates' letters which are returned to the Jail for insufficient postage and that the law library is inadequate because it does not have a trained librarian who can assist inmates in preparing legal documents nor sufficient federal legal materials. Lastly, plaintiff alleges that he and other inmates in punitive segregation are not allowed to have lotion, hair gell and shaving cream which are necessary for proper scalp and skin care.

*2 Liberally construed, it appears that plaintiff's complaint is attempting to allege two conditions of confinement claims under the Eighth Amendment to the United States Constitution and a denial of access to the courts claim under the First Amendment. Each of these claims, however, are inadequately pled and do not state claims upon which relief can be granted and will be dismissed unless plaintiff files an amended complaint setting forth sufficient allegations of fact, not conclusions, to state claims upon which relief might be stated. See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003) (citing Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir.1999) (per curiam) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [pro se] complaint gives any indication that a valid claim might be stated.")); McEachin v. McGuinis, 357 F.3d 197, 200 (2d Cir.2004) "(We have frequently reiterated that [s]ua sponte dismissals of pro se prisoner petitions which contain non-frivolous claims without requiring service upon respondents or granting leave to amend is disfavored by this Court.") (internal quotation marks and citations omitted).

1. Lack of Adequate Lighting and Heating

In order to establish a violation of the Eighth Amendment, an inmate must show "(1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain." ' Trammell v. Keane, 338 F.3d 155, 161 (2d Cir., 2003) (citing Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoted in Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir.2001)). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Ingraham v. Wright, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quotation marks and citations omitted). In Trammell, the Second Circuit Court of Appeals held that the "deliberate indifference" standard applies to conditions of confinement claims, not the more exacting "malicious or sadistic" standard applied in excessive force cases. 338 F.3d at 161 (citing Gaston, 249 F.3d at 164 (applying deliberate indifference standard to case alleging that inmate was exposed to unsanitary conditions and prolonged cold); Blissett v. Coughlin, 66 F.3d 531, 536-37 (2d Cir.1995) (applying deliberate indifference standard to case involving allegations that inmate was housed for several days in a "dark unsanitary observation cell, without any personal amenities").

A claim of inadequate lighting can state a conditions-of-confinement claim under the Eighth Amendment, see, e.g., Hoptowit v. Spellman, 753 F.2d 779, 783 (9th Cir.1985); Amaker v. Goord, No. 98 CIV. 3634(JGK), 2002 WL 523371, at ---- 7-8 (S.D.N.Y., March 9, 2002); Whitley v. Westchester Ct'y Correctional Facility, 97 Civ. 0420, 1997 WL 659100, at *4 (S.D.N.Y. Oct.22, 1997), but an inmate must allege that the lighting was so inadequate that it cause or aggravated an objectively serious medical condition and that the defendant was deliberately indifferent to the medical condition. See Amaker, 2002 WL 523371, at ---- 7-8 (citing Wilkerson v. Maggio, 703 F.2d 909, 912 (5th Cir.1983) (per curiam) (affirming dismissal of Eighth Amendment claim for inadequate lighting where evidence failed to show that the conditions of confinement were not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1000040 (W.D.N.Y.)
(Cite as: 2005 WL 1000040 (W.D.N.Y.))

an etiological cause or aggravating condition of myopia, which the plaintiff suffered from); *Whitley,* 1997 WL 659100, at *4 (allowing Eighth Amendment claim in response to a motion to dismiss where allegation was that poor ventilation aggravated condition of asthma).

**\*3** Here, plaintiff's complaint fails to allege a sufficient claim under the Eighth Amendment because he fails to allege facts that, if proven, would establish that the lack of adequate lighting or heating was " 'objectively sufficiently serious' such that he was denied 'the minimal civilized measure of life's necessities,' " *Trammell,* 338 F.3d at 161 (citations omitted), and that defendant was deliberately indifferent. Accordingly, plaintiff's condition of confinement claim relating to his allegations of inadequate lighting and heat will be dismissed unless he files an amended complaint setting forth the necessary allegations to establish, if proven, that the lack of lighting or heating was sufficiently serious and that the defendant was deliberately indifferent.

2. *Removal of Postage and Inadequate Law Library*

Plaintiff alleges that the officials at the Jail removed (and generally removes) postage from a letter that was returned for inadequate postage thereby requiring him to use new postage in order to re-mail the letter to the court. A response to a grievance attached to the complaint states that plaintiff forwarded a letter to the court, that the letter was returned for inadequate postage and checked for contraband and that, per prison policy, the stamp was removed.

In order to establish a denial of access to the courts claim, an inmate must show that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). Thus, plaintiff must show that he suffered an actual injury traceable to the challenged conduct of prison officials. A plaintiff cannot establish actual injury unless he shows that a "nonfrivolous legal claim had been frustrated or was being impeded" due to the actions of prison officials. *Lewis,* 518 U.S. at 351-52. Plaintiff's complaint herein "offers no facts to explain how [the

removal of stamp from his returned mail or the alleged inadequacy of the law library] prejudiced [his] ability to seek redress from the judicial system." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995). Accordingly, plaintiff's claims that he has been denied access to the courts will be dismissed unless he files an amended complaint which set forth allegations which, if true, would establish that the policy of removing stamps from returned mail and the lack of a trained librarian or abundant legal materials prejudiced his ability to seek legal redress from the courts.

3. *Denial of Hygiene Products*

Plaintiff alleges that as an inmate in punitive segregation he was denied access to skin and scalp products which are necessary to maintain proper hygiene. This claim, like his other conditions of confinement claim addressed above, does not sufficiently allege that the denial of hygiene products was "objectively sufficiently serious"-*i.e.,* that plaintiff has been deprived of the minimal necessities of life-*see Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), and that the defendant was deliberately indifferent. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*4** The courts in this Circuit and others have found that the lengthy denial of hygiene products-*e.g.,* toilet paper, personal hygiene items, soap, toothpaste-could constitute a denial of the basic necessities of life in violation of the Eighth Amendment. *See, e.g., Trammell,* 338 F.3d at 161 ("[d]eprivation of other toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference."); *Wright v. McMann,* 387 F.2d 519 (2d Cir.1967) (detention of an inmate in strip cell with no toilet paper unconstitutional); *Fernandez v. Armstrong,* No.

Not Reported in F.Supp.2d, 2005 WL 1000040 (W.D.N.Y.)
(Cite as: 2005 WL 1000040 (W.D.N.Y.))

3:02CV2252CFD, 2005 WL 733664 (D.Conn., March 30, 2005) (collecting cases).

Here again, plaintiff has failed to set forth facts, which if established, would show that the denial of skin lotion and hair grease was sufficiently serious and that defendant Beilein was deliberately indifferent to the risk of harm posed by the lack of such materials. In the absence of these allegations, plaintiff does not set forth a claim under the Eighth Amendment but he will be provided an opportunity to amend his complaint to allege a sufficient conditions of confinement claim based on a denial of hygiene products.

*CONCLUSION*

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization, his request to proceed *in forma pauperis* is granted. For the reasons set forth above, plaintiff's complaint must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) 1915A(b)(1) unless he files an amended complaint by May 25, 2005 in which he includes the necessary allegations regarding his claims as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

Plaintiff is advised that an amended complaint is intended to *completely replace* the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977), *cert. denied sub nom., Vesco & Co., Inc. v. International Controls Corp.,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Therefore, plaintiff's amended complaint must include all of the allegations against the defendant so that the amended complaint may stand alone as the sole complaint in this action which the defendant must answer.

Plaintiff is forewarned that if he fails to file an amended complaint as directed, the complaint will be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1). Plaintiff is further forewarned that his right to pursue further relief in federal court at public expense

will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. § 1915(e)(2)(B). *See* 28 U.S.C. § 1915(g).

*ORDER*

**\*5** IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* is granted and that his motion for the appointment of counsel is denied without prejudice;

FURTHER, that plaintiff is granted leave to file an amended complaint as directed above by May 25, 2005;

FURTHER, that the Clerk of the Court is directed to send to plaintiff with this order a copy of the original complaint, a blank § 1983 complaint form, and the instructions for preparing an amended complaint;

FURTHER, that in the event plaintiff fails to file an amended complaint as directed above by May 25, 2005, the complaint shall be dismissed with prejudice without further order of the Court;

FURTHER, that in the event the complaint is dismissed because plaintiff has failed to file an amended complaint by May 25, 2005, the Clerk of the Court shall close this case as dismissed with prejudice without further order; and

FURTHER, that in the event the complaint is dismissed because plaintiff has failed to file an amended complaint by May 25, 2005, the Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1000040 (W.D.N.Y.)
(Cite as: 2005 WL 1000040 (W.D.N.Y.))

W.D.N.Y.,2005.
Powell v. Beilien
Not Reported in F.Supp.2d, 2005 WL 1000040
(W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

Defendant Philip B. Combe is the former Commissioner for the New York State Department of Correctional Services ("DOCS").

Defendant Anthony J. Annucci is counsel for DOCS.

Defendant George Pataki [FN3] is the Governor of the State of New York.

> FN3. Governor Pataki's name is spelled incorrectly as "Patacki" in the Complaints, as well as in Defendants' papers in support of their summary judgment motion.

### Preliminary Statement

At or near the time of filing their respective Complaints, Plaintiffs were incarcerated at Tappan, which is a medium security facility located in Ossining, New York and is on the grounds of the Sing Sing maximum security facility. Since the filing of these lawsuits, all of the Plaintiffs, except Curtis Bolden, have either been transferred to another facility within DOCS or have been released on parole. Plaintiffs commenced these actions, pursuant to 42 U.S.C. § 1983, alleging that the conditions under which they were confined at Tappan violated their Eighth Amendment rights secured by the United States Constitution. Because a review of the complaints in the *Maberry* case and the *Deberry* case revealed that the claims are identical, the Court consolidated discovery in these actions. Now, in light of the fact that the two Complaints are identical, Defendants in both cases have made a single motion for summary judgment.

The Court observes, as a preliminary matter, that the papers filed by Plaintiffs in opposition to this motion fail to address any of factual assertions and legal arguments set forth in Defendants' motion for summary judgment, and Plaintiffs did not submit a Local Civil Rule 56.1 statement. [FN4] In their opposition papers, Plaintiffs also make two applications: (1) to take a deposition other than by stenographic means, and (2) for an order directing Defendants to produce certain documents. As for the first request, Plaintiffs made an identical application for

permission to conduct depositions by tape recorder on August 15, 1995 and this Court granted that motion on October 19, 1995. It is the Court's understanding that Plaintiffs have not even provided Defendants with a list of individuals that Plaintiffs seek to depose. *See* Prudenti Letter (Sept. 24, 1997). This application is denied. As for the second request, the record indicates that defense counsel responded to Plaintiffs' interrogatories and documents requests, and the Freedom of Information Law requests are not addressed to these Defendants but to the County of Westchester and the United States Department of Justice. Discovery has been closed since July 29, 1997, after this Court allowed almost two years for discovery. Plaintiffs have had ample opportunity to conduct discovery in this matter and the Court will rule on the motion papers now before the Court.

> FN4. Only Plaintiff Curtis Bolden submitted papers in response to the summary judgment motion.

### Background

**\*2** In this 42 U.S.C. § 1983 action, Plaintiffs allege that the conditions of confinement at Tappan violate the Eighth Amendment. Specifically, Plaintiffs assert that the housing units located in buildings # 9, # 10, and # 11 (all part of Tappan) are poorly designed, constructed of highly flammable materials and lack water sprinkler systems, thus making them firetraps. Plaintiffs further allege that the conditions of confinement are not sanitary insofar as cleaning supplies are in short supply; there is no ventilation system in the sleeping or bathroom areas, thus allowing moisture and "stink" to seep into the housing areas; the facility is only exterminated once every six to twelve months; and improper ventilation has caused Plaintiffs to breathe noxious fumes from the burning of raw sewage at the nearby Westchester County sewage plant. Lastly, Plaintiffs complain that the Tappan inmates (medium security) and Sing Sing inmates (maximum security) are permitted to freely mix without appropriate supervision, resulting in threats of violence, intimidation, and fear.

Defendants now move for summary judgment on these claims, arguing that there is no genuine issue for trial on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

Plaintiffs' claimed Eighth Amendment violations.

