# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

RALPH BUCK PHILLIPS,

Plaintiff,

    v.

9:08-CV-878 (FJS/ATB)

B. LECUYER, et al.,

Defendants.

---

RALPH BUCK PHILLIPS, Plaintiff, pro se
JAMES B. MCGOWAN, Ass't Att'y Gen., for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

Currently before this court is the motion for summary judgment filed by the eleven remaining defendants, seeking dismissal of the pro se plaintiff's civil rights claims that survived a prior motion to dismiss. This matter has been referred to me by Senior U.S. District Judge Frederick J. Scullin, Jr. for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff, an inmate of the Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action in August 2008. Plaintiff pled guilty to aggravated murder and attempted murder following his escape from Erie County jail and his shooting of two New York State Troopers, one of whom died from his injuries.[1] *People v. Phillips*, 56 A.D.3d 1163, 867 N.Y.S.2d 324 (4th Dep't 2008).

---

[1] While the circumstances surrounding an inmate's prior offenses are typically not relevant in a civil rights action, plaintiff's criminal history provides part of the justification for his confinement in administrative segregation. Moreover, plaintiff has consistently alleged that certain defendants were substantially motivated by his prior crimes in violating plaintiff's constitutional rights. (*See, e.g.*, Second Amended Complaint ¶¶ 12, 30, Dkt. No. 52).

Following those convictions, plaintiff initially was received into DOCCS custody at the Elmira Correctional Facility ("Elmira") on December 21, 2006, for processing, and he was thereafter transported to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. (Second Amended Complaint ("2d Am. Compl.") ¶¶ 6, 10, Dkt. No. 52).

In his first amended complaint, plaintiff asserted 28 claims against 24 defendants, arising from events at both Elmira and Clinton. (Dkt. No. 10). In March 2009, defendants filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 46). In response to that motion, plaintiff filed a motion to amend his complaint further, which Judge Scullin granted. (Dkt. Nos. 47, 51).

Defendants moved to dismiss the second amended complaint. (Dkt. No. 76). In a Memorandum-Decision and Order filed on August 29, 2011, Judge Scullin granted defendants' motion in part and denied it in part, but afforded plaintiff the opportunity to file a third amended complaint. (Dkt. No. 95 at 36-38 & n.12).[2] Plaintiff did not file a further amended complaint. Accordingly, his second amended complaint (Dkt. No. 52), as modified by Judge Scullin's August 29, 2011 opinion, is the operative pleading in this action. The surviving claims include (a) Eighth Amendment excessive force and failure to protect claims against defendants LeBel, Doyle,

---

[2] Judge Scullin's opinion was reported as *Phillips v. Roy*, 9:08-CV-878 (FJS/ATB), 2011 WL 3847265 (N.D.N.Y. Aug. 29, 2011), which accepted in part and rejected in part a Report-Recommendation by U.S. Magistrate Judge David E. Peebles, reported as *Phillips v. Fischer*, 2010 WL 7375637 (N.D.N.Y. September 27, 2010). This case was reassigned from Magistrate Judge Peebles to me on October 22, 2010, for administrative reasons. (Dkt. No. 87).

Kirkpatrick, and Marinaccio (First, Second, and Third Causes of Action); (b) procedural due process claims (Fourth Cause of Action), relating to plaintiff's initial administrative segregation hearing and a disciplinary hearing before Curtis Drown;[3] (c) a First Amendment claim alleging the denial of religious services against defendant Racette (Seventh Cause of Action); (d) an Eighth Amendment medical indifference claim against defendants LeCuyer and Lashway (Tenth Cause of Action), relating to the alleged deprivation of appropriate pain medication; (e) Eighth Amendment conditions-of-confinement and First Amendment retaliation claims against defendants Allan, Bosco and Uhler (Fifteenth, Nineteenth and Twenty-Sixth Causes of Action), relating to frequent transfers of plaintiff to noisy and unsanitary SHU cells and his placement in a "freezing and filthy" mental health observation cell for three days. *Phillips v. Roy*, 2011 WL 3847265, at 19 n.12.[4]

Defendants filed their summary judgment motion, seeking dismissal of all remaining claims on August 17, 2012. (Dkt. Nos. 133-135). After being granted an extension of time, plaintiff filed a response to the motion on October 25, 2012. (Dkt. No. 139).[5] The defendants filed a reply on October 30, 2012. (Dkt. No. 141).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be denied in part and granted in part. In particular, this court

---

[3] Mr. Drown died in March 2011, and the representative of his estate has been substituted as a defendant, pursuant to Fed. R. Civ. P. 25(a). (Dkt. No. 113).

[4] The relevant facts will be discussed below, in the analysis of each surviving claim.

[5] On the same date, plaintiff also filed his fourth motion seeking appointment of counsel. (Dkt. No. 140).

recommends that summary judgment be denied with respect to the following claims:
(a) plaintiff's Eighth Amendment excessive force claim against defendants LeBel and
Doyle and the failure-to-protect claim against defendant Marinaccio (First, Second,
and Third Causes of Action) and (b) plaintiff's Eighth Amendment conditions-of-
confinement claim against defendants Allan and Uhler relating to the transfers of
plaintiff among various SHU cells (Nineteenth and Twenty-Sixth Causes of Action).
The court recommends dismissal of the remaining claims, including all surviving
claims against defendants Kirkpatrick, the estate of Curtis Drown, Racette, LeCuyer,
Lashway, and Bosco.

## DISCUSSION

## I.    Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of
material fact and, based on the undisputed facts, the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,
272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the
outcome of the suit under the governing law will properly preclude the entry of
summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must
be apparent that no rational finder of fact could find in favor of the non-moving party
for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential
Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts
by informing the court of portions of pleadings, depositions, and affidavits which

4

support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## II. <u>Excessive Force and Failure-to-Intervene Claims</u>

### A. <u>Background</u>

The Second Amended Complaint alleges that defendants LeBel and Doyle assaulted plaintiff on December 21, 2006, following a strip frisk at Elmira. (2d Am. Compl. ¶¶ 6-8). Specifically, plaintiff asserts that, after he was re-clothed in state prison garb, defendant LeBel whispered something to someone just outside of the strip frisk room, and then angrily told plaintiff, "Your days of media glory are over!" (*Id.* ¶ 6). Plaintiff alleges that defendant LeBel grabbed plaintiff by the throat and violently slammed his head against a wall, causing plaintiff briefly to black out. (*Id.* ¶ 6). Defendant LeBel then pinned plaintiff to the wall while squeezing his throat with his right hand, severely restricting plaintiff's ability to breathe and causing plaintiff to see black spots. (*Id.* ¶ 6). Meanwhile, defendant Doyle allegedly struck plaintiff's left hip with the heel of his right hand, while placing his left hand on plaintiff's chest to pin

him against the wall.  (*Id.* ¶ 7).

"Only a few seconds" after the alleged assault began, Deputy Superintendent of Security Henderson drew back the curtain in the strip frisk room, and, after assessing the situation briefly, instructed the other officers to "knock it off."  (2d Am. Compl. ¶ 8).  Defendants LeBel and Doyle allegedly did not stop their assault on plaintiff until Dep. Sup. Henderson more forcefully directed them to "knock the shit off."  (*Id.* ¶ 8). Once the curtain was opened, plaintiff saw defendants Kirkpatrick and Marinaccio and another unknown correction officer just outside the room, watching the alleged attack, but not moving to intervene.  (*Id.* ¶ 8).  Later that day, while being transported, under video surveillance, to Clinton by several of the defendants, plaintiff allegedly heard Correction Officer ("C.O.") Marinaccio say,  to C.O. LeBel, "I tried to warn you guys . . . ."  At that point defendant LeBel allegedly put his finger to his lips to made a "shhh" gesture, which caused defendant Marinaccio to stop talking.  (*Id.* ¶ 10).

Plaintiff was examined by a nurse following the incident in the strip frisk room. Plaintiff allegedly complained that his throat was sore, his head hurt, and he had a "wicked charley horse," but had no serious injuries.  (2d Am. Compl. ¶ 8).  The nurse observed two superficial red marks" on each side of plaintiff's neck, but no swelling or bleeding, which was confirmed by photographs of the plaintiff taken during the examination. (Use of  Force Report, Dkt. No. 133-12 at 8-11, 13).  During his deposition, plaintiff testified that his throat and neck were sore for several days.  He also testified that, a day after the incident, a black and blue mark appeared on his leg, which was sore for about a week.  (Pl.'s Dep. at 54-56, Dkt. No. 133-16).

6

After this use of force, defendants LeBel and Doyle alleged that plaintiff "turned off the wall [of the strip frisk room] towards staff," in direct contravention of their orders. (Use of Force Report, Dkt. No. 133-12 at 5, 7). The correction officers claimed that they used force against plaintiff to secure him against the wall and that C.O. Doyle used the palm of his right hand to strike plaintiff's left leg to prevent him from kicking the staff. (*Id.*).

C.O. LeBel filed a misbehavior report against plaintiff alleging that plaintiff refused to obey a direct order and failed to comply with frisk/search procedures. (Dkt. No. 133-15 at 3). At the disciplinary hearing, plaintiff and C.O. LeBel presented their conflicting versions of the incident during the strip frisk on December 21st. (Disc. Hrg. Tr. at 2-4, 12-14, Dkt. No. 133-15 at 12-14, 22-24). Dep. Sup. Henderson testified that he was standing outside of the room at Elmira where defendants LeBel and Doyle were conducting the strip frisk of plaintiff. (Disc. Hrg. Tr. at 6). Dep. Sup. Henderson heard "possibly angry voices" in the room and then a "thud," causing him to open the curtain and enter the strip frisk room. He witnessed defendants LeBel and Doyle applying force to pin plaintiff to the wall and saw C.O. Doyle use his right palm to strike plaintiff's left leg or hip. Henderson issued an order "to knock it off" and "all three parties within the booth seemed to relax," ending the use of force. (Disc. Hrg. Tr. at 6-7).

Dep. Sup. Henderson interviewed the plaintiff and the various officers present during the incident, but neither Henderson, nor the other officers outside of the room, could confirm whether the plaintiff provoked the use of force by coming off the wall.

7

(Disc. Hrg. Tr. at 8-9). Henderson also testified that he did not personally observe plaintiff exhibiting any non-compliant behavior that day. (Disc. Hrg. Tr. at 11). After the incident, Dep. Sup. Henderson warned plaintiff that he was a "high profile" inmate and that he should keep in mind that there might not always be a supervisor present who could quickly respond to a situation like the one that occurred that day. (Disc. Hrg. Tr. at 7-8). As discussed further below, the hearing officer found plaintiff guilty of the disciplinary charges, but the disposition was later vacated on administrative appeal because of the officer's failure to reconcile the conflicting testimony of C.O. LeBel and Dep. Sup. Henderson.

In his decision regarding defendants' motion to dismiss, Judge Scullin found that the Second Amended Complaint stated a claim of excessive force against defendants LeBel and Doyle, and a claim for failure to intervene against defendants Kirkpatrick and Marinaccio. Judge Scullin dismissed plaintiff's claim against defendant Henderson for his alleged failure to intervene more promptly to stop the alleged assault. *Phillips v. Roy*, 2011 WL 3847265, at *7.

## B. Applicable Law

### 1. Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230

8

F.3d 14, 20 (2d Cir. 2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant;

the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### 2. Failure to Intervene

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May 24, 2010)*; Cicio v. Graham,* No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010). A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[6] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted).

---

[6] *See also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be."); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence").

## C.    Analysis

In support of their motion for summary judgment, defendants contend that the brief use of force against plaintiff was de minimis and was not maliciously intended to harm him.  (Defs.' Mem. of Law at 33-34, Dkt. No. 133-18).  The defendants also contend that defendants Marinaccio and Kirkpatrick did not have a reasonable opportunity to intervene to stop the use of force any faster than Dep. Sup. Henderson did.  (*Id*. at 34-35).  The court concludes that there are disputed issues of material fact that preclude the dismissal of the excessive force claims against defendants LeBel and Doyle and the failure-to-intervene claim against defendant Marinaccio.  However, the court will recommend the dismissal of the claim against defendant Kirkpatrick because no rational fact finder could conclude that he had a reasonable opportunity to intervene to stop the use of force before Dep. Sup. Henderson did so.

### 1.    Excessive Force

Defendants LeBel and Doyle have acknowledged that they used force on December 21, 2006, purportedly to subdue plaintiff after he came off the wall, contrary to orders, and attempted to kick one of the officers.  Defendants emphasize that, during his deposition, the plaintiff speculated that C.O. LeBel and C.O. Doyle were not trying to "really hurt" him, but were attempting to provoke him into active resistance so that they could subdue him with greater violent force.  (Pl.'s Dep. at 49-50).  Defendants also argue that the lack of medical documentation of any serious injuries to plaintiff corroborates that the use of force against him was de minimis and was not applied with malice.  (Defs.' Mem. of Law at 33-34).