### Discussion

A motion for summary judgment may be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Summary judgment is proper when reasonable minds could not differ as to the import of the evidence before the court." Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir.1990). When viewing the evidence the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990). Although the movant initially bears the burden of showing that there are no genuine issues of material fact, once such a showing is made, the party opposing a properly supported motion must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. A genuine issue of fact is when "a reasonable jury could return a verdict for the nonmoving party," and the substantive law at issue renders certain facts as material to the outcome of the litigation. Id. at 248. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise .' " Trans Sport, Inc. v. Starter Sportswear, 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

### A. Claims Against Defendants in their Official Capacities

*3 To the extent that Plaintiffs state claims against Defendants in their official capacities, those claims must be dismissed upon the doctrine of Eleventh Amendment immunity. See Gan v. City of New York, 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.").

### B. Lack of Personal Involvement by Defendants

Defendants move for summary judgment on the ground that Plaintiffs have made no allegations nor adduced any evidence through discovery to indicate that the named Defendants had any personal involvement in the alleged constitutional violations at issue here. The Court agrees.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege conduct, under color of state law, that deprives him of rights secured by the Constitution or laws of the United States. See Katz v. Klehammer, 902 F.2d 204, 206 (2d Cir.1990). A plaintiff must establish fault and causation on the part of each defendant. Consequently, a defendant's personal involvement in the alleged constitutional violation is a prerequisite to the assessment of individual liability and imposition of damages. See generally Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977) cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Moreover, the doctrine of respondeat superior does not apply to civil rights actions and cannot be used as a substitute for a lack of personal involvement on the part of a defendant. See Monell, 436 U.S. at 691-95. "The fact that [an official] was in a high position of authority is an insufficient basis for the imposition of personal liability." McKinnon, 568 F.2d at 934; see Gill, 824 F.2d at 196. In Williams v. Smith, 781 F.2d 319 (2d Cir.1986), the Second Circuit set forth the following standards for establishing personal involvement:

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. [1] The defendant may have directly participated in the infraction. [2] A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. [3] A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

continue. [4] Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Id.* at 323-24.

In this case, there are no allegations of specific facts in either Complaint to indicate that Superintendent Keane, former Commissioner Coombe, DOCS counsel Annucci, or Governor Pataki directly participated in the alleged violation; failed to remedy the alleged violation after learning of it; created a custom or policy fostering the violation; or was grossly negligent in supervising subordinates. The only mention of these Defendants is in the caption of the Complaint and that is not enough to establish personal involvement for § 1983 purposes.

**C. Eighth Amendment Claims**

**\*4** Even assuming that Plaintiffs adequately alleged Defendants' personal involvement and set forth evidence with regard to Defendants' personal involvement for § 1983 liability, the Court concludes that Defendants have set forth enough evidence on this motion to establish that Plaintiffs' conditions of confinement at Tappan comport with the Eighth Amendment and that no reasonable jury could render a verdict in Plaintiffs' favor on the alleged Eighth Amendment violations.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment" on those convicted of crimes. U.S. Const. amend. VIII. A plaintiff seeking to establish that conditions of confinement inflict cruel and unusual punishment in violation of the Eighth Amendment must prove both (1) "serious deprivations of basic human needs," Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir.1985), and (2) that the defendants imposed these conditions with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

With regard to the first prong, the Court notes initially that the Eighth Amendment "does not mandate comfortable

prisons," Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and conditions that are "restrictive and even harsh" are "part of the penalty that criminal offenders pay for their offenses against society." Id. at 347. Indeed, "nobody promised them [convicted felons] a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depress, and the like." Atiyeh v. Capps, 449 U.S. 1312, 1315-16, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981) (Rehnquist, J., in chambers). Yet, the Eighth Amendment does prohibit conditions of confinement that result in either "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347. The Second Circuit has stated:

There are numerous aspects of prison confinement that have the potential for causing deleterious effects on the physical and mental well-being of prisoners. The fact of confinement itself is chief among them. The Eighth Amendment does not guarantee that all such effects will be prevented, nor even that all reasonable steps will be taken to minimize risks. By prohibiting cruel and unusual punishment, the Amendment stands as a barrier against fundamental and shocking indecency to those whom the state has chosen to confine for their crimes.

Anderson, 757 F.2d at 36.

**1. Fire Safety Allegations**

With regard to this claim, the Court observes that it is not the province of federal courts to "become enmeshed in the minutiae of prison operations." Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Rather, federal courts must enforce constitutional standards. Correctional facilities "unquestionably have a duty to provide adequate fire safety for the inmates," Miles v. Bell, 621 F.Supp. 51, 65 (D.Conn.1985), and an inquiry into the adequacy of a prison's fire safety under the Eighth Amendment must be guided by some objective indicia rather than merely the subjective views of a judge. See Rhodes, 452 U.S. at 346.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

**\*5** Defendants have offered sufficient evidence on this motion to demonstrate that the fire safety procedures at Sing Sing, which includes the Tappan buildings, *see* Gibson Aff. ¶¶ 1, 3-4; Brady Aff. ¶¶ 3, 10, are more than adequate to protect the inmates' well-being and safety, and do not run afoul of the Eighth Amendment. Sing Sing and Tappan are inspected by a Fire Safety Officer for compliance with the New York State Uniform Fire Prevention and Building Code on a yearly basis. Since 1990, Tappan has been found to be in substantial compliance with the Uniform Fire Prevention and Building Code. Where certain aspects were not in compliance, the Fire Safety Officer discussed the condition with Sing Sing executive staff and the steps necessary to achieve compliance and, upon reinspection, found Sing Sing to be in complete compliance. *See* Prudenti Aff. ¶¶ 4-6.

In the Tappan Correctional Facility, which is located on Sing Sing's grounds but is physically separate from Sing Sing, inmates live in dormitories. Tappan inmates are not housed in cells, but rather, cubicles divided by half walls used there to separate the inmates' beds. These partitions meet existing fire and building codes. *See* Morris Aff. ¶¶ 4-6; Brady Aff. ¶¶ 3, 8. Since 1995, several renovations to the physical structure have taken place at Tappan, including renovation of the cubicles and construction of firewalls. These renovations were not required to bring the facility into compliance with the Uniform Fire Prevention and Building Code, but rather to improve the existing conditions at the facility. All renovations are 95% complete. *See* Brady Aff. ¶¶ 3-9.

In the event of a fire, Sing Sing has an alarm system on all housing units by which the watch commander's office can learn of an emergency in a particular area of the facility. In addition, designated officers carry radios assigned to a particular part of the facility. On each such radio is a pin which need only be pulled to send an alarm to the watch commander's office. In addition to sending help, the watch commander can communicate with the officers via telephone or radio. All appropriate supervisory personnel including the watch commander, have Ready Emergency Data books outlining the appropriate procedures to take in the case of any type of emergency. These manuals also contain listings for the contact of any and all required emergency services. *See* Morris Aff. ¶¶ 7-11. All of the buildings in which inmates are housed have fire

extinguishers that are inspected at appropriate intervals and which are readily available to extinguish any fire in those buildings. These hundreds of extinguishers are "all purpose types" and can be used for electrical or other fires. *See* Morris Aff. ¶ 12. In addition to fire extinguishers, the three Tappan housing units all have standpipes and fire hoses for firefighting purposes. These hoses are long enough to reach any occupied area and are inspected at appropriate intervals. There are also an extensive number of fire hydrants located throughout the grounds of Sing Sing which provide more than adequate water to extinguish any fire that occurs. Also, there are a number of portable smoke ejectors which are brought to the area of any fire and which remove smoke from the area. *See* Morris Aff. ¶¶ 13-15.

**\*6** Sing Sing and Tappan have a trained and certified firefighter, Noel Morris, who has been its Fire and Safety Officer since March 1, 1994. He is on duty five days per week, eight hours per day and is available "on-call" at all other times. There is a specially trained deputy fire chief on duty in facility on all shifts when Mr. Morris is not in the facility. The Fire Safety Officer supervises a 52 man fire brigade. The fire brigade has a fully equipped, operational fire truck on the grounds. Each member of the brigade has received training and been certified by the Westchester County Fire Training Center, located at Valhalla, New York. The brigade, supervised at all times by an assistant fire chief, is available 24 hours per day, 7 days per week, and can and does respond to any fire emergency at the facility. *See* Morris Aff. ¶¶ 16-18. Further, all correction officers go through fire safety training courses during their initial training at the DOCS Training Academy and during their yearly formal in-service training. Sing Sing has also trained members of the Correction Emergency Response Team ("CERT") available on the premises at all times. CERT members are trained in such areas as emergency evacuations of housing units during hazardous conditions. Sing Sing has self-contained breathing apparatus available at every housing unit to aid in the evacuation of inmates and staff in the event of a fire. *See* Morris Aff. ¶ 19. Sing Sing has emergency first aid equipment available to medical staff and a cadre of first aid trained and certified correction officers. There is a registered nurse on duty in the Sing Sing emergency room located in the hospital building 24 hours per day, seven days per week to provide emergency medical care. *See* Morris Aff. ¶ 20.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

Sing Sing has a mutual aid agreement in effect with the Town of Ossining Fire Department located at the border of the facility. This arrangement provides fire fighters and equipment access to all of Sing Sing within minutes of the reporting of any fire emergency since the nearest Ossining fire house is only several hundred feet from Sing Sing. In addition, the Ossining Fire Department comes into the facility at least once per year for a fire drill and an inspection. *See* Morris Aff. ¶ 21.

There is a daily check of all fire extinguishers and equipment and a daily safety inspection including maintenance problems conducted on every gallery or floor in every housing unit at Sing Sing. There is a Lieutenant assigned to each housing area who is responsible for submitting a report entitled "Daily Safety Checklist." There are also weekly, monthly and yearly check and reports by various staff members including Sing Sing's executive staff. *See* Morris Aff. ¶ 22.

Sing Sing has a Fire Safety and Environmental Services Committee which meets monthly at Sing Sing and monitors the health and safety of the various components of Sing Sing, including the inmate population. This committee performs audits of the facility and acts to correct any deficiencies found. *See* Morris Aff. ¶ 23. Finally, periodic and regular monthly fire drills are conducted in each housing unit which trains all staff and inmates in the safe and expeditious evacuation procedures of those housing units. This includes live evacuation drills. *See* Morris Aff. ¶ 24.

**\*7** Defendants also point out that since 1987, Sing Sing, which includes all Tappan buildings, have met all standards and requirements of the American Correctional Association ("ACA") and received a certification of accreditation. The mandatory standards for accreditation include administrative and fiscal controls, staff training and development, physical plant, safety and emergency procedures, sanitation, food services, rules and discipline and various other operations essential to good correctional management. *See* Prudenti Aff. ¶¶ 6-7, Ex. A; Brady Aff. ¶ 10.

Accordingly, the Court concludes that Defendants' have met their burden in establishing that no genuine issue of

material fact exists that Tappan's fire safety procedures meet Eighth Amendment standards. The Court grants Defendants' motion for summary judgment on this claim.

**2. Inmate Safety Claim**

The Eighth Amendment "requires prison officials to take reasonable measures to protect inmates from violence at the hands of other inmates." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials have a duty to duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 833-34. In order to constitute an Eighth Amendment violation, conduct that does not purport to be punishment must involve more than a lack of ordinary care for the prisoner's safety; mere negligence will not suffice. *See Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Moreover, "not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the inmates' safety." *Farmer,* 511 U.S. at 834.

In the instant matter, Plaintiffs make the conclusory assertion that the commingling of Tappan and Sing Sing inmates, coupled with the lack of supervision during this commingling, has resulted in "a great number of Tappan medium security inmates [being] attacked and badly assault robbed and extorted by maximum security inmates in the Sing Sing Maximum Facility." Compl. at 2. First, there is no proof in the record, nor any specific factual allegations, to support these contentions. Second, there is no proof in the record, nor any specific factual allegations, that Plaintiffs informed Defendants that they feared for their safety or that Defendants had knowledge of or a reason to know of these alleged threats to Plaintiffs' safety and failed to take reasonable measure to abate the risk to Plaintiffs' safety.