However, plaintiff has consistently described a much more vicious assault than the defendants admit, involving defendant LeBel violently slamming plaintiff's head against a wall and choking plaintiff until he briefly lost consciousness. Although the medical examination of plaintiff did not reveal any serious injuries,[7] the nurse detected two red marks on plaintiff's neck, which provide some corroboration of his claim that he was choked. Dep. Sup. Henderson stated that he intervened after he heard a "thud" from the strip frisk room, which plaintiff claims was the sound of his head hitting the concrete wall. (Pl.'s Dep. at 59).

The court concludes that there are disputed issues of material fact with respect to whether the force applied to plaintiff was more than de minimis and would satisfy the objective element of Eighth Amendment standards. *See, e.g., Alexander v. Deming*, 03-CV-147, 2009 WL 1044561, at *10 (W.D.N.Y. Apr. 16, 2009) (denying summary judgment on claim of excessive force where plaintiff alleged that the defendant threatened, choked and hit plaintiff's head against the wall, causing a bump on his head); *Finch v. Servello*, 06-CV-1448 (TJM/DRH), 2008 WL 4527758, at *5 (N.D.N.Y. Sept. 29, 2008) (allegation that defendant verbally harassed plaintiff, choked him, slammed him against the wall, and dragged him back to his cell, all while

---

[7] While plaintiff may have few, if any, compensable injuries, that does not support dismissal on summary judgment. *See, e.g., Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial); *Ventura v. Sinha*, 01-CV-434S, 2008 WL 365866, at *7 (W.D.N.Y. Feb. 11, 2008) (the extent of plaintiff's injuries provides no basis for dismissal of his claim if it is determined that the blows directed at him were not de minimis for Eighth Amendment purposes) (citing *Hudson*, 503 U.S. at 10).

plaintiff was unable to defend himself, could reasonably be found repugnant to society's standards and suffice to raise a question of fact whether defendants acted with malice for the very purpose of causing harm); *Ventura v. Sinha*, 01-CV-434S, 2008 WL 365866, at *6 (W.D.N.Y. Feb. 11, 2008) (a jury could reasonably credit plaintiff's claim that he was verbally abused, slammed against a wall, kicked and hit several times, and had his neck pressed against the wall until he was choked unconscious and could also find that this use of force is inconsistent with contemporary standards of decency, was not de minimis, and was with malicious intent and not for the purpose of maintaining order).

The same authority supports this court's conclusion that there are also disputed issues of material fact as to whether the defendants used force against plaintiff maliciously, rather than in a good faith effort to maintain discipline and order. In his complaint and in his deposition, plaintiff adamantly denies coming off the wall or doing anything to necessitate the use of force to maintain control over him. Sgt. Henderson's reaction to the incident–telling the correction officers to "knock it off," as opposed to intervening to assist them in controlling the plaintiff–and his observation that plaintiff had otherwise been compliant that day, provide some factual support for plaintiff's contention that he was not resisting the officers. Plaintiff's allegation that, just prior to the assault, defendant LeBel angrily told him that his days of media glory were over, was not rebutted in the declarations of defendants LeBel (Dkt. No. 133-12) or Doyle (Dkt. No. 133-9), and Dep. Sup. Henderson testified to hearing "possibly angry voices" in the strip frisk room just before he intervened. On

this record, a reasonable fact finder could conclude that defendants LeBel and Doyle applied force against plaintiff wantonly, and were not acting in good faith to maintain order. The material issues of fact should preclude a grant of summary judgment on plaintiff's excessive force claim and on the defendant's contention that they are entitled to qualified immunity.[8]

## 2. Failure to Intervene

Plaintiff's claim that defendants Marinaccio and Fitzpatrick failed to intervene to stop the "assault" by defendants LeBel and Doyle survived defendants' motion to dismiss. Plaintiff acknowledged, during his deposition, that he did not know who was outside of the room while he was being frisked by C.O. LeBel and C.O. Doyle. (Pl.'s Dep. at 42-43). When Dep. Sup. Henderson pulled open the curtain and entered the room, plaintiff saw Sgt. Marinaccio and Lt. Fitzpatrick standing behind Dep. Sup. Henderson, but did not know how long they had been at the scene or whether they had

---

[8] Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990). To the extent there are material issues of fact as to whether defendants used force against plaintiff wantonly and maliciously, there is necessarily an issue of fact as to whether it was objectively reasonable for them to believe that their use of force did not violate the Eighth Amendment. *See, e.g., Finch v. Servello*, 2008 WL 4527758, at *5 (the Eighth Amendment clearly prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate, so the material issues of fact as to whether defendants maliciously used force against plaintiff precluded a grant of summary judgment on the basis of qualified immunity); *Brown v. Catania*, 3:06cv73, 2007 WL 879081, at *9 (D. Conn. Mar. 21, 2007) (where plaintiff alleged that one of the arresting officers wrapped her legs around plaintiff's waist and choked him, causing him to lose consciousness, there were questions of fact material to the reasonableness of the force used, and the question of qualified immunity therefore cannot be resolved on summary judgment).

any interest in participating in what had been happening in the strip frisk room. (Pl.'s Dep. at 52-53, 63-65).

Lt. Fitzpatrick has filed a declaration stating that he was about 20 feet away from the strip frisk room and did not know there was anything "out of the ordinary" occurring there until he was signaled to come to the area by Dep. Sup. Henderson. (Kirkpatrick Decl. ¶¶ 4-9, 12-16, Dkt. No. 133-10). Fitzpatrick's statement clearly indicates that he did not know of an impending assault and could not have reasonably taken any action to intervene in the incident before Dep. Sup. Henderson reacted and stopped the use of force against plaintiff. Because plaintiff has not offered any information that contradicts defendant Fitzpatrick's version of the relevant events, no reasonable fact finder could conclude that Lt. Fitzpatrick violated plaintiff's Eighth Amendment rights by failing to intervene.

Sgt. Marinaccio acknowledged that he and another officer (who is not named as a defendant) were directly outside the room where plaintiff was being frisked. (Marinaccio Decl. ¶ 8, Dkt. No. 133-11). Sgt. Marinaccio alleges that he heard an usual noise from the room and then saw C.O. Doyle reacting and striking plaintiff on the thigh. (*Id*. ¶ 9). Defendant Marinaccio further states, "Before I could respond to assess the situation, Deputy Superintendent Henderson rushed past me and intervene[d]." (*Id*. ¶ 10).

Plaintiff claims that, just prior to initiating the "assault," defendant LeBel whispered something to someone outside of the strip frisk room. (Pl.'s Dep. at 44). The Second Amended Complaint (¶ 6) alleges that, after the incident in the strip frisk

room, as plaintiff was being transporting from Elmira to Clinton, Sgt. Marinaccio started to tell C.O. LeBel "I tried to warn you guys . . . . ." Both of these allegations, which defendant Marinaccio's declaration does not address, provide some factual support for plaintiff's claim that Sgt. Marinaccio knew plaintiff was going to be assaulted, could have stepped in before Dep. Sup. Henderson did so, but did not intervene. Notwithstanding the very brief duration of the alleged attack on plaintiff, there is a material issue of fact as to whether defendant Marinaccio had a reasonable opportunity to prevent or stop the "assault" and whether he violated plaintiff's Eighth Amendment rights by making no effort to intervene.

Based on the foregoing, this court recommends that the failure-to-intervene claim against defendant Fitzpatrick be dismissed. While it is a very close call, the court concludes that summary judgment should be denied with respect to the failure-to-intervene claim against defendant Marinaccio.

## III. Due Process Claims

### A. Background

On December 22, 2006 George Seyfert, a DOCCS Deputy Inspector General, issued a recommendation to place plaintiff in administrative segregation, contending that Phillips constituted "a threat to the safety and security of staff and any institution in which he is confined." (Dkt. No. 133-3 at 3-4). On December 28, 2006, an administrative segregation hearing was convened by Curtis Drown, at which plaintiff was allowed to respond to Dep. Insp. Gen. Seyfert's allegations. (Ad. Seg. Tr., Dkt.

No. 139-6 at 3-19).[9]  Following the hearing, Hearing Officer Drown, emphasizing plaintiff's history of escapes and escape attempts, determined that it was necessary to separate plaintiff from the general population "to protect the safety and security of the facility and staff."  (Ad. Seg. Tr. at 17; Ad. Seg. Hearing Disposition, Dkt. No. 133-3 at 14).

Plaintiff filed a timely appeal of Hearing Officer Drown's determination, contending that Dep. Insp. Gen. Seyfert initiated the Administrative Segregation proceedings to further punish plaintiff for the murder and attempted murder of New York State troopers and arguing that his limited disciplinary history while in New York State custody, as opposed to his misconduct in county or other facilities, did not justify administrative segregation.  (Dkt. No. 133-3 at 27-30).  His appeal made no mention of Hearing Officer Drown or his conduct at the hearing.  Deputy Commissioner Donald Selsky denied plaintiff's appeal (Dkt. No. 133-3 at 32), and plaintiff thereafter remained in custody in the Special Housing Unit ("SHU") at Clinton, receiving the required review of his administrative custodial status every 60

---

[9] During the hearing, plaintiff acknowledged, *inter alia*, that, while in custody, he had periodic verbal conflicts and at least two fist fights with other inmates.  (Ad. Seg. Tr. at 7).  He admitted that he had removed both handcuffs and shackles while in custody, using a paperclip, and he offered to demonstrate how he did so to the Hearing Officer.  (Ad. Seg. Tr. at 8).  Plaintiff described his escape from a county jail by using a screwdriver taken from a supervisor's office to cut through the roof.  (Ad. Seg. Tr. at 13).  He admitted that he formulated and executed his escape plan in as little as three days, after learning that he was facing a return to state custody.  (Ad. Seg. Tr. at 14).  Plaintiff acknowledged that, while a fugitive, he wore a stolen New York State Trooper's uniform while he pistol-whipped and threatened a bounty hunter.  (Ad. Seg. Tr. at 15).  Although he denied intending to kill any police officer, plaintiff admitted firing an assault rifle at the camouflaged New York State troopers who were trying to recapture him, killing one of them.  (Ad. Seg. Tr. at 16).

days.  *Phillips v. Roy*, 2011 WL 3847265, at \*4.

On December 21, 2006, defendant LeBel filed a misbehavior report alleging that plaintiff refused to obey a direct order and failed to comply with frisk/search procedures in connection with the strip frisk of plaintiff at Elmira on that day.  (Dkt. No. 133-15 at 3).  On January 3, 2007, Curtis Drown conducted a disciplinary hearing, at which plaintiff, Dep. Superintendent Henderson, and Officer LeBel testified.  (Disc. Hrg. Tr., Dkt. No. 133-15 at 11-25).  Hearing Officer Drown found that the testimony of Officer LeBel was credible and established that plaintiff failed to obey a direct order or follow frisk procedures.  (Disc. Hrg. Tr. at 15).  Hearing Officer Drown imposed a punishment of 200 days of SHU confinement, beginning on December 21, 2006, but suspended 100 days of that period, which could be re-imposed if plaintiff committed further infractions over the next 120 days.  (Disc. Hrg. Disposition, Dkt. No. 133-15 at 9-10; Racette Decl. ¶¶ 44-49, Dkt. No. 133-13).

Plaintiff filed a timely appeal of the disciplinary hearing, arguing that he had fully complied with frisk procedures and the orders of the officers conducting the strip frisk on December 21st, and claiming that the officers assaulted him without provocation.  (Dkt. No. 133-15 at 30-33).  The only mention of the hearing officer in plaintiff's appeal was the comment that Curtis Drown "rolled his eyes and appeared not to care" when plaintiff offered his version of the events on December 21st.  (Dkt. No. 113-15 at 31-32).  On March 7, 2007, Dep. Com'r Donald Selsky reversed the disciplinary determination, based on the hearing officer's "failure to resolve inconsistencies in testimony of employee witnesses."  (Dkt. No. 133-15 at 34-35).

Plaintiff asserted due process claims arising from the administrative segregation and disciplinary hearing against several defendants, but all of the defendants other than Curtis Drown were dismissed by Judge Scullin in response to defendants' motion to dismiss. *Phillips v. Roy*, 2011 WL 3847265, at *3-4 (dismissing claims against defendant Seyfert and the defendants who periodically reviewed whether plaintiff should remain in administrative segregation). Hearing Officer Drown was not named as a defendant until plaintiff filed his Second Amended Complaint in June of 2009. (*See* Dkt. Nos. 1, 10, 52).

In the Second Amended Complaint, plaintiff first alleged that Hearing Officer Drown made the following comment during the December 28, 2006 administrative segregation hearing, while the device recording the hearing was turned off:

> You just don't know when to shut the fuck up, do you. Do you really think I give a shit about what you say. I don't. Your gonna be tortured for the rest of your life in prison for what you've done, Phillips.