Moreover, Defendants submitted evidence establishing that all inmates are adequately supervised at all times at all locations of the grounds which comprise Sing Sing and Tappan. While the Tappan buildings are located on the grounds of Sing Sing and Tappan shares many services

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

with Sing Sing, Tappan is a separate and distinct inmate facility from Sing Sing. Only medium security inmates are housed within any one of the five Tappan buildings, and Tappan inmates have separate messhalls and recreation areas. *See* Gibson Aff. ¶ 4. While several programs and activities, including chapel services, commissary trips, and medical assistance and treatment are made available to both Sing Sing and Tappan inmates, all inmates participating in such programs or activities are closely supervised. For instance, all inmates (Sing Sing and Tappan) are escorted by a correctional officer to the commissary. Each escort officer remains in the waiting area until all inmates from his block or housing area have completed their purchases. In addition to the escort officers, an officer is stationed in the entrance to the commissary. Only twenty inmates are permitted to enter the commissary at a time. Approximately four civilian employees are employed inside the commissary and oversee the purchase of goods. Similarly, all inmates seeking to attend or participate in chapel activities must be escorted by a correctional officer. Only inmates scheduled to participate in a program or work assignment will be permitted access to the chapel area. In addition, both correctional officers and several civilian employees supervise the area. The civilian employees monitor and direct may of the programs. Inmates will be escorted back to their housing area either by a corrections officer or an inmate civilian employee. While Tappan inmates may enter the hospital facility for a scheduled appointment without an escort, maximum security inmates from Sing Sing must be escorted to and from the hospital facility by a correctional officer. In addition to the escort officers, there are correctional officers stationed on each of the four floors of the medical facility and located at the entrance to the clinics and the hospital. *See* Gibson Aff. ¶¶ 4-10.

**\*8** Defendants have met their burden of establishing that no genuine issue of material fact exists with regard to Plaintiffs' inmate safety claim, and the Court grants Defendants' motion for summary judgment on this claim.

### 3. Sanitary Conditions

While Plaintiffs conclusorily allege unconstitutional sanitary and health conditions at Tappan due to a lack of cleaning supplies, infrequent extermination of housing units (only one or two times yearly), poor ventilation in the shower and bathroom areas resulting in the seepage of "stink" and moisture into the housing areas, and the nearby burning of the raw sewage at a Westchester County Facility that results in inmates having to breathe these fumes, the Court finds that these conclusory allegations do not state Eighth Amendment violations. Further, the Court observes that, since 1987, Tappan has received accreditation from the ACA. The mandatory standards for accreditation include examination of the physical plant, sanitation, food services, and various other operations essential to good correctional management. *See* Prudenti Aff. ¶¶ 6-7, Ex. A; Brady Aff. ¶ 10. The Court grants Defendants' motion for summary judgment on this claim.

### *Conclusion*

For the reasons discussed above, the Court grants Defendants' motion for summary judgment in both the *Maberry* and *Deberry* actions. While the Court recognizes that pro se litigants are afforded a certain amount of leeway on summary judgment motions, these Plaintiffs have simply failed to raise any genuine issue of material fact on their Eighth Amendment claims. The evidence is such that no reasonable jury could render a verdict in their favor. The Court directs that these cases be closed and removed from the Court's active docket.

**SO ORDERED.**

S.D.N.Y.,1998.
Mabery v. Keane
Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

complained to two corrections officers and a corrections captain about this problem, one told him "then you shouldn't have come to jail" and others echoed this statement. *Id.* at 4. Plaintiff also asserts that he was being detained in cells without ventilation, without windows and with solid doors having a plexi-glass front. *Id.* at 3. Plaintiff claims he tried to "suck air" through a small slit in the door but was told to "get away from there" whenever he tried sucking air through the opening. (Am. Compl. Section IV at 4.) Plaintiff states that a "hispano-American officer ... liked slamming the door shut" and that "an African-American [officer] ... totally ignored [him] and others who claimed to have Asmath." (*Id.*) Plaintiff alleges that due to these circumstances, he has "been subjected to obtaining lung cancer and amphesima." (*Id.*) Plaintiff seeks relief in the form of: (1) installation of a ventilation system; and (2) monetary compensation in the amount of $4,000,000. *Id.* at 5.

DISCUSSION

A motion for judgment on the pleadings applies the same standards applicable to a motion to dismiss under Fed.R.Civ.P. 12(b)(6), under which a court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.) *cert. denied,* 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). If the court finds that the pleadings still fail to state a claim upon which relief can be granted, the complaint should be dismissed.

**\*2** Plaintiff argues that his right to equal protection under the Fourteenth Amendment was violated because he was exposed to second-hand tobacco smoke in a holding cell which he claims had no ventilation for several periods of time of at least forty-five minutes while he was a detainee at MDC.[FN5] Giglieri argues in his amended complaint that these circumstances violated his right to equal protection because "[f]ines are imposed [by the City of New York] on restaurants with poor or no ventilations at all," yet not on the prison facility. (Am. Compl. Section IV at 3.)

FN5. While defendants cite *Rehm v. Malcom,* 432 F.Supp. 769 (S.D.N.Y.1977), to show that MDC's ventilation has been sufficient, *Rehm*

does not necessarily support the contention that MDC's ventilation system today is sufficient since *Rehm* dates from 1977, and, in *Rehm,* the ventilation system had not yet been installed. (Def. Mem. at 2.)

The U.S. Supreme Court has held that the constitutionality of conditions in detention facilities are not determined by comparison with conditions in the outside world. "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."DD' *Bell v. Wolfish,* 441 U.S. 520, 545-46, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), (*quoting Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)). There is no requirement under the Fourteenth Amendment that prison conditions be equal to conditions in the outside world, *e.g.,* restaurant conditions. Plaintiff's allegation of differential treatment on this basis does not state an equal protection claim.

Since Plaintiff is a pretrial detainee, Plaintiff may also be asserting a claim under the Due Process Clause of the Fourteenth Amendment that the detention condition at issue violated his liberty interest.[FN6] A detainee may not be punished prior to an adjudication of guilt under the Due Process Clause, so Plaintiff may assert a due process violation if his complaint demonstrates that the condition at issue constitutes cruel and unusual punishment. *Id.* at 535. Under *Bell v. Wolfish,* "'a pretrial detainee is entitled to protection from adverse treatment if he can prove punitive intent *or* that a restriction or condition [of confinement] is not reasonably related to a legitimate goal ...."' *Whisenant v. Yuam,* 739 F.2d 160, 167 (4th Cir.1984) (quoting *Bell v. Wolfish,* 441 U.S. at 539).

FN6. While Plaintiff does not articulate this claim, the complaints of *pro se* plaintiffs are to be read liberally. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972).

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 287, 50 L.Ed.2d 251 (1976) the Supreme Court applied the "deliberate indifference" standard to cases involving prisoner challenges to conditions of confinement under the

Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

Cruel and Unusual Punishment Clause of the Eighth Amendment. The deliberate indifference standard has two components. The first component is an objective element which requires a finding that the deprivation be sufficiently serious. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The second component is a subjective element which requires a finding that the official accused of the violation acted with a sufficiently culpable state of mind. (*Id.*)

The Supreme Court held in *Bell v. Wolfish, supra,* that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not amount to punishment of the detainee." 441 U.S. at 538-39. Placing Plaintiff temporarily in a holding cell with other detainees for court appearance or transfers is reasonably related to a legitimate governmental objective, *e.g.,* facilitating court efficiencies or transportation of detainees.

*3 *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) is the leading case on exposure to environmental tobacco smoke ("ETS") in correction facilities. In *Helling,* the prisoner was assigned to live in a cell with another prisoner who smoked five packs of cigarettes a day. *Id.* at 28. The Supreme Court held that plaintiffs claiming involuntary exposure to ETS levels that pose an unreasonable risk of future health have stated an Eighth Amendment claim upon which relief could be granted. *Id.* at 25.

Plaintiff's amended complaint, however, does not state a claim under the objective element of the deliberate indifference test, that is, Plaintiff has not alleged facts showing that the deprivation alleged is sufficiently serious to state a claim for a due process violation. In determining whether the condition or restriction is significant enough to rise to the level of a constitutional violation, the Supreme Court has considered, among other factors, the duration of the condition or restriction. *See e .g., Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) (harsh conditions or restrictions may be constitutional violations if imposed for prolonged periods of time); *Bell v. Wolfish,* 441 U.S. 521 (holding that "double-bunking" for a maximum of 60 days did not amount to punishment and did not constitute a violation of pretrial detainees' rights). The conditions complained of

by Plaintiff, forty-five minutes at a time in a smoke-filled cell on an unspecified number of occasions for no more than a little over a month, do not constitute an extended period of time and they do not approach the level of harm in *Helling.*

Plaintiff was exposed on a temporary basis to cigarette smoke, which caused him great discomfort and apprehension, but the facts alleged are insufficient to show that the ETS levels he was exposed to on a number of occasions were so extensive as to possibly cause current or future medical problems. Thus, Plaintiff's allegations are insufficient to state a claim because of the *de minimus* nature of the alleged wrong. *Cf. Wilson v. Seiter,* 501 U.S. at 294 (Supreme Court finds prison inmate's complaints of violation of Eighth Amendment rights due to, *inter alia,* overcrowding, improper ventilation, unsanitary dining facilities and food preparation, insufficiently serious to create constitutional violations); *cf. also Whitnack v. Douglas County,* 16 F.3d 954 (8th Cir.1994) (filthy cell with excrement, vomit, etc. was deplorable but not unconstitutional because the condition only continued for 24 hours); *White v. Nix,* 7 F.3d 120, 121 (8th Cir.1991) (eleven day stay in unsanitary cell not unconstitutional because of the relative brevity of stay and availability of cleaning supplies); *Harris v. Fleming,* 839 F.2d 1232, 1235-36 (7th Cir.1988) (five day stay in filthy, roach-infested cell is not of sufficient duration for a constitutional violation).

In *Metro-North Commuter Railroad Co. v. Buckley,* --- U.S. ---- at ----, 117 S.Ct. 2113, --- L.Ed.2d ---- at ----, 1997 WL 338550 at *1 (U.S. June 23, 1997), the Supreme Court held that a plaintiff "cannot recover emotional distress damages unless, and until, he manifests symptoms of a disease." *Buckley* requires there be a "physical impact," which involves a "threatened physical contact [with the substance that might cause a disease] that caused, or might have caused, immediate traumatic harm," arising from temporary ETS exposure. *Id.*

*4 Since the conditions endured by Plaintiff in this case were only temporary and *de minimus,* Plaintiff has not alleged facts sufficient to state a claim that the conditions at issue were not merely incidental to the governmental purpose of temporarily holding Plaintiff until he could be returned to his permanent housing area or that this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

amounts to punishment. The fact that Plaintiff may have stated there was deliberate indifference by the officials is thus irrelevant.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(c) is granted. Plaintiff's claims are dismissed and this case is closed.

IT IS SO ORDERED.

S.D.N.Y.,1997.
Giglieri v. New York City D.O.C.
Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

that "[a]t no time did I 'fondle' or touch Mr. Williams sexually." (Bump Aff. ¶ 18.)

**\*2** Later that day, Officer Bump issued a misbehavior report for Williams' hostile, aggressive, and uncooperative behavior during the pat-frisk. (Bump Aff. ¶¶ 14-15; Defs' Ex. C at p. 6: Inmate Misbehavior Report.) Officer Bump's Inmate Misbehavior Report states:

I gave him a direct order to place his hands on the wall and spread his legs -- and he refused to comply by continuously moving down the wall, and removing his hands. He eventually did comply when an additional officer stepped to him. Inmate Williams ... repeatedly cursed me by calling me "a mother fucker and a goddamn faggot." As a result of this inmate's action this misbehavior report is submitted.

(Defs' Ex. C.) Williams admits asking whether Bump was gay, but denies cursing at him. (Williams Dep. at 44.)

The Misbehavior Report, or "ticket," was then given to defendant Lieutenant Buonato[FN1] for review. (Bump Aff. ¶ 19; Defs' Rule 56.1 Stmt. ¶ 42.) In accordance with prison policy, the "review lieutenant" determines whether the allegations on the ticket support the charge and, if so, warrant the inmate's placement in keeplock. (Buonato Aff. ¶ 5; Defs' Rule 56.1 Stmt. ¶ 43; *see* Williams Dep. at 46.) Lieutenant Buonato filed his review on November 16, 1994, concluding that the charges were adequately set forth and that a Tier II disciplinary hearing was warranted. (Buonato Aff. ¶¶ 7-10; Defs' Rule 56.1 Stmt. ¶ 43.)

FN1. Williams named Lieutenant Buonato as a defendant because he allegedly improperly reviewed the misbehavior report and unjustifiably placed Williams in keeplock. (Cplt. ¶ IV (E); Williams Dep. at 49-50; *compare* Buonato Aff. ¶¶ 7-10.)