(2d Am. Compl. ¶ 13). Plaintiff also alleged, for the first time in the Second Amended Complaint, that Hearing Officer Drown made the following off-the-record comments during the January 3, 2007 disciplinary hearing:

> Mr. Phillips, your [sic] in prison for shooting and killing police officers. You don't really believe you'll be treated fairly, do you?

(2d Am. Compl. ¶ 12). As noted elsewhere herein, plaintiff did not assert that Hearing Officer Drown made any such off-the-record comments during the hearings in his administrative appeals from those hearings. Those alleged off-the-record comments by Hearing Officer Drown were central to Magistrate Judge Peebles and Senior

District Judge Scullin's conclusion that the Second Amended Complaint stated a viable due process claim against Curtis Drown by indicating that he was a biased hearing officer. *Phillips v. Fischer*, 2010 WL 7375637, at *6; *Phillips v. Roy*, 2011 WL 3847265, at *3.

As noted, Curtis Drown died in March 2011, and his estate was substituted as a defendant in this action. Defendants' summary judgment motion argues that plaintiff's due process claim against the estate of Curtis Drown should be dismissed because (a) plaintiff did not exhaust his administrative remedies by raising the alleged bias of Hearing Officer Drown during his appeals of the administrative segregation and disciplinary hearings; (b) the determinations in the administrative segregation and disciplinary hearings did not implicate a liberty interest triggering due process protections; and (c) the defendant is entitled to qualified immunity because a reasonable official in Curtis Drown's position could not believe that the dispositions he imposed would implicate a federally protected liberty interest. (Defs.' Mem. of Law at 1). Plaintiff's opposition to the defense motion to dismiss his remaining due process claims continues to focus on Curtis Drown's alleged off-the-record comments as support for plaintiff's contention that he was deprived of his right to a fair and impartial hearing officer. (Pl.'s Mem. of Law at 15-16, Dkt. No. 139). Plaintiff also argues that his prolonged confinement in SHU did deprive him of a liberty interest. (*Id*. at 17).

The court concludes that plaintiff failed to exhaust his administrative remedies with respect to his surviving due process claim and recommends dismissal of the

claim on that basis. In the alternative, the court notes that no reasonable fact finder would conclude that plaintiff was deprived of a liberty interest in connection with his disciplinary confinement.

## B.    Applicable Law

### 1.    Disciplinary Confinement

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") or under similar conditions automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this Circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d

Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest. However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.*, 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. *Id*. at 65-66 (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

## 2.    Administrative Segregation

In *Arce v. Walker*, 139 F.3d 329, 334-35 (2d Cir. 1998), the Second Circuit made it clear that even though the prison condition at issue in *Sandin* was an inmate's challenge to his confinement in "disciplinary" segregation, the *Sandin* analysis is properly applied to determine whether non-punitive, "administrative" segregation implicates a state-created liberty interest.  Once the court determines that a liberty interest exists, then the distinction between administrative and disciplinary segregation determines how much process is due.

New York regulations governing administrative segregation provide that an inmate receive a hearing within fourteen days of entering administrative segregation. 7 N.Y.C.R.R. § 301.4(a).  "Administrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility."  7 N.Y.C.R.R. § 301.4(b). Once it is determined that administrative segregation is appropriate, the inmate's status must be reviewed every sixty days.  7 N.Y.C.R.R. § 301.4(d).  Inmates in administrative segregation are housed in the SHU and are subject to most of the same restrictions as inmates housed for disciplinary reasons.  7 N.Y.C.R.R. § 301.4(c) (administrative segregation inmates will be subject to the same rules and regulations as those disciplinary inmates who have completed 30 days of satisfactory adjustment).

If it is determined that the inmate had a liberty interest in remaining free of administrative segregation, due process requires only that the inmate must receive some notice of the reasons for the placement and an opportunity to present his views

to the prison official charged with deciding whether to transfer the inmate into administrative segregation. *Samms v. Fischer*, No. 9:10-CV-349 (GTS/GHL), 2011 WL 3876528, at *10 (N.D.N.Y. Mar. 25, 2011) (Report-Recommendation), *adopted*, 2011 WL 3876522 (N.D.N.Y. Aug. 31, 2011).[10] The inmate's opportunity to present his views need not be as formal as that required for disciplinary proceedings; rather, the officials may conduct an informal and non-adversarial review of the information in support of the inmate's transfer into administrative custody. *Id*. (citations omitted).

In accordance with New York regulations, plaintiff in this case was given the benefit of a formal administrative segregation hearing. Judge Scullin reasonably assumed that due process would require that such a hearing officer was "fair and impartial." *Phillips v. Roy*, 2011 WL 3847265, at *3.

### 3.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies,

---

[10] The court in *Samms* relied upon *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), for its statement of the applicable due process requirements. The court did note that although the *Hewitt* analysis for determining the existence of a liberty interest was overruled in *Sandin*, the *Hewitt* decision was still instructive in determining the appropriate level of procedural safeguards once a liberty interest is found. 2011 WL 3876528, at *10  n.4 (citing *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005)).

*inter alia*, to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

To properly exhaust administrative remedies with respect to a civil rights claim, a prisoner typically is required to follow available inmate grievance procedures. However, when an inmate is raising a due process claim relating to a disciplinary hearing, he may exhaust his administrative remedies by pursuing an administrative appeal of the disciplinary determination which raises the particular objection(s) to the hearing officer's conduct. *See, e.g., Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir. 2009) (plaintiff raised, in his administrative appeal, his objections to the hearing

officer's conduct, and could not pursue a separate grievance under New York's regulations; plaintiff's successful appeal of his administrative hearing constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court).

A key concern underlying the PLRA's exhaustion rule is that the administrative appeal adequately apprise prison officials of the particular conduct of the hearing officer about which the inmate is complaining. *Id.* at 133 (because the plaintiff properly contested the particular manner in which the officer conducted the hearing with his administrative appeal, he satisfied the exhaustion requirement). Accordingly, in order to exhaust a due process claim with respect to a disciplinary hearing, the plaintiff's administrative appeal must specify the alleged misconduct of the hearing officer with sufficient particularity to satisfy "the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation." *Flanagan v. Maly*, 99 CIV 12336, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002); *Bennett v. Fischer*, 9:09-CV-1236 (FJS/DEP), 2010 WL 5525368, at *8-9 & n.15 (N.D.N.Y. Aug. 17, 2010) ("An appeal from a disciplinary hearing that presents the precise procedural infirmities raised in the section 1983 action . . . may be sufficient to exhaust administrative remedies.") (citation omitted) (Report-Recommendation), *adopted*, 2011 WL 13826 (N.D.N.Y. Jan. 4, 2011); *Barksdale v. Frenya*, 9:10-CV-00831 (MAD/DEP), 2012 WL 4107805, at *8 & n.13 (N.D.N.Y. Aug. 17, 2012) (Report-Recommendation), *adopted*, 2012 WL

4107801 (N.D.N.Y. Sept. 19, 2012).[11]

## C. Analysis

### 1. Failure to Exhaust Administrative Remedies

As noted, plaintiff's surviving due process claim is based on the allegation that Hearing Officer Drown was biased, as demonstrated by the alleged off-the-record comments he made at the administrative segregation and disciplinary hearings.[12] Plaintiff's appeal of the administrative segregation determination made no reference to Curtis Drown's conduct at the hearing or any comments the hearing officer made suggesting that he was not impartial and fair. Because plaintiff's appeal utterly failed to provide notice to DOCCS of the basis for his current due process claim, he has not properly exhausted his administrative remedies and the claim should be dismissed. *See, e.g.*, *Khalild v. Reda*, 00Civ.7691, 2003 WL 42145, at *4-5 (S.D.N.Y. Jan. 23, 2003) (plaintiff failed to exhaust his current Section 1983 claim–that his due process rights were violated because the disciplinary hearing commenced two days later than allowed by regulation–because his administrative appeal did not raise or even allude to that issue, thus denying prison officials the opportunity to address and correct the issue–the touchstone of exhaustion); *accord, Donato v. Phillips*, 9:04-CV-1160

---

[11] *See also Matter of Cowart v, Coughlin*, 193 A.D.2d 887, 597 N.Y.S.2d 821, 822 (3d Dep't 1993) (inmate's claim, *inter alia*, that the hearing officer was biased was waived at his Article 78 proceeding challenging the hearing determination because the inmate failed to raise the bias issue at the tier III hearing ).

[12] As Judge Peebles concluded previously, in addressing defendant's motion to dismiss, plaintiff's complaint does not appear to raise any due process defects in the hearings other than the alleged bias of the hearing officer. *Phillips v. Fischer*, 2010 WL 7375637, at *5-6.

(TJM), 2007 WL 168238, at *5 (N.D.N.Y. Jan. 18, 2007).  Accordingly, this court recommends that plaintiff's due process claim with respect to his administrative segregation hearing be dismissed for failure to exhaust administrative remedies.

In his appeal of the disciplinary determination, plaintiff did not mention the alleged, explicitly biased, off-the-record comments by Curtis Drown that plaintiff belatedly quoted in his Second Amended Complaint.  However, in his appeal papers, plaintiff stated that Drown "rolled his eyes and appeared not to care" when plaintiff offered his version of the relevant underlying events.  The passing and completely subjective observation that Curtis Drown "appeared" disinterested in the plaintiff's testimony was not sufficient to give DOCCS officials notice that plaintiff was objecting that the hearing officer was not impartial, nor did it provide DOCCS a fair opportunity to address that issue administratively.[13]  Accordingly, this court recommends that plaintiff's due process claim with respect to his disciplinary hearing should also be dismissed on exhaustion grounds.  However, because the question of whether plaintiff exhausted his administrative remedies through his appeal of the later disciplinary determination is a closer question, this court will also address an alternative ground for dismissal of this claim–plaintiff's failure to establish that he was deprived of a protected liberty interest.

_____

[13] *Cf. Rosales v. Bennett*, 297 F. Supp. 2d 637, 641 (W.D.N.Y. 2004) (the factual basis for the claim of bias of the hearing officer was presented in plaintiff's appeal of the disciplinary hearing in which he alleged that the hearing officer "did not believe . . . the officer who filed the report against plaintiff . . . was capable of fabricating the report" and that plaintiff "was also denied his right to a fair and impartial fact finder").  *Rosales* is distinguishable from this case because the administrative appeal in that case included a much more explicit notice that the inmate was objecting that the hearing officer was not fair and impartial.

28

## 2. Liberty Interest

As noted above, Curtis Drown sentenced plaintiff to 200 days in SHU on the disciplinary charges against him, with 100 days suspended. Plaintiff's disciplinary term in SHU began on December 21, 2006, and was ended on or about March 7, 2007, when the disciplinary sentence was reversed on appeal. Thus, plaintiff spent approximately 77 days in SHU confinement attributable to Curtis Drown's disciplinary determination.[14] During this same time period, and thereafter, plaintiff was in SHU at Clinton on administrative segregation status.[15]

---

[14] *See Hanrahan v. Doling*, 331 F.3d 93, 98 & n.7 (2d Cir. 2003) (the duration of actual confinement as well as the success of any subsequent administrative appeals, may well be relevant in assessing whether there is sufficient evidence of a due process violation) (citing *Colon v. Howard*, 215 F.3d 227, 231 & n.4 (2d Cir. 2000) (the SHU "confinement actually served" may be the "appropriate focus" in determining whether an inmate has alleged a due process violation under Sandin)). *See also Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999) (focusing on the 101 days of confinement for which the defendant bore responsibility, including the effect of reversal of the defendant's order of administrative segregation, in determining whether plaintiff had a protected liberty interest).

[15] "[W]here a prisoner's placement in restrictive confinement has both a punitive and an administrative, non-punitive basis, the placement decision will not be found to have impaired a protected liberty interest." *Rosenberg v. Meese*, 622 F. Supp. 1451, 1468-69 (S.D.N.Y. 1985) (*citing Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984)). The period of plaintiff's confinement on the disciplinary charges overlapped with a period that he would have served in SHU anyway because of his administrative segregation status. Because plaintiff has no viable due process claim relating to his administrative segregation because of his failure to exhaust his administrative remedies, he arguably also does not have a liberty interest with respect to the concurrent period during which he confined for punitive reasons. *Cf. Sher v. Coughlin*, 739 F.2d at 81-82 (applying dual motivation analysis of *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977) in holding that, if prison officials had administrative reasons for transferring plaintiff into restrictive confinement that did not trigger due process protection, the fact that they may have been also motivated by a desire to punish the plaintiff would not impair any protected liberty interest). It should be noted that the administrative segregation imposed under New York law in this case, unlike the administrative confinement in the Reclassification Unit in *Sher*, may implicate a liberty interest protected by due process. In this case, however, plaintiff's due process claims with respect to his administrative segregation were lost because of his failure to exhaust administrative remedies.