*Williams' Placement in Keeplock and Subsequent Hearing*

Williams was placed in keeplock on November 16, 1994,

the day he received a copy of the Inmate Misbehavior Report and the day after the incident. (Williams Dep. at 32-33, 39-40; Defs' Rule 56.1 Stmt. ¶ 44.)

Prison guidelines provide that a hearing on the charges must be held as soon as practical, but in no case longer than seven days from when the inmate is placed in keeplock. *See* 7 N.Y.C.R.R. § 251-5.1. (*See also* Williams Dep. at 50-51; Cplt. ¶ IV (C).)[FN2]

FN2. Section 251-5.1 provides:

Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

7 N.Y.C.R.R. § 251-5.1.

Williams Tier II hearing took place on November 21, 1994 at 3:00 P.M. (Defs' Rule 56.1 Stmt. ¶¶ 47, 49; Gibson Aff. ¶ 11; Defs' Ex. C at p. 1; Williams Dep. at 40.) Defendant Lieutenant Gibson[FN3] found Williams not guilty at the conclusion of the Tier II disciplinary hearing. (Defs' Rule 56.1 Stmt. ¶ 51; Gibson Aff. ¶¶ 13, 15-16; Williams Dep. at 41-42; Defs' Ex. C at p. 1.) Lieutenant Gibson stated on the record that Williams was uncomfortable with the search, especially "where he was being touched." (Gibson Aff. ¶ 15; Defs' Rule 56.1 Stmt. ¶ 53; Defs' Ex. C at p. 2.) Gibson also found that Officer Bump conducted himself within the scope of his official duties and in accordance with prison rules. (Defs' Rule 56.1 Stmt. ¶ 54; Gibson Aff. ¶ 17.) Williams characterized Lieutenant Gibson's hearing as "fair." (Williams Dep. at 58, 60; Gibson Aff. ¶ 18; Defs' Rule 56.1 Stmt. ¶ 55.)

FN3. Williams named Lieutenant Gibson as a defendant because Williams alleges that the

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

hearing should have been held within the 7-day period required by state law. (Cplt. ¶ IV (E); Williams Dep. at 51.)

**\*3** Williams was released from keeplock on November 21, 1994. (Williams Dep. at 42-43, 51, 53.) While Williams alleges that he spent seven days in keeplock (Cplt. ¶ IV(D); Williams Dep. at 51, 62; *see* Defs' Rule 56.1 Stmt. ¶ 48), it appears that Williams was in keeplock for six days (November 16 to November 21).

Williams named Superintendent Keane as a defendant, alleging that Keane did not properly train the corrections officers under his control. (Cplt. ¶ IV(E).) Keane also conducted an internal facility investigation into Officer Bump's conduct, which found that Bump complied with all prison rules. (Defs' Rule 56.1 Stmt. ¶¶ 58-59; Keane Aff. ¶¶ 11-12.)

*ANALYSIS*

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. §1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S. Ct. 2749 (1994); *accord, e.g., Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at \*4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Morris v. Dann,* No. 95-CV-975, 1996 WL 732559 at \*3 (N.D.N.Y. Dec. 11, 1996). Proof that state procedural law was violated does not by itself constitute a deprivation of due process because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n.1 (2d Cir. 1990); *accord, e.g., Ruiz v. Selsky,* 1997 WL 137448 at \*4.

I. *UNDER SANDIN V. CONNER, SIX DAYS IN KEEPLOCK DOES NOT CONSTITUTE AN ATYPICAL AND SIGNIFICANT DEPRIVATION OF A PROTECTED LIBERTY INTEREST*

A. *Sandin v. Conner*

Defendants' summary judgment motion on the keeplock claim turns, in part, on application of the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293 (1995), which significantly changed the prisoner due process landscape. The Supreme Court there held:

[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

**\*4** 115 S. Ct. at 2300 (fn. & citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language and for harassing employees. *Id.* at 2295-96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in the prison's Special Holding Unit (SHU). *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S. Ct. 2963 (1974). *Sandin v. Conner,* 115 S. Ct. at 2302. The Supreme Court stated:

We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. *Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.*

*Id.* at 2301 (footnotes omitted and emphasis added).

As a result of *Sandin,* the Second Circuit has announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint.

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996); *accord,e.g., Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at *3 (S.D.N.Y. Aug. 14, 1996). A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556-58, 94 S. Ct. at 2974-75, and its progeny. *See, e.g., Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 & n.4 (S.D.N.Y. Nov. 6, 1996); *Santana v. Keane,* 1996 WL 465751 at *3 & n.1.

B. *Williams' Action Fails Because It Is Based on A Miscalculation of the Time He Spent in Keeplock*

**\*5** Williams notes, correctly, that New York's prison regulations require a disciplinary hearing to be held within 7 days of the inmate's placement in keeplock for a disciplinary infraction. 7 N.Y.C.R.R. § 251-5.1. Williams then argues, incorrectly, that he spent 7 days in keeplock before the disciplinary hearing at which he was found not guilty and immediately released from keeplock. (*See* Williams Dep. at 50-51; Cplt. ¶ IV (C).) In fact, however, the incident occurred on November 15, 1994, Williams was placed in keeplock on November 16, and his hearing was held and he was released from keeplock on November 21, 1994. (*See* Fact section, above.) Thus, on the undisputed facts, Williams was in keeplock from November 16 to November 21, at most *six* days. Accordingly, the hearing was held and Williams was released from keeplock within the seven days required by New York's prison regulations. Since the regulations were not violated, it is not necessary to examine either prong of the two-prong *Sandin* analysis; defendants are entitled to summary judgment on the keeplock claim. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (even a violation of 7 N.Y.C.R.R. § 251-5.1 "alone would not be enough generally to establish a constitutional claim"); *Dudley v. Coombe,* 96 Civ. 1665, 1997 WL 423074 at *2 (S.D.N.Y. July 28, 1997) (in light of 7 N.Y.C.R.R. § 251-5.1 requiring hearing within seven days, prisoner did not have liberty interest in five-day keeplock stay without hearing).

C. *Application of Sandin to Confinement of 6 Days in Keeplock*

Even if the Court were to assume, contrary to the undisputed evidence, that Williams' keeplock stay violated state regulations, defendants are entitled to summary judgment under the first prong of the *Sandin* analysis.

In recent decisions, the Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to the length and conditions of confinement:

The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an "atypical, significant deprivation." ... [W]e now state explicitly: *Sandin* did not create a per se blanket rule that disciplinary confinement may never implicate a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest.

**\*6** *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir. 1997); *see also, e.g., Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir. 1997); *Brooks v. Difasi,* 112 F.3d 46 (2d Cir. 1997).

While the courts have not yet determined what length of confinement will constitute an "atypical or significant hardship," the decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* "atypical or significant hardship" under *Sandin. See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996) (12 days in SHU); *Johnson v. Coughlin,* 90 Civ. 1731, 1997 WL 431065 at \*1 (S.D.N.Y. July 30, 1997) (8 days confinement prior to disciplinary hearing); *Sullivan v. Schweikhard,* 95 Civ. 0276, 1997 WL 349983 at \*3 (S.D.N.Y. June 25, 1997) (9 days in keeplock); *Duncan v. Keane,* 95 Civ. 1090, 1997 WL 328070 at \*2 (S.D.N.Y. June 13, 1997) (30 days keeplock); *Harris v. Keane,* 962 F. Supp. 397, 404 (S.D.N.Y. 1997) (23 days in keeplock; the "Second Circuit's post-Sandin decisions are unanimous that keeplock of 60 days or less in New York prisons is not an "atypical hardship.""); *Saulter v. Hanslmaier,* 94 Civ. 6855, 1997 WL 177887 at \*2 (S.D.N.Y. April 14, 1997) (7 days in keeplock); *Ragland v. Crawford,* 95 Civ. 10069, 1997 WL 53279 at \*3 (S.D.N.Y. Feb. 7, 1997) (1 day in keeplock); *Torres v. Keane,* 94 Civ. 4845, 1997 WL 35507 at \*1 (S.D.N.Y. January 30, 1997) (21 days in keeplock); *Grant v. Riley,* 89 Civ. 0359, 1996 W1727441 at \*2-3 (S.D.N.Y. Dec. 17, 1996) (10 days in keeplock, only 5 of which were served); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at \*3 (S.D.N.Y. Nov. 6, 1996) (21 days in keeplock); *Santana v. Keane,* 90 Civ. 6309, 1996 W1 465751 at \*5 (S.D.N.Y. Aug. 14, 1996) (9 days in keeplock during a prison sentence of at least 7 years); *Pampalone v. Young,* 95 Civ. 2348, 1996 WL 511569 at \*3 (S.D.N.Y. August 7, 1996) (Peck, M.J.) (10 days in keeplock); *McAllister v. Zydel,* 929 F. Supp. 102, 104 (W.D.N.Y. 1996) (15 days in keeplock); *Chambers v. Coughlin,* 95 Civ. 298, 1996 WL 243202 at \*2 & n.6 (S.D.N.Y. May 10, 1996) (7 days in SHU); *Beaty v. Scully,* 92 Civ. 3407, 1996 WL 209933 at \*2 (S.D.N.Y. April 30, 1996) (11 days in SHU); *Slaughter v. Coughlin,* 94 Civ. 6734, 1996 WL 200308 at \*3 (S.D.N.Y. April 25, 1996) (10 or 11 days in keeplock); *Levro v. Kennedy,* 95

Civ. 0198, 1996 WL 191741 at \*1 (S.D.N.Y. April 22, 1996) (several days in keeplock); *Ramirez v. Coughlin,* 93 Civ. 0765, 1996 WL 194324 at \*3-4 (S.D.N.Y. April 22, 1996) (30 days combination of SHU and keeplock); *Dawkins v. Healy,* 94 Civ. 6382, 1996 WL 145989 at \*2 (S.D.N.Y. April 1, 1996) (15 days in keeplock) *judgment vacated and reconsideration in part,* 1996 WL 280737 at \*2 (S.D.N.Y. May 28, 1996) (reconsideration limited to issue of retaliation); *Powell v. Scully,* 92 Civ. 5334, 1996 WL 145962 at \*3 (S.D.N.Y. April 1, 1996) (7 days of cell confinement); *Benton v. Keane,* 921 F. Supp. 1078, 1079 (S.D.N.Y. 1996) (9 days in administrative confinement); *Ketchmore v. Stormer,* 94 Civ. 8271, 1996 WL 117572 at \*2-3 (S.D.N.Y. March 18, 1996) (10 days of cell confinement); *Moolenaar v. Finn,* 94 Civ. 6778, 1996 WL 112200 at \*3 (S.D.N.Y. March 14, 1996) (15 days in keeplock); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions); *Ahlers v. Keane,* 94 Civ. 3297, 1995 WL 375920 (S.D.N.Y. June 22, 1995) (10 days keeplock), *aff'd* (unpublished decision), 101 F.3d 684, No. 95-2454, 1996 WL 281351 at \*1 (2d Cir. May 22, 1996); *Martin v. Mitchell,* 92-CV-716, 1995 WL 760651 at \*3 (N.D.N.Y. Nov. 24, 1995) (30 days keeplock); *Schmelzer v. Norfleet,* 903 F. Supp. 632, 634-35 (S.D.N.Y. 1995) (11 days in keeplock); *Jackson v. Keane,* 93 Civ. 6453, 1995 WL 622593 at \*3 (S.D.N.Y. Oct. 24, 1995) (14 days in SHU); *Kozlek v. Papo,* 94 Civ. 1429, 1995 WL 479410 at \*2 (S.D.N.Y. Aug. 11, 1995) (10 days in SHU); *Uzzell v. Scully,* 893 F. Supp. 259, 262-63 (S.D.N.Y. 1995) (23 days in keeplock).