DOCCS records indicate that plaintiff was confined in his first SHU cell (# 002) until April 24, 2007, during all of the 77 days that he was confined as a result of the Hearing Officer Drown's disciplinary determination. (Internal Movement History, Dkt. No. 133-8 at 2). At his deposition, plaintiff testified that he hoped to stay in 2-cell because it was the quietest SHU cell. (Pl.'s Dep. at 99). Plaintiff has also acknowledged that, during his confinement in his first cell in SHU–also the initial term of his administrative segregation–his cell was clean and freshly painted, and he had no hygiene problems with his food. (Pl.'s Dep. at 24; Pl.'s Mem. of Law at 28). However, plaintiff claimed that the two neighboring inmates were mentally ill, and the noise, banging, and screaming disturbed his sleep at all hours of the day and night. (Pl.'s Dep. at 24). Plaintiff also testified that the company beyond his cell, in which he stayed for 23 hours per day, was filthy and there was a stench "probably comparable to a zoo." (*Id*.).

The only reference in the Second Amended Complaint about SHU conditions prior to March 2007, when plaintiff's confinement on the disciplinary charges ended, is the allegation that, in February 2007, plaintiff began writing to the mental health unit at Clinton complaining that his mentally ill neighbors in SHU were "acting out" and "seriously imposing upon plaintiff's mental faculties." (2d Am. Compl. ¶ 26). It was not until the summer of 2007, well after plaintiff completed his term of disciplinary confinement, that he began making frequent and more substantial grievances and complaints about the conditions of confinement that he experienced in SHU. (2d Am. Compl. ¶ 27; Pl.'s Mem. of Law, Ex. D, Dkt. No. 139-5 at 3-65 & Ex.

G, Dkt. No. 139-6 at 110-141).

Restrictive confinements of less than 101 days under normal SHU conditions, as defined in *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999), would not constitute atypical and significant hardships giving rise to a liberty interest protected by due process. *Palmer v. Richards*, 364 F.3d at 65. The conditions of a SHU are "doubtless unpleasant and somewhat more severe than those of general population." *Sealey v. Giltner*, 197 F.3d at 589. The SHU conditions which *Sealey* found not to create a liberty interest over 101 days included solitary confinement for 23 hours per day, one hour of exercise outside of the cell, limited showers per week, and the loss of various privileges. The *Sealey* court found that plaintiff suffered no deprivation of a liberty interest, despite his allegations that the SHU cells were considerably noisier than those in general population,[16] and that "a few times," other prisoners threw feces at him. *Id*. at 581, 589.

The conditions which plaintiff alleged he experienced over the first 77 days of SHU confinement properly attributed to Curtis Drown's disciplinary determination were not more severe than "normal" SHU conditions as defined by *Sealey*, and did not give rise to a protected liberty interest. This court concludes that defendants' motion for summary judgment on plaintiff's due process claims relating to his disciplinary hearing should also be granted on that basis. *See also Smith v. Taylor*, 149 F. App'x

---

[16] *See also Hamilton v. Fisher*, 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("An inmate normally cannot state a valid claim based on 'inmate-generated' noise as an impermissibly harsh condition of confinement.") (citing, *inter alia*, *Griffin v. Coughlin*, 743 F. Supp. 1006, 1018 (N.D.N.Y. 1990)) (Report-Recommendation), *adopted*, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

12, 13 (2d Cir. 2005) (the district court correctly granted summary judgment and dismissed Smith's due process claims because Smith failed to offer evidence that his SHU confinement for 45 days involved conditions more onerous than those generally present in the SHU); *Pilgrim v. Bruce*, 9:05-CV-198 (GLS/GHL), 2008 WL 2003792, at *15 (N.D.N.Y. May 7, 2008) (plaintiff's conclusory allegations, which notably do not include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subjected to more severe conditions than in normal restrictive confinement); *Holland v. Goord*, 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (77 days in keeplock during which plaintiff was deprived of TV, phone, packages, and commissary, was unable to go to Muslim services and classes did not create a protected liberty interest (*citing, inter alia, Arce v. Walker*, 139 F.3d 329, 332 (2d Cir. 1998) (deprivation of exercise and access to communal religious services did not rise to a level of "an atypical and significant hardship")).[17]

---

[17] Second Circuit cases that have found a possible liberty interest in SHU confinements of less than 101 days are distinguishable because they involved more substantial evidence that the inmate suffered conditions more severe than "normal" SHU restrictions. *Cf. Palmer v. Richards*, 364 F.3d at 66 (77-day SHU confinement could implicate due process rights where plaintiff alleged that he was deprived of his property, personal clothing, grooming equipment, hygienic products, reading and writing materials, communication with his family, personal food and vitamin supplements, and placed in mechanical restraints during escorts); *Welch v. Bartlett*, 196 F.3d 389, 393-94 (2d Cir. 1999) (90-day SHU confinement could implicate due process rights where plaintiff alleged that he received inadequate toilet paper, soap and cleaning supplies, a filthy mattress, and infrequent changes of clothes); *Davis v. Barrett*, 576 F.3d at 134-35 (given plaintiff's allegations that (1) his cell had no furniture, and thus all items, including his clothes and food tray, had to be kept on the floor; (2) that his mattress was "infected" with body waste; and (3) that his cell was subject to "daily" flooding, and feces and urine thrown by other inmates, an issue of fact exists as to the actual conditions of plaintiff's 55 days of SHU confinement and summary judgment should not have been granted on his due process claim).

## IV.    Denial-of-Religious-Service Claims

### A.    Background

The Second Amended Complaint (¶ 15) alleges that, on December 26, 2006, plaintiff submitted requests to defendant Racette, the Deputy Superintendent of Security, seeking permission to attend congregate Native American religious ceremonies approximately ten times per year, which request was ignored.  Judge Scullin denied defendants' motion to dismiss this First Amendment claim[18] because defendants had not presented any legitimate penological justification for denying plaintiff the opportunity to attend group religious services.  *Phillips v. Roy*, 2011 WL 3847625, at *8.[19]

---

[18] In his Report and Recommendation, Magistrate Judge Peebles observed that plaintiff's Second Amended Complaint did not contain a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), although the allegations in the complaint could support such a claim.  *Phillips v. Fischer*, 2010 WL 7375637, at *10 n.16.  Claims under the RLUIPA are analyzed utilizing principles similar to those which inform the analysis of plaintiff's free exercise claim, although there are subtle distinctions between the two provisions and their application in a prison setting.  *See Salahuddin v. Goord*, 467 F.3d 263, 273-74 (2d Cir. 2006) (RLUIPA protects inmates by providing that a government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means).  As noted above, Judge Scullin, after dismissing many of plaintiff's claims under Fed. R. Civ. P. 12(b)(6), provided him with an opportunity to file a third amended complaint, which plaintiff chose not to do.  Plaintiff's Memorandum of Law (Dkt. No. 139) in opposition to the summary judgment motion did not address defendants' arguments to dismiss the claim based on the denial of plaintiff's request to attend congregate religious services.  Accordingly, the court will address plaintiff's claim, as pled in the Second Amended Complaint, as one under the First Amendment. *See, e.g., Jones v. Goord*, 435 F. Supp. 2d 221, 259-64 (S.D.N.Y. 2006) (declining to address possible RLUIPA claims where plaintiff did not plead one and did not seek to amend to add one).

[19] Plaintiff also alleged that a facility Rabbi violated his First Amendment rights by denying him the opportunity to engage, in his SHU cell, in "smudging," a Native American religious ceremony.  (2d Am. Compl. ¶ 15).  Judge Scullin dismissed this claim in response to defendants' motion to dismiss.  *Phillips v. Roy*, 2011 WL 3847625, at *8-9.

In support of the defense motion for summary judgment, defendant Racette filed a sworn declaration stating that DOCCS regulations prohibited inmates housed in the SHU from attending congregate religious services. (Racette Decl. ¶¶ 21-24, Dkt. No. 133-13). Dep. Sup. Racette also set forth, in considerable detail, the reasons why he considered plaintiff, in particular, to pose a danger to the safety and security of the facility, which defendant Racette contended provided substantial penological justification for his denial of plaintiff's request to participate in religious services in the general population setting. (*Id*. ¶¶ 25-33). While plaintiff contests many of the grounds upon which the defendants rely in determining he was a serious security risk, his admitted prior conduct provides substantial penological justification for restricting him from general population activities such as congregate religious services. Accordingly, this court concludes that no reasonable fact finder could conclude that the defendants violated plaintiff's First Amendment rights by excluding him from such religious services.

### B.    Applicable Law

The free exercise clause of the First Amendment affords inmates at least some measure of constitutional protection of their right, in appropriate circumstances, to participate in congregate religious services. *See Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). That First Amendment right, however, is limited by valid penological concerns, including those relating to institutional security. *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (". . . a

prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Salahuddin*, 993 F.2d at 308. As the Second Circuit has observed, the determination of whether a refusal to permit attendance at a religious service impinges upon inmates' First Amendment free exercise right is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.'" *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988).

This Circuit has clearly stated that it is error to assume that prison officials are justified in limiting appellant's free exercise rights simply because the prisoner is in disciplinary confinement. *Young v. Coughlin*, 866 F.2d 567 (2nd Cir. 1989). As the *Young* court stated: "[N]ot every prisoner in segregation lawfully can be prevented from attending church services in the chapel ... [because] [n]ot all segregated prisoners are potential troublemakers. . . ." *Id*. at 570 (citing *LaReau v. MacDougall*, 473 F.2d 974, 979 n. 9 (2d Cir. 1972)). Prison officials must make individual determinations on a case-by-case basis as to the need for exclusion. *Id.* (citing *Leon v. Harris*, 489 F. Supp. 221, 225 (S.D.N.Y. 1980)).

## C.    Analysis

By virtue of his position as Deputy Superintendent for Security at Clinton, defendant Racette reviewed, every 60 days, the determination that plaintiff presented a

threat to the security of the facility who should remain in administrative segregation in the SHU. (Racette Decl. ¶¶ 8-11). Defendant Racette repeatedly determined that plaintiff continued to create such a security threat, based on, *inter alia*:

> Mr. Phillips' admitted escape from a local, secure facility; his admission to the shooting of three State Police members in an effort to avoid being taken into State custody; his demonstrated admitted ability to remove restraints; his admitted possession of a CB radio while in a State prison; his admitted possession of contraband, including weapons, even while within administrative segregation; his admitted ability to remove his own handcuffs with a simple paper clip; his admitted tampering with locks and other security devices while in administrative segregation; and his many threats to staff and the general security of the facility.

(Racette Decl. ¶¶ 25-26).

Plaintiff denies that he presented a significant security risk in a secure state prison and has offered various explanations of why some of his conduct could not reasonably be perceived as creating a security threat. (Pl.'s Dep. at 88-98).[20] However, plaintiff has admitted, *inter alia*, that (1) he had previously removed both handcuffs and shackles while in custody, using a paperclip (Ad. Seg. Tr. at 8) and he tried to conceal a paperclip at least once while at Clinton (Pl.'s Dep. at 29, 93-94); (2) he had escaped from a county jail by using a stolen screwdriver to cut through the roof (Ad. Seg. Tr. at 13); (3) he formulated and executed his escape plan in as little as three

---

[20] For example, plaintiff claimed that a piece of metal, which prison officials classified as a weapon, was only used by him as a weight on the end of a long line which he used to pass items, such as magazines, back and forth between his cell and that of other inmates. (Pl.'s Dep. at 88-92). While plaintiff admitted that he possessed a working, homemade CB radio and local map while previously confined at Auburn prison, he claimed that he only used these items to communicate driving directions to passing truckers. (Pl.'s Dep. at 17-18). Plaintiff's purported "innocent" uses for such contraband does not eliminate substantial security issues arising from his possession and use of such items.

days (Ad. Seg. Tr. at 14); (4) while a fugitive, he wore a stolen New York State Trooper's uniform while he pistol-whipped and threatened a bounty hunter (Ad. Seg. Tr. at 15); (5) although he never intended to kill a police officer, he fired an assault rifle at the camouflaged New York State troopers who were trying to recapture him, killing one of them (Ad. Seg. Tr. at 16); (6) he threatened to kill Lt. Allan at Clinton (Pl.'s Dep. at 110); and (7) he had periodic verbal conflicts while in custody and at least two incidents of fist fights with other inmates (Ad. Seg. Tr. at 7).