**\*7** Indeed, decisions in this Circuit have held that keeplock or SHU confinement of longer than 30 days does not implicate a liberty interest. *See, e.g., Frazier v. Coughlin,* 81 F.3d at 317-18 (12 days in SHU and eleven months in "close supervision unit"); *Thompson v. Keane,* 95 Civ. 2442, slip op. at 5-6 (S.D.N.Y. Aug. 6, 1997) (91 days in SHU); *Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at \* 5 (S.D.N.Y. March 24, 1997) (Peck, M.J.) (192 days in SHU during 10-20 year prison sentence); *Reaves v. Williams,* 95 Civ. 0281, 1997 WL 10132 at \*4-5 (S.D.N.Y. Jan. 10, 1997) (90 days of keeplock imposed, of which 69 days were served); *Odom v. Keane,* 94 Civ. 8032, 1997 WL 3262 at \*1 (S.D.N.Y. Jan. 6, 1997) (46 days of keeplock); *Coleman v. Galgano,* 95 Civ. 5835, 1996 WL 715533 at \*1, 3 (S.D.N.Y. Dec. 11, 1996) (60 days in SHU and 180 days in keeplock); *Whitfield v. Scully,* 94 Civ. 3290, 1996 WL 706932 at \*5 (S.D.N.Y.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

Dec. 6, 1996) (60 days in SHU); _Bennett v. Dolan,_ 93 Civ. 5215, 1996 WL 499519 at *1, 3 (S.D.N.Y. Sept. 4, 1996) (45 days of keeplock imposed, 24 days served); _Nogueras v. Coughlin,_ 94 Civ. 4094, 1996 WL 487951 at *5 (S.D.N.Y. Aug. 27, 1996) ("210 days in SHU does not in and of itself trigger due process concerns."); _Duncan v. Keane,_ 93 Civ. 6026, 1996 WL 511573 at *3-5 (S.D.N.Y. Aug. 22, 1996) (Peck, M.J.) (58 days in keeplock); _Brown v. McClellan,_ 93-CV-0901, 1996 WL 328209 at *5 (W.D.N.Y. June 11, 1996) (two confinements in SHU for 60 days each); _Guzman v. Kelly,_ 88-CV-1391, 1996 WL 291985 at *3 (W.D.N.Y. May 28, 1996) (8 months in SHU); _Trice v. Clark,_ 94 Civ. 6871, 1996 WL 257578 at *2-3 (S.D.N.Y. May 16, 1996) (150 days in SHU); _Arce v. Coughlin,_ 93 Civ. 4702, 1996 WL 252371 at *6-7 (S.D.N.Y. May 14, 1996) (120 days in SHU); _Camacho v. Keane,_ 95 Civ. 0182, 1996 WL 204483 at *2 (S.D.N.Y. April 25, 1996) (90 days, only 40 days of which were served, in keeplock); _Rouccio v. Coughlin,_ 923 F. Supp. 360, 373 (E.D.N.Y. 1996) (47 days in SHU) (citing cases, including unpublished 2d Cir. decisions upholding 60 days SHU and 71 days segregated confinement); _Villano v. Irvin,_ 93-CV-0196, 1996 WL 343251 at *3 (W.D.N.Y. March 18, 1996) (85 days in keeplock out of a 90-day keeplock sentence); _White v. Artuz,_ 94 Civ. 4592, 1996 WL 84498 at *2 (S.D.N.Y. Feb. 27, 1996) (55 days in protective custody); _Walker v. Mahoney,_ 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. decisions upholding 60 and 71-day confinements); _Rivera v. Coughlin,_ 92 Civ. 3404, 1996 WL 22342 at *4-5 & n.6 (S.D.N.Y. Jan. 22, 1996) (89 days in disciplinary segregation; loss of good time credits reversed administratively so no effect on length of sentence); _Rosario v. Selsky,_ 94 Civ. 6872, 1995 WL 764178 at *5-6 (S.D.N.Y. Dec. 28, 1995) (120 days imposed but inmate served less than 3 months in SHU during a ten-year sentence); _Tulloch v. Coughlin,_ 91-CV-0211, 1995 WL 780970 at *1-2 (W.D.N.Y. Dec. 22, 1995) (180 days in SHU; loss of good time allowance restored through prior state proceeding; implies that any SHU confinement, regardless of length, is permissible under _Sandin_), _appeal dismissed on other grounds_ (unpublished decision), 101 F.3d 1393, 1996 WL 414457 (2d Cir. 1996); _Morales v. Santor,_ 94-CV-217, 1995 WL 760625 at *2 (N.D.N.Y. Dec. 4, 1995) (60 days in keeplock); _Ross v. Jewett,_ 91-CV-1414, 1995 WL 760675 at *2, *4 (N.D.N.Y. Nov. 27, 1995) (60 days in keeplock), _aff'd_ (unpublished decision), No. 96-2004, 1996 WL 304752 (2d Cir. June 7, 1996); _Zamakshari v. Dvoskin,_ 899 F. Supp. 1097, 1108

(S.D.N.Y. 1995) (Peck, M.J.) (60 days in SHU); _Delaney v. Selsky,_ 899 F. Supp. 923, 927-28 (N.D.N.Y. 1995) (365 days in SHU ordinarily not atypical but because plaintiff over 7 feet tall and SHU bed too small for him, summary judgment denied); _Medina v. Bartlett,_ 94-CV-0358, 1995 WL 529624 at *2 (W.D.N.Y. Aug. 28, 1995) (no liberty interest created by 2,555 days in SHU); _McMiller v. Wolf,_ 94 Civ. 0623, 1995 WL 529620 at *1, *3 (W.D.N.Y. Aug. 28, 1995) (365 days in SHU reduced to approximately 180 days in SHU); _Carter v. Carriero,_ 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (360 days reduced to 270 days in SHU); _Hutchinson v. Adorno,_ 93 Civ. 3949, 1994 WL 549568 (S.D.N.Y. Oct. 6, 1994), _aff'd_ (unpublished decision), No. 94-2652, 1995 WL 737493 at *1-2 (2d Cir. Dec. 13, 1995) (1 year of segregated confinement and 90 days keeplock, reduced to 71 days in segregated confinement).

**\*8** Chief Judge McAvoy of the Northern District of New York concluded that "courts in this and other districts have subsequently [to _Sandin_] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of _Sandin._ Indeed, _it now appears that any period of segregation of one year or less affords no protected liberty interest._" _Polanco v. Allan,_ No. 93-CV-1498, 1996 WL 250237 at *3 (N.D.N.Y. May 6, 1996) (emphasis added) (365 days in SHU upheld), _reaffirmed on reconsideration,_ 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996) ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in SHU was not "outside the parameters of plaintiff's sentence").[FN4]

FN4. _But see Wright v. Miller,_ 96 Civ. 1224, 1997 WL 438795 at *3 (slip op. at p. 6) (S.D.N.Y. July 31, 1997) (12-15 months in SHU may create atypical and significant hardship; summary judgment denied); _Porter v. Coughlin,_ 964 F. Supp. 97, 103 (W.D.N.Y. 1997) (36 months in SHU creates liberty interest; _Bishop v. Keane,_ 92 Civ. 6061, 1995 WL 384443 at *3 n.4 (S.D.N.Y. June 28, 1995) (whether 87 days in keeplock imposes atypical or significant hardship is a question of fact precluding summary judgment); _Lee v. Coughlin,_ 902 F. Supp. 424, 431 (S.D.N.Y. 1995) (376 days in SHU imposed an "atypical and significant hardship" for an inmate serving a 2-year

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

sentence), *motion for reconsideration granted, Lee v. Coughlin,* 914 F. Supp. 1004, 1005 (S.D.N.Y. 1996) (reconsideration granted for defendants to address recent *Sandin* decision); *Williams v. Fountain,* 77 F.3d 372, 374 n.3, 376 (11th Cir.) (assumes that a year of solitary confinement is a substantially "atypical and significant hardship" entitling plaintiff to due process, but finds that prisoner received sufficient due process), *cert. denied,* 117 S. Ct. 367 (1996).

Consistent with the above-cited cases, whatever *Sandin*'s outer limits, it is clear that Williams' confinement of 6 days[FN5] in keeplock does not constitute an "atypical or significant hardship" under *Sandin.*[FN6] Accordingly, the Court grants defendants' summary judgment motion on this first issue.

> FN5. The Court's analysis would be no different if plaintiff had spent 7 days in keeplock as Williams originally alleged.

> FN6. Because Williams has not established the first *Frazier* prong (that his 6 day keeplock confinement is an atypical and significant hardship under *Sandin*), the Court need not reach the second *Frazier* prong (of whether New York has granted its inmates a liberty interest in being free of disciplinary confinement).

II. *UNDER BODDIE v. SCHNIEDER, WILLIAMS' ALLEGATION OF SEXUAL ABUSE DOES NOT RISE TO A CONSTITUTIONAL DEPRIVATION*

A. *In Boddie v. Schnieder, the Second Circuit Recognized an Eighth Amendment Claim for Sexual Abuse*

**\*9** Williams' second claim, for alleged sexual abuse by Corrections Officer Bump, is governed by the Second Circuit's recent decision in *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir. 1997), which recognized a § 1983 Eighth Amendment[FN7] claim for sexual abuse by a corrections officer, but also found the complaint of conduct there to

not involve a harm of federal constitutional proportions. The same is true of Williams' claim here.

> FN7. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

In *Boddie,* the Second Circuit recognized that the "Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The 'unnecessary and wanton infliction of pain' on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 861. The Eighth "Amendment proscribes more than physically barbarous punishments. The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' against which we must evaluate penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976) (citations omitted).

*Boddie* reiterated a two-prong, objective-subjective test for Eighth Amendment violations, including claims of sexual abuse:

> An official violates the Eighth Amendment when two requirements are met. First, the alleged "punishment" must be, "objectively, sufficiently serious." Under the objective standard, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Second, the prison official involved must have a "sufficiently culpable state of mind." Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

*Boddie,* 105 F.3d at 861 (citations omitted, including to *Farmer v. Branham,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)).[FN8]

> FN8. *See also Mathie v. Fries,* No. 1274, Docket 96-9138, 1997 WL 426567 at \*3 (2d Cir. July 31, 1997), *affirming* 935 F. Supp. 1284, 1299

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

(E.D.N.Y. 1996) (pretrial detainee awarded damages for sexual assault including sodomy by prison official). Decisions in other circuits similarly recognize a § 1983 Eighth Amendment claim for serious sexual abuse by prison personnel. See, e.g., Freitas v. Ault, 109 F.3d 1335 (8th Cir. 1997) (to prove a constitutional claim for sexual abuse, the inmate must demonstrate that the alleged abuse objectively caused "pain," and that the officer involved subjectively had a "sufficiently culpable state of mind."); Jordan v. Gardner, 986 F.2d 1521, 1527-31 (9th Cir. 1993) (female inmates stated valid § 1983 Eighth Amendment claim challenging prison policy allowing cross-gender clothed body searches; Watson v. Jones, 980 F.2d 1165, 1165-66 (8th Cir. 1992) (summary judgment for defendant female correction officer reversed where inmates alleged sexual harassment and sexual fondling of male prisoners during pat frisks almost daily over a two-month period); Meriwether v. Faulkner, 821 F.2d 408 (7th Cir.) (complaint that transexual inmate is regularly forced to strip before male guards and inmates states Eighth Amendment claim), cert. denied, 484 U.S. 935, 108 S. Ct. 311 (1987); Thomas v. District of Columbia, 887 F. Supp. 1, 4-5 (D.D.C. 1995) (summary judgment for defendant denied where corrections officer sexually harassed plaintiff including touching his penis and tried to coerce prisoner to have sexual relations); Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia, 877 F. Supp. 634 (D.D.C. 1994) (court found numerous violations of the Eighth Amendment for repeated rape, sexual assaults and harassment of female prisoners), aff'd in part on other grounds, reversed in part on other grounds, 93 F.3d 910, 928 (D.C. Cir. 1996), cert. denied, 117 S. Ct. 1552 (1997), on remand, CA No. 93-2052, 1997 WL 361600 at *2-3 (D.D.C. June 16, 1997) (ordering remedial measures to eliminate sexual harassment); Galvan v. Carothers, 855 F. Supp. 285, 291 (D. Alaska 1994) ("minimal standards of privacy and decency include the right not to be subject to sexual advances, to use the toilet without being observed by members of the opposite sex, and to shower without being viewed by members of the opposite sex"; nevertheless, summary judgment

for defendant on qualified immunity grounds).

*10 Objectively, "[s]exual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm," and "has no legitimate penalogical purpose." Boddie, 105 F.3d at 861. As to the subjective prong of the test, "[w]here no legitimate law enforcement or penalogical purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." Id.

The Second Circuit in Boddie nevertheless affirmed the district court's dismissal of Boddie's claim:

[A]llegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983. However, we agree with the district court that Boddie nevertheless failed to state an Eighth Amendment claim. He asserts a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

Boddie, 105 F.3d at 861.[FN9]

FN9. The Second Circuit summarized Boddie's allegations as follows:

First, Boddie maintains that on March 3, 1993, Officer B. Schnieder, a female corrections officer, "made a statement" that Boddie believed to be "a pass" at him, but that he "could not be sure."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

Second, Boddie claims that on the next day, Schnieder squeezed his hand, touched his penis, and said, "[Y]ou know your [sic] sexy black devil, I like you."