The conduct which plaintiff admits, before and during his incarceration in state prison, provides ample legitimate penological justification for the conclusion that plaintiff created a substantial risk to the security of the facility and should not be allowed to participate in religious services with the general population of the facility. The court concludes there are no material issues of fact relating to the viability of plaintiff's free-exercise-of-religion claim and recommends that this First Amendment claim be dismissed on summary judgment. *See, e.g.*, *Aliym v. Miles*, 679 F. Supp. 1, 2 (W.D.N.Y. 1988) (granting summary judgment dismissing First Amendment claim challenging prison prohibition on attendance at congregate worship services by SHU inmates considered to be a threat to other inmates, staff, and the security of the facility); *Matiyn v. Henderson*, 841 F.2d 31, 37 (2d Cir. 1988) ("we agree with the district judge's . . . holding that [plaintiff] was prevented from attending communal services [while in administrative segregation] for reasons related to legitimate penological objectives, and that his [First Amendment] claim was therefore without merit"); *O'Lone v. Estate of Shabazz*, 482 U.S. at 350-51 (prison officials did not

violate inmate's rights, by assigning him to outside work detail that prevented him from attending weekly congregational service, because rules relating to outside assignments were reasonably related to legitimate penological objectives).

## V.     **Medical Indifference Claims**

### A.     **Background**

The tenth cause of action in the Second Amended Complaint accuses Nurse Administrator Brian LeCuyer and Nurse Practitioner Amber Lashway of deliberate indifference to plaintiff's serious medical needs.  That claim is based upon the delay in granting plaintiff's request that Neurontin be prescribed for "chronic and severe" back pain, instead of the over-the-counter pain medication he was initially provided.  (2d Am. Compl. ¶¶ 19–21).  Judge Scullin denied defendants' motion to dismiss this claim, finding it "barely plausible," *Phillips v. Roy*, 2011 WL 3847625, at *10, and Magistrate Judge Peebles noted "it appears likely that plaintiff's deliberate indifference claim does in fact implicate nothing more than a disagreement over the course of treatment[,]" *Phillips v. Fischer*, 2010 WL 7375637, at *13.

In support of the defense motion for summary judgment, defendants Lashway and LeCuyer have filed sworn declarations and documented plaintiff's medical history.  Plaintiff's medical records confirm that, in late January 2007, he complained of back pain and requested Neurontin, which had been prescribed for him during a previous DOCCS confinement in 2004.  (Ambulatory Health Record ("AHR"), Dkt. No. 134-2 at 51).  Defendant Lashway, a Nurse Practitioner ("N.P.") who then provided primary medical care at Clinton and was authorized to prescribe medication,

initially treated plaintiff with over-the-counter pain medications. (Lashway Decl. ¶¶ 4-7, 50, Dkt. No. 134-2; Pl.'s Dep. at 75-76, 79). Defendant Lashway also recommended physical therapy, which plaintiff declined because he exercised regularly in the SHU, which helped him manage his back pain. (*Id*.).

Plaintiff originally agreed to conservative treatment without the use of Neurontin, understanding that N.P. Lashway viewed that medication as a "last resort." (Pl.'s Dep. at 74, 75-76). Between January 2007 and March 2008, plaintiff was seen by the medical staff at least 16 times for a variety of medical issues. (AHR, Dkt. No. 134-2 at 42-50). The medical notes indicate that plaintiff complained of back pain twice during this time period, both during the summer of 2007, and he was then prescribed ibuprofen. (AHR, Dkt. No. 134-2 at 45-46).

Medical records indicate that on March 30, 2008, plaintiff again complained of back pain and refused any further over-the-counter pain medication because "they don't work." (AHR, Dkt. No. 134-2 at 41).[21] On May 1, 2008, plaintiff was again seen by the medical staff for cervical pain and stated that he had been prescribed Neurontin in the past. (AHR, Dkt. No. 134-2 at 40). The medical staff prescribed Motrin and ordered an x-ray of plaintiff's cervical spine, which was performed on May 6th, resulting in a diagnosis of spondylolisthesis[22] and a suggested referral for

---

[21] Plaintiff was next seen by the Clinton medical staff on April 9, 2008, based on a complaint of dry lips. (AHR, Dkt. No. 134-2 at 41).

[22] "Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/.

more comprehensive x-rays and an MRI. (Dkt. No. 134-2 at 40, 70-71). On May 23, 2008, plaintiff again requested medication for back pain and was prescribed Motrin. (AHR, Dkt. No. 134-2 at 39). On May 27, 2008, plaintiff told the medical staff he was not getting back pain relief from Motrin and wanted Neurontin prescribed. The provider notes reflected uncertainty about the true level of plaintiff's back pain and stated that plaintiff had been observed doing pull ups and other vigorous exercise in the SHU with no evidence of limping or pain. (AHR, Dkt. No. 134-2 at 38).

Plaintiff complained again of back pain on May 30 and June 10, 2008, and he was then scheduled for further x-rays. (AHR, Dkt. No. 134-2 at 36-37). A more thorough series of x-rays was performed on June 18, 2008, resulting in a diagnosis of "severe spondylolisthesis at L5-S1." (Dkt. No. 134-2 at 74).[23]

On or about June 1, 2008, plaintiff wrote Nurse Administrator LeCuyer complaining that he was being denied medical attention for the pain and numbness caused by compressed discs in his lower back, but he did not specify that he was being denied Neurontin in favor of over-the-counter pain medication. (Dkt. No. 134-3 at 12-13). Defendant LeCuyer was a Registered Nurse ("R.N.") who was responsible for scheduling nursing care at Clinton; he did not have the authority to provide primary care to inmates or prescribe medication, and was not directly involved in plaintiff's care. (LeCuyer Decl. ¶¶ 4-6, 8, Dkt. No. 134-3). R.N. LeCuyer responded to

---

[23] The medical staff discussed an MRI with plaintiff, who advised that he had undergone an MRI during a prior period of confinement at Clinton. The June 19, 2008 medical notes indicated that the staff was going to try to find the report of the prior MRI. (AHR, Dkt. No. 134-2 at 35-36).

plaintiff's letter on June 3rd, by advising him that he should address his concerns at his next scheduled appointment with his primary care provider. (LeCuyer Decl. ¶ 14).[24]

After plaintiff reported, during three medical appointments in July and August, that Motrin and similar over-the-counter medications were not working, the medical staff prescribed Neurontin, starting on September 4, 2008, which alleviated "98 percent of his back pain." (AHR, Dkt. No. 134-2 at 33-34, 132; Pl.'s Aff. ¶ 101, Dkt. No. 139-3).

## B. Applicable Law

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was

---

[24] Plaintiff's June 1st letter stated that he had, since December 2006, "continually filed grievances concerning my extreme back pain." In his opposition papers, plaintiff did include a number of his prior grievances about what he viewed as inadequate medical care for a variety of medical problems. (Dkt. No. 139-6 at 80-101). The grievances filed between December 2006 and June 2008 only mentioned delays in treatment for back pain a couple of times, and never complained that he had been denied Neurontin. (Dkt. No. 139-6 at 80, 81, 95, 100).

'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).  If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id*. at 185.   The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F. App'x at 236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) and *Smith v. Carpenter*, 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a

substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly*, 784 F. Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (table).

## C.    Analysis

This court will assume, without deciding, that there are material issues of fact as

to whether the delay in providing different medication to plaintiff to treat his back pain had sufficiently serious medical consequences to satisfy the objective prong of the Eighth Amendment standards for medical care. The court finds, however that, based upon the conclusive evidence regarding the course of plaintiff's medical treatment, he cannot establish that either defendants Lashway or LeCuyer acted with deliberate indifference to his serious medical needs. Accordingly, this court recommends that the plaintiff's claim for constitutionally deficient medical care be dismissed.

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d at 311. An inmate does not have the right to treatment of his choice. *Ross v. Kelly*, 784 F. Supp. at 45 (citing, *inter alia*, *Dean v. Coughlin*, 804 F.2d at 215). In order to establish "deliberate indifference," plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id*. (citing *Farmer*, 511 U.S. at 839-40).

The medical records summarized above reflect that the Clinton medical staff did not callously ignore plaintiff's complaint of back pain, but provided a consistent course of treatment. Plaintiff does not dispute that defendant Lashway, his primary care physician, was always willing to provide medication for his back pain, "except for Neurontin." (Pl.'s Dep. at 79). Although plaintiff suggests that the defendants

ignored repeated requests for Neurontin for close to two years (2d Am. Compl. ¶¶ 19-21), the medical records and grievances indicate that plaintiff did not begin to complain that the over-the-counter medications provided to him were not reasonably managing his back pain until March 2008.[25] Over the next five months, the Clinton medical staff ordered x-rays and took other steps to clarify the nature of plaintiff's back problems and the extent of his pain, and then, in early September 2008, agreed to prescribe Neurontin. Even if the delay in changing plaintiff's medication reflected negligence or even malpractice, it does not constitute deliberate indifference. *See, e.g., Estelle v. Gamble*, 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

N.P. Lashway advises that the use of the anti-seizure medication Neurontin to treat back pain has not been approved by the FDA and that the drug has a variety of

---

[25] *See e.g., Emerson v. New York State Dep't of Corr. Servs.*, 9:08-CV-824 (NAM/ATB), 2011 U.S. Dist. LEXIS 116377, at *28 (N.D.N.Y. Sept. 9, 2011) (plaintiff's suggestion that the prison medical staff completely failed to address his pain with medication during parts of 2006 and 2007 does not create an issue of fact in the face of the overwhelming documentary evidence to the contrary–the declarations of his treating doctors, which are, in turn, corroborated by the applicable DOCS medical records) (citing, *inter alia, Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (Report-Recommendation), *adopted*, 2011 U.S. Dist. LEXIS 112521 (N.D.N.Y. Sept. 30, 2011); *Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record) .

serious adverse side effects, including increasing the risk of suicide and/or violence. (Lashway Decl. ¶¶ 40-46; Pl.'s Dep. at 78). While such use of the drug by a qualified medical provider is allowable, N.P. Lashway contends "it was entirely appropriate to rely upon . . . less invasive and dangerous approaches before resorting to off-label usages of Neurontin to treat plaintiff's reported back pain." (Lashway Decl. ¶¶ 43, 46). Plaintiff advised N.P. Lashway that his prior use of Neurontin made him "violent" and that, following his prior release from custody, he decided to wean himself from the use of Neurontin. Plaintiff also told defendant Lashway that, while he was out of jail, he managed his back pain with regular physical exercise and over-the-counter pain medications. (Pl.'s Dep. at 67-69, 76, 78). Nurse Lashway personally observed plaintiff engaging in vigorous physical exercise outside of his SHU cell, and, for a time, concluded that the safest way to manage plaintiff's back pain was a conservative treatment plan of exercise and over-the-counter pain medication. (Lashway Decl. ¶¶ 28-33, 38-39, 46-56).

While plaintiff and N.P. Lashway clearly had a disagreement as to the most appropriate medication to treat plaintiff's back pain, such a disagreement does not constitute deliberate indifference. *See, e.g.*, *Evans v. Manos*, 336 F. Supp. 2d 255, 262, 263 (W.D.N.Y. 2004) (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not

46

constitute deliberate indifference to a serious medical need); *Morrison v. Mamis*, 08

Civ. 4302, 2008 WL 5451639, at *10 (S.D.N.Y. Dec. 18, 2008) (doctor refusing to

switch prescription pain killers for an inmate complaining of back pain and migraines

does not give rise to an deliberate indifference claim) (Report and Recommendation),

*adopted*, 2009 WL 2168845 (S.D.N.Y. July 20, 2009). Nurse Lashway's expressed

concerns about the serious side effects of Neurontin, and the fact that defendant

admitted the medication had made him violent in the past, properly influenced her

professional treatment decisions and strongly rebuts plaintiff's conclusory allegations

of deliberate indifference.[26]  Defendant Lashway could also reasonably consider the

objective evidence that plaintiff was exaggerating his pain–*e.g.*, his observed ability to

engage in vigorous exercise without apparent physical limitation or pain–in delaying

the prescription of a medication with more serious side effects for an "off-label" use.

"The mere fact that [DOCCS] physicians in other facilities may have previously

provided plaintiff with some of the treatments and accommodations he demanded at

[Clinton] does not render the medical decisions of [N.P. Lashway] 'deliberate

indifference .'"  *Gillespie v. New York State Dept. of Correctional Services*,

9:08-CV-1339 (TJM/ATB), 2010 WL 1006634, at *6, (N.D.N.Y. Feb. 22, 2010)

(citing cases) (Report-Recommendation), *adopted*, 2010 WL 1006643 (N.D.N.Y. Mar

19, 2010).

---

[26] *Cf. Wright v. Genovese*, 694 F. Supp. 2d 137, 160-61 (N.D.N.Y. Mar. 9, 2010) (concern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could become dependent, may inform a medical judgment about what drug to prescribe) (collecting cases), *aff'd*, 415 F. App'x 313 (2d Cir. Mar. 23, 2011).