Third, Boddie alleges that on March 19, 1993, ... Schnieder stopped [him], accused him of wearing an orange sweatshirt, and told him to take off the sweatshirt. According to Boddie, he resisted, stating that he was a cardiac patient, that the hallway was very cold, and that he would give the sweatshirt to her when they returned to his cellblock. When Boddie began to walk past the officers, Schnieder stopped him, "bumping into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." Boddie states that Schnieder did this to Boddie twice, pinning him to a door. When he tried to pass her again, Schnieder again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door."

*Id.* at 859-60.

B. *Williams' Allegation of Sexual Abuse Fails to State a Valid Claim Under § 1983*

**\*11** Williams' allegations, like Boddie's, are not sufficient to state a valid § 1983 claim for sexual abuse. The conduct alleged by Williams, accepting his allegations as true, is no more egregious than the conduct in *Boddie*. Moreover, the instant case involves only a single incident of alleged abuse, whereas *Boddie* involved several. Thus, under *Boddie*, it is clear that Williams' claim does "not involve a harm of federal constitutional proportions as defined by the Supreme Court." *Boddie*, 105 F.3d at 861; *see also, e.g., Green v. Elias*, 9 F.3d 1551 (9th Cir. 1993) (affirms grant of summary judgment to defendant correction officer where male prisoner alleged female guard grabbed his genitals during a clothed pat frisk of inmates leaving the dining hall); *Kaestner v. Mitchell*, No. C 96-2370, 1996 WL 428357 at *1 (N.D. Cal. July 24, 1996) (alleged unwarranted sexual advances including touching of prisoner's buttocks "does not rise to the level of egregious, pervasive and/or widespread sexual harassment necessary

to implicate the Eighth Amendment."); *Duncan v. Keane*, 95 Civ. 1090, 1995 WL 649931 at *5-6 (S.D.N.Y. Nov. 6, 1995) (claim that correction officer felt plaintiff's rear end does not provide sufficient facts to state Eighth Amendment claim); *Friedman v. Young*, 702 F. Supp. 433, 434, 436 (S.D.N.Y. 1988) (complaint that correction officer fondled plaintiff's genitals and anus during pat search dismissed; "[a]ccepting the allegations of the complaint [as true], the line between a pat down and a fondle is too insubstantial to support the burden of supporting a claim for constitutional tort.").

Accordingly, accepting for purposes of this motion Williams' version of the facts, this isolated incident during a routine pat-frisk fails to state an Eighth Amendment claim under *Boddie*. The Court grants defendants' summary judgment motion on this second issue.

*CONCLUSION*

For the reasons set forth above, defendants' summary judgment motion is granted. The Clerk of the Court is directed to enter judgment for defendants dismissing this action with prejudice.

SO ORDERED.

DATED:

S.D.N.Y.,1997.
Williams v. Keane
Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63.)

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

## DISCUSSION

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

*5 As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

*6 It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, *Correction Law § 851 et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 et seq., contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

Correction Law § 855(9). Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 et seq. In addition, courts that have considered whether inmates in New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

**\*7** However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995
Greenwaldt v. Coughlin
Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

working as a licensed massage therapist at his booth in the Carousel Center mall. *See* Dkt. No. 1 at ¶ 10. Around 8:00 p.m. of that evening, he saw a "Hispanic man of color" ("Paredes") walking toward him and noticed a mall security officer pointing Paredes out to Defendants Hennessey and Mullen. *See id.* at ¶ 11. When Defendant Hennessey tried to stop Paredes by placing his hand on Paredes' chest, Paredes spat on the floor and continued shouting that he was going to kill someone. *See id.* at ¶ 12. Defendant Hennessey then took Paredes behind Plaintiff's booth, told him to show some respect, and smashed his back and head against a concrete pillar. *See id.* at ¶¶ 13-14. Paredes then either pushed or kicked at Defendant Hennessey, at which point they both tumbled and knocked over Plaintiff's booth. *See id.* at ¶¶ 15-16. With Paredes face-down on the floor, Defendant Hennessey placed his knee in Paredes' back and began punching him in the back. *See id.* at ¶¶ 18-19. Defendant Mullen then also placed his knee in Paredes' back and began punching him in the back and sides. *See id.* at ¶ 21. Defendant officers each hit Paredes six or more times after they had subdued him. *See id.* at ¶ 22.

**\*2** Plaintiff crouched by Defendant officers and told them that they had gone over the top and were out of control. *See id.* at ¶ 24. Defendant Mullen told Plaintiff to get back, and Plaintiff complied. *See id.* at ¶¶ 26-27. After Defendant officers continued to punch Paredes in the back, Plaintiff again told them that they were over the top. *See id.* at ¶¶ 28-29. Defendant Mullen told Plaintiff that, if he did not stop, he would be arrested for Obstructing Governmental Administration. *See id.* at ¶ 30. Plaintiff stopped speaking to Defendant officers, and they pulled Paredes up and led him away. *See id.* at ¶¶ 31-32.

At approximately 9:00 p.m., Defendant Mullen returned to Plaintiff's booth with Defendant Cecile and a mall security guard. *See id.* at ¶ 33. Defendant Cecile told Plaintiff that he understood that Plaintiff had been involved in an incident earlier in the evening and asked Plaintiff to explain what happened. *See id.* at ¶ 34. As soon as Plaintiff began to explain, Defendant Cecile stopped him and asked him whether he understood that he could be arrested. *See id.* at ¶ 35. Defendant Cecile told Plaintiff that, at the time of the incident, it was Defendants Hennessey's and Mullen's call whether to arrest Plaintiff but that, if Plaintiff made a complaint, it would be his call whether to arrest Plaintiff. *See id.* at ¶ 37. After Plaintiff

said that he was not sure how the complaint procedure worked, Defendant Cecile showed Plaintiff the patch on his shoulder and said, " 'It's right here with me, right now." ' *See id.* at ¶¶ 38-39. Plaintiff told Defendant Cecile that he did not think that this was the only way to file a complaint. *See id.* at ¶ 40. Defendant Cecile then told Plaintiff that, if he filed a complaint, Defendant Cecile would take him down. *See id.* at ¶ 41. Next, Defendant Cecile told Defendant Mullen, " 'He's not happy. We're going to get a complaint. Take him in,' or words to that effect." *See id.* at ¶ 42. When Plaintiff said that he had things at his booth that he could not leave unsecured, Defendant Cecile told him that he should have thought of that before. *See id.* at ¶ 44. Upon Defendant Cecile's direction, Defendant Mullen arrested Plaintiff for Obstructing Governmental Administration by giving him an appearance ticket. *See id.* at ¶¶ 45-46.

That same night, Defendant Hennessey submitted a complaint information affidavit in support of Plaintiff's arrest. *See id.* at ¶ 47. The affidavit contained a number of statements that were false and that Defendant Hennessey knew to be false when he made them. *See id.* at ¶¶ 48-49. Plaintiff's counsel filed a motion to dismiss the information for insufficiency. *See id.* at ¶ 51. On January 10, 2004, the Syracuse City Court dismissed the information in its entirety. *See id.* at ¶ 52.[FN3] In or about November 2004, Carousel Center management informed Plaintiff that he could not set up his booth during the holiday season because it was concerned about potential negative publicity arising from these incidents. *See id.* at ¶ 53.

FN3. It appears to the Court that this dismissal actually occurred on January 14, 2004, and was made pursuant to New York Criminal Practice Law § 170.40. *See* Dkt. No. 9 at Pt. 5.

**\*3** Plaintiff filed the instant action on December 15, 2004. *See* Dkt. No. 1.

### III. DISCUSSION

A. Defendants' motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) of the Federal Rules

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

of Civil Procedure

Defendants argue that the Court lacks personal jurisdiction over them because Plaintiff failed to serve them with summonses. The docket sheet contains four affidavits of service that indicate that each Defendant was served with the summons and the complaint sometime between January 12, 2005, and January 26, 2005. *See* Dkt. Nos. 5-8. Perhaps these affidavits are mistaken; Plaintiff's counsel has filed an affidavit stating that Plaintiff personally served summonses and complaints for all Defendants upon Defendants' counsel on February 8, 2005, one day after Defendants filed their motion to dismiss. *See* Dkt. Nos. 9, 14 at ¶ 4. Since Defendants do not address insufficiency of service of process in their reply memorandum of law, the Court presumes that they were served summonses and are abandoning their motion to dismiss pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Regardless, both Local Rule 7.1(a)(2) and common sense dictate that a motion to dismiss for a failure to serve summonses requires a supporting affidavit, which Defendants have not provided. *See* L.R. 7.1(a)(2). Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

B. Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

*1. Standard of review*

In considering a motion to dismiss for failure to state a claim, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir.1999)*. Hence, dismissal is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994)* (quotation omitted).

*2. Defendant City's liability for Plaintiff's § 1983 claims*

A municipality may only be held liable under § 1983 when its policies or customs result in a plaintiff's constitutional injury. *Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978)*. The existence of a policy or custom may be inferred when a plaintiff presents evidence that a " 'municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction....' " *DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir.1998)* (quotation and footnote omitted). Contrary to some earlier Second Circuit cases, there is no heightened pleading requirement for claims of municipal liability. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 167-68 (1993)* (rejecting contention that "plaintiff must do more than plead a single instance of misconduct" to state a claim for municipal liability); *contra Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir.1993)* (citation omitted). As the Supreme Court noted, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman, 507 U.S. at 168-69*.

**\*4** Plaintiff's complaint alleges that Defendant City has a policy or custom of threatening those who verbally challenge, or indicate the desire to file a complaint about, police misconduct with Obstructing Governmental Administration and that Defendant City has shown deliberate indifference in failing to train its police officers in how to handle the public while making arrests and failing to train its officers about what constitutes the crime of Obstructing Governmental Administration. *See* Dkt. No. 1 at ¶¶ 55, 64, 71-73. Plaintiff's allegations of municipal liability are directly related to his allegation of personal injury and, if shown to be true according to the evidence, might support a determination of municipal liability. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City for failure to adequately plead municipal liability.

*3. Plaintiff's § 1983 and common law false arrest and false imprisonment claims*

*a. elements of false arrest and false imprisonment*

"The elements of false arrest ... under § 1983 are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

'substantially the same' as the elements under New York law." *Boyd v. City of N.Y.,* 336 F.3d 72, 75 (2d Cir.2003) (quotation omitted). The elements of false arrest and false imprisonment claims are identical: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (quotation omitted).

The central dispute between the parties is whether the issuance of an appearance ticket constitutes the requisite confinement.

*b. common law false arrest and false imprisonment*

Every New York case of which the Court is aware that has considered whether the issuance of an appearance ticket constitutes confinement has held that the issuance of an appearance ticket, in and of itself, does not constitute confinement for purposes of a common law false arrest or false imprisonment claim. *See Du Chateau v. Metro-North Commuter R.R. Co.,* 253 A.D.2d 128, 129, 132 (1st Dep't 1999) (citations omitted) (police officer escorted plaintiff from train, talked to him, and issued an appearance ticket); *Kramer v. Herrera,* 176 A.D.2d 1241, 1241 (4th Dep't 1991) (citations omitted); *Pozzanghera v. Anderson,* 136 A.D.2d 912, 913 (4th Dep't 1988) ("Plaintiff's sole contention is that he was detained by the service of an appearance ticket. This did not restrict plaintiff's freedom and, therefore, does not form a basis for his wrongful arrest claim." (citation omitted)); *Pritchett v. State,* 61 A.D.2d 1110, 1110 (3d Dep't 1978); *cf. Reinhart v. Jakubowski,* 239 A.D.2d 765, 766 (3d Dep't 1997) (issuance of criminal summons requiring court appearance insufficient to support false arrest claim); *Vill. of Ellenville v. Searles,* 235 A.D.2d 692, 693 (3d Dep't 1997) (brief traffic stop in order to serve process did not constitute requisite confinement) (citations omitted).