With respect to defendant LeCuyer, he was not authorized to provide primary care to inmates or to prescribe medication. After receiving plaintiff's complaint (which did not even specify his objections to the medications provided), R.N. LeCuyer reviewed plaintiff's medical records and saw no indication that plaintiff was not receiving appropriate treatment. (LeCuyer Decl. ¶ 25). In the absence of any evidence that defendant LeCuyer knew that N.P. Lashway had maliciously denied plaintiff appropriate medication, his reliance on the medical judgment of plaintiff's primary care provider could not constitute deliberate indifference. *See, e.g.*, *Gillespie v. New York State Dept. of Correctional Services*, 2010 WL 1006634, at *6 & n.11 (Nurse-Administrator who deferred to or confirmed the treatment decisions of the primary doctor was not deliberately indifferent) (citing *Smith v. Woods*, 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at *9 (N.D.N.Y. Mar. 20, 2008) (unless other members of the medical staff knew, or reasonably should have known, that the primary doctor was engaged in deliberate indifference to plaintiff's serious medical need, they could not be liable under the Eighth Amendment for failing to intercede in plaintiff's care)).[27]

## VI. Retaliation/Conditions-of-Confinement Claims

### A. Background

The fifteenth cause of action in the Second Amended Complaint accuses

---

[27] Defendant LeCuyer would also be entitled to qualified immunity under these circumstances. *See Cuoco v. Moritsugu*, 222 F.3d 99, 110-11 (2d Cir. 2000) (prison Health Services Administrator was entitled summary judgment on qualified immunity grounds because there was no evidence that, as a non-doctor, he had the authority to intervene in an admittedly medical decision made by qualified professionals).

defendants William Allan and Maureen Bosco of conspiring to retaliate against plaintiff for filing prior grievances against them, by causing plaintiff to be held for observation in the Office of Mental Health ("OMH") Unit at Clinton, where he was allegedly subjected to cruel and unusual conditions of confinement for three days. (*See also* 2d Am. Compl. ¶¶ 26-29). The nineteenth cause of action alleges that defendant Allan further retaliated against plaintiff by causing him to be moved to a different SHU company which was unsanitary and excessively noisy, in violation of plaintiff's Eighth Amendment rights. (*See also* 2d Am. Compl. ¶ 32). Plaintiff's twenty-sixth cause of action charges defendant Allan and Donald Uhler with punishing plaintiff with frequent "retaliatory" transfers to various SHU cells at Clinton which subjected plaintiff to severe mental and emotional distress, again contrary to the Eighth Amendment. (*See also* 2d Am. Compl. ¶¶ 32, 39-40). Magistrate Judge Peebles and Senior District Judge Scullin construed these overlapping causes of action as stating plausible First Amendment retaliation claims and/or Eighth Amendment claims of unconstitutional conditional of confinement. *Phillips v. Fischer*, 2010 WL 7375637, at *14-15, 16-18; *Phillips v. Roy*, 2011 WL 3847265, at *12, 14-15.

On November 30, 2007, pursuant to an administrative mail watch targeting plaintiff, Lt. Allan intercepted an outgoing letter in which plaintiff suggested that he was considering hanging himself. (Allan Decl. ¶¶ 80-83, Dkt. No. 133-1). In support of their motions for summary judgment, defendants Bosco and Allan argue that the suicidal reference in this letter provided a clear, non-retaliatory reason for their

referral of plaintiff to OHM observation. They further contend that neither defendant had any influence or control over the conditions of plaintiff's brief OMH confinement. (Defs.' Mem. of Law at 27-29, 31-32). This court agrees with the defendants' position and recommends granting their motion for summary judgment with respect to the fifteenth cause of action.

With respect to the nineteenth and twenty-sixth causes of action, defendants Allan and Uhler argue that the clear security threat that plaintiff posed to the facility established a non-retaliatory reason for his various cell transfers, and contend that transfers among similar cells in the same SHU unit could not constitute "adverse action" that would support a retaliation claim. (Defs.' Mem. of Law at 29-31). The court recommends dismissal of the retaliation claim based on the conclusion that, even if the defendants harbored some retaliatory intentions, the plaintiff would still have been periodically transferred between different SHU cells for legitimate penological reasons. Defendants Allan and Uhler further argue that plaintiff cannot demonstrate that they were aware of or responsible for the conditions of confinement in the various SHU cells to which plaintiff was assigned during his confinement at Clinton. (Defs.' Mem. of Law at 31-32). This court concludes that there are disputed issues of material fact with respect to defendant Allan and Uhler's personal involvement in the conditions of plaintiff's SHU confinement, and concludes that the Eighth Amendment claims against them should not be dismissed.

### B.    Applicable Law

#### 1.    Retaliation

In order to establish a viable claim of retaliation under the First Amendment, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).

#### 2.    Conditions of Confinement

The Eighth Amendment protects prisoners from "cruel and unusual

punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 199) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v.*

*Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*.

### 3. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition

or event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d at 152–53 (stating that defendant could be liable under section 1983 if he failed to remedy a constitutional violation after learning of it, or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

## C.  Application

### 1.  Confinement for OMH Observation

Plaintiff alleges that in August 2007, he filed a complaint with defendant Bosco, the OHM Unit Chief at Clinton, accusing her of "purposeful neglect" of mentally ill inmates housed in SHU, including a specific neighbor of plaintiff who created frequent disturbances and unsanitary conditions, by smearing feces over his body and cell.  (2d Am. Compl. ¶ 27).  Defendant Bosco allegedly ignored the letter, but, when later making rounds in SHU, told plaintiff to "mind your own business."  (*Id.*).

On Friday, November 30, 2007, plaintiff was escorted to OMH for an interview with defendant Bosco about his "suicide note."  Plaintiff stated that "he may be a bit 'homicidal' occasionally (jokingly) but never suicidal" and demanded to see the note. When defendant Bosco declined to show plaintiff the note, plaintiff told her "since she wanted to play games, she would be in his lawsuit."  (2d Am. Compl. ¶ 28).  Stating that she felt "threatened," Ms. Bosco terminated the interview and advised plaintiff that she would hold plaintiff for observation over the weekend.  (*Id.*; Pl.'s 12/26/2007 Grievance at 3, Dkt. No. 139-4 at 130).

Plaintiff, allowed to wear only a patient smock, was then placed, by other staff members, in a mental health cell for observation for a period of three days, subjecting

54

him to a cell that was "bitter" cold and filthy, infested with cockroaches, with walls smeared with feces, a sink filled with feces, urine in puddles on the floor, an inoperable toilet "full of shit," and no toilet paper, soap, or other hygiene products. (2d Am. Compl. ¶ 29). Plaintiff complained about his condition to unknown prison/OMH staff over the weekend, but was not released back to the SHU until the following Monday, after being told by someone on the OHM staff that it was a "grave error" to place him on a suicide watch. (*Id.*).

Lt. Allan, who was supervising an ongoing "mail watch" of plaintiff's correspondence, has stated that he referred plaintiff to OMH for an evaluation after reviewing an outgoing letter from plaintiff which stated, in pertinent part:

> I am sooo [sic] overwhelmed with grieving -- may be [sic] I'll hang up -- but I'll have to jerk-off while I'm doin' it - may be [sic] I'll die with a stiff cock. Then they can photograph that and give the pictures to their wives and daughters to prove mine is bigger!

(Allan Decl. ¶ 82, Dkt. No. 133-1; Pl.'s 11/29/07 Ltr. at 3, Dkt. No. 133-3 at 37). Lt. Allan noted that "hanging up" is prison slang for attempted suicide by hanging and is a basis for a mental health referral, specifically listed on the appropriate DOCCS form. (Allan Decl. ¶ 83; 11/30/07 Mental Health Referral, Dkt. No. 133-3 at 33). Plaintiff has since admitted writing the letter, knowing that he was subject to a mail watch, and acknowledges that his letter was the basis for Lt. Allan's OMH referral. (Pl.'s Dep. at 83-84). Although plaintiff alleged that Lt. Allan retaliated against him in various ways for "filing grievances against the administration" and for what plaintiff was "writing in [his] letters[,]" plaintiff does not specifically identify grievances or written

complaints directed to or focused on defendant Allan prior to November 2007. (2d Am. Compl. ¶¶ 32, 35; Pl.'s Aff. ¶¶ 103-105, Dkt. No. 139-3 at 19-20).[28]

Lt. Allan contends that, after making the referral, he had no responsibility over whether the mental health professionals at OMH would keep plaintiff for observation or treatment, or over the conditions under which plaintiff might be housed in the OMH. (Allan Decl. ¶¶ 87-90). During his deposition, plaintiff testified that he did not know whether Lt. Allan had any responsibility for the condition of the OMH observation cells. (Pl.'s Dep. at 85).

Defendant Bosco is a licensed social worker with a master's degree in that field. (Bosco Decl. ¶ 3, Dkt. No. 134-1). On November 30, 2007, she read Lt. Allan's OMH referral and plaintiff's letter with the reference to "hanging up" and decided to interview plaintiff to assess his mental health, and in particular, his suicide risk. (Bosco Decl. ¶ 29-30). Plaintiff denied being suicidal, but stated he "may be 'homicidal' occasionally" and threatened to sue defendant Bosco. As documented by her contemporaneous medical records, defendant Bosco determined that, because of plaintiff's failure to cooperate with the interview, she could not complete a proper assessment of plaintiff. (Bosco Decl. ¶¶ 31-36, 38; Dkt. No. 134-1 at 21-25). Accordingly, she terminated plaintiff's interview and directed that he be admitted to the OMH observation unit "in a safe holding environment in order to assess his level of suicidality." (*Id.*). Defendant Bosco contends that she placed plaintiff in OMH

---

[28] Plaintiff did file grievances and complaints explicitly relating to Lt. Allan well after plaintiff's referral to OMH in November 2007. (*See, e.g.*, Pl.'s 11/14/08 Grievance, Dkt. No. 133-3 at 63-69).

observation to ensure that his mental health needs were being appropriately addressed, not because of any retaliatory motivation regarding plaintiff's prior complaints. (Bosco Decl. ¶ 25).[29]  She acknowledges that, following further observation and interviews by other OMH staff, it was determined that "plaintiff was no longer in need of Mental Health Services and he was discharged" back to the SHU on or about December 3, 2007.  (Bosco Decl. ¶ 39 & Dkt. No. 134-1 at 28-41).[30]

Defendant Bosco has stated that she did not direct that plaintiff be assigned to any particular observation cell in the OMH, and that she was not directly responsible for his continuing observations while he was in OMH.  (Bosco Decl. ¶¶ 41-42).  She stated that she had no responsibility for the day-to-day conditions of the observation cells, and that she relied on other OMH and DOCCS staff "to assess and address plaintiff's needs while house in an OBS cell."  (Bosco Decl. ¶¶ 22, 42).  As noted above, plaintiff complained about the conditions in his observation cell to OMH/DOCCS staff other than defendants Bosco and Allan, and he acknowledged that he was "not sure" that Chief Bosco had any responsibility for the condition of those cells.  (Pl.'s Dep. at 85).

---

[29] Defendant Bosco appears to acknowledge that plaintiff made prior complaints about OMH's failure to prevent mental health patients from creating disruptive and unsanitary conditions in the Clinton SHU.  She stated that, while it was not unusual for her to receive complaints from inmates, to the extent plaintiff was complaining about matters within her area of responsibility, "nothing in Mr. Phillip's complaint demonstrated real insight worthy of any particular note."  (Bosco Decl. ¶¶ 17-23).

[30] Plaintiff was moved to a second OMH observation cell on December 2, 2007, after three days of confinement in the first cell about which he complained.  He was transferred back to the SHU on December 3rd.  (Internal Movement History, Dkt. No. 133-8 at 2).