**\*5** Plaintiff contends, however, that his complaint alleges more than the mere issuance of an appearance ticket. Conduct that accompanies the issuance of an appearance ticket certainly can constitute confinement for purposes of a false arrest or false imprisonment claim. *See Wiggins v. Metro-North Commuter R.R. Co.,* 228 A.D.2d 198, 198

(1st Dep't 1996) (police escorted plaintiff off train, questioned him in a railroad police facility, and issued an appearance ticket). Unfortunately, Plaintiff does not specify which of his allegations he believes show that Defendants confined him. The relevant allegations are:

33. Approximately one hour later, at about 9:00 p.m., Officer Mullen returned to Plaintiff's booth with [Sergeant Cecile] and a mall security guard.

34. Sergeant Cecile told Plaintiff that he understood he had been involved in an incident earlier and asked the Plaintiff what happened.

35. As the Plaintiff began to tell him, Sergeant Cecile interrupted Plaintiff and asked if Plaintiff understood that he could be arrested.

36. Plaintiff was quite surprised at this statement as he had complied with Officer Mullen's directive and had not interfered with Paredes' arrest or done anything unlawful.

37. Sergeant Cecile said that right then it was the officer's call, but if they were going to receive a complaint from the Plaintiff, it would be his call whether to arrest Plaintiff.

38. Plaintiff said that he was not sure how the complaint procedure worked.

39. Sergeant Cecile showed Plaintiff the patch on his shoulder and said, "It's right here with me, right now."

40. Plaintiff said that he did not think that was the only way to file a complaint.

41. Sergeant Cecile then told Plaintiff, "I'll tell you right now if you're filing a complaint, I'm taking you down," or words to that effect.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

42. Sergeant Cecile told Officer Mullen, "He's not happy. We're going to get a complaint. Take him in," or words to that effect.

43. Plaintiff explained that he had expensive things in his booth that he could not leave unsecured.

44. Sergeant Cecile told Plaintiff that he should have thought of that before.

45. Sergeant Cecile told Officer Mullen to give Plaintiff an appearance ticket, which Officer Mullen did.

See Dkt. No. 1 at ¶¶ 33-45. Although Plaintiff alleges that Defendant Cecile threatened to arrest him, the mere threat to arrest does not constitute confinement. See Blumenfield v. Harris, 3 A.D.2d 219, 220 (1st Dep't 1957) (citations omitted), aff'd 3 N.Y.2d 905 (1957).[FN4]

FN4. In articulating his first cause of action, Plaintiff alleges that "[i]n the course of arresting Plaintiff, plaintiff was not free to leave and was confined against his will at the Carousel Center." See Dkt. No. 1 at ¶ 58. However, in light of the more specific allegations that Plaintiff made in his statement of facts, this allegation is too vague and conclusory to support a reasonable inference that Defendants confined him.

Accepting all of Plaintiff's allegations as true and drawing every reasonable inference from them, the Court does not find that he has alleged that Defendants took any actions that would constitute confinement for purposes of a common law false arrest or false imprisonment claim. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim.

c. § 1983 false arrest

*6 The question of whether the issuance of an appearance ticket constitutes confinement for purposes of § 1983 is not so clear. Defendants rely upon Angel v. Kasson, 581 F.Supp. 170, 177-78 (N.D.N.Y.1983) ("[I]t [is] well settled that the issuance of such tickets under the provisions of N.Y.Crim. Proc. Law § 150.10 does not constitute an arrest." (citation and footnote omitted)). Plaintiff, on the other hand, relies upon Dorman v. Castro, 214 F.Supp.2d 299 (E.D.N.Y.2002), which states that,

[a]lthough this is a close case, the Court finds that Plaintiffs were subject to a "seizure" under the Fourth Amendment. Plaintiffs claim that their liberty was restrained because "at the point when the Plaintiffs were informed that they were being issued a Summons" they "were not free to leave until the Plaintiffs had the Summons in hand."

Id. at 308 (quotation omitted). Dorman goes on to note that "district courts in this circuit that have analyzed Murphy [v. Lynn, 118 F.3d 938 (2d Cir.1997)], however, have held that the mere issuance of an appearance ticket, without any restraint on travel, is a sufficient restraint of liberty to constitute a 'seizure' under the Fourth Amendment." Id. (citing Kirk v. Metropolitan Trans. Auth., No. 99 CV 3787, 2001 WL 258605, *15 (S.D.N.Y. Mar. 14, 2001); Kirton v. Hassel, No. 96 CV 1371, 1998 WL 146701, *6 (E.D.N.Y. Mar. 25, 1998); Sassower v. City of White Plains, 992 F.Supp. 652, 656 (S.D.N.Y.1998)) (other citation omitted).[FN5]

FN5. Contrary to Dorman's statement, two of the supporting cases it cites do not involve appearance tickets and the third, Kirk, involves a desk appearance ticket that the defendant issued after the plaintiff had been arrested and detained. Kirk, 2001 WL 258605, *2-*4.

Dorman and all the supporting cases that it cites rely upon Murphy. Murphy, applying Albright v. Oliver, 510 U.S. 266 (1994), held that, in order for a plaintiff to establish a § 1983 malicious prosecution claim, he "must show ... that the initiation or pendency of judicial proceedings" resulted in a Fourth Amendment "seizure." Murphy, 118 F.3d at 944. The court went on to hold that "[t]he liberty deprivations regulated by the Fourth Amendment are not limited to physical detention." Id. at 945. Finally, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

court, relying upon Justice Ginsburg's solitary concurrence in *Albright,* held that

> while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and *may order him to make periodic appearances,* such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.

*Id.* at 946 (emphasis added).

Like *Murphy,* all three of the supporting cases that *Dorman* cites concern malicious prosecution claims. There is certainly considerable similarity between the analysis of a § 1983 malicious prosecution claim and a § 1983 false arrest claim; both arise out of the Fourth Amendment's protection against unreasonable seizures. However, *Murphy* does not expressly address false arrest claims. Furthermore, there is reason to constrain the application of *Murphy* to the precise issues it addresses. Judge Jacobs, dissenting in *Murphy,* after noting the majority's reliance upon Justice Ginsburg's solitary concurrence, pointed out that "[a] probable cause determination is required only for 'those suspects who suffer restraints on liberty *other* than the condition that they appear for trial." ' *Id.* at 953, 955 (quoting *Gerstein [v. Pugh],* 420 U.S. [103,] 125 n. 26, 95 S.Ct. [854,] 869 n. 26 [ (1975) ] (Judge Jacobs' emphasis)) (footnote omitted). In *Sassower,* Judge Lowe noted the novelty of the *Murphy* holding and quoted Judge Jacobs' statement that " 'strange is the majority's holding that [plaintiff] was seized within the meaning of the Fourth Amendment because he was required to appear in court." ' *Sassower,* 992 F.Supp. at 655, 656 (quotation omitted).

**\*7** Although in the context of a malicious prosecution claim *Murphy* would be controlling, given the tenuousness of its reasoning, the Court holds that the issuance of an appearance ticket does not, in and of itself, constitute confinement for purposes of a § 1983 false arrest or false imprisonment claim. Furthermore, since the circumstances surrounding the issuance of the appearance ticket in this case do not present any alternative forms of the restraint of Plaintiff's liberty, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to

state a claim.

**4. Plaintiff's § 1983 First Amendment claims**

Second Circuit First Amendment retaliation case law is, to put it mildly, confusing. There are at least three formulations of the elements of a First Amendment retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) ((1) protected speech or conduct, (2) the defendant's adverse action against the plaintiff, and (3) " 'a causal connection between the protected speech and the adverse action" ' (quotation omitted)); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir.2002) ((1) conduct that the First Amendment protects that (2) prompts or substantially causes the defendant's action (citations omitted)); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) ((1) protected speech or conduct that (2) motivates or substantially causes the defendant's action, which action (3) effectively chills the plaintiff's exercise of his First Amendment right (citation omitted)).

In an attempt to make sense of this case law, one approach is to distinguish cases according to broad types. The great majority of First Amendment retaliation cases arise in the prisoner and public employee contexts. Less typical are those cases, like the one currently before the Court, in which a private citizen alleges that state actors took some action against him in retaliation for his exercise of his First Amendment rights. Unfortunately, even in this subset of cases, there is disagreement about the elements of the claim. The most recent case in this subset to set forth the elements of a First Amendment retaliation claim is *Dougherty.* In that case, the plaintiff alleged that the defendants had revoked a previously issued building permit in retaliation for his exercise of his First Amendment rights. Although the court indicated that there may have been additional protected speech, it specifically noted the plaintiff's allegation that the permit revocation occurred soon after the defendants' receipt of his opposition papers to their motion to dismiss an action that he had filed in relation to an earlier denial of a permit. *See Dougherty,* 282 F.3d at 91-92. The court held that the circumstances that the plaintiff alleged gave rise to a sufficient inference of a causal relationship between his protected conduct and the defendants' action to withstand a motion to dismiss. *See id.* at 92.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

**\*8** The next most recent case in the subset of private citizen plaintiffs is *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *Garcia* involved a student who claimed that the defendants dismissed him from medical school in retaliation for his exercise of his First Amendment rights. The court followed the same formulation of the elements of a First Amendment retaliation claim as did *Gill* but concluded that the plaintiff's assertions did not satisfy the third element of that formulation. *See id.* at 106-07 (quotation and other citation omitted).

After *Garcia,* the next most recent case in this subset is *Curley.* The facts of that case are more analogous to those of the instant action than are those of either *Dougherty* or *Garcia.* The plaintiff in *Curley* alleged that the defendants arrested him in retaliation for comments that he had made while campaigning for municipal office about a police cover-up and failure to discipline. *See Curley,* 268 F.3d at 72-73. The court found that the defendants were entitled to summary judgment on the plaintiff's First Amendment retaliation claim because the existence of probable cause to arrest him negated the second element of such a claim and because the fact that the plaintiff continued his campaign and later campaigned for another municipal office negated the third, "chilling," element of the claim. *See id.* at 73.

*Curley* is distinguishable from *Dougherty* and *Garcia.* All the Second Circuit cases that the Court has found involving a private citizen plaintiff who alleges that the defendant arrested him in retaliation for his exercise of his First Amendment rights have articulated the same formulation of the elements of a First Amendment retaliation claim as did *Curley. See Kerman v. City of N .Y.,* 261 F.3d 229, 241-42 (2d Cir.2001) (citation omitted); *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998) (citations omitted). Although it might be difficult to explain the distinction between private citizen arrestee plaintiff cases and the other private citizen plaintiff cases, the distinction is present in the case law. Therefore, the Court will follow the *Curley* formulation of the elements of a First Amendment retaliation claim.[FN6]

FN6. The only Second Circuit case that Plaintiff

cites in support of his First Amendment retaliation claims is *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). *Gagliardi* applies the same formulation of the elements of the claim as does *Dougherty. See id.* at 194 (quotation and other citations omitted). However, *Gagliardi,* like *Dougherty,* is a private citizen zoning dispute case rather than a private citizen arrestee case.

The only challenge [FN7] that Defendants currently make to Plaintiff's First Amendment retaliation claims is that he fails to allege that they prevented him from filing a compliant, i.e., he fails to allege that Defendants' actions effectively chilled him from exercising his First Amendment rights. However, this challenge reads Plaintiff's claims too narrowly. Two distinct forms of speech are at issue in Plaintiff's first two causes of action. Plaintiff's first cause of action alleges that he verbally complained about Defendants' actions during the course of their arrest of Paredes. From Plaintiff's second cause of action, it may be reasonably inferred that he also desired to file a formal complaint about Defendants' actions after the arrest incident. With respect to the second cause of action, Plaintiff has not alleged that Defendants' actions effectively chilled him from filing a complaint. Therefore, Plaintiff's second cause of action fails to state a First Amendment claim. Accordingly, the Court grants Defendants' motion to dismiss the First Amendment claims in Plaintiff's second cause of action for failure to state a claim.

FN7. It is possible that Plaintiff's conduct in criticizing Defendants' actions during the course of their arrest of Paredes may not be protected activity. If the allegations in Defendant Hennessey's affidavit in support of the complaint information are true, Defendants likely had probable cause to arrest Plaintiff for Obstructing Governmental Administration and, thus, their threat to arrest him on that charge was privileged. *See* Dkt. No. 1 at ¶ 48. However, since Defendants have not raised the issue of whether Plaintiff's conduct was privileged, and the Court must accept the allegations in Plaintiff's complaint as true, the Court cannot address this issue at this time.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

**\*9** However, with respect to Plaintiff's first cause of action, the Court finds that it may reasonably infer from the complaint that Defendants' conduct effectively chilled Plaintiff's speech. The relevant allegations are:

> 24. Plaintiff then crouched down and told the officers that they were "over the top" and that they were "out of control" or words to that effect.