### a. Retaliation Claim

The undisputed facts in the record establish that the suicidal ideations referenced in plaintiff's letter and his failure to cooperate with his mental health assessment provided a clear, non-retaliatory basis for defendant Allan to make the referral to OMH and for defendant Bosco to order plaintiff to be held over the weekend for observation. Whether or not plaintiff's letter reflected sincere thoughts of suicide, the DOCCS/OHM staff would have been derelict in their duties to ignore the evidence that plaintiff might resort to self-harm. Even if either defendant harbored any retaliatory motives–and plaintiff's conclusory allegations are extremely thin in that regard[31]–his First Amendment claims fail because no reasonable fact finder would conclude that the defendants would not have taken the same actions based on the indications that plaintiff presented a suicide risk. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone); *Watson v. Wright*, 9:08-CV-62 (NAM/ATB), 2011 WL 4527789, at *11-12 (N.D.N.Y. Aug. 4, 2011) (the defendant physician provided rational, medically-based reasons for

---

[31] Plaintiff's conclusory and general allegations that defendants Allan and Bosco conspired to retaliate against him are insufficient to support a viable Section 1983 claim. A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by allegations of conduct easily explained as individual action, are insufficient. *See Iqbal v. Hasty*, 490 F.3d 143, 177 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See also Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).

stopping plaintiff's medication; even if plaintiff had made a showing of retaliatory or discriminatory motive, defendants would avoid liability under section 1983 because they have demonstrated that they would have made the same treatment decision, even in the absence of the allegedly improper motivation) (Report- Recommendation), *adopted,* 2011 WL 4528931 (N.D.N.Y. Sept. 28, 2011). The retaliation claim against defendant Allan would also be subject to dismissal on the independent ground that he lacked the responsibility or authority to make the medical determination that plaintiff should be admitted for OMH observation.[32]

### b. Conditions-of-Confinement Claim

With respect to plaintiff's Eighth Amendment claims regarding the conditions in his observation cell, defendants Allan or Bosco both allege that they had neither control over, nor responsibility for, the conditions of plaintiff's confinement during the weekend he spent in the OMH. Plaintiff acknowledges that he interacted with OHM/DOCCS staff other than the named defendants with respect to the conditions in his OMH cell, and he provides no evidence of Lt. Allan or Chief Bosco's personal involvement. Accordingly, this court recommends that plaintiff's possible Eighth Amendment claim regarding his OMH incarceration for three days be dismissed. *See,*

---

[32] *See, e.g., McQuilkin v. Central New York Psychiatric Center*, 9:08-CV-975 (TJM/DEP), 2010 WL 3765847, at *15 (N.D.N.Y. Aug. 27, 2010) (plaintiff's claim that he was transferred to a psychiatric facility, in retaliation for serving a notice of summons on the prison superintendent, fails because the record reflects that the transfer decision was made by OHM care providers following an evaluation of plaintiff's mental status) (Report-Recommendation), *adopted*, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010). *See also Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (because they lack the authority to intervene in medical decisions, the failure of non-doctors at a prison to intercede in the medical treatment of an inmate is not unreasonable and supports summary judgment on qualified immunity grounds).

*e.g., Green v. Bauvi*, 792 F. Supp. 928, 941-942 (S.D.N.Y. 1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions); *Gonzales v. Carpenter*, 9:08-CV-629 (LEK/ATB), 2011 WL 768990, at *5 (N.D.N.Y. Jan. 3, 2011) (in the absence of any factual allegations that the defendant correctional officer had any control over the conditions in the OMH satellite unit in another facility, the 1983 claims against him based on plaintiff's confinement there should be dismissed for lack of personal involvement) (Report-Recommendation), *adopted*, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011).

### 2.    Cell Transfers Within the SHU

Plaintiff alleges that defendants Uhler and Allan subjected him to "excessive cell moves" within the Clinton SHU "based on retaliatory harassment." These cell transfers resulted in plaintiff's confinement in filthy and unsanitary cells, previously occupied by mentally ill inmates who "made it a point to splash 'feces' about the cell" or cells "in proximity to seriously mentally ill who created an atmosphere of continuous noise and unsanitary living conditions." (2d Am. Compl. ¶¶ 32, 39).

The Second Amended Complaint specifically references the December 26, 2007 transfer of plaintiff from an "open cell" to a "shielded cell" on a company "used for assaultive and disruptive inmates . . . ." (2d Am. Compl. ¶ 32). Plaintiff claims that defendant Uhler explained the transfer by telling him: "I'd say Lt. Allan doesn't care for what your [sic] writing in your letters, but don't quote me on it." (*Id.*). The Second Amended Complaint also points to a "retaliatory" cell transfer by defendant

Uhler, on or about June 19, 2008, that placed plaintiff in a filthy cell (# 3) previously occupied by a mentally ill inmate. (2d Am. Compl. ¶ 40). Prior to this transfer, plaintiff admittedly provoked a verbal confrontation with a neighboring, mentally ill inmate and then "exploded abrasively verbally towards defendant [Uhler] until he left the company." Shortly thereafter, plaintiff claims, a correction officer told him he was moving and said: "You know better than to speak to the captain that way." (*Id*.).

Over the two and one-half years between the time of his arrival at Clinton and the date on which he filed the Second Amended Complaint,[33] plaintiff was moved a total of nine times between nine different SHU cells. (Allan Decl. ¶ 55; Internal Movement History, Dkt. No. 133-8 at 2). Defendants Uhler and Allan contend that plaintiff was periodically moved between SHU cells in an effort to address the serious security risk that he posed and to interdict his antisocial behaviors. (Uhler Decl. ¶¶ 30-32, 34, 36-39, Dkt. No. 133-14; Allan Decl. ¶¶ 45, 48, 50-51). As Lt. Allan explained, DOCCS' policy to move SHU inmates

> enhances security of the prison by trying to limit the opportunities of inmates in a particular cell location from forming alliances with the immediately neighboring inmates, by limiting the opportunity of an inmate to become so familiar with a particular cell as to develop and attempt an escape, by limiting the opportunity of an inmate to manipulate fixtures and other features of the cell to create and secret contraband including weapons, by interfering with the inmates' ability to have a steady supply from [sic] contraband, by limiting the ability of the inmate to supply contraband to other inmates, by providing additional opportunities for staff to discover contraband, by congregating inmates who need additional supervision in areas of enhanced security and observation, and by allowing staff to utilize the variety of security features

---

[33] Plaintiff has acknowledged that as the relevant time frame relating to his claims of excessive cell moves. (Pl.'s Dep. at 86).

61

which are available in differing cells.

(Allan Decl. ¶ 51). The determination of the particular cell to which a SHU inmate will be reassigned, and who his neighboring inmates may be, are usually strongly influenced by the availability of cell space; and a cell transfer of one inmate often requires that other inmates be moved at the same time. (5/6/2008 Uhler Mem. to Artus, Dkt. No. 139-5 at 57; 7/20/200[8] Uhler Mem. to Artus, Dkt. No. 139-5 at 37; Pl.'s Dep. at 109).

In explaining the specific concerns that prompted plaintiff's periodic cell transfers, the defendants point to plaintiff's prior history of escapes and the commission of homicide and other violent crimes, as summarized above, which provided the basis for his confinement in administrative segregation. (Allan Decl. ¶¶ 12-22). They also describe plaintiff's checkered disciplinary history at Clinton, which included numerous incidents of threats to assault and kill staff;[34] verbal harassment of other inmates and staff; intentionally damaging or tampering with cell doors and locks;[35] possession of contraband, including weapons, paper clips (which plaintiff claims he can use to escape from restraints), and materials used to surreptitiously

_____

[34] Plaintiff was transferred to a new cell on February 18, 2009, the same day he was charged with throwing a food tray at a correction officer and threatening to throw feces at him. (Allan Decl. ¶ 30 & Ex. F, Dkt. No. 133-7). According to Capt. Uhler, plaintiff was, in some instances, transferred to cells "which had security features which would limit his ability to tamper with cell doors, and would allow, among other things, Plexiglas shields to be put in place in an effort to limit his ability to assault staff with food, urine and feces, which plaintiff would often threaten to do and reportedly did from time to time." (Uhler Decl. ¶ 36).

[35] Defendant Allan alleges that plaintiff's November 10, 2008 transfer resulted from damage to the door in his cell and the need to move plaintiff so it could be repaired. (Allan Decl. ¶ 28-29 & Dkt. No. 133-3 at 63-69).

exchange items between inmates in different cells; and violating prison rules by using mail to harass and threaten others, and to solicit personal advice about a DOCCS employee. (Allan Decl. ¶¶ 25-38, 42-43 & Exs. C-F, Dkt. Nos. 133-4 - 134-7; Uhler Decl. ¶¶ 31, 35-38).

In contemporaneous internal responses to plaintiff's complaints, defendant Uhler explains the reasoning behind the two cell transfers that plaintiff specifically discusses in the Second Amended Complaint. In a May 6, 2008 Memorandum to Clinton Superintendent Artus, Capt. Uhler states that plaintiff was moved to 1 Company, 1 Cell on December 26, 2007, because he was caught attempting to smuggle mail out of the facility through another inmate, which resulted in a guilty disposition on a misbehavior report. (Dkt. No. 139-5 at 57; *see also* Allan Decl., Ex. D, Dkt. No. 133-5). In a July 20, 2008 Memorandum,[36] Capt. Uhler informs Sup. Artus that plaintiff's June 19, 2008 transfer from SHU 9 cell to SHU 3 cell "was clearly based on security reasons" because inmate Phillips was a "high escape risk" and it is "appropriate to periodically move such inmate[] due to his history." (Dkt. No. 139-5 at 37).

During his deposition, plaintiff acknowledged that some of his cell movements likely related to his damaging the doors or tampering with the locks to his cells (Pl.'s Dep. at 88, 95-97, 104-105); his possession of "weapons" or materials used to exchange items with inmates in other cells (Pl.'s Dep. at 88-91); and his threat to kill

---

[36] This memorandum is dated "7/20/**07**, but it is clear from the context of the document that it was created in 2008.

Lt. Allan and other threats and verbal outbursts directed at staff (Pl.'s Dep. at 110, 114, 116-18).  Plaintiff claims, however, that, in causing his periodic transfers between SHU cells, defendants Uhler and Allan acted with a retaliatory motive because of the frequent complaints and grievances he filed.  Plaintiff did, in fact, file numerous grievances and complaints during his tenure at Clinton, and Lt. Allan and Capt. Uhler were sometimes the subjects or recipients of those grievances and/or were periodically involved in responding to them.  (*See, e.g.*, Pl.'s 1/11/2008 Ltr. to Uhler, Dkt. No. 139-5 at 55-56; Pl.'s 1/17/2008 Ltr. to Uhler, Dkt. No. 139-5 at 51-54; Pl.'s 1/23/2008 Ltr. to Uhler, Dkt. No. 139-5 at 48-50; 2/7/2008 Uhler Mem. to Phillips, Dkt. No. 139-5 at 46; Pl.'s 4/14/2008 Grievance, Dkt. No. 139-5 at 8-13; Pl.'s 4/23/2008 Ltr. to Uhler, Dkt. No. 139-5 at 62-64; 5/19/2008 revised Uhler Mem. to Phillips, Dkt. No. 139-5 at 34; Pl.'s 7/9/2008 Ltr. to Fischer, Dkt. No. 139-5 at 41-44; 7/22/2008 Allan Mem. to DSS Racette, Dkt. No. 139-4 at 111; 7/27/200[8] Uhler Mem. to Artus, Dkt. No. 139-5 at 37; Pl.'s 11/10/2008 Grievance, Dkt. No. 139-5 at 14-19; 11/20/2008 Allan Mem. to Uhler, Dkt. No. 133-3 at 66; 2/3/2009 Uhler Mem. to Artus, Dkt. No. 139-5 at 36).

Starting in September 2007, plaintiff frequently filed grievances and complaints that he was housed in SHU near mentally ill patients who allegedly created constant noise and disturbances and who generated a terrible stench because of their poor personal hygiene and their tendency to smear feces about their cells.  (Pl.'s 9/6/2007 Grievance, Dkt. No. 133-14 at 38-41; Pl.'s 10/9/2007 Grievance, Dkt. No. 133-14 at 49-52; Pl.'s 4/10/2008 Ltr. to Artus, Dkt. No. 139-5 at 26-28; Pl.'s 4/11/2008 Ltr. to

LeClaire, Dkt. No. 139-5 at 29-31; Pl.'s 4/23/2008 Ltr. to Uhler, Dkt. No. 139-5 at 62-64; Pl.'s 7/9/2008 Ltr. to Fischer, Dkt. No. 139-5 at 41-44; Pl.'s 9/23/2008 Ltr. to LaValley, Dkt. No. 139-6 at 137-39). Capt. Uhler and Lt. Allan were involved in investigating some of plaintiff's specific grievances about the unsanitary conditions in and around his SHU cell and contended that remedial action had been taken or that plaintiff's complaints were unfounded. (Uhler Decl. ¶¶ 14, 18-19, 23-25 & Ex. B, Dkt. No. 133-14 at 38-73; 5/19/2008 revised Uhler Mem. to Phillips, Dkt. No. 139-5 at 34; 7/20/200[8] Uhler Mem. to Artus, Dkt. No. 139-5 at 37; Allan Decl. ¶¶ 67-70). Plaintiff contends that the defendants' responses to his complaints were often completely inadequate. For example, after plaintiff complained that a neighboring inmate created a sickening smell by smearing feces in his cell, the staff responded by hosing down the cell, but plaintiff claims that the staff left fecal matter in the corridor which was not removed for another two days, despite frequent complaints. (Pl.'s 10/9/2007 Grievance, Dkt. No. 133-14 at 50).

Defendants Allan acknowledges that he has supervisory responsibility with respect to the Clinton SHU, and Capt. Uhler has stated that he made daily rounds of the SHU. (Allan Decl. ¶ 5; 5/6/2008 Uhler Mem. to Artus, Dkt. No. 139-5 at 57; 5/19/08 Uhler revised Mem. to Phillips, Dkt. No. 139-5 at 34). However, these defendants contend that they reasonably relied on subordinate staff to ensure the day-to-day cleanliness of SHU cells and were not personally involved in, or responsible for, any unsanitary or other adverse conditions that plaintiff may have been exposed to. (Uhler Decl. ¶¶ 12-13; Allan Decl. ¶¶ 65-66, 71-72).