> 25. Plaintiff did this because the police officers were brutalizing Paredes.

> 26. Officer Mullen told Claimant to get back.

> 27. Claimant complied by stepping back.

> 28. Officers Mullen and Hennessey then continued to punch Paredes on the back after Paredes was subdued.

> 29. Plaintiff told the officers again that they were "over the top" or words to that effect.

> 30. Officer Mullen then told the Plaintiff that if he didn't stop, he would be arrested for Obstructing Governmental Administration.

> 31. Plaintiff stopped speaking to the officers.

*See* Dkt. No. 1 at ¶¶ 24-31. Accordingly, since Plaintiff has sufficiently alleged that Defendants' (or at least Defendant Mullen's) actions effectively chilled his exercise of his First Amendment rights, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim.

*5. Plaintiff's § 1985(3) claims*

Defendants have asserted three bases for the dismissal of

Plaintiff's § 1985(3) claims. First, they argue that Plaintiff, as a white person, lacks standing to assert a § 1985(3) claim. Second, they contend that Defendants, as agents or employees of a corporate entity, by definition, may not conspire with one another. Finally, they assert that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*i. standing*

Despite the age and extensive use of § 1985(3), case law contains little discussion of the question of who has standing to assert a claim under that statute.[FN8] However, the Court finds that the case law provides sufficient guidance to answer the question currently before it: whether a non-minority person who alleges that he was injured by a conspiracy that aimed to deprive minority persons of the equal protection of the law has standing to assert a § 1985(3) claim.

> FN8. The parties have cited conflicting precedents, none of which are binding on this Court. Defendants cite two cases for the proposition that a plaintiff asserting a § 1985(3) claim must himself be a member of a class that the statute protects: *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 692 (S.D.N.Y.1996) (citations omitted); *McLoughlin v. Altman,* No. 92 Civ. 8106, 1993 WL 362407, \*6 (S.D.N.Y. Sept. 13, 1993) (citation omitted). Although *McLoughlin* cites *Griffin v. Breckinridge,* [403 U.S. 88, 102,] 91 S.Ct. 1790, 1798 (1971), for the proposition that "a claimant must show, among other things, that she belonged to the type of class that is protected by that statute," *McLoughlin,* 1993 WL 362407, at \*6, it does not appear that *Griffin* stands for such a proposition. Likewise, although *Puglisi* discusses several other cases, when it holds "that plaintiff cannot bring this § 1985(3) claim because ... plaintiff is not a member of the class protected by the statute nor a member of the race triggering the alleged racial discrimination[,]" *McLoughlin* is the only case that the court cited that supports this holding. *Puglisi,* 947 F.Supp. at 692.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

The cases upon which Plaintiff relies are also suspect. He contends that a white person who has sought to vindicate the rights of members of a racial minority and against whom the defendants conspire has standing to assert a § 1985(3) claim. He cites three primary cases to support this proposition: *Maynard v. City of San Jose,* 37 F.3d 1396, 1403-04 (9th Cir.1994) (citations and footnote omitted); *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 216 (E.D.N.Y.1996) (citing *Maynard* ); *Bryant v. Polston,* No. IP 00-1064-C-T/G, 2000 WL 1670938, *7 (S.D.Ind. Nov. 2, 2000)* (citing *Maynard* ). In *Maynard,* the Ninth Circuit sought to apply the law of that circuit which provided that "[p]laintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined 'require[s] and warrant[s] special federal assistance in protecting their civil rights." ' *Maynard,* 37 F.3d at 1403 (quotations and other citation omitted). The court reasoned that, because Title VII "grants special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices" and "to all employees-regardless of race-who are subjected to retaliation for assisting in the investigation of discriminatory employment practices," such persons may have standing to assert a § 1985(3) claim. *Id.* (citation omitted). The plaintiff in *Maynard* had alleged that his employer and other defendants had retaliated against him for complaining about discriminatory hiring practices. *See id.* at 1399-1400. Since it does not appear that the Second Circuit has articulated a general statement of the requirement for standing under § 1985(3), the Court does not find *Maynard* persuasive.

The Supreme Court has discussed the statute's purpose: "[t]he predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,* 463 U .S. 825, 836 (1983). This statutory purpose implies that, if a white person who sought to vindicate the rights of members of a racial minority were injured by a conspiracy that aimed to deny members of that racial minority of the equal protection of the laws, he would have standing to assert a § 1985(3) claim.

**\*10** At least two Courts of Appeals have expressly held that a plaintiff asserting a § 1985(3) claim need not himself be a member of a class that the statute protects. *See Cutting v. Muzzey,* 724 F.2d 259, 260 (1st Cir.1984) (holding that a non-Italian had standing to assert a § 1985(3) claim against members of a town planning board who allegedly conspired to deprive Italians of access to housing); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1244 (3d Cir.1978) (*en banc* ) ("[M]embers of a conspiracy to deprive women of equal rights are liable under § 1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether male or female."), *vacated on other grounds,* 442 U.S. 366 (1979).[FN9] Although the Second Circuit has not addressed whether a white person may have standing to assert a § 1985(3), the Court finds that, in light of the discussion in *Scott,* the holdings of *Cutting* and *Novotny* are persuasive. Therefore, the Court concludes that the fact that Plaintiff is white does not, in and of itself, bar him from asserting a § 1985(3) claim. Consequently, since Plaintiff has alleged that a conspiracy whose object was to deprive the constitutional rights of a member of a racial minority injured Plaintiff while he was seeking to vindicate those rights, the Court finds that he has adequately alleged standing for his 42 U.S.C. § 1985(3) claim.

FN9. The Supreme Court vacated *Novotny* because the plaintiff in that case alleged that the conspiracy that injured him had the goal of depriving women of their Title VII rights. The Court held that, because allowing a plaintiff to base a § 1985(3) cause of action upon rights that Title VII created would circumvent the procedural requirement that Congress had built into Title VII, "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Novotny,* 442 U.S. at 378. Since the Fourth Amendment creates the rights of Paredes of which Plaintiff alleges Defendants conspired to deprive him, the Court's holding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

does not bar Plaintiff's action.

*ii. intra-corporate conspiracy doctrine*

" 'Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together[ ]' " while acting within the scope of their employment. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (quotations and other citations omitted); *see Crudele v. City of N.Y. Police Dep't,* No. 97 Civ. 6687, 2004 WL 1161174, *5 (S.D.N.Y. May 24, 2004) (citations omitted). Although courts first applied this doctrine to cases involving public corporations, they have subsequently held that the doctrine is applicable to municipal entities and their officers, agents, and employees. *See County of Nassau,* 345 F.Supp.2d at 304 (citation omitted); *Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003) (quotation omitted). "However, '[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.' " *County of Nassau,* 345 F.Supp.2d at 304-05 (quotation omitted); *see Stoner v. N.Y. City Ballet Co.,* No. 99 Civ. 0196, 2002 WL 523270, *9 (S.D.N.Y. Apr. 8, 2002) (quotation and other citation omitted).

Individual Defendants are officers of Defendant City. *See* Dkt. No. 1 at ¶¶ 7-9. Plaintiff's allegation that at the time that individual Defendants "conspired to violate Plaintiff's civil rights and committed acts in furtherance of such conspiracy, they were acting as police officers for the City of Syracuse[ ]" is presumably an admission that individual Defendants were acting within the scope of their employment. *See* Dkt. No. 1 at ¶ 79.

**\*11** Nonetheless, Plaintiff contends that the personal interest exception applies. "[T]hat exception applies where 'a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose.' " *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (quotation and other citation omitted); *see Salgado v. City of N.Y.,* No. 00 Civ. 3667, 2001 WL 290051, *9 (S.D.N.Y. Mar. 26, 2001). Plaintiff has not alleged that individual Defendants had a personal interest in their alleged conspiracy. *See* Dkt. No.

1 at ¶¶ 77-83. In his motion papers, Plaintiff concedes that he "does not allege Defendants' personal stake in their bias against Plaintiff or Paredes...." *See* Dkt. No. 15 at 14. However, he contends that he has "allege[d] sufficient facts to infer that the Defendants were motivated by personal gain in silencing Plaintiff about what he witnessed concerning their brutality and/or misconduct in subduing and arresting Paredes and preventing Plaintiff from filing a complaint about such misconduct." *See id.* at 14-15 (citations omitted). He further argues that "the complaint alleges sufficient facts to infer that Defendants' employment opportunities and interest in not answering a complaint about their misconduct was Defendants' personal stake or interest in participating in the conspiracy." *See id.* at 15. However, since Defendant City arguably has the same general interest, Plaintiff's allegations do not give rise to a reasonable inference that individual Defendants' interests in the alleged conspiracy were distinct from those of Defendant City.

Accordingly, since the intra-corporate conspiracy doctrine applies, the Court grants Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim.[FN10]

> FN10. Since the Court concludes that the intra-corporate conspiracy doctrine applies, it will not address Defendants' alternative argument that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*6. Plaintiff's common law malicious prosecution claims*

In order to recover for malicious prosecution, a plaintiff must establish four elements: that a criminal proceeding was commenced; that it was terminated in favor of the accused; that it lacked probable cause; and that the proceeding was brought out of actual malice. *Cantalino v. Danner,* 96 N.Y.2d 391, 394-95 (2001) (citations omitted). Defendants argue that a dismissal in the interest of justice of an accusatory instrument pursuant to New York Criminal Practice Law § 170.40 cannot constitute a favorable termination. However, Defendants only cite pre-*Cantalino* case law to support their argument. *Cantalino* directly addressed "whether the dismissal of criminal charges against plaintiff in the interest of justice constituted a termination in her

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

favor." *Id.* at 395. It expressly rejected "a per se rule that a dismissal in the interest of justice can never constitute a favorable termination," and held that

the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused. A case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges....

**\*12** *Id.* at 396 (internal citation omitted). Unfortunately, in this case, the state court did not state on the record its reasons for dismissing the charges. *See* Dkt. No. 9 at 2. Furthermore, even if the state court had stated its reasons on the record, that record is not part of Plaintiff's pleadings. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's common law malicious prosecution claims for failure to state a claim.

*7. Plaintiff's common law libel claim*

Defendants argue (1) that Plaintiff has failed to comply with New York Civil Practice Law and Rules § 3016(a)'s requirement that a complaint asserting a claim for libel or slander set forth the particular words complained of and (2) that, if the Court dismisses all of Plaintiff's federal claims, it should decline to exercise jurisdiction over his state claims.

Since federal law governs the procedural issues in this case, " 'the mode of pleading defamation is governed by Rule 8, Fed.R.Civ.P." ' *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986) (quotation omitted). Therefore, the heightened pleading requirement of New York Civil Practice Law and Rules § 3016(a) does not apply to this action. *See Silverman v. City of N.Y.,* No. 98-CV-6277, 2001 WL 218943, \*8 (E.D.N.Y. Feb. 2, 2001) (quotation and other citation omitted). The allegations of libel in Plaintiff's complaint satisfy Rule 8's requirements of "a short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8(a), (e)(1); *see* Dkt. No. 1 at ¶¶ 47-49, 94-96. Furthermore, the Court has not dismissed all of Plaintiff's federal claims. Accordingly, the Court denies Defendants' motion to

dismiss Plaintiff's libel claim for failure to state a claim.

IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion to dismiss Plaintiff's complaint for insufficient service of process is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City of Syracuse for failure to sufficiently allege municipal liability is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his second cause of action is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim is GRANTED; and the Court further

**\*13** ORDERS that Defendants' motion to dismiss

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

Plaintiff's common law malicious prosecution claims for
failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's
common libel claim for failure to state a claim is
DENIED.

IT IS SO ORDERED.[FN11]

> [FN11.] The following claims of Plaintiff remain
> in this action: (1) § 1983 claims for denial of
> First Amendment rights against Defendants City,
> Mullen, and Hennessey, alleging that these
> Defendants arrested him for speaking to
> Defendant officers about their conduct in
> arresting a third-party; (2) § 1983 claims for
> failure to train against Defendant City; (3)
> common law malicious prosecution claims
> against all Defendants; (4) a common law libel
> claim against Defendant Hennessey; and (5) a
> claim for attorney's fees pursuant to 42 U.S.C. §
> 1988.

N.D.N.Y.,2005.
Griffin-Nolan v. Providence Wash. Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 1460424
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.