Plaintiff acknowledged that Lt. Allan and Capt. Uhler delegated responsibility to subordinate staff to clean cells, but stated that Lt. Allan was informed about whether cells were cleaned. (Pl.'s Dep. at 100-101). Although Clinton SHU inmates were not provided opportunities to periodically clean their cells when plaintiff first arrived, they were allowed to do so following plaintiff's September 6, 2007 grievance, and were then offered cleaning supplies three times per week. (Pl.'s Dep. at 101-102).[37] Plaintiff acknowledged that the cleanliness of the SHU company, as opposed to individual cells, improved somewhat thereafter. (Pl.'s Dep. at 102). Plaintiff was provided an opportunity to thoroughly clean each new cell to which he was moved, and, as long as he had soap and shampoo, he cleaned his cell daily. (Pl.'s Dep. at 101, 103).

However, plaintiff alleges that, notwithstanding DOCCS' claims that SHU cells are cleaned before an inmate is transferred in, each cell to which he was moved after leaving his first SHU cell was "filthy" and/or "disgusting," and sometimes unsanitary and smeared with human waste. (Pl.'s Dep. at 101; Pl.'s Aff. ¶ 106; Pl.'s Mem. of Law at 28). As noted above, the Second Amended Complaint (¶ 40) alleges that, on June 19, 2008, plaintiff was transferred to a "filthy" cell previously occupied by a mental health inmate. (*See also* Pl.'s 7/9/2008 Ltr. to Fischer, Dkt. No. 139-5 at 41-44). Plaintiff specifically alleges that he was moved, on November 10, 2008, into #13 Cell, which was "splattered" with feces from ceiling to floor and had a toilet "caked"

---

[37] The response to plaintiff's September 6, 2007 grievance corroborates his position that SHU inmates were given regular opportunities to clean their cells only after he complained. (Dkt. No. 133-14 at 41, 42).

66

with feces, notwithstanding the claim that the "third man" on the SHU staff cleaned the cell. (Pl.'s 11/10/2008 Grievance, Dkt. No. 133-3 at 63-68).[38] In his March 8, 2009 grievance, plaintiff renewed his complaint that the DOCCS staff was not cleaning the company, as claimed, and the company had a stench from unwashed bodies and fruit flies. (Dkt. No. 133-14 at 68-73).

### a. Retaliation Claim

The facts in the record clearly establish that defendants Uhler and Allan had a strong, legitimate penological basis for periodically transferring plaintiff between different SHU cells.[39] In many instances, plaintiff concedes that particular cell transfers resulted from specific instances of his misconduct or anti-social behavior, which would not constitute protected activity under the First Amendment.

Clearly, during the relevant time period that plaintiff was being transferred among SHU cells, plaintiff also engaged in protected conduct, such as filing grievances and written complaints. However, while the fact that protected activity was close in time to an adverse action can establish a causal connection that suggests retaliation, such circumstantial evidence of retaliation, without more, is insufficient to

---

[38] Plaintiff's September 6, 2007 and October 9, 2007 grievances complained of the stench from cell #13 when it was occupied by a "mental health inmate" who purportedly defecated in the corner of his cell and smeared feces on the walls. (Dkt. No. 133-14 at 38-41, 49-52).

[39] The court will assume, as Judge Scullin did, that a cell transfer within the same SHU unit can constitute "adverse action" for the purposes of a retaliation claim. Particularly in light of the fact that plaintiff alleges that he was transferred to cells that were, unlike his first SHU cell, filthy and unsanitary, that appears to be a reasonable assumption. *Phillips v. Roy*, 2011 WL 3847265, at *11 (*citing Holmes v. Grant*, 03 Civ. 3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006) (a transfer to SHU, which the plaintiff alleged to be noisy and unhygenic, could serve as the basis for a retaliation claim).

survive summary judgment. *See, e.g., Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370-71 (S.D.N.Y. 2011) (collecting cases). For a prolific author of grievances and complaints like this plaintiff, relying solely on the temporal link between a protected communication and an adverse action to establish causation would make every adverse action by prison officials, no matter how strongly supported by penological justification, an act of retaliation. Given that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," *Bennett v. Goord*, 343 F.3d at 137, inferences of retaliation must have less tenuous factual support.

Plaintiff makes but one factual allegation that, in his mind, suggests a causal link between truly protected speech and a SHU cell transfer, on December 26, 2007: he claims that, when plaintiff inquired why he was being moved, Capt. Uhler stated: "I'd say Lt. Allan doesn't care for what your [sic] writing in your letters . . . ." (2d Am. Compl. ¶ 32). However, as documented above, the December 26, 2007 transfer immediately followed the issuance of a misbehavior report against plaintiff for attempting to kite a letter to another DOCCS inmate, which disciplinary charge was later sustained at a hearing. (Dkt. No. 139-5 at 57; *see also* Allan Decl., Ex. D, Dkt. No. 133-5). That violation followed another disciplinary infraction in October 2007 involving an outgoing letter written by plaintiff which included threats, harassment, and solicitation of violent conduct. (Allan Decl. ¶ 25 & Ex. C, Dkt. No. 133-4). Given that Lt. Allan supervised the mail watch of plaintiff's correspondence, Capt. Uhler's reference to Lt. Allan's reaction to what plaintiff was "writing in his letters"

clearly refers to plaintiff's violation of prison correspondence rules, not letters he wrote complaining about prison conditions.[40] Plaintiff's disciplinary infractions involving personal correspondence clearly do not constitute protected activity and would provide a clear, non-retaliatory reason to move plaintiff to another cell. Moreover, as the Second Amended Complaint notes (at ¶ 32), the December 26, 2007 transfer moved plaintiff into a "shielded" cell with an additional security feature, which would be penologically justified given the strong evidence that plaintiff presented a serious security threat. (*See* Uhler Decl. ¶ 36).

Based on the current record, this court concludes that, even if the defendants harbored some retaliatory motives, no reasonable fact finder would conclude that the defendants would not have made the cell transfers based on the security risk posed by the plaintiff and/or his particular misconduct. Accordingly, this court recommends that plaintiff's retaliation claim against defendants Uhler and Allan be dismissed. *See Bennett v. Goord*, 343 F.3d at 137 (DOCS defendants may avoid liability on a section 1983 retaliation claim if they demonstrate that they would have taken the same adverse action against the plaintiff even if he had not engaged in protected conduct) (citing *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. at 287) .

---

[40] It should also be noted, based on plaintiff's various grievances and complaints and the DOCCS responses to them, referenced above, that, although plaintiff had submitted several grievances before his December 2007 transfer, his flurry of letters of complaint to various DOCCS officials did not start until January 2008. It is also clear that, while Lt. Allan was primarily involved in the mail watch of plaintiff, he played a much less active role than Capt. Uhler in responding to plaintiff's various grievances and complaints, which further demonstrates that Capt. Uhler's reference to Lt. Allan's reaction to plaintiff's letters related to plaintiff's abusive outgoing personal correspondence, not letters of complaint to DOCCS.

### b. Conditions-of-Confinement Claim

As noted, defendants Uhler and Allan have moved to dismiss the Eighth Amendment claim against them on the basis that they were not personally involved with respect to the condition of plaintiff's SHU confinement because they reasonably relied on subordinate staff to maintain the SHU unit in a sanitary and otherwise constitutionally adequate manner. (Defs.' Mem. of Law at 32). The defendants do not argue that no rational fact finder could conclude that plaintiff could otherwise satisfy the objective and subjective components of his conditions-of-confinement claim.[41]

The court concludes that, at a minimum, there are material issues of fact as to whether defendants Uhler and Allan were personally involved with respect to the objectionable conditions of plaintiff's SHU confinement at Clinton. As discussed above, Capt. Uhler and Lt. Allan were clearly aware of and involved in addressing many of plaintiff's frequent complaint about the conditions of his confinement. By

_____

[41] There would appear to be material issues of fact with respect to each prong of the Eighth Amendment analysis. Transferring plaintiff to SHU cells that were smeared with human feces or where he was subjected to the smell of feces from neighboring cells, could qualify as creating a substantial risk of harm to the plaintiff's health. *See, e.g.*, *Samms v. Fischer*, 9:10-CV-0349 (GTS/GHL), 2011 WL 3876528, at *14 (N.D.N.Y. Mar. 25, 2011) (plaintiff's allegations that there were "human feces smeared all over the rec cages" over a period of several months and that he had to "smell and breath[e] in the atrocious odor of feces being thrown" are sufficient to plausibly suggest that plaintiff was subjected to unconstitutional conditions of confinement) (*citing Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (finding that triable issue of fact existed where prisoner alleged that he was, *inter alia*, exposed, for several days, to human feces directly in front of his cell) (Report-Recommendation), *adopted*, 2011 WL 3876522 (N.D.N.Y. Aug. 31, 2011). The defendants' declarations suggest that they responded appropriately when the plaintiff complained about unsanitary and disruptive conditions in the SHU, but plaintiff asserts that the unsanitary conditions persisted and recurred despite repeated complaints. That would create an issue of fact as to whether the defendants acted with "deliberate indifference," which would also preclude summary judgment, including on the grounds of claimed qualified immunity.

virtue of making frequent rounds in the SHU and/or follow-up communications with plaintiff, they were in a position to learn whether offensive or unsanitary conditions were, in fact, adequately addressed by their subordinate staff. The factual dispute between the defendants and the plaintiff as to whether the allegedly unconstitutional conditions of confinement persisted or recurred creates an issue of fact as to whether Capt. Uhler and Lt. Allan were personally involved in that they "failed to remedy the wrong" or were "grossly negligent in managing subordinates who caused the unlawful condition[s]." *Williams v. Smith*, 781 F.2d at 323–24. *See, e.g.*, *Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (plaintiff's statement that the defendants had actual knowledge of the inhumane conditions to which he was subjected in SHU–which we were not conclusory because it was premised on the assertion that those men "made daily rounds" of SHU–should have led the district court to deny summary judgment with respect to plaintiff's Eighth Amendment claim). Accordingly, this court recommends that the motion for summary judgment be denied with respect to plaintiff's conditions-of-confinement claim against defendants Uhler and Allan.

## VII.  **Motion for Appointment of Counsel**

Plaintiff has filed a fourth motion for appointment of counsel in this action. (Dkt. No. 140). Senior District Judge Scullin, Magistrate Judge Peebles, and this court have each denied a previous motion for appointment of counsel by plaintiff at various stages of the litigation. (Dkt. Nos. 7, 11, 130). Each prior order has reviewed the relevant legal standards for appointment of counsel to indigent plaintiffs and concluded both that this action is not unduly complex and that plaintiff has shown that

he has been able to effectively litigate this action.  Plaintiff has continued to demonstrate the ability to effectively litigate this action in connection with the pending motion for summary judgment.

My last order denied plaintiff's motion for appointment of counsel "without prejudice to renew at the time of the trial in this matter."  (Dkt. No. 130 at 5).  If, after Judge Scullin's review of this court's recommendations, some of plaintiff's claims survive for a trial, this court will reconsider appointing counsel to represent plaintiff.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. Nos. 133-135) be **DENIED IN PART**, with respect to (a) the Eighth Amendment excessive force claim against defendants LeBel and Doyle and the failure-to-protect claim against defendant Marinaccio (First, Second, and Third Causes of Action) and (b) the Eighth Amendment conditions-of-confinement claim against defendants Allan and Uhler relating to the transfers of plaintiff among various SHU cells (Nineteenth and Twenty-Sixth Causes of Action), and it is further

**RECOMMENDED**, that defendants' motion for summary judgment be **GRANTED IN PART**, in that the remaining claims in the Second Amended Complaint against the remaining defendants[42] be **DISMISSED**, and it is further

---

[42] As discussed above, this court is recommending dismissal of the following claims in the Second Amended Complaint that had survived defendants' prior motion to dismiss:  (a) the Eighth Amendment excessive force and failure to protect claims against defendant Kirkpatrick (First and Second Causes of Action); (b) the due process claim against the estate of Curtis Drown (Fourth Cause of Action); (c) the claim alleging the denial of religious services against defendant Racette (Seventh Cause of Action); (d) an Eighth Amendment medical indifference claim against defendants LeCuyer and Lashway (Tenth Cause of Action); (e) the Eighth Amendment

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 140) is denied without prejudice to renewal following the decision of Senior U.S. District Judge Scullin with respect to this Report-Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated:  February 19, 2013

*Andrew T. Baxter*

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

conditions-of-confinement and First Amendment retaliation claims against defendants Allan and Bosco relating to plaintiff's confinement in an OMH observation cell for three days (Fifteenth Cause of Action); and (f) the First Amendment retaliation claims against defendants Allan and Uhler relating to transfers of plaintiff among various SHU cells (Nineteenth and Twenty-Sixth Causes of Action).